**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SINGULARDTV, GMBH, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-10130_____ |
| ZACHARY LEBEAU and KIMBERLY JACKSON, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

### SINGULARDTV GMBH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND, IN THE INTERIM, TEMPORARY RESTRAINING ORDER

November 29, 2021

KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

Benjamin J. A. Sauter
Christopher S. Cogburn

*Attorneys for Plaintiff*
*SingularDTV GmbH*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

I.   LeBeau, Lubin, And Levy-Cohen Found SingularDTV And Raise Initial Capital For The

Company By Launching The SNGLS Token. ..................................................... 3

II.  LeBeau Arranges For The Company's ETH To Be Stored On A Wallet For Which He

Holds The Lone Key. ............................................................................................ 5

III. LeBeau And Jackson Gain Control Of SingularDTV's E-mail Accounts. .......... 6

IV.  LeBeau Recklessly Or Fraudulently Transfers Millions Of Dollars Worth Of SNGLS And

ETH From SingularDTV ........................................................................................ 7

V.   LeBeau Is Removed From SingularDTV Leadership And Stripped Of His Authority To

Act For The Company ............................................................................................ 9

VI.  LeBeau And Jackson Continue To Purport To Act For SingularDTV And Cut Off E-mail

Access For All SingularDTV Employees. ............................................................. 11

LEGAL STANDARDS ............................................................................................... 13

ARGUMENT ............................................................................................................... 15

I.   SingularDTV Is Entitled To A Preliminary Injunction. ....................................... 15

A.  SingularDTV Is Likely To Succeed On The Merits Of Its Claims Against LeBeau And
Jackson ............................................................................................................... 16

B.  LeBeau and Jackson have irreparably injured SingularDTV and, absent an injunction,
will continue to do so .......................................................................................... 21

C.  The equities strongly favor SingularDTV ......................................................... 24

II.  The Court Should Issue A Temporary Restraining Order Until This Motion Can Be Heard

On Notice To LeBeau And Jackson ...................................................................... 25

III. No Bond Is Necessary At This Stage. .................................................................. 25

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Al Hirschfield Found. v. Margo Feiden Galleries Ltd.*,
   296 F. Supp. 3d 627 (S.D.N.Y. 2017) ..................................................................... 13

*Allstate Ins. Co. v. Harvey Family Chiropractic*,
   677 F. App'x 716 (2d Cir. 2017) ............................................................................ 21

*Andino v. Fischer*,
   555 F. Supp. 2d 418 (S.D.N.Y. 2008) .................................................................... 25

*Beacher v. Estate of Beacher*,
   756 F. Supp. 2d 254 (E.D.N.Y. 2010) .................................................................... 18

*BroadBridge Media, LLC v. Hypercd.com*,
   106 F. Supp. 2d 505 (S.D.N.Y. 2000) .................................................................... 22

*Broker Genius, Inc. v. Volpone*,
   313 F. Supp. 3d 484 (S.D.N.Y. 2018) .................................................................... 15

*Chevron Corp. v. Donziger*,
   871 F. Supp. 2d 229 (S.D.N.Y. 2012) .................................................................... 18

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ..................................................................................... 15

*De Beers Consol. Mines v. United States*,
   325 U.S. 212 (1945) ............................................................................................... 13

*Dong v. Miller*,
   No. 16-cv-5836 (NGG) (JO), 2018 WL 1445573 (E.D.N.Y. Mar. 23, 2018) ......... 15

*Douglas v. Harry N. Abrams, Inc.*,
   2018 WL 1406616 (S.D.N.Y. Mar. 19, 2018) ........................................................ 16

*Dunkin' Donuts, Inc. v. Albireh Donuts, Inc.*,
   96 F. Supp. 2d 146 (N.D.N.Y. 2000) ..................................................................... 24

*Elsevier Inc. v. www.Sci-Hub.org*, No. 15-cv-4282 (RWS),
   2015 WL 6657363 (S.D.N.Y. Oct. 30, 2015) ......................................................... 14

*Eng v. Smith*,
   849 F.2d 80 (2d Cir. 1988) ................................................................... 15

*Global Switching, Inc. v. Kasper*,
   No. 06-cv-412 (CPS), 2006 WL 385315 (S.D.N.Y. Feb. 16, 2006) ........................................ 23

*Greendige v. Allstate Ins. Co.*,
   No. 02-cv-9796 (JCF), 2003 WL 22871905 (S.D.N.Y. Dec. 3, 2003) ..................................... 15

*Gucci America, Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014) ................................................................. 13

*Iacovacci v. Brevet Holdings, LLC*,
   437 F. Supp. 3d 367 (S.D.N.Y. 2020) ......................................................... 19

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
   443 F. Supp. 3d 303 (E.D.N.Y. 2020) ................................................ 14, 21, 22

*Ivy Biomedical Sys., Inc. v. Amendola*,
   No. 3:21-cv-01210 (JAM), 2021 WL 4224421 (D. Conn. Sept. 16, 2021) ............................ 14

*Ligon v. City of N.Y.*,
   925 F. Supp. 2d 478 (S.D.N.Y. 2013) ......................................................... 24

*Motorola Credit Corp. v. Uzan*,
   202 F. Supp. 2d 239 (S.D.N.Y. 2002) ......................................................... 13

*Mullins v. City of New York*,
   626 F.3d 47 (2d Cir. 2010) ................................................................... 21

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010) ......................................................... 25

*Nechis v. Oxford Health Plans, Inc.*,
   421 F.3d 96 (2d Cir. 2004) ................................................................... 13

*Norlin Corp. v. Rooney, Pace Inc.*,
   744 F.2d 255 (2d Cir. 1984) ................................................................. 18

*Nyack Hosp. v. Moran*,
   No. 08-cv-11112 (SCR) (PED), 2010 WL 4118355 (S.D.N.Y. June 1, 2010.) ....................... 19

*Register.com, Inc. v. Verio, Inc.*,
   126 F. Supp. 2d 238 (S.D.N.Y. 2000) ...................................................... 13, 18

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)............................................................................22, 23

*Saint Tropez Inc. v. Ningbo Maywood Indus. & Trade Co.*,
  2014 WL 3512807 (S.D.N.Y. July 16, 2014) .........................................................13

*Schatzki v. Weiser Capital Mgmt., LLC*,
  995 F. Supp. 2d 251 (S.D.N.Y. 2014).....................................................................17

*Shamrock Pwr. Sales, LLC v. Scherer*,
  No. 12-cv-8959 (KMK) (JCM), 2016 WL 6102370 (S.D.N.Y. Oct. 18, 2016).......................23

*Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC*,
  No. 16-cv-6805 (JSR), 2017 WL 737315 (S.D.N.Y. Feb. 6, 2017).........................13

*United States v. Coluccio*,
  51 F.3d 337 (2d Cir. 1995)......................................................................................18

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ..................................................................................................3

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..............................................................................................14, 24

*Wisdom Import Sales Co. v. Labatt Brewing Co.*,
  339 F.3d 101 (2d Cir. 2003)....................................................................................23

**Statutes**

18 U.S.C. § 1030.............................................................................................................14

18 U.S.C. § 1030(g).........................................................................................................14

18 U.S.C. § 1836(b)(3) ...................................................................................................14

18 U.S.C. §§ 1831–39......................................................................................................14

**Rules**

Federal Rule of Civil Procedure 65 ...............................................................................14

SingularDTV GmbH ("SingularDTV" or the "Company") respectfully submits this memorandum of law in support of its motion (the "Motion") for an order to show cause why a preliminary injunction should not issue against Defendants Zachary LeBeau and Kimberly Jackson (together, the "Defendants") and a temporary restraining order to preserve the status quo pending the resolution of the Motion. The Motion is supported by the Declaration of Benjamin J. A. Sauter, Esq. dated November 29, 2021 ("Sauter Decl."), the Declaration of Patrik Allenspach dated November 26, 2021 ("Allenspach Decl."), and the Declaration of Michael Mráz dated November 26, 2021 ("Mráz Decl."), all of which have been filed concurrently with the Motion.

## PRELIMINARY STATEMENT

This case involves two former officers of SingularDTV who, upon termination, refused to relinquish control of Company property and computer systems and are now maliciously and irreparably harming SingularDTV's business. This Motion seeks preliminary relief directing these rogue former officers to: (i) return what they have admitted is Company property, namely, over US $50 million worth of Ether ("ETH") and other digital assets raised by SingularDTV; and (ii) restore the Company's access to and control over its e-mail accounts and electronic documents, which Defendants (or others under their control) are continuing to access without authorization.

The Defendants' wrongful possession of Company property and e-mail has no color of right. LeBeau admits, as he must, that the ETH is Company property: in a recent Swiss legal filing naming SingularDTV as Respondent, LeBeau conceded that the digital "wallet" containing the ETH is "Respondent's Wallet." Furthermore, both Defendants have been stripped by valid and binding Board resolutions of any authority to continue acting on behalf of the Company. As

LeBeau admitted in the same filing, SingularDTV has "already revoked [his] signing authority" and terminated "his role as a corporate officer."

Under these circumstances, the Defendants' continued possession of Company property and e-mail accounts is malicious and wrongful. Apparently recognizing this, Defendants' lawyer previously offered to "transfer the [ETH] to a custodial account while the corporate disputes get resolved." But LeBeau refused to make good on that offer. With no access to its operating assets and e-mail systems, SingularDTV now has no choice but to seek equitable and injunctive relief from this Court.

The Defendants' wrongful possession of the Company's property and e-mail systems presents a grave risk of irreparable harm to the Company. Without access to the ETH, the Company cannot finance its business operations and strategic investments. And by cutting off access to Company e-mail accounts, Defendants have impeded the Company's ability to communicate with its customers, financial institutions, and other commercial counterparties, with potentially devastating consequences for SingularDTV's goodwill and legal obligations. Worse still, Defendants have confirmed through counsel that they (or someone acting on their behalf) are affirmatively accessing the Company's e-mail accounts, the contents of which include trade secrets, employee information, and other confidential material. Finally, an ongoing shareholder dispute between LeBeau and SingularDTV's two other founders is currently playing out in Switzerland (the "Swiss Shareholder Dispute"), and Defendants' unilateral control of SingularDTV e-mail accounts raises an additional risk that evidence stored in those accounts may be modified or destroyed.

Meanwhile, Defendants have no legitimate interest in continuing to interfere with the Company's property and e-mail accounts. The Defendants' actions are a transparent hostage tactic

to generate leverage in the Swiss Shareholder Dispute. Regardless of how that dispute ultimately resolves, the Defendants—as former officers and a director of the Company—are not entitled to help themselves to the Company's business assets and e-mail systems in the meantime. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 654 (1997) ("A company's confidential information . . . qualifies as property to which the company has a right of exclusive use.").

To avoid further irreparable injury, SingularDTV respectfully submits this Motion for an order to show cause why the Court should not issue a preliminary injunction requiring that LeBeau and Jackson immediately:

- restore or cause to be restored Plaintiff's access to and control over its e-mail services;

- refrain from accessing or causing other persons to access Plaintiff's and/or its employees' e-mail accounts and other electronic records;

- return to Plaintiff all assets in their possession or control that are the property of the Plaintiff, including but not limited to the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and any and all proceeds thereof; and

- refrain from taking, or causing any other person to take, any step to transfer, encumber, or conceal any assets in their possession or control that are the property of the Plaintiff, including but not limited to the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and any and all proceeds thereof.

In addition, given the ongoing and irreparable nature of the harm being inflicted on its business operations, SingularDTV respectfully requests that the Court preserve the status quo pending a hearing by issuing a temporary restraining order granting this requested relief.

## FACTUAL BACKGROUND

**I.     LeBeau, Lubin, And Levy-Cohen Found SingularDTV And Raise Initial Capital For The Company By Launching The SNGLS Token.**

SingularDTV is a private company organized under and governed by Swiss law and headquartered in Zug, Switzerland. It was founded in December 2016 for the purposes of "development, marketing, distribution and licensing of software, in particular the creation of a

Blockchain and Ethereum-based production and distribution platform, as well as the development, marketing, distribution and licensing of high-quality film and TV content." (Allenspach Decl. ¶ 3 and Ex. 1 (the "Articles of Association") art. 2.) SingularDTV's shares were divided among its three founders—Zachary LeBeau, Joseph Lubin, and Arie Levy-Cohen—in accordance with their respective capital contributions. (*Id.* ¶ 4.) LeBeau and Lubin each received 43-percent ownership shares in SingularDTV, while Levy-Cohen received the remaining 14 percent. (*Id.*) In addition to their ownership interests, each of the founders acted as managing directors for SingularDTV and held executive positions at the company. (*Id.*) Specifically, LeBeau acted as the company's Chief Executive Officer ("CEO"), Levy-Cohen as its Chief Financial Officer ("CFO"), and Lubin as its Chief Technology Officer ("CTO"). (*Id.*) In late 2018, SingularDTV also engaged Kimberly Jackson, LeBeau's common-law wife, as an independent contractor who would provide Chief Operating Officer ("COO") services to the company.  However, Jackson was not authorized to unilaterally sign contracts or other legally binding instruments on the Company's behalf. (*Id.*; Mráz Decl. ¶ 12.)

