

**Minutes**

of the

**4th Board Meeting 2018**

**of**

**SingularDTV GmbH**

held on Tuesday, 11 September, 2018

10.30 am – 12.30 am ET

At the offices of SingularDTV LLC, 40 Fulton Street, New York

**Attendees**:

- **Arie Levy-Cohen,** CFO / Board Member / Chair

- **Zachary LeBeau,** CEO / Board Member

- **Joseph Lubin,** Board Member

- **Kim Jackson,** Co-Founder

- **Carl Volz,** US General Counsel**,** SingularDTV LLC

- **Patrik Allenspach,** Project Manager, Codex Execution GmbH

- **Amrita Rizal,** Head of Compliance**,** SingularDTV GmbH

- **Simon Waelti,** Head of Legal**,** SingularDTV GmbH

- **Ed Greenwood,** Financial Controller**,** SingularDTV LLC

- **Shreesh Tiwari,** Head Business Strategy**,** SingularDTV LLC

**Agenda:**

1. Introductions

   - Attendance list

   - Approval of minutes of the last BoD meeting

2. Pending Items

   - Corporate Structure / Corporate Governance

        O  Elect Kim Jackson onto Board of Directors (to commence during shareholders meeting); role as COO

        O  Transition plan GmbH to US public entity; approval of phase 1 (fact finding of legal/tax assessment re transition)

        O  Future role of Arie Levy-Cohen Chairman of the Board of SingularDTV GmbH / appointment of new local director

        O  Hiring a new CFO (interim in CH, long term in US)

        O  Scope of Ed Greenwood as Controller

        O  Form holding company in Zurich

   - Banking Relationship / Reverse KYC

        O  USD in Credit Suisse AG

   - Token assessment – future path and roadmap for SingularDTV GmbH

        O  SNGLS 1.0 – 3.0 - $ 1 Billion IPO

   O  SNGLS: the 400 million founders tokens

- Japan TGE

- Blockhaus

   O  Examination of overall revenue/obtain percentage of ownership/profit

- Tokit and regulated Crowdfunding

- SingularX

- High risk transactions on Tokit (without KYC)

3. Patent of SingularDTVFinances

4. Project Updates

  A. Film Projects

  B. Rentalist

  C. Reg A and Tokit as a CF platform Offering for US

5. Schedule future board meetings

1. **Introductions**

Attendance list and minutes of last board meeting are being approved.

2. **Pending items**

**Corporate Structure / Corporate Governance**

**Election of Kim Jackson**

Simon opens the meeting, re-explains the agenda and the first item to be the election of Kim Jackson to the board of the company.

Joe: I first would like to know more about the company, where it stands right now, all liabilities and businesses, before deciding on electing new persons to the board.

Kim: but that was discussed long time ago

Joe: I did not vote on your election.

Kim: it was discussed in April, Arie and Zach have discussed this then.

Zach: the reason for and the goal of the election of Kim to the board is to regain balance in the company. Kim currently is not formally and properly involved in any decision of the board, her election would simply give her a voice.

Kim: since Joe is not around a lot, and Zach and Arie taking care of other things but not focusing on pressing issues such as financial stability, I am the only one asking these questions. But from a legal perspective, I do not have any authority in the GmbH.

Joe: we are trying to consolidate all information in one place, aren't we?

Carl: it is currently being discussed; there are however on GmbH level also legal concerns how to share all documents with people that are not board members of the GmbH

Kim: we have seen numbers with reference to agreements, we have not seen them all yet, I think I can help oversee the organization better when having access

Joe: Carl, do you believe she should be a member. Why?

Carl: the LLC is the main part of the company, so she should be a part of this. Kim was running the LLC since the incorporation.

Joe: but the GmbH does not own the LLC though, there is only a service agreement. So with this clear separation, this is not necessarily a valid reason. Why is it structured that way, why does the GmbH not own the LLC?

Kim: I do not know

Joe: Should then not be a balance? Some projects are not owned by the GmbH, should they not be owned by the GmbH? Should then not the same apply for the LLC?

Kim: that would be fine by me.

Joe: the US entity is considered a piece of Singular, so it should be owned by the GmbH?

Carl: liability and tax considerations spoke strongly for a separation. Also privacy restrictions are stronger in Switzerland and Europe.

Zach: still, Kim is also made aware on everything.

Arie: the reason for the separation between the LLC and the GmbH (and no respective ownership in each other entity) in my view has to do with liability. Because the LLC is active and has presence in the US, but the launch was done in Switzerland, it was decided to have this separation.

Joe: currently I am mainly representing Consensys' interest. I do not have enough information about SingularDTV GmbH, obviously there are two sides to all these stories, I do not like to decide on anything that could affect either side without having the full picture.

Arie: I agree that this is premature; the idea is to have a mandate to find out all the implications and then make any decision and change

Joe: our founders call a month ago was constructive; I also hear that Arie is discussed to be moved out of the project. Arie, do you want to be moved out?

Arie: not like this.

Joe: what do you want to be happening right now?

Arie: decisions are being made mid-stream, the current CFO [Iwona] is not even present in this board meeting, although the closing of the books is ongoing right now, this process should be done all together. Changes can be made in the future; especially if the mean and initiate a transfer to a more professional board/management in which I do not have to be a part of either. But taking over mid-stream to me seems not wise.

Joe: there is a plan to restructure. Why is voting Kim into the board necessary?

Carl: in order to have her access to all the information.

Joe:there are other ways for her to have access to all the information. I would like to understand what happened before deciding on any changes.

Zach: Patrik, the transition will take months, correct?

Patrik: first there will be an assessment to find out what can and should be done, this will take 1-2 months, including defining milestones.

Joe: I do not see why Kim cannot have access to all the information even now.

Simon: The main problem is that the LLC and GmbH are not in the same group, so any transfer of information is legally speaking a transfer between two independent entities and thus there must me respective measures implemented, adhered to and respected by both entities.. That said, the current set up with the service agreement does not cover and give us enough reassurance as with regards to the treatment of confidential information such as personal data. It is only a service agreement that empowers the LLC to act as a production node. Now, it is clear that this set up does not reflect all that is intended and what should be implemented. Also, most of the GmbH information can be shared if Kim is legally connected in some role to the GmbH, but e.g. employment agreements and all other documents that include personal information cannot be shared cross border. Kim could be mandated in a different way to have legal access at least on-site in Switzerland.

Joe: I still do not understand all what happened in the GmbH. I would rather not make that decision on election somebody new to the board right now. Kim, I would like you to be fully involved, but I would like not to make any rushed decisions.

Kim: there is financial chaos on both sides. It's been a year and a half, and there is not proper bookkeeping. There is necessity for a restructure. There is a lot of information that none of us have, no board member, nobody else like me. E.g. financial transactions must be approved by the board, I would not do it if I were you. We need a real CFO, we need a smaller footprint in Switzerland.

Simon: currently, 14 people are being employed in Switzerland.

Kim: there are two offices, and some projects that we do not know about. Not even Simon as the legal counsel has access to all the information.

Joe: Arie, is this description accurate?

Arie: Iwona is not here, so it is impossible to explain how we got here. There are a variety of factors that brought us to this point, with different projects, delays, etc. that include the financial situation. Also the crypto situation at the moment is difficult. Finally, many transactions have been done with wallets that are not under the control of the company. We were working hard to input all the data to finally have the financial reports, but it is a lengthy procedure right now.

Process right now is almost to give birth to the consequences of the difficulties and hurdles. The restructuring will force us to face all the difficulties that we were created by us. The restructuring is something in line with our initial conversation.

It is not accurate to put the responsibility on Iwona and finance.

Joe: so Arie, where are you now, where do you stand? Do you have a clear overview over the finances?

Arie: Iwona is unfortunately not here. She should be allowed to present the finances she had been working on for a year.

Kim: Iwona shared this three documents with us a month ago, without any additional information and/or data. She has quit, so she will leave within a couple of weeks.

Ed: we are still talking about the financials for 2017, we do not have an overview for 2018.

Kim: when I look at the employees list, there is a bookkeeper, but we do not have books for the company.

Shreesh: Joe, we will be happy to share more business information about SDTV with you wherever and whatever you require. We need to be active right now, so there is necessity to be active about that.

Patrik: there are two layers of restructuring: a corporate level, but also with regards to personnel. It has been discussed with Arie and Zach to have an interim CFO currently in the GmbH, before transferring this job to the US potentially.

Arie: I agree to that; however, it would be prudent to have Iwona accompany that person for a smooth transition.

Patrik: we will have interviews with two candidates next week, Kim and Zach are going to be there as well.

Zach: so we will discuss the election of Kim at the end of this meeting? I think Kim would bring a lot of balance to the company.

Simon: the service agreement needs to be reevaluated since many things are done from LLC. Except for employment data, I shared everything that I have received and have gained access to, some agreements are lost or not there anymore, we need to work on that. If we can properly mandate Kim to have access to these documents, this might help a proper restructuring, but it will also mean that she needs to involve her fully into this. We can grant Kim almost all the powers and entitlements to have access and work/effect on the GmbH in other ways, if it should not be accepted or deemed to be valid to have her elected to the board by other directors/shareholders. This at least will grant her full access on-site when she will be in Switzerland, with certain restrictions for cross-border transfer of information and documents that must not be forwarded since the GmbH and the LLC are not companies of the same group, but only legally connected through the service agreement.

Zach: Arie, are you now against or for the election of Kim being a part of the board?

Arie: I am not against that, I would just like it to be what we all want to do, without diminishing anyone. The statement that for months things have been asked for and not given is not accurate; Iwona had to work on many things and to fight to receive all the information so they can be forwarded.

**Transition Plan**

Patrik: the goal is to attain being a US public entity. The GmbH does not necessarily need to be shut down. GmbH is mandated to fulfill the four promises. Transfer of all necessary operations and IP – if possible and need be – to a self-sustaining US company can also be finished after the fulfillment of all the promises.

The GmbH currently owns all the money and the IP.

Joe: the GmbH owns the IP?

Simon: yes.

Joe: the LLC has no banking issues right now, why?

Patrik: my understanding is that LLC is not considered a blockchain company, the GmbH is, that is why the LLC so far has had no banking issue. We seek to have a new bank account for the GmbH with Bank Frick. It seems to be the only valid option at the moment. Frick is actually "pressing" us to open the account, where we also can exchange ETH, etc.

Assessment for the transition plan aims to make clear and allow us to see what currently resides in CH, what in the US. Another aspect is to clearly define what the target in the US is; we do have around 20 work packages to figure out what and how we can transition business to US.

Joe: is it contemplated that Arie would leave the board, or removed?

Patrik: it would neither hinder and enforce that plan. Basically, we would spend the coming 6-8 weeks to define and assess the majority of all legal and tax implications for any potential transition.

Carl: it will be the board's decision what should be done, what structure implemented. That would include the question whether Arie to stay or not.

Patrik: Board, do you agree for the Go-ahead for Transition Phase I?

The Board agrees unilaterally.


**Personal structure of management/future role of Arie**


Zach: Arie, do you have anything to say about this? The balance is gone right now. I would like not to have you as the president. I would rather have Herbert Sterchi on the board.

Joe: why was Herbert removed?

Arie: I was under the impression that we do not need two resident directors, that was not necessary anymore because I had moved there to be the resident director.