Shortly before incorporating SingularDTV, the founders launched an Ethereum-based cryptographic token, SNGLS, to raise money for a range of initial projects, including an original television series, a documentary division, a digital-rights-management platform, and a video-on-demand distribution portal. (Allenspach Decl. ¶ 5.) The launch ("Token Generation Event," or "TGE") generated one billion SNGLS tokens, all of equivalent value. (*Id.*) 500 million of those tokens were purchased at launch at a value of 0.00116 ETH per token, raising approximately 580,000 ETH (worth roughly US $7.5 million at the time). (*Id.*) 100 million tokens were granted to the Company's early financial contributors. (*Id.*) The remaining 400 million tokens were allocated to the Company's founders, to be used for the benefit of SingularDTV. (*Id.*)

## II.    LeBeau Arranges For The Company's ETH To Be Stored On A Wallet For Which He Holds The Lone Key.

The ETH raised through the launch of the SNGLS tokens were stored in a "cold wallet"—in other words, a storage arrangement in which the private "keys" used to transfer the ETH would be stored on a device that was not connected to the internet (the "Cold Wallet"). (Allenspach Decl. ¶ 6.) The founders used a cryptographic, self-executing "smart" contract to transfer the ETH to the Cold Wallet automatically. (*Id.*) Although the Cold Wallet was initially set up as a multi-signature wallet, LeBeau later reconfigured the Cold Wallet as a single-signature wallet to which he alone holds the private key. (*Id.* ¶ 7.) Unlike multi-signature wallets (which require the use of multiple private keys to engage in transactions), single-signature wallets permit one person to unilaterally transfer or withdraw the assets held inside. (*Id.* ¶ 7; *see also id.* Ex. 9 at 2–3 (Levy-Cohen stating, at Board meeting, that "there is a need to set up proper multi-sig wallets" to "manage the funds from the TGE proceeds").)

LeBeau also possessed the physical device on which that private key is stored, which SingularDTV believes to be a laptop computer held in one of LeBeau's New York City apartments. (*Id.* ¶ 8.) Accordingly, LeBeau maintained exclusive physical control over the Company's ETH while he worked at the Company—control that he now refuses to relinquish even though he has been removed as a Company director and officer. This ETH represented, and still represents, the vast majority of SingularDTV's liquid assets. (*Id.*)

Notwithstanding LeBeau's physical control over the ETH, there has never been any dispute that the ETH is Company property. After all, the Company, not LeBeau, raised the ETH in the Token Generation Event.  The Company always accounted for the ETH as Company property, as reflected in a valuation of the ETH completed for the Company's 2018 financial statements. In that document, which LeBeau signed, the "members of the board confirm[ed] that . . . the company

is the beneficial owner and can dispose of the assets." (Allenspach Decl. Ex. 2.) And, as recently as this September, LeBeau again confirmed that the ETH is Company property: in his request for conciliation filed in Switzerland, which LeBeau submitted to initiate the Swiss Shareholder Dispute against the Company as the named Respondent, LeBeau admitted that the Cold Wallet is "Respondent's Wallet." (Mráz Decl. Ex. 8.)

## III.   LeBeau And Jackson Gain Control Of SingularDTV's E-mail Accounts.

In addition to controlling the ETH and other digital assets on the Cold Wallet, Defendants also gained control over the Company's e-mail accounts during their tenure as officers of the Company. Defendants and/or Breaker LLC,[1] a New York company which Defendants own and control, arranged for a third-party reseller that they chose and directed, DAG Tech, to provide Microsoft Exchange e-mail services to the Company. (Allenspach Decl. ¶ 11.)[2]

Defendants did not disclose DAG Tech or its role in providing e-mail services to the Company. (*Id.*) From the Company's perspective, its e-mail services were being supplied to it directly by Microsoft for SingularDTV's benefit. (*Id.*) SingularDTV (and Defendants) operated for years as if the Company controlled its e-mail accounts, and conducted Company business through these e-mail accounts as a matter of course. (*Id.*) Invoices were issued on Microsoft letterhead to SingularDTV as the "billed party." (*Id.* ¶ 11, Ex. 3.) Indeed, in an affidavit filed with this Court in July, Daniel Ghazi, DAG Tech's CEO, stated that "DAG Tech has been providing IT support and services for SingularDTV GMBH and its affiliates . . . including managing their email systems and computer networks, for approximately 2 years." *See SingularDTV GmbH v. Doe*, No. 1:21-cv-6000 (VEC), Aff. of Daniel Ghazi (Dkt. No. 6-9). Mr. Ghazi's reference to SingularDTV's

---

[1] Breaker LLC's formal corporate name is SingularDTV LLC. To avoid confusion, this memorandum will refer to it as "Breaker."

[2] SingularDTV has attempted to meet and confer with Defendants about the nature of DAG Tech's services and agreement, but Defendants have refused to provide any information in this regard.

"affiliates" could not have been a reference to Breaker LLC, because Breaker LLC is not an affiliate of SingularDTV; Breaker LLC is wholly owned by Jackson. (Allenspach Decl. at ¶ 10.)

Because Defendants brokered the e-mail services through DAG Tech, Microsoft apparently does not recognize a direct contractual relationship with SingularDTV. (*Id.* ¶ 12.) Moreover, despite its CEO's sworn statements describing "SingularDTV GMBH and its affiliates" as the beneficiaries of its services, DAG Tech still appears to be taking direction from Defendants. (*Id.*) The practical effect of this scenario is that Defendants exercised—and continue to improperly exercise—control over SingularDTV e-mail accounts through their relationship with DAG Tech.