Joe: what would Herbert do?

Patrik: he would have signatory authority, including that he would require authorization by the board for any decision.

Zach: I would like to also have then Kim on the board.

Simon: so it would then be Arie, Joe, Zach, Herbert and Kim?

Patrik: also, an interim CFO shall be hired asap, the hiring of a US CFO shall be started to be in place beginning of next year.

Kim: in the meantime, Ed as the controller can work with the interim CFO.

**Scope of Ed Greenwood as Controller**

Kim: Ed Greenwood is currently the controller of the LLC. It might make sense to implement him as head treasurer when the treasury department is being formed

Carl: can he be represented as a representative of GmbH so he can have access to the finance information?

Patrik: we can try to find a way how this can be structured, I will work with Simon and Ed on this.

**Form holding company in Zurich**

Simon: the holding structure in Switzerland was the goal where Patrik and I are trying to get for some months now. In the course of the transition evaluation, we first need to make the assessment from a tax perspective and see what and how much shall remain in Switzerland, and what shall be transferred to the US. Still, the holding structure does make sense, but it is at this stage not clear what would remain in what entity.

Patrik: we believe it makes sense to have two "baskets", one in CH, one in US, so the transition can be done smoothly when ready.

Joe: it is clever to maintain the IP of the company/group in Switzerland, I know this from my other company – despite of Trump's tax initiatives, we were advised and convinced to keep the IP for tax and regulatory reasons in Switzerland, the rest can be then in the US.

**Banking relationship / Reverse KYC**

Patrik: the taskforce was created based on Credit Suisse AG's decision to no longer maintain the relationship with SingularDTV GmbH. Various options were discussed, full KYC of all investors vs reverse KYC on the known investors. We have reviewed about a dozen of potential banks, two remained. No KYC of all initial KYC/token purchasers is necessary, but on the about 30% of the initial purchasers which is acceptable for Bank Frick. So currently, we are working with Bank Frick with positive prospects to getting a bank account.

Simon: Other potential bank might be Hypothekarbank Lenzburg, with reverse KYC in the course of a token swap.

**Token assessment**

SNGLS Upgrade

Zach: SNGLS 1.0-3.0 will be also rely on the transition roadmap.

Shreesh: 1.0-2.0 will add additional functions, also KYC on current token holders, 3.0 will be the listed tokens. In order to move on with this process, it is necessary to move forward with the transition plan.

400 million SNGLS token

Simon explains what the function of these 400 million SNGLS tokens, makes it clear that the token terms clearly state that all (i.e. gross) revenue shall be allocated to the SNGLS token; so it will even be difficult the extract any costs for the GmbH.

Joe: so they (the SNGLS token held by the GmbH) are the only source of inflow/revenue? We then have to think about having different sources of income.

Simon: yes, there is no other inflow, and all revenues from the promises must be allocated to the SNGLS. At the current definition, all (gross) revenue will be allocated to SNGLS token. So any update should consider having a change to that aspect as well, without being at any legal or regulatory (suing) risk.

Zach: only the net revenue shall be pushed to the tokens

Simon: the terms say it differently – all (which includes "gross") revenues are supposed and expected to be allocated to the SNGLS

Joe: that is tricky. I think we will be sued in any way and/or case.

**Japan TGE**

Carl: the TGE was executed by SingularDTV NZ, which is 50% owned by Centrality, 50% by Arie and Zach.

Simon: that is not completely accurate – the NZ company is 100% owned by Aaron MacDonald of Centrality. Also, we have received a legal assessment by Nagashima Ohno & Tsunematsu NY LLP (NOT) stating that there are clear regulatory and civil legal risks for the (Japanese) company that is intended to receive the funds from the TGE; as authorities and courts in Japan could deem the company having colluded with the NZ company that executed the TGE on behalf of the Japanese entity, especially since only Japanese investors have been addressed.

Carl: apologies and thank you Simon for this clarification. The TGE/transaction was being done in consistence with NZ law, the Japanese entity was only envisioned as beneficiary and recipient of the proceeds of the TGE. What we've learned is that NZ entity was under the impression that the TGE was done in accordance with NZ and Japanese law, without however being able to provide any proof and/or document, and they (Centrality) are against any decision to unwind or repay the TGE money. Centrality states that there were discussions with exchanges in Japan, but it is not clear if there was an exchange involved in the TGE, and there is no respective documentation around that. The decision is whether the transfer to the Japanese entity (no subsidiary of GmbH); we do have Japanese legal assessment that there is a possible/potential liability for the Japanese entity. Centrality does not believe that anything was done improperly.

Joe: what do you think?

Carl: we are respectively I am waiting on the last piece from the New Zealand people. We currently do not know if there was an agency relationship between the NZ entity and the exchange in Japan which would be legally required. We yet do not know if the Japanese did play a role or not, and if it only was poorly documented or if there were only talks but no execution through that exchange. The potential danger of any violation of law can be considerable harsh, including jail.

The argument from Centrality against any repayment is to avoid to create bad blood, as well as the risk to lose more business and be at a reputational risk, and the risk to have monetary consequences through the Japanese authority against the immediate risk of having to repay all the money. Also, the process of repaying will be burdensome.

Joe: so it sounds like it might be better to keep the money and cross the fingers.

Zach: also, there was only a small number of investors.

Amrita: the small number of investors does not save us from the outlined regulatory requirements that have possibly not been fulfilled. Besides the number of investors it also matters how much money is being collected; we are over the respective threshold and thus it does not matter if it was only a small number of investors.

Joe: how much was it?

Zach: about 22'000 ETH.

Patrik: if we moved forward, what is the fine amount, and what is the timeline?

Carl: there is no time expectation, I want to say the fine is up to USD 5 million.

Zach: I have a feeling that Centrality will not cooperate in the case of refunding. And the token purchasers are becoming impatient.

Amrita: the tokens have not been released to them. Simon and I do have strong reservations since the fine and other potential legal, regulatory, tax and other consequences due to a potential not fully compliant TGE could fall back on this project and potentially the company.

Simon: I agree. Also, the potential fine is an estimate, I would rather like to know the exact potential number.

Joe: still, I think we should go forward and use the money for what it was intended to be used.

Zach: I would like to see efforts in Japan.

Carl: Centrality does not have documentation, only representation that an exchange was used.

Amrita: I asked that in an e-mail, and both Dan and Aaron confirmed that no exchange was used.

Arie: my concern was always with regards to risk, it seems that you are voting to take the risk. I would have abstained from the TGE if I did have all the information at the time.

Carl: it will be a process, FSA will not immediately fine us with 5 million USD.

Arie: it should be the GmbH, not Zach and Arie as persons owning SingularDTV NZ.

Amrita: it was discussed to have several other players like Centrality be involved in the Japan entity that should receive the funds of the TGE. Currently, Mayu owns 100% of the Japan entity. For now, the New Zealand entity would be the beneficiary of the IP that would be created with the Japanese token.

Simon: my understanding is that the TGE was done via NZ for tax reasons. In the respective bare trust deed that was incorporated for tax reasons – which were not clearly disclosed to us, also we never received any documentation re any respective tax advantage with that structure – it is stated that a company to be defined by SingularDTV GmbH shall be the Beneficiary.

Shreesh: it was purely done for tax reasons through NZ entity.


**Blockhaus**


Zach – I am dealing with this directly with Centrality. Arie was offered 30% of the TGE revenues, Arie would have helped there as well. Since they wanted to include CTIA, Arie stepped out of the deal, so they are now going into a completely different direction.

**Tokit regulated CF**

Zach: we do have a group that is moving forward to have tokit used in the US as a CF platform.

Joe: is it a legal entity?

Carl: we are assessing this right now, if it should be a subsidiary of GmbH, of the LLC or something else.

Zach: Dan is about to talk about this; there are a variety of projects that could be funded with tokit cf. if we raise to 5-10%, this could mean 10-15 million USD.

Amrita: we can work on this fairly quickly, provided to have a legal and compliance person in place.

**SingularX**

Zach: everything is positive so far with the current setup seen by the legal experts. However, the automated order matching may change that assessment. That is why we are thinking about approaching FINMA to get their assessment.

Simon: it is currently owned 50% by SDTV, 50% by Centrality, so I think it might be helpful to at least inform them about our intent to approach FINMA at some point.

Joe: what is the current relationship with them (Centrality)?

Zach: the relationship is very good, I am in constant contact with them.

Simon: Amrita and I however have had some difficulties in getting in contact with them, which would have been beneficial also with regards to the Japan/NZ TGE.

Amrita: as soon as we have Ruben's feedback regarding technical aspects, then we will approach FINMA.

**High risks transactions**

Amrita: for the upcoming audit, we have like 30 transactions without KYC, 5 are high risk. Milad has confirmed that this is the future of the blockchain, but we cannot do anything at the time. I would like to make the board aware that this might be a potential risk for the company.

Joe: you can put KYC into it for future use. It may be the case that how it was built it does not apply KYC controls, but an additional layer can certainly be added.

Zach: we will check with Milad.

Joe: can we do the presentation now so I can attend the rest on the phone?

DAN HYMAN makes presentation (see attachment)

## Patent of Singular

Simon: this is an issue that I wanted to address for some time. I just learned that the patent filed for the SingularDTV ecosystem is not being held by SingularDTV GmbH, but by Codex Puerto Rico, a company with no ties to SingularDTV GmbH or the LLC, but held by Zach an Milad. This to me makes no sense, and I would like to assign the patent to the GmbH.

Zach: in 2017, we were rushed to have the patent provisionally registered, Puerto Rico at that time played a big role in SDTV. Codex PR was supposed to play a part in GmbH, MME and Arie hat reservations about that.

Joe: so you Zach and Milad own the IP?

Zach: we submitted the patents.

Joe: Milad has an agreement with Consensys, so that would be transferred and allocated to Consensys.

Simon: I think it makes sense that this will be transferred and be added to the transition plan.

Zach: agreed.

## Finances

Simon: Iwona's e-mail sent out on 7 August 2018 that included a document with several transactions and transactions that lack proper documentation.

Kim: what needs to be happening is for Iwona to lead the three board members through this document and have the board members agree or disagree on it.

Zach, Joe and Arie agree.

## Budget Planning

Patrik: we are talking about the budget that we want to send to Bank Frick. Yesterday there was a discussion with Shreesh and Ed, this afternoon I will conduct a conversation with the marketing department. We would like to show a conservative, realistic budget plan for the next 2.5 years that can be presented to the banks.

Carl: is Frick still asking for this?

Patrik: it is not a pending request, but for future references, if compliance, legal and all other divisions should ask for it it will be helpful to have such a doc at hand.

Shreesh: the important point is that it only covers our promises.


**Tax situation**


Patrik: Iwona sent out an e-mail that CHF 65'000.00 was "reserved" for taxes for 2017. In context to the discussion about how much money can be transferred to the LLC with the tax advisors, this is still being assessed. The MME tax ruling is being questioned right now, so a new ruling is in the making to figure out if and how much GmbH will have to pay in Zug and Zurich. As a conservative person, I would like to reserve CHF 1 million for that figure. There is nothing we can do right now, the documentation is being completed, then MME will talk with the tax authorities. After their verdict, we may be able to talk to the tax authorities, but until then, there is not much we can do at the moment.