## IV. LeBeau Recklessly Or Fraudulently Transfers Millions Of Dollars Worth Of SNGLS And ETH From SingularDTV.

LeBeau's conduct as SingularDTV's CEO came under scrutiny by the spring of 2021. In particular, it appears that LeBeau routinely submitted false or inflated invoices for work allegedly performed by Breaker. (*Id.* ¶ 10.) The Company's investigation is ongoing, but LeBeau's interference with SingularDTV's e-mail accounts is obstructing that investigation.[3]

Lubin's and Levy-Cohen's faith in LeBeau reached a breaking point this past May when an alleged hacker—allegedly using a spoofed e-mail address and aided by unauthorized access to an e-mail account of SingularDTV's then-general counsel—allegedly impersonated Levy-Cohen for the purpose of stealing digital assets from the company. (*Id.* ¶ 22; Mráz Decl. ¶ 3.) Allegedly duped by this scheme, on May 6, 2021, LeBeau (then-CEO of SingularDTV) transferred 76.8 million of SingularDTV's SNGLS tokens and 11,520,000 of SingularDTV's SNGJ tokens to two digital wallet addresses provided by the hacker, without Board approval—indeed, without even

---

[3] In fact, this would not be the first time that LeBeau has been involved in such a scheme.  In 2010, prosecutors charged LeBeau with a dozen felony counts based on his and others' use of sham expense records, generated through a film-production company, to steal transferrable tax credits from the state of Iowa. *See* https://www.mprnews.org/story/2011/01/14/iowa-movie-program-plea-mn-filmmaker.

discussing the transfer with the other SingularDTV Directors, one of whom (Levy-Cohen) was the intended recipient of the funds. (Allenspach Decl. ¶ 22, Mráz Decl. ¶ 3.) At the time of the transfer, these tokens were worth approximately US $2 million. (Allenspach Decl. ¶ 22, Mráz Decl. ¶ 3.) The hacker has since transferred the SNGLS tokens to Binance, an offshore cryptocurrency exchange, making it virtually impossible to recover the assets. (Allenspach Decl. ¶ 22.)

SingularDTV is investigating this sequence of events (the "Hack") and has not ruled out the involvement of one or more company insiders, including LeBeau. (Allenspach Decl. ¶ 23, Mráz Decl. ¶ 3.) The Company's ongoing investigation, and LeBeau's erratic behavior in connection with it, is the subject of a related action pending in this District. *See SingularDTV GmbH v. Doe*, No. 1:21-cv-6000 (VEC) (S.D.N.Y.) (the "John Doe Case").  As described in SingularDTV's pending Motion to Intervene in the John Doe Case, *see id.* (Dkt. No. 12 at 6-9), there are substantial reasons to suspect that LeBeau was complicit in at least some of the transfers involved in the Hack and is not being transparent about those transfers.

In the aftermath of the Hack, Lubin, through counsel and in his capacity as a Director of the Company, wrote to LeBeau to demand an explanation for LeBeau's unilateral and reckless transfer of such substantial company assets. (Allenspach Decl. ¶ 24, Ex. 7.) Lubin's letter also insisted that, to avoid similar catastrophes in the future, LeBeau transfer SingularDTV's digital assets—including the remaining ETH and company SNGLS tokens—to a more secure storage method involving multi-signature protections (*i.e.*, digital asset wallets requiring the consent of multiple digital "signatories" to effectuate any transfer) or to a wallet custodied at the company's residential bank in Switzerland. (*Id*. Ex. 7.) In fact, the digital assets were always intended to be held under multi-signature protections, which LeBeau resisted with vague assurances that the company's assets were "safe" without those protections. Yet LeBeau refused to explain his

conduct during the Hack or the lack of multi-signature protections on the wallet currently holding the digital assets, nor did he make any commitment to transfer the company's assets to a custody arrangement protected by industry-standard multi-signature protocols. (*Id.* ¶ 24.)

**V.    LeBeau Is Removed From SingularDTV Leadership And Stripped Of His Authority To Act For The Company.**

Given LeBeau's failure to explain his actions or respond to the other Directors' efforts to exercise oversight and secure company assets, Levy-Cohen—acting as chairman of SingularDTV's Board of Directors—invited the Company's Directors to participate in a Board meeting on May 27 to discuss "the compliance incident" (*i.e.*, the Hack) and "resolutions to be taken" in response, including "the exit of [LeBeau] as CEO." (Mráz Decl. ¶ 4, Ex. 2 at 1.) Although LeBeau raised unfounded objections to the May 27 meeting (and ultimately refused to attend despite never officially excusing himself), the meeting was convened in accordance with Swiss law and SingularDTV's bylaws, and a quorum of the company's directors participated. (*See id.* ¶ 5, Ex. 3 (the "Bylaws") §§ IV.C (requiring "notice of any board meeting . . . not less than seven (7) days prior to the date of the meeting"), IV.D ("A board meeting is validly constituted, if at least 50% [of] the Managing Directors are present (including by video or telephone conference).").) At the meeting, SingularDTV's board of directors voted to:

- terminate LeBeau as CEO with immediate effect;
- revoke LeBeau's signatory powers and authority to act on SingularDTV's behalf;
- direct LeBeau to return SingularDTV assets to a multi-signature custody arrangement controlled by SingularDTV;
- terminate SingularDTV's relationship with Breaker "as soon as possible"; and
- cease "any spending on content" immediately and "take[] all steps to completely exit any remaining obligations for the production of content, effective immediately."

(*Id.* ¶ 6, Ex. 4.)

On May 28, 2021, SingularDTV further instructed Jackson "to perform no additional work from receipt of this notice," "to incur no additional fees," and to "full[y] deliver [. . .] any intellectual property or financial assets held by Breaker LLC on behalf of Singular[DTV]." (*Id.* ¶ 7, Ex. 5.) Neither Jackson nor LeBeau responded to this notice—and, based on their actions since, appear to have disregarded it altogether. (*Id.* ¶ 8.) After Jackson failed to surrender or even respond to SingularDTV's request to deliver its intellectual property and financial assets, on June 8, 2021, the Board resolved to terminate Jackson's position as COO. (*Id.* ¶ 9, Ex. 6.)

The Swiss Commercial Register provides the legally authoritative record of SingularDTV's directors and authorized signatories according to Swiss law. (*Id.* ¶¶ 10–11, Ex. 7.) The Commercial Register clearly and unambiguously shows that LeBeau has been removed as an authorized signatory of SingularDTV and that Jackson never was an authorized signatory.

LeBeau himself recently and repeatedly admitted his lack of authority to act for SingularDTV in a September 24, 2021 filing in Switzerland in which he seeks judicial dissolution of SingularDTV, writing:

- "Lubin and Cohen had already revoked plaintiff's authority to sign and had it removed from the commercial register."

- "The plaintiff cannot represent the company anymore. He has been deprived of any ability to influence the company's operational developments."

- "The agenda includes the removal of the plaintiff as managing director of the company. Due to the majority situation in the company, it is to be expected that the plaintiff will be voted out of office."

- "As a result, Lubin and Cohen can henceforth exercise operational control over the company and its assets without accountability to Plaintiff."

- "He [LeBeau] can hardly have any influence on the happenings of the company. Likewise, he is currently excluded from the management of the company."