We did receive other projections where the tax costs accrue between CHF 300'000 and CHF 8 million. It is highly unlikely that we will even get close to the high number, but still, the reserved CHF 65'000.00 might not be accurate any longer.

Simon: the value you had paid at the time of the purchase/receipt of crypto is supposed to be the value that has to be declared as asset to the tax authority. It seems as if MME's tax ruling and their tax assessment no longer holds true, even though it was only written beginning of 2017. I would like to meet with them and ideally our new interim CFO to get more clarity.

Zach: Simon and Codex Execution should assess what happened with MME, and we should have a meeting with MME when we are in Switzerland to understand the status quo of the tax ruling and the accuracy of the respective provisions in the books.

Everybody agrees to this action item.


**Project updates**


Kim: not much news, Ed can give us an update regarding investments into film projects.

LLC is approaching to obtain a guild membership, so in a corporate structure point of view, we have to figure out how we can structure this since the guilds want to see separate entities for guild membership film projects. Usually, SPV must be incorporated for each film projects. So it must be figured out how these SPV under the current and future structure since they must have a connection to a guild and its respective guidances.

**Rentalist**

Carl: the license request is sitting with the SEC, so far, no respective RegA+ project has been approved by the SEC in that regard. It is not necessarily that they will be approved in the respective order that they have been submitted, but we currently cannot assess the timing and the validity of such an application.

--------------------------------------------------------

Zach: so to summarize, I still believe and strongly suggest that Kim shall be elected to the board and be in the position of a board member

Joe: I am absolutely for adding Kim to the board when the time is ready, at the moment I would rather have her granted access to all the information without this election at this current moment.

Kim: can maybe Matt Corva represent you and speak more regularly with Simon, Patrik and the team to have you updated and informed better? How can we improve you being more involved?

Joe: sure, Matt will be included by me more so he can update me. I did my best to be more invested in calls and meetings this year.

Zach: what is your position on Kim joining the board?

Arie: it the same as Joe's.

**MEETING ADJOURNED**

**SingularDTV LLC**
(the **Company**)

Registered Office: Zug, Canton of Zug, Switzerland
Enterprise Identification No.: (CHE-143.156.740)

**Minutes of the Meeting of the Managing Directors of the Company** (collectively the
**Board**)
**Held via Videoconference on June 8, 2021**

_____

**Present**

–      Arie Yehuda Levy Cohen, Chairman of the Board ("AYLC")

–      Joseph Michael Lubin, Managing Director ("JML")

**Absent**

—   Zachary James LeBeau, Managing Director ("ZJL")

**Chairman**

—   Arie Yehuda Levy Cohen

**Secretary**

—   As ZJL declined to attend the meeting and presumably instructed company counsel to do
the same, JML will be acting as secretary.

A.   **Agenda**

1.      Constitution of the Meeting

2.      Discussion of legal representatives for the Company

3.      Discussion of Kim Jackson's COO appointment with the Company

4.      Miscellaneous

B.   **Business Transacted and Resolutions Passed**

1.      Mr. Levy Cohen takes the chair (the **Chairman**); it being noted that the prior secretary
Carl Volz was terminated by ZJL, for purposes of this meeting AYLC and JML agree that
JML acts as secretary.

The Chairman opens the meeting at 5PM CEST. He directs the record to show that the meeting of the Board has been duly convened and that a majority of the Managing Directors are present and therefore the Board has a quorum. No objections are raised against these ascertainments.

2.   The Chairman and JML discuss the appointment or purpointed appointment of attorneys Paolo Losinger and Neil Postrygracz.

3.   The Chairman and JML conclude that neither Losinger and Postrygracz appear to be acting in the interests of the Company and refute that either, at any time, had a valid mandate from the Board to serve the Company.

4.   The Chairman and JML resolved to confirm that neither Losinger nor Postrygracz is authorized to act on behalf of the Company and that the Company shall take all steps necessary to prevent any unauthorized service, including instructing the Company to refuse any and all fee for services proposed by either Losinger or Postrygracz on behalf of the Company, noting that the Resident Director, in his discretion, is approved to settle any reasonable outstanding retainer with Mr. Losinger for fees incurred previous to June 1, when JML through his agents made clear to Mr. Losinger that the Board did not recognize any mandate. The Chairman and JML resolved to confirm that it is the opinion of the Board that only the firm Wenger & Vieli has a mandate to serve the Company, and the Board reiterates such mandate and appointment.

   (a)   Voting in Favor: 

   Voting Against:

5.   As a miscellaneous item, with it being known that Kim Jackson, owner of Breaker LLC, the relationship to which the Company terminated via notice still holds an appointment of "COO" under an agreement with the Company, the Chairman and JML resolved to approve the Company to terminate that agreement as soon as possible, approving an additional one month equivalent of notice payment under that agreement.

   (a)   Voting in Favor: 

   Voting Against:

There being no further business to be transacted, the Chairman closes the board meeting.

[*signatures on the next page*]

Executed as of the date written on the cover page to these resolutions

The Chairman:                                    The Secretary:

Arie Yehuda Levy Cohen

**Distribution:**

_   Domicile
_   Managing Officers



# SingularDTV

**MINUTES**

of the

**2nd Board Meeting**

**of**

**SingularDTV GmbH**

held on Friday, Feb 9, 2018

2.30pm – 3.30pm

at the offices of SingularDTV GmbH, Gotthardstrasse 26, 6300 Zug, Switzerland

---

**Present:**      - Arie Levy-Cohen, CFO / Board Member / Chair
                  - Herbert Sterchi, Board Member
                  - Zachary LeBeau, CEO / Board Member
                  - Kim Jackson, Founder
                  - Amrita Rizal Vijay, Minutes

**No Show:**      - Joseph Lubin, Board Member

**Mr. Arie Levy-Cohen** opens the Meeting and takes the Chair. **Amrita Rizal** is the Corporate Secretary and takes Minutes.

I.   **Attendance and Review of Agenda**

The Corporate Secretary noted that at least 50% of Board Members were present, and therefore, as required by the By-laws, a quorum was in attendance and the Board was empowered to proceed with the meeting.

It was further noted that a meeting notice had been circulated, together with the Agenda, and she reviewed the meeting agenda for the Board. The Board approved the Agenda. The Minutes of First Board meeting was also circulated and the Board confirmed to have

received them.

II.      **Agenda**

- Business report of the Board of Directors:
    - o   Report of the CEO
    - o   Report of the CFO
- Special Event (if any)
- By-Laws
- SRO Application progress
- Comments and Announcements (if any)
- Miscellaneous

III.     **Discussions and Resolutions**

1.       **Report of the CEO**

Due to the fact that the Shareholders are also members of the Board of Directors, the Board members have been currently updated on the company's business situation.

The CEO, **Zach LeBeau** reports that he is transitioning most of the CEO tasks to **G Thomas Esmay** and **Shreesh Tiwari**, both members of Senior Management, so he can participate in movie making and business development.

From CEO and Business development perspective, Asia is going to be a focus for SingularDTV.

The CEO also confirms that the overall health of the company is good and aggressive hiring in Business development, Tokenomics, Marketing, Programming will take place within the next few months.

2.       **Report of the CFO**

The CFO confirms that the books for 2017 is being closed and the draft of the financial statement as of December 31, 2017 are being prepared. Resolution concerning the allocation of the annual profit/loss will be discussed once the financial statements have been finalized. The CFO also confirmed that SingularDTV is evaluating the GILTI tax exposure to the company.

The CFO presented the Compliance Report (Annex 1) and confirmed that we are ensuring compliance with respect to Swiss regulations by securing a membership with the SRO.

The CFO proposes that there is a need for the setting up of a Treasury team who would manage the funds from the TGE proceeds. He proposes to make a motion in the next Board meeting to vote on this proposal. He further concludes that there is a need to set up proper multi-sig wallets, tokens and all financial transactions that should be managed

through the proposed Treasury team under the Finance department.

3.    **Special Events**

**Herbert Sterchi**, a Board Member, is stepping down as the Director of SingularDTV GmbH, effective immediately. With respect to this, he has signed the required documentation. Following this, **Arie Levy-Cohen** would be the sole resident director of SingularDTV GmbH. The Board accepts the decision by show of hands.

The CEO makes the motion to include **Kim Jackson** (one of the founders of SingularDTV) in the Board of Directors. The Board approves the decision by show of hands.

**Kim Jackson**, the newest proposed Board Member proposes to include another Board Member and she proposes **Iwona Popieluch's** name. The Board agrees to this proposal and agree that a motion regarding this will be passed in the next Board meeting.

4.    **By-Laws**

The CEO requests to change several points on the By-laws to be corrected on pages 4, 5, 6, 7 and 9. The Board discussed and agreed to approve all the requested changes and the newer updated version of By-laws is signed. The updated signed copy of By-laws is attached to the Minutes as Annex 2.

5.    **SRO Application progress**

All the documents regarding the SRO application to VQF has been prepared, signed and the application to VQF is underway.

6.    **Miscellaneous**

Upon inquiry by the Chairman no further issues are raised. The Chairman therefore closes the meeting after having ascertained that during the entire Board Meeting all shares were duly represented.

Zug, 9 February 2018

Chair:                                        Secretary:

_____        _____
Arie Levy-Cohen                          Amrita Rizal Vijay
**Annexes:**

**SingularDTV GmbH**, Zug, II Board meeting, 9 February 2018 - 3/4

- Annex 1 – Compliance Report
- Annex 2 – By Laws



**Minutes**

of the

**3rd Board Meeting 2018**

**of**

**SingularDTV GmbH**

held on Wednesday, 11 July , 2018

10.00 am – 12.00 am ET

At the offices of SingularDTV LLC, 40 Fulton Street, New York

**Attendees**:

- **Arie Levy-Cohen,** CFO / Board Member / Chair

- **Zachary LeBeau,** CEO / Board Member

- **Joeseph Lubin,** Board Member

- **Kim Jackson,** Co-Founder

- **Carl Volz, External General Counsel,** SingularDTV LLC

- **Amrita Rizal, Head of Compliance,** SingularDTV Gmbh

- **Simon Waelti, Head of Legal,** SingularDTV Gmbh

**Agenda:**

1. Introductions

    - Attendance list

    - Approval of minutes of the last BoD meeting

2. Follow up and Pending items from last meeting

    - Banking Relationship / Reverse KYC / token assessment

    - Token assessment – future path and roadmap for SingularDTV GmbH

    - Wallet management and Treasury team

    - Japan TGE

    - SingularX

    - Corporate Structure / Corporate Governance

3. Finances

4. Project Updates

    A.    Film Projects

    B.    Rentalist

    C.    Reg A and Tokit as a CF platform Offering for US

5. Schedule future board meetings

1. **Introductions**

Arie opens the floor and gives an overview. It is important to preserve the heart and soul of SingularDTV. Our Intention is to find the four pillars to keep the company going. Ready to follow the step laid on the agenda.

Approval of minutes of the last BoD meeting

Simon: Any comments from the Board? The minutes of the last BoD meeting are hereby approved.

2. **Pending items from last meeting**

Banking Relationship / Reverse KYC / token assessment - future path and roadmap for SingularDTV GmbH

Arie gives updates on banking relationship, token assessment etc from last minutes. Arie was mandated to do a full reverse KYC and CS came back saying that they will close us.