(*Id.* ¶ 14, Ex. 8.)

10

**VI.    LeBeau And Jackson Continue To Purport To Act For SingularDTV And Cut Off E-mail Access For All SingularDTV Employees.**

Despite being stripped of his authority to act for SingularDTV, LeBeau (or perhaps Jackson, who never had any such authority to begin with) authorized a New York law firm to file the John Doe Case in this District on or about July 13, 2021, identifying "SingularDTV GmbH" as the plaintiff. *See generally SingularDTV GmbH v. Doe*, No. 1:21-cv-6000 (VEC), Compl. (Dkt. No. 1). Just three months later, the same New York law firm filed a derivative complaint, naming LeBeau as the plaintiff and Lubin, Levy-Cohen, and the Company (among others) as defendants (the "Derivative Complaint").

In the John Doe Case, Jackson submitted a declaration in July 2021 in which she asserted, "I am the Chief Operating Officer of Plaintiff company, SingularDTV GmbH," even though SingularDTV's Board passed a resolution removing her as COO a month earlier. (Allenspach Decl. ¶ 10.) Jackson likewise neglected to mention that she had no authority to unilaterally enter into contracts on the company's behalf even when she was SingularDTV's COO, because she was never listed in the Swiss Commercial Register as an authorized signatory and was never granted a power of attorney in the Company's records. (Mráz Decl. ¶ 12.) Several months later, LeBeau and Jackson purported to instruct a Swiss lawyer, again on behalf of SingularDTV, to initiate a complaint against Levy-Cohen. (*Id.* ¶ 15, Ex. 9.)

After learning that LeBeau and Jackson were engaged in these *ultra vires* transactions on behalf of the Company from which they had been terminated—and concerned that the two of them might be engaged in a host of similar conduct that had not yet come to light—SingularDTV's representative attempted to contact them to discuss the matter. (Allenspach Decl. ¶ 20.) In response, LeBeau's personal lawyer informed SingularDTV on October 8, 2021 that Breaker would "no longer be providing [SingularDTV] with e-mail services." (*Id.* ¶ 20; Ex. 6.) As noted above,

although Breaker performed certain services for SingularDTV under a services agreement, it never "provided" SingularDTV with e-mail services; rather, LeBeau and/or Jackson brokered those services through a third-party reseller, DAG Tech. (*Id.* ¶ 12.) Based on statements LeBeau's personal lawyer has since made, SingularDTV believes that Defendants instructed DAG Tech to suspend SingularDTV employees' access to their e-mail accounts and route those accounts instead to Defendants or persons under Defendants' control. (Sauter Decl. ¶¶ 4-5.) As of October 8, 2021, SingularDTV employees have been completely unable to access their company e-mail accounts. (Allenspach Decl. ¶ 21.)

Worse, on information and belief, Defendants have assumed for themselves unauthorized access to and control over the SingularDTV e-mail accounts. On November 8, 2021, the undersigned counsel conducted a meet and confer with Jerald Tenenbaum (the lawyer that purports to represent SingularDTV in the John Doe Case) and Neil Postrygacz (LeBeau's personal lawyer) to discuss potential solutions to the untenable situation created by Defendants' conduct. (Sauter Decl. ¶ 3.) During that discussion, Mr. Postrygacz refused, among other things, to answer questions about the e-mail accounts, and further refused to restore e-mail access to SingularDTV's employees. In addition, Mr. Postrygacz admitted that the e-mail accounts were being actively monitored by Defendants or persons under their control, yet refused to identify who or how many people had such access. (*Id.* ¶ 5.)

In addition, despite previously informing the other founders that LeBeau was "more than willing to transfer the [ETH] to a custodial account while the corporate disputes get resolved," (Allenspach Decl. ¶ 25, Ex. 8), Mr. Postrygacz also refused to agree that the funds would be held in escrow pending the outcome of the parties' dispute. (Sauter Decl. ¶ 7.)

## LEGAL STANDARDS

This Court has "inherent equitable authority" to issue preliminary injunctive relief where, as here, the plaintiff is "pursuing a claim for final equitable relief and the preliminary injunction is ancillary to the final relief." *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 130–31 (2d Cir. 2014) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 219–20 (1945)).

A preliminary injunction may be issued to support "the ancient remedies of . . . constructive trust and restitution," through which "wrongdoers" are "compelled . . . to disgorge . . . their ill-gotten gains." *Id*. at 132 (citations omitted); *accord Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2004) (recognizing that "constructive trust" is a "form[] of equitable restitution . . . imposed when, in the eyes of equity, a plaintiff is the true owner of funds or property" (internal quotation marks omitted)). The same is true for a claim of replevin, which has long been recognized as a "form[] of equitable relief." *Saint Tropez Inc. v. Ningbo Maywood Indus. & Trade Co.*, 2014 WL 3512807, at *9 (S.D.N.Y. July 16, 2014). Courts in this District routinely fashion preliminary injunctions to protect assets targeted by claims—like SingularDTV's here—for replevin (*see Al Hirschfield Found. v. Margo Feiden Galleries Ltd.*, 296 F. Supp. 3d 627, 634 (S.D.N.Y. 2017)), restitution (*Shaoxing Bon Textiles Co. v. 4-U Performance Grp. LLC*, No. 16-cv-6805 (JSR), 2017 WL 737315, at *2 (S.D.N.Y. Feb. 6, 2017)), constructive trust (*see Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239, 250 (S.D.N.Y. 2002)), and trespass to chattels (*see Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 251 (S.D.N.Y. 2000).

In addition, this Court has authority to issue a preliminary injunction in support of SingularDTV's claims under two federal statutes: the Computer Fraud and Abuse Act (the "CFAA," 18 U.S.C. § 1030) and the Defend Trade Secrets Act ("DTSA," 18 U.S.C. §§ 1831–39). Both statutes expressly permit courts to grant injunctive relief to private claimants. *See* 18 U.S.C.

§ 1030(g) ("Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."); 18 U.S.C. § 1836(b)(3) (in "civil action[s] . . . with respect to the misappropriation of a trade secret," authorizing courts to grant "an injunction" to, among other things, "prevent any actual or threatened misappropriation" or "requiring affirmative actions to be taken to protect the trade secret"). In a recent case involving private CFAA and DTSA claims, another court in this Circuit acted on this authority, granting a temporary restraining order requiring the defendant to "immediately refrain from . . . using, disclosing, misusing or further converting" or "destroying, damaging or otherwise disposing of" the plaintiff's confidential and proprietary information. *See Ivy Biomedical Sys., Inc. v. Amendola*, No. 3:21-cv-01210 (JAM), 2021 WL 4224421, at *2 (D. Conn. Sept. 16, 2021). Other district courts have done the same. *See, e.g.*, *Elsevier Inc. v. www.Sci-Hub.org*, No. 15-cv-4282 (RWS), 2015 WL 6657363, at *6 (S.D.N.Y. Oct. 30, 2015) (granting preliminary injunction to CFAA claimant); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 347–48 (E.D.N.Y. 2020) (granting preliminary injunction to DTSA claimant).