Arie: Identified what are the challenges, tactical ways, half a dozen banks. Created a chartflow on a daily basis to satisfy or cure the challenges of financial institutions. That lead us to the conclusion whether to approach FINMA or not. Engaged with local counsels and BR and Carl to become compliant in Switzerland. SingularDTV GmbH needs to be compliant under Swiss law, all threats are interconnected. Fix the compliance issues will also lead in a broader picture to a higher level of corporate conduct and other matters that need to be fixed to become a fully compliant company in Switzerland. This will be required to be able to present ourselves in the US, e.g. a collaboration with Bittrex, RegA process, etc.

We need to implement a new governance and corporate structure to be more prudent and compliant.

Clara joins.

Simon: as you know, Bank Credit Suisse AG (CS) told us that blockchain companies are assessed as high risk relationships and thus the management has decided not to onboard any new clients from the blockchain sphere – and every existing relationship with a blockchain company had to undergo a profound scrutiny. The result in our case is that CS no longer wishes to maintain our banking relationship – because no KYC/AML control was conducted in the course of the TGE, nor at a later stage (we lack any respective documentation). In principle, KYC documentation of the initial token holders is required. To acquire a comprehensive KYC for current token would involve a swap. But this would only provide us info of the current token holders and not of the initial token holders. Approached WalderWyss (WW) and MME, to independent law firms in Switzerland. WW assessment has been summarized and circulated. MME legal memo is not finalized yet. Both however say the SNGLS are not a payment token and hence no AML documentation is legally needed. Banks said legal memo will be helpful, but an assessment from FINMA will be better (because this will be an independent assessment by the local regulator). WW advised this as well. If FINMA says we don't need KYC then it's the best for us.

Zach: What functionality will FINMA allow us to have for SNGLS?

Simon: FINMA identifies 3 token classes: Payment, utility and asset token. SNGLS are most likely not to be assessed as a payment token, but rather a hybrid between a utility and mainly an asset token. AML documentation and controls are only required for payment tokens. If FINMA says SNGLS qualify as asset and/or utility token and thus do not required any KYC, the banks will be likely not push back and still ask for AML documentation.

Zach: No AML/KYC documentation required for asset and utility tokens?

Simon: Not required. If FINMA would return with this assessment for SNGLS, then there never has been a requirement to do an AML or KYC control and documentation under Swiss law. Most ICOs at the time did the same (or rather neither did any KYC/AML controls) and are facing the same problems. It is however still likely that banks may ask for some level of KYC documentation – this we might have to negotiate with them, which will be easier with the FINMA assessment in our hand.

Zach: Revenue function?

Simon: That is possible, but very clearly would trigger the asset token characteristics and hence makes SNGLS a security. It has to be made clear though: if FINMA says SNGLS are an asset token and we start spreading this assessment and will live by it, most decentralized exchanges no longer can list us, we would have to seek for centralized exchanges. This is one of the consequences.

Joe: no worries about trading since we will be able to list the security tokens, but we can list it on other exchanges.

Arie: if we are coming to US we are coming to be a security. We may as well be a security here and in Switzerland.

Kim: Carl?

Carl: Based on token functionality SEC will conclude that we are a security.

Zach: So to clean up our mess to be able to present us in the US we first need to get to clean up our Swiss set-up and formally become a security?

Kim: we want to come to the US; why do we need this extra-exercise in Switzerland?

Carl: If we are not complying under Swiss regulations and laws then SEC will also not like it. I am not saying there has been any breach of any law in Switzerland. But this is a pressing issue, to heal banking relationships in Switzerland, which will also help in the US, also with regards to the banking relationships in the US.

Kim: Joe any comments?

Zach: Everyone agrees that we need to present SNGLS as securities in Switzerland.

Kim: Joe, have you seen this in any of your other companies?

Joe is not aware that anyone of his colleagues is trying to become a security because his companies never issued security and/or are not even present in Switzerland.

Kim: Neither did we. Last time we agreed to get SNGLS in the US as security in Reg A.

Zach: Carl said if we want to be in US then Swiss house needs to be cleaned up first.

Carl: We may not have violated Swiss law, just want a designation from FINMA about the qualification of SNGLS in Switzerland. This will also help with banking situation.

Zach: We all agree this is the route we go.

Kim: Make sure that all the documents need to be vetted.

Arie: Risks are there. Imprisonment and steep fines.

Simon: Risks are there when we are approaching FINMA – but if FINMA initiates an inquiry itself, then that is more riskier and the fines and further punishments will probably be harder. FINMA furthermore will appreciate us proactively approaching them and signaling that we want to be compliant and find a solution that is admissible under Swiss law.

Carl: WW recommends the FINMA approach strongly.

Kim: makes logical sense, I agree

Zach: Agree

Joe: Agree

Kim: If there are issues around how we are structuring GmbH with regards to its governance structure when approaching FINMA, then we are not in agreement.

Arie: Corporate Restructuring is not required for FINMA.

Simon: The assessment from FINMA might even be helpful for Reg A – and the restructuring of the company will be more important with regards to an SEC approach.

Kim: We have to be able to operate in Hollywood. All the other products are not important. We need to be in the USA.

Arie: We started these discussions last October. But it was put back over and over again. We are now working on getting ready. However, I do not want to transfer the whole company to the US.

Simon: As said before, the assessment by FINMA – the official security assessment –will have an impact on the token price of SNLGS in exchanges.

Arie: We can be on exchanges that can list us. Lykke is on talks for listing SNGLS.

Joe: Don't worry about the negative effects of this qualification. While decentralized exchanges at least at the moment will no longer be able to list us, we can approach several new exchanges that allow security tokens to be listed.

Simon: Also, market makers disowned us as an effect of this.


Wallet Management and Treasury Team


Simon: next is wallet management and treasury team. We must not manage wallet for third parties, this is considered financial intermediation. While this activity would be covered by our SRO membership with VQF, we do lack the respective personnel to offer such services on a professional basis – we might not even be able to properly manage the wallets internally for ourselves at this moment. I understand that Arie is working on establishing a treasury team, is that correct?

Arie has started to build an actual treasury team with experienced people that are capable of managing the wallets, starting with people in the firm (for internal needs, proprietary trading). This could potentially start and lead to a spin-off for third parties (with arbitrage and market making activities). This treasury team has identified all stakeholders, all pitfalls and challenges re cryptographics, key management, back-up systems, definition and terms that are being used, in-depth discussions with Finance and Mutara (external book keepers), figure out balance sheets and flow of funds, plus they will build a wireframe to deal with these challenges – the results will be presented to the board.

Kim: Who are these people?

Arie: two young men. Came recommended.

Kim: have they received proprietary information about the GmbH?

Arie: they are employed by the GmbH, so they see the confidential information of the company.

Kim: I think it is important that the founders are informed about the employment of people in such a difficult and delicate position.

Arie: this was agreed, to create a treasury department.

Joe: depending on what employees are hired, it might require at least an information to the board.

Kim: the fact that Arie is drawing lines is an issue for the company in general.

Arie: agreed, you will receive all information that you ask for. I will be happy to inform you all more if that is required, but I was mandated to build the treasury department.

Joe: Does the organization have different level of classes of decisions?

Amrita: By laws can be used.

Kim: We have always been inclusive. We are one company. It is going to be problematic. Will not vote on any of these decisions.

Zach: Will you like to meet them.

Kim: Are there background checks, we have NDAs.

Arie: That is possible.

Kim: this hire needs more thorough discussions.

Zach: Let us discuss offline.

Arie: Will agree to do background checks on these guys.

Zach: I am interested to see the wireframes.

Arie: Will do both (background checks and wireframes)


Japan TGE


Amrita: we have reached out to a second Japanese law firm (Nagashima Ohno & Tsunematsu, NO&T) that was recommended to us by Brown Rudnick to have the TGE re-assessed by them with regards to regulatory and legal requirements (that should have been in place), respective risks and potential penalties. The legal memo was a bit unclear, we have met them yesterday to get more clarity. Result: SNGLS are deemed as a virtual currency under Japanese law, not only a prepaid payment token. We did however not request a license to issue those virtual currency token, neither did we use an accredited exchange in Japan for the issuance. Both would be required by law before issuing such a token to Japanese buyers.

Recommendation: talk to FSA and claim we are a prepaid payment token and await their assessment, but this will take up to six months according to NO&T. If we wait for another six months, the community will be impatient, plus we have no control what they would do with the tokens if they should receive it. The other option is to refund the investors.

Zach: can you please talk to Aaron and Dan, because they are convinced that everything was done legally compliant. Maybe you can tell and show them that they do not have the full picture, and hear what their assessment is why everything is legally compliant.

Arie: Shreesh was told that everything was taken care of. We only had 12 days to try to figure out what needs to be done.

Amrita: in principle, if we did a refund, the FSA does not have to be involved. If an investor should take civil action, FSA might come after us.

Zach: I might have to apologize personally.

Amrita: another way: we might get in contact with another exchange that would then approve our tokens with a swap.

Simon: also, keep in mind that the main goal of the FSA is to protect the investors, so if we do refund them, it is very likely that the FSA will not see any reason to go after the issuer (since there will be no damage for the investors). And – so far, there was only a private sale with 46 investors, which is still very manageable.

Arie: I think I would feel best if we just refund the investors.

Joe: Why did we sell different tokens in Japan? Can't we just use our SNGLS tokens there as well?

Zach: this idea was based on the mega production strategy, Japan being one of the regions that we wanted to focus on. We heard that Netflix strategy with approaching the local market with their "common" strategy and exposure (built up in the US) was not successful and not appreciated in Japan. Raise money in these regions with the goal to create content for that specific region. If this was a success, we would do it in other regions. But the success here clearly was not given.

All agree to refund Japan investors. Only 46 investors.

Zach: Japan is a hot economy and industry and we will pursue this. 90% of local films are being done out of one company, but maybe we shall just use our money raised in our TGE. I guess I thought we thought we were too clever to do this in a separate TGE, but obviously it was not executed very cleverly.

Joe: Was a proper KYC/AML control done in the course of this TGE?

Amrita: yes, we do have all KYC information, sanction list checks, etc.

SingularX

Amrita: Simon had circulated the WW assessment to the all participants of this meeting. Also: approach FINMA for a assessment and non-action letter. As long as no auto-trading, auto-market making is executed on the platform, but making it decentralized by making it peer-to-peer, we should be good (i.e. no license requirements). No securities dealer license is required based on the assessment by WW, but FINMA shall confirm this.

Arie: inside SingularX, it is a clear interaction between two individuals/peers. The moment we make this process automatic, SingularX will require a license. There is a Q1 release that explores that possibility. If this should happen, we no longer have that cover of no license requirement for the app we share with another party, without having any agreement with that other party in written. There is no understanding of the future pathway for SingularX, so we need to be compliant and aware of the consequences of any changes. We need to understand the set-up with Centrality more clearly.

Amrita. FINMA might need to figure out how to treat SingularX, since there is no precedent and practice for such a construct. But WW does not see any license requirement.

Arie: we have to be aware that this needs to be clearly structured for the way to the US as well, SEC will only be interested in the exchange, they will not care about the film & entertainment.

For SingularX, we need to figure out how to treat SingularX together with Centrality, we need it documented before we may approach FINMA. Centrality must also be informed about a possible FINMA approach.