Federal Rule of Civil Procedure 65 authorizes a preliminary injunction where a plaintiff "establish[es] [i] that he is likely to succeed on the merits, [ii] that he is likely to suffer irreparable harm in the absence of preliminary relief, [iii] that the balance of equities tips in his favor, and [iv] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit view these requirements holistically. Thus, "[i]n the Second Circuit, a movant may obtain a preliminary injunction" even if its likelihood of success on the merits is unclear, provided that it demonstrates "the existence of 'serious questions going to the merits to make them a fair ground for litigation'" and "'a balance of hardships tipping decidedly toward the

party requesting the preliminary relief." *Dong v. Miller*, No. 16-cv-5836 (NGG) (JO), 2018 WL 1445573, at *5 (E.D.N.Y. Mar. 23, 2018) (quoting *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). "To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

## ARGUMENT

**I.      SingularDTV Is Entitled To A Preliminary Injunction.**

SingularDTV satisfies all of the prerequisites for a preliminary injunction. As an initial matter, the "public interest" factor is not implicated here because SingularDTV's dispute with LeBeau and Jackson is a "purely private litigation." *See Greendige v. Allstate Ins. Co.*, No. 02-cv-9796 (JCF), 2003 WL 22871905, at *3 (S.D.N.Y. Dec. 3, 2003). As for the other three factors—SingularDTV's likelihood of success, the irreparable harm it will continue to experience in the absence of an injunction, and the balance of the equities—all weigh decisively in favor of the requested relief. The Court should therefore enter an order to show cause why the Court should not grant a preliminary injunction requiring that LeBeau and Jackson:

- restore or cause to be restored Plaintiff's access to and control over its e-mail services;

- refrain from accessing or causing other persons to access Plaintiff's and/or its employees' e-mail accounts and other electronic records;

- return to Plaintiff all assets in their possession or control that are the property of the Plaintiff, including but not limited to the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and any and all proceeds thereof; and

- refrain from taking, or causing any other person to take, any step to transfer, encumber, or conceal any assets in their possession or control that are the property

of the Plaintiff, including but not limited to the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and any and all proceeds thereof.

**A.      *SingularDTV Is Likely To Succeed On The Merits Of Its Claims Against LeBeau And Jackson.***

SingularDTV is likely to prevail on its equitable and statutory claims.

First, SingularDTV is likely to succeed on its replevin claim. "To succeed on a replevin claim, a party must show (1) that it has a superior possessory right to the chattel, and (2) that it made a demand for possession of the chattel from the defendant." *Douglas v. Harry N. Abrams, Inc.*, 2018 WL 1406616, at *5 (S.D.N.Y. Mar. 19, 2018) (internal quotation marks omitted). The ETH and other digital assets stored on the Cold Wallet are clearly Company assets: they were raised as part of the Company's Token Generation Event and have always been treated by the Company as Company assets. In 2018, LeBeau himself signed a valuation of the ETH that, among other things, "confirm[ed] that . . . the company is the beneficial owner and can dispose of the assets." (Allenspach Decl. Ex. 2.) LeBeau has admitted that the Cold Wallet belongs to the Company, describing it in the Swiss Shareholder Dispute as "Respondent's"—i.e., SingularDTV's—"Wallet." (Mráz Decl. Ex. 8.) Likewise, the company's e-mail accounts contain its trade secrets and other valuable property. The CEO of DAG Tech, the company that apparently set up the Company e-mail accounts, admitted in a declaration submitted to this Court that the accounts were provided "for SingularDTV GMBH and its affiliates." *See SingularDTV GmbH v. Doe*, No. 1:21-cv-6000 (VEC), Aff. of Daniel Ghazi (Dkt. No. 6-9). In addition, SingularDTV has demanded several times that LeBeau return those assets to the Company. LeBeau's attorney even offered to place the ETH in escrow pending resolution of the parties' dispute (Allenspach Decl. Ex. 8), though LeBeau ultimately failed to follow through on that offer. More recently, during a

meet-and-confer discussion and follow-up correspondence earlier this month, SingularDTV again demanded return of the assets to no avail. (Sauter Decl. ¶ 7.)

Second, SingularDTV is likely to succeed on its restitution claim. To prevail on this claim, a "plaintiff must prove, by a preponderance of the evidence, that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Schatzki v. Weiser Capital Mgmt., LLC*, 995 F. Supp. 2d 251, 252 (S.D.N.Y. 2014). As discussed above, there can be no reasonable dispute that LeBeau has been "enriched . . . at [SingularDTV's] expense": he currently possesses (and refuses to return) over US $50 million worth of digital assets and entire email accounts, which he and others acting on his behalf have admitted belong to the Company. LeBeau's unwillingness to deposit the digital assets into an escrow arrangement pending resolution of the parties' dispute, and the Defendants' continued interference with and monitoring of the Company's email accounts, is further evidence of their intent to actively misuse those assets for their own purposes. Moreover, "equity and good conscience" require the return of these assets to the Company. The Company needs these assets for its business operations, while LeBeau's retention of the assets appears to be simply a self-help measure to advantage his negotiating position in the Swiss Shareholder Dispute. Defendants' have likewise enriched themselves by commandeering access to the Company's e-mail accounts, which contain trade secrets and other valuable information of a competitively sensitive nature that Defendants, on information and belief, have misappropriated to their benefit and at the Company's expense. Just two weeks ago, counsel for SingularDTV asked counsel for LeBeau and Jackson to explain why their clients would not return these assets to the Company. Counsel for LeBeau and Jackson declined to provide reasons, responding instead that the Company's right to control its

17

own property should be resolved through litigation, and that SingularDTV would learn Defendants' position on these issues in court filings. (Sauter Decl. ¶ 7.) Equitable principles favor disgorgement.