Zach: they do what they want, so let's see how they will react.

Arie: the exchange SingularX is a *component* of the SingularDTV economy, not THE economy.

Amrita: next step will be initiating conversation with Aaron/Centrality.

Zach: I will text them both re SINGJ and SingularX and have discussions with them.

Carl: Next steps is talk to Aaron about this. Zach will initiate the discussions with Aaron. Formalize the set up. And take it from there.


Corporate structure / Corporate Governance


Simon: The presented corporate structure/org chart is not a solid set in stone plan. It is fair to say, we are running behind to clean up the house because we are not doing things right from the beginning. That is why, from a legal and compliance, but also a finance point of view, we do need to have proper corporate structure and governance in place with clear reporting lines, where the aforementioned departments will be involved and considered ab initio. We need to set up allocation of powers, beginning with a stronger, bigger and more independent (thus more critical) Board that can oversee, collective signatory power, etc. The 4 silos that we have drafted in the corporate structure chart can have proper allocation of power.

Zack: I for example do not want to be in charge of tokenomics. Shreesh and G are and should be leading this.

Arie: I would like to achieve to get back to where we start in the first place, so everyone can do what they love to do, where their passion is. I for example would be finance head, with a proper structure. I want for us to have freedom, to create for us to be what we were supposed to be and do. Kim, you do not trust me, I do trust you, but I have no clue about what happens in the LLC.

I am now only a *business* partner, and I was not able and allowed to act out my "powers". Example: LLC was meant to be a production company for token holders and GmbH, but is has behaved like the main office.

Kim: but you should have been informed, you have created a team that should be informed and involved.

Arie: the current set up is unsustainable. We do not talk, we do not trust each other. So let's divide and conquer.

Joe: sounds like everybody wants to go forward in a healthier way. Why don't anyone make a list with their expectation?

Arie: The trust is broken.

Kim: Arie, even a simple questions on the business plan upset you.

Joe: Make a list of what you want to see from each other.

Arie: I would like to preserve everyone's dream, but maybe not as involved in everything all the time.

Kim: for me, trusting you with money and finance is tough right now. We have to do counselling to get back on the trust.

Arie: I want to preserve divisions, I will not to move back to the US. Finance, Legal, Compliance, treasury etc. shall stay in Switzerland with the GmbH.

Zach: Need to sit down and put thoughts to papers. How the corporate organization should look like and how the board should look like.

Carl: Tax consequences have to be considered when we draft a new structure. I would recommend for Kim not to become a director right now – after all the pending issues and risks are settled, then she should position herself again.


It is agreed that all the founders shall put down their expectations and thoughts in the company and the project so it is possible to start create a better corporate structure.


3. <u>Finances</u>

Arie: we are engaging an auditor, unfortunately we have to take responsibility for a number of unaccounted transactions. The board members will have to represent these transactions to the auditors, without knowing what they were about. Iwona will provide a list with all these transactions that are unaccounted for.

Joe: What are these funds about?

Zach: what is the estimation of the number of transactions and amount of numbers?

Arie: Iwona will send out a comprehensive overview.

Joe: how and why is this happening? Because LLC and GmbH were not communicating?

Arie: Because Biz dev took up projects without involving GmbH.

Zach: Will take a relook and try to get information for the writeoffs.

Arie: Having a full set of financial information is going to close the book.

Joe: Are the missing transactions from Ether accounts or Bank accounts?

Arie: All unaccounted transactions are made from crypto, the fiat accounts are under tigh control.

Joe: Did we lose any wallets?

Zach: no

Arie: there is no business rationale visible behind the transactions.

Joe: is it from wallets where public keys have been lost?

Arie: this as well is unclear to me. Usually, it is X number of ETH from or to an unknown party.

Joe: any way we can search for these addresses? Do we have e-mail addresses?

Arie: most of the payments were via the multi-sig wallet, we do not know who the other parties are, Zach does not know who they are either.

Zach: A lot of conversation is on Slack and we don't pay for Slack.

Joe: why don't we call the Slack or Beta company, say we pay them for the info and see what infos we receive from there re the opposite party of the transactions?

Arie: in principle, there is no reason to have ever an undocumented transaction on the blockchain, so let's hope to find the information.

Arie: Signification number of transactions still not documented. And we may not have all information about it. Greater need for corporate governance and finance controls.

4. Project Updates

Film projects

Kim: No new updates re our film projects, they are on track. But: re sexual harassment, we want to implement a zero tolerance policy within the next couple of weeks. Budgets are being created until 2020, including all content that should be put on the platform.

Entertainment team is asked how we can settle the payment structure on the Ethervision platform; this discussion includes legal and compliance, what can we say and offer. What is separating us from all the other platforms like Hulu and Netflix, what special incentive is being offered? This is something we need to figure out a roadmap for this so we know when we can communicate our solutions. Bringing out the roadmap to legal and compliance what our platform will be. Hired a SVP of brand marketing that will create a clear marketing roadmap of our products. That external language to the multiple audiences we have is important. Carrie is that person.

Rentalist

Carl: I just received the offer document last night, could not review it yet. The audit came out clean, was completed end of last week. The offer will not be submitted for presumably another week. Carl will forward the document to this whole group.

RegA license / Tokit CF Platform

Clara: the RegA process would involve three steps: 1) Application, corporate record, financial statement, etc, this can take up to 3 weeks 2) Offering circular draft, another 3-4 weeks 3) Assessment from SEC, the timeline cannot be assessed.

CF platform: SEC and FINRA controls. It can be registered with SEC, but will be forwarded to FINRA who then will give the license. All efforts in the US are in essence one, the disclosure level is always more or less the same. FINRA must respond within 60 days.

If platform shall be set up, talk to SEC. In general, this requires a banking relationship. However, this might be different since everything will be embedded on the blockchain.

Artist tokens on Tokit as CF platform: every artist would then have to fill out a form C, which acts like a prospectus. Transfer restrictions for the tokens for one year is one of the consequences. Normally, with CF platforms, the platforms leave the participants to have their own legal assessment. In SingularDTV's case, it is intended to help artists. It might be possible to use a standard document for all artists.

Focusing on Bittrex. Bittrex treats some tokens differently. So there is a possibility.

Simon: This might create conflicts, as we will then be offering advice

Carl: if we do it for them, this augments our liability. If we leave it to them, it will not be as attractive for the artists, because it is too burdensome.

Arie: I also want to say that in my opinion, Shreesh Tiwari is not a proper CSO for this company.


<u>Iwona's List</u>


The e-mail is being well received.

Arie: Joe, you have requested a list to line out what would be required for her to stay in the company. There shall be a path for her to step down for a new head CFO, she could work for that CFO as head of treasury.


**MEETING AJOURNED**



**AGENDA** /Minutes

For the

**5th Board of Directors Meeting**

**of**

**SingularDTV**

Held on Wednesday, 12 December, 2018

10:00 am – 1:30 pm ET

At the offices of SingularDTV, 40 Fulton Street, 5th Floor, New York, NY 10038

Invitees:

- Arie Levy-Cohen, Director, Chairman, represented by Joseph Lubin
- Zach LeBeau, Director
- Joseph Lubin, Director
- Matt Corva, legal counsel of ConsenSys
- Kim Jackson, co-founder, President of Entertainment, COO of SingularDTV
- Carl Volz, US Counsel of SingularDTV
- Martin Trepp, CFO of SingularDTV
- Simon Wälti, Head Legal Counsel of SingularDTV
- Shreesh Tiwari, CSO, Head Business Development/Business Strategy
- Victoria Maksheeva (via Zoom), Dep. Head Compliance of SingularDTV
- Veronica Molina, VP Operations and Human Ressources of SingularDTV

1. **Introductions**

   - Attendance list                                                    Arie

Simon: all attendees are present and/or properly represented, Arie has submitted a POA with which he appoints Joseph Lubin as his lawful representative.

   - Approval of minutes of the last BoD meeting                        Simon

No remarks or corrections are being made – minutes of last meeting are approved.

2. **Pending items**

   - Compliance Report (status quo/updates)                            Simon

Simon: reverse KYC has been initiated, Gatecoin reverse KYC is finalized, still collecting KYC information from other big investors to be better documented. Not only banks, but also other market participants are asking for as much documentation as possible. This also shows the company is properly set up.

   - SRO Membership                                                     Simon

Simon: update about VQF; audit was in October, audit meeting in November. VQF is very strict, did not like that the KYC information on the users has not been done properly and completely in the past (namely source of wealth and source of funds). We could find a solution with VQF to complete this documentation (lack): since the majority (more than 90%) of the users only invested a couple of hundred francs, we can solve this by reaching out to the users and state that we would assess the invested funds origin from savings, and if not, that they shall be reaching out to us within 30 days. That way, the users are not forced to be active unless they want this information to be corrected.

   - Finma                                                              Simon

Simon: FINMA Update; non action letter was sent out in August, still pending, we have not yet received any feedback. Update of SNGLS token will have an impact, see SNGLS update 1.0 – 3.0.

- Corporate Structure / Corporate Governance

  - Legal structure today vs. legal structure in the future, appoint and contract resident director                                    Simon

  - Transition plan GmbH to US public entity; assessment/ presentation of findings from phase 1 (fact finding of legal/tax assessment re transition)                                       Carl

  - Reg S / RegA+                                                                 Carl

Carl: there is no way to leave all Swiss operations completely. What will be the role of each entity will need to be assessed, including the service agreement, that presumably needs an update to some extent. Lack of information and transparency was an issue, as well as privacy issues that we do face with the current setup.

What will be a better structure for the future then? Should we update the service agreement, or should the parent organization purchase the LLC, which then would become a wholly-owned daughter company. The respective tax analysis hasn't done yet.

Regarding RegS or RegA+: RegA+ is not a valid option right now, but RegS may be a valid option in the course of the SNGLS token update that we shall discuss in a bit. With the updated tokens, we could offer some tokens being held by the company.

Joe:  would that be a new offer?

Carl: not really, we would offer tokens we currently hold right now. With RegS we would be regulated, and in the cue to be accepted and onboarded for and by all ATS. We would be quasi-approved by SEC.

Slide Corporate Structure

Martin: Codex Holdings GmbH is still with Arie as director, as well as SingularDTV AG (LIE), I would suggest to replace Arie as director.

Joe: I have nothing to add, am sure that Arie would like to be replaced.

Martin: so we can proceed with this.

On the other hand, we have BlockKeeper GmbH and PayCheck Software GmbH, which I do not think we should have to keep.

Joe: does Blockhaus still exist?

Zach: it is a bit of a mess. Plug was initiated by Arie with an entity called Qadre (with Nick W. as principal), Centrality (with Aaron as principal) and SingularDTV GmbH (Arie as principal). The deal, where SDTV spent around CHF 200'000.00, was that the three entities would create a PLUG partnership. Arie then had a falling out with both Nick and Aaron. The result of this was that Centrality, with the help of Blockhaus, initiated the ICO for Plug, raising around USD 60 million. The BoD of this PLUG entity consisted of Nick, Aaron and Zach. The 60 million would be mostly the liability of Centrality and Blockhaus, so Centrality would doll out the payments to Qadre. SDTV was basically supplying the seed money (CHF 200'000) and assessing what plug is all about.

Joe: so what is the purpose of plug?