Third, SingularDTV is likely to prevail on its constructive trust claim. "[T]he elements in a constructive trust cause of action are: (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment." *Beacher v. Estate of Beacher*, 756 F. Supp. 2d 254, 276 (E.D.N.Y. 2010) (citing *United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995)). As SingularDTV's CEO, LeBeau owed fiduciary duties of care and loyalty to the Company. *See, e.g.*, *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984). SingularDTV allowed the ETH to be transferred to LeBeau's possession and control in reliance on his promise to hold and use them for the benefit of the Company. (*See* Allenspach Decl. ¶ 9, Ex. 2.) By maintaining the ETH in a single-signature wallet, LeBeau unjustly enriched himself by seizing unilateral control over these assets, which he now refuses to return to the Company in violation of the Company's demands.

Fourth, SingularDTV is likely to prevail on its trespass to chattels claim. The elements of trespass to chattels are "(1) intent, (2) physical interference with (3) possession (4) resulting in harm." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 258 (S.D.N.Y. 2012). "Evidence of mere possessory interference is sufficient to demonstrate the quantum of harm necessary to establish a claim for trespass to chattels." *Register.com*, 126 F. Supp. 2d at 250. As discussed above, Defendants are intentionally withholding the Company's digital assets and blocking the Company's access to and control over its business e-mail accounts. In doing so, they are interfering with SingularDTV's possessory interest in those assets causing harm to the Company on an ongoing basis.

Fifth, SingularDTV is likely to prevail on its CFAA claim. To prevail on this claim, SingularDTV must prove that Defendants (1) "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access," (2) "thereby obtain[ed] . . . information from [a] protected computer," and (3) by doing so, caused SingularDTV to suffer a "damage or loss" of $5,000 or more. *Nyack Hosp. v. Moran*, No. 08-cv-11112 (SCR) (PED), 2010 WL 4118355, at *6 (S.D.N.Y. June 1, 2010.). During a meet-and-confer discussion last week, counsel for LeBeau and Jackson admitted that they or some unidentified persons acting on their behalf is accessing and monitoring SingularDTV's e-mail accounts. (Sauter Decl. ¶ 5.) Worse, Defendants have used their unauthorized control over SingularDTV's e-mail accounts to prevent Company employees from viewing the contents of, or sending e-mails from, these accounts. (Allenspach Decl. ¶ 21.) SingularDTV has suffered over USD $5,000 in losses as a result of Defendants' interference.

Finally, SingularDTV is likely to prevail on its DTSA claim. To prevail on this claim, SingularDTV must prove that Defendants "possessed a trade secret that the defendant misappropriated." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020). Here, the e-mail accounts that Defendants have commandeered contain company trade secrets. As discussed above, LeBeau and Jackson are misappropriating those trade secrets—along with other confidential information, including employee data—by accessing and monitoring SingularDTV's e-mail accounts.

SingularDTV expects that LeBeau and Jackson will try to defend against the Company's claims by asserting, as LeBeau has in the Derivative Complaint, that they were never properly removed from Company leadership. This argument lacks merit for several reasons. To begin with, whatever disagreement Defendants might have about their termination as directors and officers, that does not entitle them to misappropriate Company property and interfere with Company e-mail

accounts in derogation of clear Board resolutions. To the extent Defendants disagree with how their termination occurred, that is a question for the Swiss courts—not an excuse for Defendants to steal Company assets and e-mail accounts on their way out the door.

Second, Defendants would be incorrect in suggesting (as they have previously) that Levy-Cohen "resigned . . . as Director of the Company on February 12, 2019" (Derivative Complaint ¶ 66) and thus was not authorized to participate in the Board vote on their termination. In fact, as the minutes of the relevant Shareholders meeting confirm, Levy-Cohen did not relinquish his directorship; he merely withdrew from his role as "Resident Director," a position responsive to the Swiss-law requirement that one of the directors of a limited liability company reside in Switzerland, because he planned to move back to the United States. (Allenspach Decl. Ex. 12 at 1 ("The CEO observed that Mr. Levy-Cohen has resigned as Resident Director of SingularDTV GmbH . . .").) Subsequent Board minutes confirm that Levy-Cohen remained on the Board and continued to participate in Board meetings by proxy after February 2019. Any suggestion now that Levy-Cohen resigned from SingularDTV's Board of Directors altogether is flat wrong, as is the corresponding suggestion that all subsequent Board activities in which he was involved (including LeBeau's removal as CEO and Managing Director) were ineffective. (*See* Mráz Decl. ¶ 13.)

Third, Defendants would be incorrect in arguing (as they have before) that the May 27, 2021 Board Meeting, where LeBeau was removed as CEO, was defective because it was purportedly convened "without proper notice to LeBeau." (Derivative Complaint ¶ 91.) In fact, SingularDTV's bylaws provide that "notice of any board meeting shall be dispatched in writing by courier, mail, fax, or e-mail not less than seven (7) days prior to the date of the meeting." In compliance with this directive, on May 19—eight days before the meeting—Levy-Cohen invited

all directors, including LeBeau, to participate in the meeting that ultimately led to LeBeau's termination and the revocation of his power to act for SingularDTV.

In sum, SingularDTV's corporate records confirm what LeBeau has already admitted in Swiss court filings: that LeBeau's "authority to sign" on SingularDTV's behalf was revoked and that, because of his termination as CEO and removal from the Board, he "cannot represent the company anymore." (Mráz Decl. Ex. 8 at 6.) These basic facts doom any claim LeBeau and Jackson might have to continue withholding assets and exercising powers that belong solely to SingularDTV, and thus make it more than likely that SingularDTV will prevail on its claims to recover those assets.

### B.     LeBeau and Jackson have irreparably injured SingularDTV and, absent an injunction, will continue to do so.

Defendants' actions are irreparably harming the Company. "Irreparable harm is defined as certain and imminent harm for which a monetary award does not adequately compensate," and "exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017) (internal citations and quotation marks omitted). "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original).

Although there is no "typical" case of irreparable harm, one clear context in which courts in this circuit have repeatedly found such harm sufficient to support an injunction is where a defendant has "meaningful access" to "trade secrets or confidential information" belonging to the plaintiff. *See Intertek*, 443 F. Supp. 3d at 332. Because the misuse of such information "is likely to cause imminent harm to [the plaintiff's] goodwill, customer relationships and business in a

manner that will elude a straightforward dollars-and-cents calculation," courts addressing like situations have found that the plaintiff "will likely suffer irreparable harm absent a preliminary injunction." *Id.* at 333 (internal citations and quotation marks omitted); *accord Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("We have found, for example, that injunctive relief is appropriate where it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." (internal quotation marks omitted)).