Zach: creating meta-verse of chain. Nick and Qadre seemingly hijacked the project. What is happening right now, is Centrality buying out Qadre for USD 15 million. So now, SDTV has basically zero interest in plug. What we are trying to find is a buyer for SDTV's shares of the respective GmbH. Centrality is interested, but I also have other interested buyers.

Joe: so Blockhaus ran the ICO? We only need to cover what regards to SDTV.

Zach: Blockhaus was a mixture of Arie and Centrality.

Simon: but Arie owns Blockhaus AG in Switzerland, he owns nothing in Blockhaus NZ.

Zach: I do not know the exact setup currently.

Veronica: Blockkeeper and Paycheck were created for these endeavors.

Simon: these entities were created based on MoU and JV, but nothing was ever allocated (e.g. IP or the likes) to these entities. They are empty.

Zach: Carl, can you talk to Centrality and assess?

Carl: yes.

Shreesh: technology wise, not much progress has happened so far.

Carl: we can investigate, Simon and I, and prepare an update for next BoD meeting.

Martin: so the last question would be re SDTV GmbH, where Arie is currently the resident director, he wishes to step down.

Joe: I think we can assume that. Arie has not interest in pursuing any work there.

Martin: so we can pursue with finding a new local director.

Simon: resident director needs to be appointed then by the general assembly.

- Banking Relationship / Reverse KYC

  - Closing of Credit Suisse AG account                    Simon/Martin

  - Status update new bank relationship(s)                 Simon/Martin

Martin: we had bigger problems with Credit Suisse. They are offboarding all relationships with crypto companies.

We now have a new relationship with Bank Frick. We also set up a new relationship with Signature Bank in the US for the GmbH. We need to have certain papers signed.

Simon: we might be able to be onboarded by Banca Zarattini after having the FINMA non-action letter. I just want to point out that the fact that we do have the bank account with Bank Frick really was the work and endeavor of Patrik Allenspach, and nobody else.

- Token assessment – future path and roadmap for SingularDTV GmbH

  - SNGLS 1.0 – 3.0                                        Zach/Carl

  - SNGLS: the 400 million founders tokens                 Carl

Zach: SNGLS token do have now a large utility function. With the update/BRKR token, we can add the revenue push function, we could list them then on ATS. SNGLS can be kept, can be traded. But with BRKR, we do have new functionalities.

Joe: just one SNGLS token for one BRKR token per trade?

Zach: yes.

Carl: what Zach describes is a redemption. The SEC might have an issue with an unlimited redemption period, but this would probably our initial approach. But people will probably want the BRKR tokens, and we can do a KYC review on the update from SNGLS to BRKR.

Zach: Carl mentioned a 60% chance that this would go through.

Carl: we are exploring both technological as well as the technical issues. This might be including a RegD with the "upgraded" treasury/project/founders tokens. The assessment and the readiness to do this will take presumably six months. If we can use Matt's and Joe's connections with SEC to see if this approach is doable.

Joe: if authorities agree with this, it seems very reasonable.

Zach: there is 400 million founders tokens. My original idea was to put 100 million into treasury. The remaining 300 could be kept by the GmbH or be allocated to the founders. I would take 100 million of my SNGLS and put them into treasury.

Carl: you might recall, Joe, what was discussed in the past. Simon and Amrita have raised the issue in the past, these tokens presumably act as treasury tokens already. The fact that the terms "all revenue" may be deemed as revenue model for the company, since all revenue of the company shall be allocated to the tokens.

Joe: so is the whitepaper very difficult and confusing? I am planning to assign my tokens to ConsenSys.

Carl: there is ambiguity right now, but with the upgrade, the approach towards the SEC, we might be able to clarify this.

Simon: also, let's be clear: so far we have not seen any respective (legal) document that would prove any other use of these tokens than to keep them in the GmbH as revenue source of the GmbH. We know there have been talks to treat them like founders tokens, but no statement, no public document confirms this assessment – and the other token holders might thus not agree to the approach of treating them like entitlements of the founders.

Joe: so let's absorb more information and see if this is a feasible option.

Zach: if we can create that we are the last intermediary; what are we really special for? We would essentially just be another channel; why would we need any additional revenue, so then we could shift from net to gross again. That way, with the use of having respective fees implemented, we should be able to be operable.

Simon: if GmbH does a token update (and it should be the GmbH, since SNLGS have been allocated to it), FINMA should be informed beforehand, so they could give any feedback, if necessary and required. It has be done through the GmbH, since that entity holds all SNGLS and endeavors of the company, so the LLC cannot do the update.

Matt: you could pursue with CH approach, and simultaneously approach SEC. But SEC will most likely not respond within 3-6 months. There is political pressure raising, as SEC is forcing business to change jurisdiction.

- SingularX/CodexArb                                                      Carl/Simon

Carl: I have raised the issue re etherdelta with Joe and Matt. My inclination is that we are closer to a similar assessment like etherdelta as we wish to be. I can tell you from a legal side, that my initial view as an SEC lawyer, we should drop it as fast as possible and not promote it anymore.

Zach: initial intent was to facilitate all users of tokit to have a platform, but let's have them used other platforms. SDTV not even owns the source code, all is now with Centrality. I also do not see how it fits with Breaker.

Carl: okay, so going forward, we will make sure to liquidate the "share" in this endeavor and get rid of it.

- High risk transactions on Tokit (without KYC): follow up                Simon

Simon: Update re the fact that people purchased directly via blockchain, without using tokit and KYC interface. Crypto-savvy people are capable of circumventing the tokit interface and purchase tokens directly. That way, the KYC interface embedded in tokit does not have to be filled out by these purchasers. What this means currently is that compliance has to review each successful campaign and check whether all token buyers have been properly KYC'ed/documented.

Zach: there are some, with large transactions. Joe and I talked about this, I have looked at this with Milad and he is trying to find a solution. I have some clues as to who the purchasers are.

Matt: just think if we want to do that – the more you know, the more you have to do and review.

Zach: we do have about five contacts that we want to approach. Also, there is a Tokit 2.0 discussion, where we presumably can include a better control.

Carl: I will follow up on the size of the transactions not properly documented because of this loop-hole. It could increase the liability, but we have to investigate.

Joe: if there is nothing we can do about the historical transactions, what can we do?

Simon: hiding it is the worst idea, for sure. The authority must know about this, you have to be transparent.

Zach: tokit's number one purpose is rights and management gateway, the TGEs now are rather misleading.


- Project Updates/Film projects                                    Kim

Kim presents slides about all projects.

Kim: DDP platform, will be called Breaker. Breaker will be replace SingularDTV. See separate presentation.

Joe: IPFS, Infura could be used in the future. They are not yet where we would need them, but it may still make sense to have them tracked and potentially used in the future. It will probably take 3-5 years, but it will be the future, I think.

Zach: the talk is also to have a mobile app at some time in Q3 2019.

Kim: the discussion was always, how should we approach the platform to begin with? We would like to create a place where a more meaningful interaction between artist and user is happening, without having anything offered that the user is not interested in.

Kim gives additional update re the current film projects SDTV is involved

Zach: special remarks re San Pedro (the fourth promise of SDTV's TGE), which is budgeted rather with a large budget of USD 24-30 million, so we will need external help to have this financed and produced as well.

Kim: we will presumably need external help for a lot of the projects, e.g. for airplane screening, etc. In that regard, we should have a ticketing application so we can create revenues from sale of tickets for any screening of a film that we are involved. Also, we are in conversations with Telcos who want to provide content worldwide, they are seemingly very much interested in participating in our endeavors.

Zach: this represents the ideal scenario for the production of San Pedro. Another plan would be to take New Frontiers, reshape the respective script and produce this one instead of San Pedro (at least for the moment). New Frontiers would then replace San Pedro, since we have to fulfil the four promises made in the course of our TGE.

Kim: we have ourselves covered with projects for sure until June 2019. But as you all know, we do not know if the technology will work out in the end.

3. **New Items**

  - Promises of the TGE: status update                                    Zach

      - DDP
      - Tokit
      - Film projects (Trust Machine, San Pedro, others?)
      - Production entity (LLC)

Zach: I think we covered a lot already. DDP is coming soon, Tokit is going through an optimization. I like Trust Machine a lot, it has even been shortlisted for the Academy Awards for documentaries. San Pedro we have already covered and discussed.

-   Key Suppliers relationships                                    Zach/Joe

    -   Codex Execution GmbH
    -   Digital Mob
    -   Consensys
    -   Centrality

Zach: Codex Execution is being terminated.

Joe: you are shutting down this relationship and asking for a repay for the loan? I have seen that Arie wrote an e-mail stating to give Herbert some time.

Martin: that is the plan; but the loan has a term until the end of 2020.

Joe: was there a purpose of the loan?

Martin: to build up and run the office.

Joe: I do not know what is going on there. Herbert does a lot of reasonable work, but I do not understand this.

Zach: ConsenSys is developing the DDP. Is there a way to give us a grace period for the payment of the DDP?

Joe: we are much more interested in revenues, so we can discuss payment schedules. I know you are using a lot of resources of ConsenSys.

Zach: there are basically three teams working on the DDP, we do not know how we can use the mobile app. We basically created a team within this team; and we do not know how to use the front end.

Joe: the question is rather, who will carry the costs of the DDP and the conversion of the platform?

Zach: we do not have the resources, ConsenSys does, so we need them.

Simon: also, certain people from Digital MOB are working on this, so we do pay "double the price".

Zach: Centrality – we do have a good relationship with them. I think we should sell and drop all projects we have with them right now.

- Budget planning, ETH conversion plan                                Martin

Martin: let's have a short view at the budget. The budget for 2019 is USD 21 million. We have currently ETH 190'000, which is depending on the rate to convert it, currently not sufficient. We need to have external funding.

Zach: it hurts to see us having to convert 40'000 ETH.

Martin: the question really is where ETH is going in the future.

Joe: I have nothing authorized to say about any crypto currency price developments. There is a lot of activity going on, but we cannot assess if this will benefit the value of ETH. It is also possible that there will remain an overhang, and there will not be enough significant buyers that would create a value appreciation. The correlation of other crypto currencies to bitcoin is mostly 0.8 or higher, so they depend on the value development of bitcoin.

Martin: with the new budget, we need around USD 5 million only for the first quarter. We cannot guarantee that the value will be risen or stay at the same value, so we need to ascertain.

Joe: are there projects that we can stop and not pay any money for the time being?

Kim: we do have contracts that state if we do not have any scripts, we do not pay. We are at the situation right now.

Joe: how much is budgeted for films?

Kim: currently, we are talking about marketing, etc. So we do not have additional spends on films.

Joe: why did spend so much money on film projects, if we are trying to create a decentralized (film) distribution channel?

Kim: we also did spend money on other projects, and we do have to have some proprietary content to explore the platform.

Joe: sounds reasonable if we did have a lot of money.

Zach: so Joe, do you want to convert the ETH right now?

Joe: you run things, what do you want to do, convert right now?

Zach: it seems like a secure and reasonable approach to safeguard the operations right now.

Joe: that is a very conservative and fair assessment.

Martin: we need USD 21 million to get through 2019, without starting new endeavors.

Joe: why do you need marketing in the near future? I know you do want to do a rebranding initiative for the whole company, but still…?