Here, LeBeau and Jackson are irreparably harming the Company by interfering with the Company's access to its own e-mail accounts. This hijack has caused multiple immediate and acute business problems for SingularDTV, including that SingularDTV's current officers and employees cannot access or use their own business e-mail accounts; have no idea whether they are receiving e-mails from current or prospective contractors, customers, or other business partners; and do not even know whether those business partners have any idea that the Company's employees are not receiving their e-mails. *See, e.g.*, *BroadBridge Media, LLC v. Hypercd.com*, 106 F. Supp. 2d 505, 509–10 (S.D.N.Y. 2000) (finding irreparable harm where plaintiff's "loss of [its] email address" rendered it "unable to provide" services to "its own clients" and may have caused clients to "assume that plaintiff [was] out of business or failing to provide" services).

Worse yet, LeBeau and Jackson have affirmatively stated, through counsel, that the Company e-mail accounts are being accessed on a regular basis by individuals other than SingularDTV and its employees. It is difficult to overstate the potential harm that could befall the Company if these individuals—whom LeBeau and Jackson have refused to identify (or even enumerate) to SingularDTV—are permitted to continue accessing and perhaps deleting, modifying, or even responding to e-mail correspondence that arrives in the inboxes of SingularDTV's

employees. For as long as this state of affairs continues unremedied, SingularDTV will face a threat of "irreparable harm through loss of reputation, good will, and business opportunities." *Register.com*, 356 F.3d at 404.

Moreover, Defendants' are causing irreparable harm to the SingularDTV by denying the Company access to the ETH and other digital assets stored on the Cold Wallet, thereby impeding the Company's ability to fund its ordinary-course business expenses, strategic investments, and services to counterparties. "A party's loss of control of a business constitutes irreparable harm." *Global Switching, Inc. v. Kasper*, No. 06-cv-412 (CPS), 2006 WL 385315, at *3 (S.D.N.Y. Feb. 16, 2006) (citing *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114-15 (2d Cir. 2003). Moreover, the ETH and other assets on the Cold Wallet are cryptographic. This makes dissipation especially risky: cryptocurrencies know no borders, fluctuate wildly in price, and, when sold on third-party exchanges, are virtually impossible to trace and disgorge. Because the replevin, restitution, constructive trust, and trespass to chattels claims through which SingularDTV seeks to recover those assets are equitable in nature, an injunction requiring LeBeau and Jackson to return those assets is appropriate. *See, e.g.*, *Shamrock Pwr. Sales, LLC v. Scherer*, No. 12-cv-8959 (KMK) (JCM), 2016 WL 6102370, at *7 (S.D.N.Y. Oct. 18, 2016) (approving injunction freezing assets "to the extent they are the target of a claim for equitable relief").

In much the same way, SingularDTV will be irreparably harmed if LeBeau and Jackson are permitted to continue falsely representing to third parties that they are authorized to act for the company. To understand the seriousness of that threat, the Court need look no further than a lawsuit filed in this district just months ago. In *SingularDTV GmbH v. Doe*, No. 1:21-cv-6000 (VEC) (S.D.N.Y.), LeBeau and Jackson instructed their personal lawyer to file a lawsuit, purportedly on the company's behalf, with the stated purpose of investigating and recovering over US $2 million

in assets that LeBeau was responsible, at least negligently and perhaps purposely, for transferring to an alleged hacker. Though purportedly filed on its behalf, SingularDTV had no notice of this lawsuit and, for now, has no control over its strategic direction (though it has now filed a motion to intervene in that action through counsel of its choice). *See generally Doe*, Mot. to Intervene and Supporting Papers (Dkt. Nos. 11-15). Indeed, SingularDTV has never even discussed that lawsuit with the lawyer who claims to be prosecuting it on SingularDTV's behalf, and the Company has no way to determine whether LeBeau intends to use that litigation to cover up his potential involvement in the theft of Company assets, nor any way to ensure that a recovery in that lawsuit makes its way into the Company's hands. If LeBeau and Jackson likewise deceive other third parties into doing business with them as though they represent SingularDTV, their conduct is "likely to cause injury to [the company's] reputation and goodwill, which is not easily measured in monetary terms" and could "subject [the company] to a loss of business and exposure to substantial . . . liability." *See Dunkin' Donuts, Inc. v. Albireh Donuts, Inc.*, 96 F. Supp. 2d 146, 149 (N.D.N.Y. 2000) (granting preliminary injunction to prevent franchisee from purporting to represent corporation outside scope of franchise agreement).

## C.     *The equities strongly favor SingularDTV.*

The equities strongly favor SingularDTV's requested relief.   The third step of the preliminary-injunction analysis calls for the Court to "balance the equities." *Ligon v. City of N.Y.*, 925 F. Supp. 2d 478, 539 (S.D.N.Y. 2013) (quoting *Winter*, 555 U.S. at 20) (alterations omitted). The Court must ensure that, in fashioning injunctive relief, it does not create "an arrangement less fair to the parties than the status quo." *Id.* at 540. To do this, courts consider whether "the hardship imposed on one party" by the requested relief would "outweigh[] the benefit to the other." *Id.*

The equities in this case uniformly favor the injunction SingularDTV seeks. As discussed above, such an injunction would prevent irreparable harm to SingularDTV by allowing it to fund

24

its business operations, access its trade secrets and other sensitive business information, and prevent third-party interlopers from accessing such sensitive information. LeBeau and Jackson, on the other hand, would suffer no cognizable harm from an injunction returning the e-mail accounts and digital assets that rightfully belong to SingularDTV (and that Defendants themselves previously agreed to place in escrow).

## II.   The Court Should Issue A Temporary Restraining Order Until This Motion Can Be Heard On Notice To LeBeau And Jackson.

This Court should issue a temporary restraining order until this Motion can be heard.  "It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases). For the reasons discussed above, SingularDTV has satisfied that standard.

## III.   No Bond Is Necessary At This Stage.

Courts have "wide discretion in the matter of security, and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010) (citations omitted). The relief SingularDTV requests would simply require them to return assets that they or others acting on their behalf have already admitted belong to the Company. Given that Defendants have no color of right to these assets, there can be no cognizable harm to them by returning these assets to their rightful owner, SingularDTV.

## CONCLUSION

For the foregoing reasons, SingularDTV respectfully requests that the Court enter an order to show cause why the Court should not issue a preliminary injunction. In addition, to preserve the status quo until SingularDTV's request for an injunction can be heard on notice to LeBeau and Jackson, SingularDTV respectfully requests that the Court grant a temporary restraining order.

Dated: New York, New York
      November 29, 2021

Respectfully submitted,

/s/ Benjamin J. A. Sauter
Benjamin J. A. Sauter
Christopher S. Cogburn
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

*Attorneys for Plaintiff SingularDTV GmbH*