Zach: we do have internal people working on that, their budget has been reduced dramatically.

Joe: investors?

Matt: you might want to do the Reg D part before doing the upgrade on the tokens?

Joe: do you have industry friends who could help you financially? You should have these discussions right now.

Kim: we are using Trust Machine on traditional channels.

Joe: how much will that bring in?

Kim: not enough, and will probably only start end of Q1/beginning of Q2 2019.

Joe: you need a lot of runway, a lot of help. DDP will not bring revenues in the near future.

Shreesh: with mobile app revenues should be coming in 2020.

Joe: like what?

Shreesh: we have numbers that should result in revenues in 2020.

Joe: well, Zach, you are a good sales person. We all thought you have a big war chest, I would suggest to approach people in the industry who believe in this. Do you have an investor deck?

Kim: we are working on that. There are a few global companies, who might be interested.

Joe: I think you need to sell the 40'000 ETH to ensure a certain degree of survival. Matt?

Matt: the objective of the company is to fulfill the promise, not to speculate on crypto. The main priority is to sustain the business, not to speculate on cryptos. By continuing speculation, you could run into a situation that will be much more dire.

Joe: hopefully we will kick us about it because ETH will go up.

Matt: also, there are a lot of hedge service companies, which could potentially be approached at a later stage. But this is expensive, and may be dangerous as well.

Martin: let's push the 40'000 ETH to Bank Frick and convert it there. In Switzerland, the appreciation while converting in Switzerland with Frick is low, it would be unwise to convert it on the LLC level.

Joe: another point though is that this procedure may be discussed by other entities, this would influence the ETH price.

Martin: I would still get all the ETH to Frick, and then convert it in 2-3 tranches. The market rate of Frick is better than Cumberland, but there is an additional exchange rate.

Matt: a lot of people might be selling before the year end to avoid tax losses, so the window is rather short if you want to do it now.

- Audit for 2018 (limited audit not possible anymore)                Martin

Martin: the auditors are reviewing if the limited audit is still permissible or if a full audit will be required for 2018.

-    Financial Controls / Serenity Strategy                   Zach

Martin: We are implementing an approval process for all expenditures.

-    Salaries/benefits/expenses of executives 2017 approval     Simon

Joe: should the company pay your rent?

Kim/Zach: not in that amount. The company did not pay the rent in 2017. Arie's rent was paid in 2017, because he moved to Switzerland.

Simon: we had the discussion in the past, it was my understanding that the company did in fact (and still does) pay for your apartment. If you say this is not true, then let's have this corrected. If it is true, how should we proceed with this?

Joe: if Arie's rent was paid in 2017 with this narrative, I guess this makes sense. With Kim and Zach, I would prefer this not to be paid by the company. Also: a car should not be paid by the company.

Repaiment chart for founders:

Zach: USD 80'000.00 is the car in Puerto Rico, I do not see where the amount in my name is coming from (CHF 49'440.18).

Joe: can you present Arie with an invoice? 30 days to pay seems reasonable for this amount. You should probably do it in parallel for all three outstanding dues of all founders.

Kim: I repay monthly now.

Kim/Zach: we would like to see the breakdown of my costs.

Joe: it certainly looks better if we use the same narrative for all three founders and their outstanding dues.

-    Rebranding                                    Zach

Has already been discussed before.

4.  **Financial Closing 2017**

    -   Audited financials 2017                                         Martin

    -   Board Resolutions re undocumented transactions         Martin

    -   Board Resolutions re transactions above CHF 1 million   Martin

Joe: I am ready to sign this resolution, and am ready to sign it.

5.  **Project (unrelated to TGE promises)**

    -   Ariadne
    -   Plug
    -   Paycheck
    -   Blockkeeper

Martin: Ariadne – contract put in place in Switzerland by Arie; the contract is not in our favor, but we are trying to get out of it.

Joe: they are seeking investment. Willi Brammertz is a very respected visionary accountant. I do not know what he was supposed to do with SDTV; Willi suggested that we invest in a new company; my concerns are that they are doing the same the existing company does, but just on the blockchain. I need to better understand what they are doing, what the potential benefit could be.

If there is information, I would like to look into that as well.

6.  **Schedule future board meetings**

    -   February 2019
    -   June 2019
    -   September 2019
    -   December 2019

Joe will send a note to Margaret so she will reach out to the rest of the group with date suggestions.

**MEETING AJOURNED**

New York, 12 December 2018

CEO
Zach LeBeau

Secretary
Simon Waelti

**Minutes**

**Of the**

**Shareholders' General Assembly**

**of**

**SingularDTV**

Held on Thursday, 2 May 2019

12:00 pm – 12:15 pm ET

At the offices of SingularDTV, 40 Fulton Street, 5th Floor, New York, NY 10038

Invitees:

- --      Arie Levy-Cohen, Director, Chairman, represented by Joseph Lubin

- --      Joseph Lubin, Director

- --      Zach LeBeau, Director

- --      Carl Volz, US Counsel of SingularDTV

- --      Martin Trepp, CFO of SingularDTV

1. **Introductions**

Chief Executive Officer of SingularDTV GmbH opens the meeting.  He appoints Carl Volz as Secretary, teller and head of the meeting.

The head of the meeting notes that 86% of the capital of the company of CHF 20,000 is represented in this meeting.  Furthermore, the head notes that Arie Levy-Cohen, who owns 14% of the company's shares, is rightfully represented by Joseph Lubin.  All owners and representatives of any shares have given their consent to hold this shareholders meeting.

The shareholders assembly has a quorum for all decisions according both to the law and the Articles of Association, as well as the bylaws of the company.

2. **Agenda Items**

    --      Approval of annual report of the Board of Directors

The CEO presents the annual report.  The report is approved by the shareholders.

    --      Approval of annual financial statements

The annual financial statements have been distributed to the shareholders together with the invitation to this meeting.  The shareholders take note of the audited financial statements dated from 17 April 2019, and approve the audited financial statements.

    --      Decision regarding the use of the net profit of the Company

The shareholders vote to carry forward the net profits and to keep said net profits within the Company.

    --      Discharge of the Board of Directors

The shareholders assembly unilaterally grants discharge to all members of the Board of the Company for the business years 2018

    --      Election of the auditors

The shareholders assembly hereby re-elects the Company's auditors, KBT Treuhand AG Zug, Neuhofstrasse 5A, 6340 Baar, for another one-year tenure.

No further items were discussed and the General Assembly was adjourned

New York, 2 May 2019

Signed:

_____
Zach LeBeau
CEO

_____
Carl Volz
Secretary



**MINUTES**

of the

**2nd Board Meeting 2018**

**of**

**SingularDTV GmbH**

held on Saturday, 9 June, 2018

4.30pm – 6.30pm

at the offices of SingularDTV GmbH, Gartenstrasse 6, 6300 Zug, Switzerland (the "company")

---

**Present:**        - Arie Levy-Cohen, Board Member / Chair (ALC)
- Zachary LeBeau, CEO / Board Member (ZL), via video call
- Joseph Lubin, Board Member (JL), via video call
- Kim Jackson, President of Entertainment (on invitation) (KJ) , via video call
- Iwona Poplieluch, CFO (on invitation) (IP)
- Simon Waelti, Head of Legal (on invitation) (SW)
- Amrita Rizal, Head of Compliance (on invitation) (AR)
- Carl Volz, External legal counsel (on invitation) (CV), via call
- Clara Krivoy, External Legal counsel (on invitation) (CK), via call

**Mr. Arie Levy-Cohen** opens the Meeting and takes the Chair. **Carl Volz** presents the meeting and **Amrita Rizal** and **Simon Waelti** take the minutes.

I.   **Attendance and Review of Agenda**

The Chairman noted that at least 50% of Board Members were present, and therefore, as required by the By-laws, a quorum was in attendance and the Board was empowered to proceed with the meeting.

It was further noted that a meeting notice had been circulated, together with the Agenda, and he reviewed the meeting agenda for the Board. The Board approved the Agenda. The Minutes of Second Board meeting was also circulated and the Board confirmed to have received them.

II.     **Agenda**

1.  Introductions                                                    ZL, ALC

2.  Pending items from last meeting                                  ZL, ALC

3.  Update on Financial Group                                        ALC

4.  Risks                                                            CV, CK

5.  Project Updates

      A.      Corporate governance/Financial Controls          CV

      B.      Corporate restructuring                          ALC, ZL, CV

      C.      Film Projects                                    KJ

      D.      Rentalist                                        ZL

      E.      Reg A Offering                                   VL, CV

6.  Schedule future board meetings                                   CV

III.    **Discussions and Resolutions**

**1.     Pending items from last meeting**

-   Kim and Iwona on Board were proposed to the Board, the Board agrees to address the motions in the next Shareholders' meeting;
-   Treasury department implementation: The Board voted 'yes' to set up a Treasury department under the CFO in the offices of the company.

**2.     Update on Financial Group**

- Arie and Iwona updated the Board that the closing of books is being done for year end 2017 and the Board will be updated on the financials when the books are successfully closed.

## 3.     Risks

**Banking risks**

- Clara provides the US perspective – one area that requires a strategy is communication. A company is as weak as its weakest link. Weakest link for blockchain in the US is Public communication. To remedy this, Clara recommends that the company must be careful in how it communicates and that as a company, it needs to assess the promises that were made and try and fulfil them and refrain from making new promises.

- Clara further suggests that Compliance needs to be assessed for each department and company separately, SingularX, Rentalist, etc. Clara and Carl will work together to make the assessment for the company. Further – financial aspects need to be properly assessed and addressed.

- Carl recommends that the Corporate Governance and Financial Controls need to be improved for the whole company, also with regard to a broader regulatory oversight. Idea is to address the pending issues and lay out a broader strategy – but not address all details, but work on them based on the agreed strategy and agenda.

- Arie lists out the Banking risks. He explains there are bilateral issues with banks. One has to do with banking regarding traditional services as a company with a bank. He confirms that we are the sole ICO/blockchain company still onboarded with Credit Suisse AG. However, identification/documentation of source of funds and source of wealth are pending issues. The company does not have a proper KYC and AML documentation on token holders, thus the company cannot offer proper provenance on the token holders/investors. The company is only allowed to transact in a very restricted manner. There is a need to deep-dive into all regulatory matters regarding KCY/AML on all token holders, what the company can and must do to be compliant.

Arie also discusses exchanges, where tokens are listed. He points out that market makers reach out and ask for the qualification on SNGLS tokens: are they a security or not? SNGLS 2.0 story has been presented to Binance and law firm in Hong Kong. A potential direction has been presented, so SNGLS can stay on Binance. On the other hand, the company is discussing to become a security token. To be compliant with the US regulation and Bittrex, SNGLS need to become a security token. As a consequence, the company could then only list the SNGLS on exchanges that allow market activity for a regulated token security.

It is understood that without banking, the company will not be able to operate.

- Carl confirms that the KYC is a process that should happen immediately. It is comparably easy to implement these measures very quickly and have appropriate KYC and AML processes.

- Joseph asks if it will be a post facto KYC process?

- Arie answers this has been discussed in the past and requests Amrita and Clara to pitch in.

- Amrita suggests that the idea is to do a reverse KYC on the token holders that have purchased token in the value of CHF 5000 (the Swiss AML threshold) or more, probably including an AML check as well. The banks require this.

- Joseph asks if this needs to be done for everyone?

- Amrita answers that we have proposed to do on all buyers CHF/USD 5'000 or more, but it is possible that the banks will ask on a control on all purchasers. There are about 117 token holders as per Iwona's report in the initial purchase above that threshold.

- Joseph asks if these tokens have ever moved? This needs to be checked. The drastic consequence might be to create a token as a security and then make a transition from the initial tokens to the new security tokens.

- Amrita answers that this has been proposed by a law firm in Switzerland as well, by doing a swap. But right now, the company is about to lose the only remaining relationship with a bank in Switzerland.

- Joseph recommends to include the tokens holders in this discussion, have them participate. Let them vote on this, agree to the transition.

- Amrita informs that technically, the token holders have no voting right.

- Zach pitches in and confirms that it is about the narrative to the community.

- Carl says it might be a solution. However, we need to be compliant first

- Clara says it is important to see what has been communicated to the token holders in the past, to avoid any lawsuits from a disappointed token holder.

- Joseph suggests that the initial raise was 7.5 million ETH. You could simply offer a refund in USD equivalent in ETH to all token holders who do not want to participate in this swap.

- Arie informs that the SEC was not sure if the value appreciation would have to be considered or not. From a business perspective, it was a clean swap. But regulatorily, this is not clear at the moment.

- Carl informs that initially, it is a pending issue with the bank, going forward it is more with SEC and government in general.

More important – is to clean the own house before going to the market with such a proposal.

-Clara provides perspective:  SEC protects the investors. Their review and assessment will be based on the premise – what will be the expectation, and also the appreciation will be considered.

-Joseph asks if there was any disclaimer or geotracking, especially with regards to (US) investors.

-Zach states there was

This however needs to be assessed. Legal and Compliance do not think there was any disclaimer, and the investors did not have to tick anything before making the investment/token launch.

-Joseph points out that SingularDTV ICO happened very early, sophistication was not very high at that moment.

-Carl says the restrictions have become more vigorous. At the time what was required was done. But we are at a different stage now. We do however have immediate issue of KYC, and the larger issue where to go with SNGLS

- Arie confirms the decision will have impact on business, liquidity, consequences to the value of the tokens, the perception in the market, for community building, we need to be sensitive to the timing and how we are going to do this. The narrative the company is telling to the market place will be crucial, if and how to do KYC AML.

-Joseph asks what's your perspectives in the market?

-Zach answers that we have conducted measures to re-engage with the community, there has been disengagement. Not regulatory, but our amplifiers and social media people burned out from engaging with the impatient community who wanted to know everything. It is difficult to give them exactly what they want. Things look positive at the moment.

-Arie says we do see a lot of positive feedback from the community, but there is still nagging, always the same questions from the same people, some have a significant amount. They are raising noise and awareness. They want transparent accounting, revenues, million dollars that Zach promised, the want movies, etc. We might have to take this moment to change with warp speed, but we need to be on the same page. The community still loves the dream, but they are critical.

-Kim confirms that in the considerably short period of time that we are operative, our projects develop very well, the community simply keeps asking for more and more.

-Arie points out to agree to go forward with the banking issues, that relate to the film projects, to token, to moving forward, etc, there is problem between moving forward and mitigating and managing the present risks at present.

-Joseph says three things were promised, a documentary, a series and management distribution system. If you refocus the narrative on documentary and series and explicitly

indicate to deliver a whole lot of more by saying there will be more moving forward, be open on the ongoing dialogue

-Kim says we are updating people on all current projects. But we can work on the narrative more.

-Carl says that if you loop it in to a larger narrative - -where does the company go – the overall process is necessary, e.g. the KYC AML process, to potentially dampen some of the community concerns. Instead of having more communication about individual projects, maybe have a more broader communication, and have internally all mechanical aspects covered to bring the projects out.

-Zach says that the team is in place to continue the narrative, we just need to strategy to go forward.

-Carl recommends that there is an immediate need to engage with the bank to respond to them – a board vote is required to do what is necessary to satisfy with the banks. A vote to Arie to go forward to do whatever is necessary in regards to KYC AML issues and if the Board has a motion?

-Zach says he would like to propose that motion:

*Arie Levy-Cohen shall be mandated to conduct and execute all necessary measures to revise and resolve all issues with the banks, namely to be in compliance with their AML and KYC requirements.*

-The motion is passed to authorize Arie and personnel he sees fit to conduct KYC AML controls necessary to first effectuate banking relationships and second put processes in place for eventual offering of securities to US investors.

-Arie says that he is accepting this engagement, I will include all co-founders.

### 5. Project Updates

### A. Corporate Governance

- Carl talks about the regulatory issues – a process needs to be implemented, internal investigation of all representations to regulators and token holders performed, get an image what has been promised, what has been fulfilled and what not. Maybe go back to regulators and correct statements, make public announcements, clearer determination of what needs to be done to "settle" the representations. Example: Japan.

- Joseph asks if Carl can give more specifics about Japan?

- Amrita informs that when project was launched, it was during a very short period, where regulatory and tax issues had to be figured out. No proper assessment was done beforehand. The tokens sold are pre-functional, might even be a CIS; FSA requires to pre-approve every

ICO before launching. There was no proper assessment done and we have collected a good amount of money as well.

- Simon also points out about the bare trust structure. The company still does not know how to transfer the money from NZ to Japan.

- Zach says SingularJapan should have never been launched. If the questions are so large, we can give all the Ether back to the investors. It was his understanding that it had all been settled and figured out. Zach thinks we need to investigate these concerns more to know if we should backtrack or not.

- Carl suggests that this is why we think we need more investigation for such projects. Zach's suggestion might be feasible, it might also maybe not be necessary. Clara and Carl will review the projects and then find a solution for all projects done.

That is why we need a better corporate structure, so all necessary department should be included and involved and can give in their thoughts before a decision is taken, so the board can then take the strategic decisions.

Idea: overall compliance plan for each jurisdiction, present to the board, already including process, also indicating where more needs to be done. We need to get this house in order before going to the US, the SEC, and present ourselves.

- Arie says we will have to face some discussions in exchanges with the exchanges and explain them where SNGLS are and should go. Grandfathering is no longer a possibility.

- Zach says SNGLS token may also be non-functional, and create a new securities token.

- Joseph says we cannot say if there is anything absolutely pending, but Japan seems to have been done in a rush, it does not appear as cleanly made as it should have been. But having now a clear assessment of all things done is very much welcomed. The option of refunding Ether to investors might help us to deploy getting us into a better position. You can make apologies, you can deliver of at least two of three promises, so the story is pretty decent.

- Kim says we did on purpose not raise too much money with the company's ICO, because we did not want to be arrogant about anything. We want to be able to offer an entertainment platform – this should be possible in the United States. Let's figure out where the risks and crevices are and address these pendings.

- Joseph asks Iwona that she has resigned. Is this still the current situation, or can this be healed?

- Iwona says she needs to think about it.

- Joseph asks if she can you put together a list with requirements that would allow her to continue in her role?

- Iwona confirms as Yes

- Kim says she would welcome to address this in a separate call. She would welcome that conversation.

- Carl says what is also lacking is the there has never been a proper budget presented and approved. There is no proof for any misspending, but this obviously lacks of a clean structure.

- Kim says more transparency is requested, the LLC is very open, but nothing from the company has been presented. We need to agree on a spend before any activity is being taken.

- Arie says the biggest challenge in this has been the books, that could not yet be closed. We are working with a service provider, we are making great processes, but still, we are facing much obstacles here. The company has a service agreement with LLC, LLC can take advantage from cost plus model, the overall flow of funds is not clearly governed and settled yet.

- Zach says we have always been going in the right direction, but were facing many obstacles over the course of last year. Board votes yes for implementing of budget.

- Kim says she would like to see and have monthly cost reports implemented.

- Zach proposes to have Kim Jackson on the board as a board member.

- Arie confirms this needs to be done in a separate meeting, shareholders assembly.

**B. Corporate Restructuring**

- On a separate topic, Board asks how will all what we have decided impact the communication?

- Kim says the process now is every communication is pre-approved by Amrita. We should continue that process.

- Carl says that for the near future, no new entities should be incorporated. Every new endeavor should first be discussed with Amrita, Simon, Clara and Carl, to be aligned with the overall strategy. For the short-term it would be very helpful not to have any additional engagement with any new incorporation without running through the legal and compliance team, but having Clara and Carl included as well.

- Arie says that the proposal has been presented, it may be amended, but this is the core idea. All four founders can elevate their core activity, without being hindered by the other three.

- Carl says the draft is interesting, but might need more in depth development, before being presented to the board.

**C. Film Projects**

- Kim presents the current Time Machine developments, to be promoted in New York in October, LA in November. Educational/University after that, and on the platform later on.

Happy worker – David Lynch as executive producer. Michael Keaton on the cast, shooting happening in fall.

Animated feature film – Back From The Dead Red, female pirate. Screenplay is being circulated, production is being started. Red as a new character might be very interesting for marketing purposes as well.

Writers Room coming together, four writers together with Zach. It is very early, we are starting a writers room right now.

- Zach says also bringing on board two producers. Executing it has been very complicated so far. Putting the right team together has been very difficult.

- Kim talks about Perfect – executively produced by Steven Soderbergh, it will be on platform next spring

Prospect, also on platform next spring.

New Frontiers, sci-fi based story, production has been taken over by us after initially having planned to have another company having it produced for us.

Lots of other smaller indie films in smaller stages.

Also actively looking for libraries for the platform, approaching different companies and studios. Interesting, because with regards to this, we do not want to be exclusive.

**D. Reg A offering**

- Carl says RegA offering has been discussed very broadly, so this does not need to take place here. RegA is very new, there are still a lot of unknowns. We are trying to keep the deadlines on schedule, but we are trying to make sure that everything with Rentalist will not have a negative impact on the company itself. At this point everything looks good and clean, and we should soon get the offering documentation for our review.

- Zach says, also based on the outcome of the Rentalist Reg A process, we are looking to get Tokit as a crowdfunding platform.

The Rentalist project however is more imminent and interesting.

**E. Rentalist**

- Zach says Rentalist is a peer-to-peer entertainment material service/renting company. Based in New York. It could be an interesting testing field for a RegA registration.

- Iwona confirms, currently the company owns 50% of Rentalist, after the last payment, the remaining 20% for the company (SingularDTV GmbH) should be transferred.

- Arie says it was negotiated to arrive at 70-30%, based on milestones. We made two payments and are now at 50%, upon the RegA registration, it will be 70% in the company's books.

**Miscelleneous**

- Joseph asks if the status of initial wallets is healthy?

- Zach confirms it is still the same. Actual hardware of interface have been destroyed for security issues, we felt more comfortable to destroy the hardware interface. When we need to access again, we can do so.

**6. Schedule for future board meetings**

- Carl says such meetings make much sense, his suggestion is to always have more than usually required. For the time now, monthly meetings would make a lot of sense. As things stabilize, quarterly meetings can be implemented.

Also, an in person meeting in Switzerland should take place.

All in favour of monthly meetings.

- The Board confirms in affirmative.

Meeting is adjourned.

Zug, 9 June 2018

Chair:                                    Minutes:


_____          _____
Arie Levy-Cohen                          Amrita Rizal and Simon Waelti