LC1sSINc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SINGULARDTV GMBH,

                    Plaintiff,

            v.                          21 Civ. 10130 (VEC)

ZACHARY LEBEAU and KIMBERLY JACKSON,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        December 1, 2021
                                        2:30 p.m.

Before:

                    HON. VALERIE E. CAPRONI,

                                        District Judge

                         APPEARANCES

KOBRE & KIM LLP
      Attorney for Plaintiff
BY:   BENJAMIN JEFFREY AARON SAUTER

NEIL LEON POSTRYGACZ
      Attorney for Defendants

LC1sSINc

```
 1            (Case called)

 2            THE DEPUTY CLERK:  Counsel, please state your

 3   appearance for the record.

 4            MR. SAUTER:  Benjamin Sauter for the plaintiff,

 5   SingularDTV GmbH.  I'm a partner at the firm Kobre & Kim.

 6            THE COURT:  Good afternoon, Mr. Sauter.

 7            MR. POSTRYGACZ:  Good afternoon, your Honor.

 8            Neil Postrygacz on behalf of the defendants,

 9   Zach LeBeau and Kimberly Jackson.  Good afternoon, your Honor.

10            THE COURT:  Please be seated.  My courtroom has been

11   cleared, so you don't have to wear a mask when you're talking.

12            All right.  Mr. Sauter, this is your motion, so you

13   get the floor.

14            MR. SAUTER:  Thank you.

15            Your Honor, first of all, let me express my

16   appreciation, my client's appreciation, for the court's

17   willingness to hear this motion on short notice.

18            As described in our papers, we are here because

19   SingularDTV GmbH, Swiss entity, is asking the court to issue a

20   preliminary injunction, a temporary restraining order.  In the

21   interim, to preserve a return and return company property,

22   including, in particular, about $50 million worth of a

23   cryptocurrency called Ethereum, and company e-mails that are

24   in the exclusive possession or control of the defendants, we

25   believe, Mr. Lebeau and his common law wife, as I understand
```

LC1sSINc

1    it, Kimberly Jackson.

2           The background of how these assets in question came

3    into Mr. LeBeau's and Ms. Jackson's possession is described in

4    our paper.  I wasn't planning to spend my time today going

5    through the entire history of the company.  I will say that

6    based on the declaration and the evidence that we submitted, I

7    think it remains, your Honor, undisputed that currently today,

8    there is not a dispute that the $50 million worth of Ethereum

9    belong to the GmbH company.  I also don't think there is a

10   dispute that Mr. LeBeau is in exclusive possession of those

11   assets, as well as in at least control of the e-mails.

12           THE COURT:  So I read the affidavit or declaration

13   that Mr. Postrygacz submitted to say that, in fact, one of the

14   premises of your case, which is that this is a singular key

15   Cold Wallet, is not accurate.

16           MR. SAUTER:  The way I read his declaration,

17   your Honor, is that at one time it was multi-signature.

18   Technically, that may or may not still be true.  Maybe there is

19   a fact issue there.  But, regardless, I think his declaration

20   is clear that Mr. LeBeau possesses a master key, as he calls

21   it, that would allow LeBeau sole unilateral access to spend

22   those assets.

23           THE COURT:  I read it that way as well, that whatever

24   the escape key is, he's got.

25           MR. SAUTER:  That was my understanding, your Honor.

LC1sSINc

```
 1              I can say there is a statement in that declaration
 2     that it is only set aside in case the other keys are lost.
 3     That is not consistent with my understanding.  My understanding
 4     is last May, and this is the subject of another --
 5              THE COURT:  May of '21?
 6              MR. SAUTER:  May of 2021, correct.
 7              THE COURT:  This May, OK.
 8              MR. SAUTER:  As your Honor's aware, there is a
 9     separate case, it's SingularDTV against John Doe, that has to
10     do with a hack.
11              THE COURT:  Correct.
12              MR. SAUTER:  Shortly before that hack, there was
13     another transfer of 599 Ethereum from the ColdStar's wallet.
14     The circumstances of that are described in the motion to
15     intervene we just submitted in that case.
16              Your Honor, I apologize, they are not in these papers,
17     but we do describe the circumstances of what we are about to
18     say in those papers, and we have a declaration.
19              Our understanding is that 599 Ethereum, worth about
20     $2 million at the time, were transferred out of the Cold
21     Wallet, not reported to the company.  When I say "the company,"
22     I mean the GmbH.  They saw it on the block chain after it was
23     transferred and asked Mr. LeBeau about it.  And what we
24     understand is those funds went to a company called Writer's
25     Block, which we also believe -- and, again, this is laid out in
```

LC1sSINc

1    my declaration in that other case.

2         THE COURT:  So the coins went to where?

3         MR. SAUTER:  To a company called Writer's Block, which

4    we believe is also owned and controlled, or at least controlled

5    by Mr. LeBeau, or potentially Ms. Jackson.  That is based on a

6    few circumstances.

7         One is statements made to the GmbH company around that

8    time stating that Writer's Block was set up to work for

9    breaker, which is the entity that Ms. Jackson owned.

10         THE COURT:  I'm sorry.  You trailed off there.

11         MR. SAUTER:  Breaker is the U.S. entity that we'll

12    probably talk about today that Ms. Jackson owns.

13         So our statements that Writer's Block was set up to

14    perform services for Breaker.  The address, when it was

15    registered, Writer's Block, is the same address where Breaker

16    is registered, and corporate filings have been filed for

17    Writer's Block by an employee of Breaker.  So there are a lot

18    of these circumstances.

19         My point, your Honor, is just that this wallet has

20    been used unilaterally by Mr. LeBeau, it appears, in the not

21    too distant future.

22         THE COURT:  That was the point.  Got it.

23         MR. SAUTER:  OK.  What I would like to jump to, your

24    Honor, is a case we cited to in our papers.  It's called Global

25    Switching.  I would like to spend a few minutes of the court's

LC1sSINc

1    time just explaining why I think it's an important case for

2    current purposes.

3              It's factually, I think, analogous, and it also deals

4    with some of the same circumstances that I submit warrant a

5    temporary restraining order and eventually a preliminary

6    injunction in this case.  So if you'll bear with me, I'll just

7    recite for a minute the facts of that case, as I read them.

8              In that case, you had a company called SkyMax that

9    ended up being 50 percent owned by two shareholders.  One was

10   an individual named Casper, who was also its CEO, and the other

11   50 percent was bought by a company called Global Switching.

12   Casper and Global Switching ended up having a shareholder's

13   dispute like the one that's at issue here.  Global ended up

14   terminating Casper as the CEO.  Subsequent to that, Casper

15   began taking actions on behalf of the company, began

16   interfering with customer relationships.

17             THE COURT:  I'm sorry.  Casper did or Global did?

18             MR. SAUTER:  Casper did.  Casper.

19             He began instructing other people that were doing

20   business with the company to do business only with him, and I

21   think most significantly, began transferring assets.  These

22   were bank assets, not crypto assets.  But they were assets that

23   used to be in an account that could be controlled by both

24   signatories, both account holders, and he transferred them

25   unilaterally to a bank account that only he controlled.

LC1sSINc

1          The court issued a preliminary injunction on that case

2     on a few different grounds, or had a few different reasons for

3     granting the preliminary injunction, but at the core of all of

4     them was this unilateral user patient of the company by the

5     former CEO.  I think that on its own it is important for this

6     case, your Honor, because it does show that interfering with

7     corporate business opportunities, dissipating corporate assets,

8     can be a basis for the irreparable harm finding that we're

9     asking the court to make here.

10          In addition, I think another important part of this

11    case is there were other ancillary proceedings between the

12    shareholders.  There was an arbitration filed to deal with some

13    of the breach of fiduciary duty claims that were going on

14    between the two shareholders, just like we have here, too.  I

15    will address the derivative case in time, but it's a different

16    issue, your Honor.

17          I think this is a very important response to the

18    submission that opposing counsel has put in.  there are claims

19    between the shareholders.  There are personal claims for

20    damages.  That is what's happening in this New York State

21    derivative case.  We are not asking the court to intervene with

22    that, interfere on that case.  There are claims for damages

23    between the shareholders.  What we're trying to achieve here is

24    a recognition that this property is company property.

25          Your Honor, I want the record to be clear.  I don't

LC1sSINc

represent Joe Lubin.  I don't represent Arie Cohen.  I've been

retained by the company to represent the company and to try to

bring its assets back to the company.

          Just to conclude that section, I submit that many of

the same factors that justify the preliminary injunction in

Global Exchange are present here as well.  Now, the legal

standard for granting the Global Exchange was a preliminary

injunction case, or at least the decision was for a preliminary

injunction.  The legal standard is the same, your Honor, for

preliminary injunction and TROs.  I think on its own it

supports the reason we're here today is the TRO.  But I

actually think there are other reasons that warrant, in

particular, a temporary restraining order, and that is what

I will turn to right now.

          The first is, I submit, LeBeau's demonstrated

willingness to take action purportedly on behalf of the

company, notwithstanding there is a dispute about Mr. LeBeau's

role and Ms. Jackson's role within that company now.  There is

a way to resolve that dispute, but the way he has resolved it

is, I think, akin to self-help.  He's filed litigation on

behalf of the company without telling the company.  He's filed

criminal complaints on behalf of shareholders without telling

the company.  He's transferred assets without telling the

company.  This is all after he knew that the board had removed

him as CEO.  Now, he doesn't have to agree with that process,

LC1sSINc

1    but I think it is the case, your Honor, that he can't engage in

2    self-help and take company assets, which is what is happening

3    here.

4            Second, LeBeau has demonstrated an unwillingness to

5    share information about the e-mail accounts or the assets with

6    the company.  And, frankly, with me on confer calls.  So we

7    still, despite meet and conferring, don't know who has access

8    to the e-mails that contain CFO e-mail accounts, company

9    financials, core confidential company trade secrets that the

10   company no longer has access to and that LeBeau is withholding

11   for some reason that hasn't been explained to us yet.

12           THE COURT:  When you say "withholding," can your

13   people no longer get into their e-mail accounts?

14           MR. SAUTER:  That's correct, your Honor.  My people

15   cannot get into their e-mail accounts.  They can't access

16   historical e-mail accounts, can't send e-mails from their

17   accounts.  This is disrupting their banking and government

18   relationships, for example, and also impeding their activities.

19   They don't know if people are sending them e-mails.  And

20   furthermore, it's creating uncertainty for counter parties.

21   They don't know that SingularDTV is not receiving their

22   e-mails.  Bad enough on its own, somebody -- we don't know who

23   or how or why -- is accessing these e-mails on behalf of

24   LeBeau, as we understand it.  So the unwillingness to share

25   information with the company, I think, also weighs in favor of

LC1sSINc

1    preserving the status quo here.

2            Third, your Honor --

3            THE COURT:  Well, you're not really asking for the

4    status quo to be preserved.  You're asking for an affirmative

5    injunction.  You want them to do affirmative things.

6            MR. SAUTER:  Some of both, you're correct, your Honor.

7    It's some of both.  We want the assets to not be dissipated.

8    That is, I think --

9            THE COURT:  That's a status quo.

10           MR. SAUTER:  Correct.

11           We also do want the assets back, but I think in some

12   ways, your Honor --

13           THE COURT:  You want access to the e-mail.  That's

14   going to require them to do something, I presume.

15           MR. SAUTER:  That's correct.  But it will preserve the

16   status quo of the business being able to continue its business.

17   But you're correct.

18           THE COURT:  No.  The status quo according to you is

19   that your company can't get into their e-mail accounts.  You're

20   asking for a change to the status quo.

21           MR. SAUTER:  That's correct, your Honor.

22           THE COURT:  OK.

23           MR. SAUTER:  That's correct.

24           Third, I submit to the court that there is here, I

25   believe, a very real risk that the company's property --

LC1sSINc

1    particularly the assets, but also the e-mails -- aren't safe in

2    their current location under LeBeau's unilateral control.

3            I went through earlier -- I won't repeat it, but I

4    went through the circumstances involving Writer's Block, which

5    I think clearly demonstrates Mr. LeBeau's willingness and

6    ability to transfer assets and not tell the company about it.

7    Same thing with the alleged hack that's the subject of the

8    other case.  Both of those show that funds can leave this

9    wallet and are not secured at this time.  They are

10   cryptographic, which means they can move very, very quickly and

11   be sold and be very difficult to track after that.

12           I think, finally, Mr. LeBeau has been asked several

13   times in the past by the company to just put the assets in a

14   custody arrangement.  That is not the company's preference

15   here, your Honor, because that only solves half the problem, it

16   solves the dissipation problem, but it doesn't solve the

17   problem of the company not having access to those assets.

18           But the fact that LeBeau has not been willing to do

19   that, despite not having an argument they are his assets as

20   opposed to company assets, I submit is a red flag.

21           THE COURT:  There, again, you're not asking, as part

22   of the temporary restraining order, you're not asking that the

23   Cold Wallet be put in the hands of a third-party custodian?

24           MR. SAUTER:  In the alternative, your Honor, our

25   primary request is that they be returned to the company.  They

LC1sSINc

1    could be done with restrictions, but what we ask is that they

2    do be returned to the company, you're correct.

3              In the alternative, your Honor, if the court's not

4    willing to grant that type of affirmative relief --

5              THE COURT:  I'm just saying you never asked for it.

6    That wasn't in your proposed order.  The temporary restraining

7    order asked me to restrain the defendants from taking any steps

8    to dissipate, etc., etc., etc., the digital assets, but you're

9    not seeking that it be turned over.  That appears to be --

10   that's part of the request for the preliminary injunction, but

11   not for the temporary restraining order.

12             MR. SAUTER:  Well, OK.  I understand what you're

13   saying, your Honor.

14             THE COURT:  I'm just clarifying what you're asking

15   for.

16             MR. SAUTER:  I was speaking in reference to our

17   briefing, which seeks the return.

18             THE COURT:  Correct.

19             MR. SAUTER:  You're correct, what we submitted is to

20   preserve the status quo until the preliminary injunction is

21   heard.

22             THE COURT:  OK.

23             MR. SAUTER:  Just a couple exhibits I would draw the

24   court's attention to.  One is Allenspach 10.  This is -- your

25   Honor, these are board minutes at the time that Mr. LeBeau is

LC1sSINc

1  removed as a managing director.  Shareholder minutes.

2  THE COURT:  I thought he was removed in June?

3  MR. SAUTER:  He was removed as a CEO in June.

4  THE COURT:  OK.

5  MR. SAUTER:  He was deprived of his signature

6  authority in June.  He was formally removed as a director by

7  the shareholders in August.

8  THE COURT:  OK.

9  MR. SAUTER:  In advance of that meeting, he submitted

10  to the board a submission that he wanted attached to the

11  minutes.  They were.  They are in this Allenspach 10 exhibit.

12  Towards the end of his submission, there is a letter

13  that he wrote to Mr. Lubin and Mr. Cohen.  Again, I don't

14  represent them, but I do think that this letter is telling as

15  to what his intent is in holding the digital assets.  It's not

16  under color of right, it is to achieve an outcome --

17  THE COURT:  I'm sorry.  Where specifically in the

18  letter are you directing me?

19  MR. SAUTER:  Excuse me.  It is page 13 of 16 of

20  Allenspach 10.

21  THE COURT:  That's where I am.  Where specifically are

22  you reading from?

23  MR. SAUTER:  I come to you with a solution that I hope

24  you will both agree with.  Path one.

25  It's at the bottom of that page.

LC1sSINc

1        THE COURT:  Very bottom.  OK.

2        MR. SAUTER:  So his first proposed path is to litigate

3    for years and dissolve the company.

4        His second proposed path is to basically divide it up

5    between the shareholders, and it's just a horse trade over the

6    amount in the bank account, the amount in the Cold Wallet.

7        I think this is a good place to address an issue that

8    is in opposing counsel's affidavit, about this being a

9    purported attempt to circumvent the case in New York or the

10   case in Switzerland.  It is neither, your Honor.  It is not

11   an attempt to circumvent the case in Switzerland because, in

12   fact, the company thinks these issues should be resolved in

13   Switzerland.  They are governed by Swiss corporate law.  The

14   articles, of course, are governed by Swiss law and, in fact,

15   the New York case asserts violations of Swiss law as causes of

16   action.  So from the company's perspective, these are disputes

17   that should be resolved in Switzerland.  And as I've said, I'm

18   not asking the court to resolve those disputes.  What we are

19   trying to do is safeguard the company's property in the

20   meantime.

21       As to the New York case, the GmbH is not an actual

22   party to that case.  As I've said, that is a shareholder

23   dispute.

24       THE COURT:  It's a derivative action.

25       MR. SAUTER:  Correct.

LC1sSINc

1          The company is on the caption as a nominal party that

2      hasn't been served, your Honor, and it hasn't appeared at this

3      time.  It is, I submit, not an end run around that case, which

4      involves different actual parties.

5          OK.  In terms of the likelihood of success prong of

6      the analysis, I would just draw your court's attention to

7      Mraz 8, Mraz Exhibit 8.

8          THE COURT:  Is that the Swiss declaration?

9          MR. SAUTER:  That is the Swiss lawyer declaration,

10     correct, your Honor.  Well, Mraz is the Swiss lawyer.

11     Exhibit 8 to his declaration is a copy of the pleading that

12     Mr. LeBeau filed in Swiss dissolution proceedings.

13         THE COURT:  Which is these are not his assets?

14         MR. SAUTER:  Correct.  I don't need to go through

15     every one of them.

16         THE COURT:  That's OK.

17         MR. SAUTER:  Finally, for my part, in terms of a bond,

18     I respectfully submit that one is not appropriate in this case

19     because this isn't a scenario where turning company assets back

20     to the company could result in any harm to Mr. LeBeau.  They

21     are company assets.  The only harm being meted out is the

22     company's inability to access its assets and access its e-mail

23     accounts.

24         As I've said, if there are restrictions that would

25     need be to put in place, I would expect that it could be done.

LC1sSINc

```
 1   I don't think a bond is appropriate for the company to get its

 2   assets back.

 3            I'll pause there for a moment, your Honor.  I'm happy

 4   to answer any questions.  I also have a few points I would want

 5   to make on Mr. -- I don't want to mispronounce the name, I'll

 6   say opposing counsel, his declaration.  I'm happy to do that

 7   after.

 8            THE COURT:  Why don't you save that for reply.

 9            MR. SAUTER:  You got it.

10            THE COURT:  Couple of questions.

11            One, relative to the e-mails, what specifically --

12   I'm concerned that your proposed language is vague.  What

13   specifically do you want me to order the defendant to do?

14            MR. SAUTER:  What the company would like is to be

15   restored --

16            THE COURT:  No, that is vague.

17            What specifically?  That's the result.  What do you

18   want me to order them to do?

19            MR. SAUTER:  Direct DAG Tech -- well, let me just

20   pause there for one moment.

21            THE COURT:  Why don't you think about it?

22            MR. SAUTER:  What I think we want is to direct

23   DAG Tech to give administrator access to Patrick Allenspach,

24   who is the company's resident signatory right now, to all --

25            THE COURT:  I'm sorry.  Do you want the defendants to
```

LC1sSINc

1    be directed to direct DAG Tech --

2              MR. SAUTER:  To cause.  Part of our problem is, we

3    don't have visibility, complete visibility into that

4    arrangement.  Even the declaration submitted says "any

5    agreement," it doesn't even say what the agreement is.  So it

6    remains vague how this has been set up.

7              Ultimately, what we want is the defendants to cause

8    administrative access over these accounts to be given to

9    Patrick Allenspach.

10             THE COURT:  Patrick, what's his last name?

11             MR. SAUTER:  Allenspach, A-l-l-e-n-s-p-a-c-h.  That

12   would be sole control of those e-mail accounts.

13             THE COURT:  So you want him to have sole

14   administrative access to all e-mail accounts associated with

15   what?

16             MR. SAUTER:  Used by SingularDTV GmbH employees or

17   contractors.

18             THE COURT:  OK.

19             MR. SAUTER:  Your Honor, because this is something

20   that came up in opposing counsel's declaration, I would want

21   that as well to apply regardless of whether the suffix to the

22   e-mail is SingularDTV or Breaker.  They began as SingularDTV,

23   so employees in Switzerland began with their name at

24   SingularDTV.io.  At some point, for marketing PR purposes, they

25   changed that suffix to Breaker.  There wasn't, as I understand

LC1sSINc

```
1    it, any change in the way those e-mail addresses were used, it

2    was just a shape in the address.

3           So GmbH employees continued using an e-mail address

4    that ended with Breaker, but it was still done for GmbH

5    business.  So I would want the order to apply to those

6    employees regardless of the ending of that e-mail.

7           THE COURT:  All right.  Thank you.

8           MR. SAUTER:  Thank you, your Honor.

9           THE COURT:  OK.  Mr. Postrygacz.

10          MR. POSTRYGACZ:  Yes, your Honor.  Good afternoon,

11   again.

12          THE COURT:  You can remove your mask while you're

13   arguing.

14          MR. POSTRYGACZ:  OK.  Thank you.

15          As the court is aware, it was difficult for us to

16   submit an opposition to the TRO request.

17          THE COURT:  I don't understand that at all.  You

18   called.  You said you needed something from a Swiss lawyer.  My

19   exact response to the person who delivered that message was,

20   It's Switzerland, not the moon.  It's evening in Switzerland by

21   this point.

22          MR. POSTRYGACZ:  Yes.

23          THE COURT:  I don't understand at all what the --

24          MR. POSTRYGACZ:  We had difficulties getting in touch

25   with Swiss counsel and getting a declaration to submit to deal
```

LC1sSINc

1      with the Swiss portion of this case.

2              THE COURT:  OK.  I'm not sure that that is the primary

3      issue.

4              MR. POSTRYGACZ:  I wanted to initially say that.

5              Now, we do know that there was a complaint -- I'll

6      take that back.

7              I want to address some inconsistencies in plaintiff's

8      papers that they then relied on to create this imminent harm,

9      and imminent harm that would require the court to grant the

10     preliminary injunction and, perhaps, a temporary restraining

11     order.

12             THE COURT:  We're just talking about a TRO right now.

13             MR. POSTRYGACZ:  The TRO then.

14             In Mr. Patrick Allenspach's declaration, he states

15     that Ms. Jackson was an independent contractor who was only

16     retained by the company in late 2018.  That's certainly not the

17     case.

18             THE COURT:  Why is that --

19             I read that in your declaration.  I don't understand

20     why that is all that important.  The issue isn't really what

21     her role in the company was.  She's not -- by all indication,

22     she is not a shareholder, so she wasn't in a position to vote

23     on whether they were keeping LeBeau as the CEO or not.  That

24     strikes me as a red herring.  I don't understand why that is

25     important.

LC1sSINc

| | |
|---|---|
| 1 | MR. POSTRYGACZ:  I understand that, your Honor.  The |
| 2 | reason that it's important, it just shows that plaintiffs will |
| 3 | go to whatever ends possible to create facts that just don't |
| 4 | exist and are directly contradicted by their own statements. |
| 5 | THE COURT:  OK.  But focus on the facts that matter. |
| 6 | So is there any dispute -- based on the fairly substantial |
| 7 | documentation the plaintiff has presented, there doesn't seem |
| 8 | to be -- that Mr. LeBeau does not contest that the assets in |
| 9 | the Cold Wallet belong to the company? |
| 10 | MR. POSTRYGACZ:  That is correct, your Honor.  The |
| 11 | status quo -- |
| 12 | THE COURT:  Hang on.  Is there any dispute that |
| 13 | Mr. LeBeau was terminated as CEO in May or June? |
| 14 | MR. POSTRYGACZ:  Yes. |
| 15 | THE COURT:  What's the dispute? |
| 16 | MR. POSTRYGACZ:  The dispute is that Arie Cohen was no |
| 17 | longer a director of SingularDTV, that he resigned, I believe |
| 18 | it was, in 20- -- I think it was 2019 that he resigned.  That |
| 19 | was after he was already replaced as CFO of SingularDTV due to |
| 20 | financial improprieties. |
| 21 | THE COURT:  Why does that matter? |
| 22 | MR. POSTRYGACZ:  Because -- |
| 23 | THE COURT:  Who had the authority to act on behalf the |
| 24 | company? |
| 25 | MR. POSTRYGACZ:  At what point, your Honor? |

LC1sSINc

1          THE COURT:  The point when LeBeau was fired.

2          MR. POSTRYGACZ:  LeBeau and Lubin.  We claim that

3     Lubin doesn't have authority because he was conflicted, and

4     there is all --

5          THE COURT:  No one has authority to act on behalf of

6     the company?

7          MR. POSTRYGACZ:  LeBeau does.

8          THE COURT:  Except they say he was fired.

9          MR. POSTRYGACZ:  Exactly, but they include the

10    director who resigned.  I have the resignation that was part of

11    the record.

12          THE COURT:  So fine.  You put it to the shareholders.

13          MR. POSTRYGACZ:  But it's not a shareholder decision.

14    At that point, it was a director's meeting.  The shareholders'

15    meeting didn't occur until September, in which case --

16          THE COURT:  Your evidence on that is?

17          Because your affidavit seems shy on evidence.

18          MR. POSTRYGACZ:  Yes, your Honor.  Well, again, we

19    were told to put something in.  We had until 11:00 a.m., and

20    what we submitted is -- we did not include exhibits.  I was

21    under the impression when I spoke to the court that we would be

22    able to bring in documentation, if we had it, and that it would

23    be discussed.

24          I certainly do have that with me.  Again, some of the

25    documentation was already exhibits to the plaintiff's

LC1sSINc

| 1 | application, like the resignation of Arie Cohen. |

THE COURT:  OK.  Point that out to me.

MR. POSTRYGACZ:  Sure, your Honor.

It is document 9-10 and page 16 of 16 of that
document.

THE COURT:  Document 9-10?

MR. SAUTER:  Your Honor, if I may, I believe it is the
same Allenspach 10 document we were looking at earlier, if you
flip another page behind.

I'll address it on reply.  I just wanted to point your
Honor to that.

THE COURT:  Thank you.  Allenspach 10.

These are the minutes of the August board meeting
which indicates that Levy-Cohen is a member of the board.

MR. POSTRYGACZ:  I'm talking about page 16 of 16 of
that document, your Honor.  It's not part of the minutes.  It's
a letter addressed SingularDTV GmbH from Arie Cohen dated
February 12, 2019.

THE COURT:  I'm sorry.  Counsel, what does that prove?
That proves he resigned at that point.

What's the evidence that he didn't come back and
wasn't back on the board?

MR. POSTRYGACZ:  There is no minutes.  They haven't
provided any minutes.  There is no evidence --

THE COURT:  But you haven't put that in issue.

LC1sSINc

1          MR. POSTRYGACZ:  I did put that in issue, your Honor.

2     We said that he has no authority, that he's not part of the

3     board.

4          THE COURT:  OK.  So you've given me a declaration for

5     someone who has no firsthand knowledge of anything with not a

6     single exhibit.  They, on the other hand, have provided me all

7     kinds of exhibits, all kinds of declarations of people with

8     personal knowledge of what is going on.

9          MR. POSTRYGACZ:  Your Honor, respectfully, obviously

10     they had ample time or took their time in working on their

11     filing.  We had less than 24 hours to put together our

12     opposition.

13          THE COURT:  You filed a lawsuit on behalf of the

14     company.  You had to know this was coming.

15          MR. POSTRYGACZ:  Your Honor, no.

16          THE COURT:  They had known because they sought -- I'm

17     sorry, you didn't personally -- your clients, your clients

18     retained counsel to bring a lawsuit on behalf of the company.

19          MR. POSTRYGACZ:  Exactly.  And we expected, and I

20     believe they stipulated, that they would respond to that

21     action.  Mr. Lubin consented Mr. Cohen, and in that action --

22          THE COURT:  No, no, no.  Different lawsuit.  Federal

23     lawsuit against John Doe.

24          MR. POSTRYGACZ:  Yes, your Honor.

25          THE COURT:  My point is, your clients have had to have

LC1sSINc

1    known that this was coming.

2                MR. POSTRYGACZ:  No, your Honor.

3                THE COURT:  Did they really think that the company was

4    just going to allow them to bring litigation in the United

5    States at the same time that there is dissolution litigation

6    going on in Switzerland?

7                MR. POSTRYGACZ:  They are the ones that brought the

8    dissolution, and it was --

9                THE COURT:  So what.

10               MR. POSTRYGACZ:  -- and it was for litigation in the

11   U.S., your Honor.

12               THE COURT:  So what.

13               Again, what is the evidence of that?

14               But in any event, so your contention is that LeBeau

15   has a right to the assets because he is still the CEO of the

16   company?

17               MR. POSTRYGACZ:  No, your Honor, that's not what I'm

18   saying.

19               THE COURT:  OK.  So is he still an employee of the

20   company?

21               MR. POSTRYGACZ:  He is still a director and a

22   shareholder and CEO of the company.  Yes, your Honor.

23               THE COURT:  He's still an employee.  You believe that

24   he's still CEO and a director.  No question he's still a

25   shareholder.  You believe he's still CEO and a director of the

LC1sSINc

1   company?

2          MR. POSTRYGACZ:  That's correct, your Honor.

3          THE COURT:  Essentially, I should just ignore the

4   evidence that shows that board meetings were held where he was

5   terminated?

6          MR. POSTRYGACZ:  Your Honor, there is a related action

7   that's referenced, and that is part of the record that makes

8   those board meetings, we're asking --

9          THE COURT:  Are you talking about the New York State

10  case?

11         MR. POSTRYGACZ:  Yes.  In the New York State case --

12         THE COURT:  The derivative --

13         MR. POSTRYGACZ:  -- they are asking for declaratory

14  judgment that the meetings were null and void and that they

15  have no effect on Mr. LeBeau.

16         THE COURT:  OK.  But that's the lawsuit.  That's what

17  you're claiming in that lawsuit.

18         MR. POSTRYGACZ:  Yes.  That's correct, your Honor.

19         THE COURT:  That sort of supposes that those things

20  all happened, and they do have an effect.

21         MR. POSTRYGACZ:  I'm sorry, your Honor?

22         THE COURT:  In any event, that lawsuit, what's

23  happened with that lawsuit?

24         MR. POSTRYGACZ:  Defendants have all retained counsel,

25  and there is a stipulation, I believe, where they are to

LC1sSINc

1    respond in the next week or so, maybe two weeks.

2                THE COURT:  So you don't really know?

3                MR. POSTRYGACZ:  No.

4                THE COURT:  Are who is the counsel on that case?

5                MR. POSTRYGACZ:  Morris Tenenbaum.

6                Your Honor, there is a stipulation where they have

7    agreed to personal service, and there is a time for when they

8    are supposed to respond to the complaint.  I am not sure of the

9    time, the exact date that that response is due, but I believe

10   it's in mid December.

11               One of the causes of action of that litigation is that

12   there is a declaratory judgment requesting declaratory judgment

13   that the resolutions and meetings in question and relied on by

14   plaintiff are null and void due to the numerous reasons and

15   improprieties of Mr. Lubin and Mr. Cohen.

16               I mean, Mr. Cohen wasn't part of the company for two

17   years before the May 21, 2021, meeting.  He was replaced as

18   CEO -- CFO, I'm sorry -- due to financial improprieties and

19   self-dealing.  He then resigned as director of the company in

20   February of 2019, and he only shows up again in May of 2021, to

21   use this hack as an excuse to try and get rid of Mr. LeBeau.

22               They've taken no other actions related to the hack.

23   Their papers state so much.  It's been how many months and they

24   are still investigating.  They didn't bring the John Doe

25   action.  They didn't serve the subpoenas.  They were just

LC1sSINc

| 1 | interested in taking over a company that had four founders from

2 | the beginning.

3 |         THE COURT:  They had three shareholders from the

4 | beginning?

5 |         MR. POSTRYGACZ:  Three shareholders, four founders.

6 | And in Switzerland, founders of companies are afforded extra

7 | rights, is my understanding.

8 |         THE COURT:  OK.  But I'm not sure what all of that

9 | amounts to.  And therefore?

10 |         MR. POSTRYGACZ:  And, therefore, Mr. Cohen did not

11 | have authority to act as a director at the meetings referenced

12 | and relied on by plaintiffs.  The resolutions that come out of

13 | those meetings are null and void.  We have a clear resignation

14 | from Mr. Cohen.

15 |         THE COURT:  But that's from two years ago.

16 |         MR. POSTRYGACZ:  And then he's not part of any --

17 |         THE COURT:  What's your evidence of that?

18 |         MR. POSTRYGACZ:  Your Honor, again, and part of this

19 | was me going to ask your Honor for additional time to submit

20 | this evidence.  I can submit all the minutes.  I was working

21 | diligently on trying to get an opposition filed by 11 o'clock

22 | today, while reviewing all the papers and still trying to

23 | contact Swiss law.

24 |         If your Honor would give me the opportunity, I'll make

25 | sure that all of the minutes that the company has are filed

LC1sSINc

1   today, and any other exhibits that we had to support the

2   allegations in the declaration.  But I will submit that the

3   resignation was part of plaintiff's submission.  They don't

4   deny that he resigned.  And our complaint, that's the related

5   action here, your Honor, with no --

6          THE COURT:  I don't have to take -- you're asking me

7   to take the allegations in your complaint as true.  I'm not

8   litigating -- I don't have the state derivative action before

9   me, so I don't need to do that.

10          What I need to deal with is whether I should restrain

11   the dissipation of assets from the Cold Wallet and send --

12   order you, your clients, to restore the GmbH e-mail accounts so

13   that the Swiss company and its employees can use them.

14          So why don't you shift to talking about the e-mail

15   accounts?

16          MR. POSTRYGACZ:  OK.  With the e-mail account, the

17   e-mail addresses are in the name of Breaker.  They have always

18   been in the control and operation of SingularDTV LLC, the U.S.

19   entity, doing business as Breaker.

20          THE COURT:  Again, the evidence of that is what?

21          MR. POSTRYGACZ:  The e-mail address itself says

22   Breaker.

23          THE COURT:  I have nothing.  I've got a declaration

24   from someone who doesn't have firsthand information.  I've got

25   nothing.

LC1sSINc

```
 1          MR. POSTRYGACZ:  Your Honor, I believe their record
 2     includes e-mails that exhibits --
 3          THE COURT:  But what does that prove, that it was
 4     Breaker at -- it was Breaker.io?
 5          MR. POSTRYGACZ:  That it is not belonging to the GmbH.
 6          THE COURT:  Who says?  Who says that?  What's the
 7     evidence?
 8               You're just saying things and saying "therefore."
 9          MR. POSTRYGACZ:  Your Honor, if I have a company --
10          THE COURT:  Hang on a second.  What the plaintiff has
11     said, and they have submitted affidavits that says our e-mail
12     accounts are no longer able to be accessed by our employees,
13     whether that's because there was, before these people had a
14     divorce, whether there was an arrangement that the American
15     company was going to handle the contract or Microsoft, whatever
16     it was.  It doesn't really -- I don't have any evidence of
17     that.  You certainly didn't give me any evidence of that.
18               So the question is, OK, let's assume that was the
19     deal.  The question is now, your client, an American company,
20     is holding their e-mail accounts hostage.
21          MR. POSTRYGACZ:  My client's company is the company.
22     The Swiss company was set up just for regulatory purposes.
23     That's in the minutes as well.  What happened is --
24          THE COURT:  You are not the company.  You are not
25     representing the company before me.
```

LC1sSINc

1          MR. POSTRYGACZ:  I understand that, your Honor, but I

2     have reviewed the documents.  I've reviewed the record that's

3     been provided to me by my clients, one of which is a director

4     and shareholder of the company.

5          THE COURT:  And a declaration from him might have been

6     useful.  He has firsthand information.  I still don't

7     understand, you're not closing the loop on saying your client

8     is in control of the Swiss company is assuming a fact that is

9     not accepted.  There is a separate entity which is the Swiss

10     company.  It has employees.  It has documents.  They are being

11     held hostage by whoever the U.S. company is.  That's the

12     plaintiff's allegation.

13          MR. POSTRYGACZ:  I understand, your Honor.

14          THE COURT:  Your response to that didn't really engage

15     with that fact other than just to say that they've always been

16     controlled by the American company, right?

17          MR. POSTRYGACZ:  Your Honor, my contention is that the

18     e-mail -- the e-mails in question were controlled by the

19     enterprise, which consisted of the GmbH and the LLC, and that

20     my client had access and authority, and they are the ones who

21     had control.

22          Why is it that they have control of those e-mail

23     addresses?

24          THE COURT:  I have no idea.

25          MR. POSTRYGACZ:  And that's the status quo, your

LC1sSINc

1    Honor.  Again --

2            THE COURT:  That is the status quo.

3            MR. POSTRYGACZ:  And what plaintiff is asking now, in

4    the midst of what we, at least -- even if we don't know the

5    facts, we know there is a shareholder's dispute, a business

6    divorce -- and in the midst of that, we are dealing with these

7    issues, your Honor.

8            THE COURT:  I understand that.  But I still don't

9    understand why, even in the midst of all of that, the Swiss

10   company should not have control and should not be why the

11   American -- why LeBeau and Jackson should not be ordered to

12   take steps to restore the Swiss company to its e-mail accounts.

13           MR. POSTRYGACZ:  But there is a difference there.

14   You're asking for restoration and control.  Those are two

15   different things, having access and control.  Much of the

16   business that, again, the SingularDTV enterprise conducted was

17   out of the New York enterprise.

18           Most of the e-mails are with the New York enterprise

19   and its employees, your Honor.

20           THE COURT:  They are not asking for that.

21           MR. POSTRYGACZ:  They are.  If they are asking for

22   control, then they are asking to be able to cut off the U.S.

23   entity's access to its e-mails.

24           THE COURT:  So what they want is -- you will recall

25   that I spent some time early on asking your opponent exactly

LC1sSINc

1    what he wanted relative to the e-mail, and it was that he

2    wanted administrative access to all e-mail accounts used by

3    GmbH employees or their contractors, not employees of the U.S.

4    company.

5              MR. POSTRYGACZ:  It's the same e-mail.  It's

6    controlled by the same -- it's all under the same

7    administration.

8              So if they --

9              THE COURT:  Why can't it be split?

10             MR. POSTRYGACZ:  Because they are using the Breaker.io

11   e-mail address as well.  So the New York entity uses

12   breaker.io.  The GmbH uses Breaker.io as well.  So giving one

13   access -- giving one control, essentially takes control away

14   from the other and gives them the ability to then limit access

15   to e-mails as well.

16             THE COURT:  What is your understanding of why the

17   Swiss employees do not have access to their e-mail accounts?

18             MR. POSTRYGACZ:  Your Honor, I don't have an answer to

19   that.

20             THE COURT:  What has been done to block their access?

21             MR. POSTRYGACZ:  Again, I'm not sure.  I wasn't

22   involved in that, your Honor.

23             THE COURT:  OK.  So you have no idea of whether then

24   it couldn't be ordered that your client take steps to restore

25   those accounts to their, when did your client --

LC1sSINc

1          Mr. Sauter, when did your clients lose access that

2     their e-mail accounts?

3          MR. SAUTER:  October 8, your Honor, is the date when

4     opposing counsel wrote to Mr. Allenspach, after Mr. Allenspach

5     asked why he couldn't access his or company e-mails anymore,

6     and was told Breaker will no longer be providing service,

7     e-mail services, to you, as you may be aware.  That was the

8     only information we have about this, except we tried to get

9     them turned back on.

10          We got the runaround from DAG, which is the service

11     provider that is apparently engaged, and Microsoft wouldn't

12     talk to us.  So there was a state of the world before October 8

13     where the GmbH had access and control over its e-mails, and

14     when they wanted to add a new CFO, they get on the phone with

15     Breaker.

16          I'm going to spend some time on the relationship with

17     Breaker, but the GmbH was directing that.  They would add an

18     employee.  I need somebody else set up.

19          THE COURT:  Is Breaker a separate company or is

20     Breaker --

21          MR. SAUTER:  It is a separate company, your Honor.

22     The statement my client's company is the company conflates.

23     Breaker is a company owned by Ms. Jackson, that has a

24     contractual relationship to provide services, exclusively, your

25     Honor, to the GmbH.  Breaker is not free to compete with the

LC1sSINc

1   GmbH, to provide services that it provides to the GmbH to

2   anybody else.  It has an exclusive relationship to the GmbH.

3   The GmbH is not so exclusively controlled and can go hire other

4   people if it wants to.  But Breaker is engaged to provide

5   certain services to the GmbH.

6          One of the services that it provided was to set up

7   these e-mails, but those e-mails were GmbH e-mails, whether you

8   put one suffix or the other on it, because Breaker was

9   exclusively providing services to the GmbH.

10          THE COURT:  That is Breaker didn't provide service to

11   anybody else?

12          MR. SAUTER:  Well, they were not supposed to.  They

13   have, and that may be the subject of some other dispute, your

14   Honor, but for current purposes, they were not supposed to.

15          THE COURT:  So, Mr. Postrygacz, why can't they be

16   ordered -- your client cannot be ordered to restore the same

17   level of service that existed on October 1?

18          MR. POSTRYGACZ:  I'm not saying they can't do that,

19   your Honor.

20          THE COURT:  What would be the harm of doing that?

21   What is the harm to your client?

22          MR. POSTRYGACZ:  Your Honor, standing here now, I

23   cannot think of one.

24          THE COURT:  OK.  Then the other issue is freezing the

25   Cold Wallet.

LC1sSINc

1          MR. POSTRYGACZ:  Your Honor, that was --

2          THE COURT:  Doesn't dissipate it.

3          MR. POSTRYGACZ:  Your Honor, that was not part of the

4     TRO.

5          THE COURT:  Yes, it is.  That is part of the TRO.

6          MR. POSTRYGACZ:  Not to dissipate, yes.

7          THE COURT:  Yes.

8          MR. POSTRYGACZ:  I'm sorry, your Honor.  My apologies.

9     My client has no issue -- my clients have no issue with that.

10          THE COURT:  So you're conceded that there is no

11     problem with the TRO, so I should issue the TRO --

12          MR. POSTRYGACZ:  Well, no.

13          THE COURT:  You have just said there is no harm to

14     your client saying they can't dissipate the assets in the Cold

15     Wallet, and there is no problem in ordering your clients to

16     restore e-mail service as it existed on October 1.

17          MR. POSTRYGACZ:  There are two other things, I

18     believe, requested in their TRO, your Honor.

19          THE COURT:  Those were the primary things.

20          What's the thing?

21          MR. POSTRYGACZ:  They cannot hold themselves out as

22     representatives or officers of SingularDTV, the other was that

23     they have no access to the e-mails, I believe, your Honor.

24          THE COURT:  Accessing or causing another person to

25     access the plaintiff's or its employees' e-mails accounts and

LC1sSINc

 1    electronic records.

 2             MR. POSTRYGACZ:  Again, your Honor, the e-mail

 3    accounts are one in the same.  So by --

 4             THE COURT:  Its employees e-mails.  Plaintiffs meaning

 5    the Swiss company's e-mails, not the U.S. company's.

 6             Look, you've clearly each got issues with the e-mail

 7    accounts.  You've got employees, Mr. LeBeau's Breaker.io

 8    account.  We're not talking about that.  We're talking about

 9    the GmbH employee and contractors' e-mails.

10             MR. POSTRYGACZ:  It says e-mail accounts, and my point

11    is that the accounts themselves are the same.

12             THE COURT:  What do you mean?

13             What do you mean by an account?

14             MR. POSTRYGACZ:  So, let's say, I'm not sure, let's

15    say it's run through Microsoft Office 365, the e-mail extension

16    Breaker.io, for example.  But those e-mails that are used by

17    both the GmbH and by the New York entity.

18             THE COURT:  The extension is, but not the individual

19    e-mails aren't.

20             MR. POSTRYGACZ:  But that is e-mail addresses.  We're

21    talking about e-mail accounts.

22             THE COURT:  OK.

23             MR. POSTRYGACZ:  Our position would be that Mr. LeBeau

24    still should have access to GmbH employee accounts based on his

25    position as director and CEO of the company.

LC1sSINc

1          THE COURT:  The problem you've got with that right now

2     is that, based on the evidence before me, the plaintiff has a

3     probability of success on the merits on that point.

4     Ultimately, you may have evidence that undercuts that, but I

5     haven't seen that.

6          MR. POSTRYGACZ:  Your Honor, again, I'm not trying to

7     make excuses, but we were under a very tight deadline.

8          THE COURT:  I know.  This is always the problem with

9     TROs, that's why they are temporary.  The TRO is only good for

10    two weeks.  I can advance it.

11         Do you want to do your preliminary injunction briefing

12    and the hearing faster than that?

13         MR. POSTRYGACZ:  No.

14         THE COURT:  I'm happy to do it faster.

15         MR. POSTRYGACZ:  No, your Honor.

16         As you see, it's a very convoluted and

17    multi-jurisdictional conflict.  What I will say is that, again,

18    there is no harm with them holding themselves out as

19    representatives of the company.

20         THE COURT:  There is huge harm.  You've got a mess of

21    litigation now where we've got a company saying they don't

22    represent us.  You're saying we do represent them.  You've got

23    a litigation in New York Supreme, you've.  Got two separate

24    cases pending in this court now.  There is a case pending in

25    Switzerland.

LC1sSINc

So the notion of having multiple people holding themselves out as representatives of a company is a huge problem.

MR. POSTRYGACZ:  Your Honor --

THE COURT:  Now, you may be right.  It may be that his client -- the people, not the company -- but the humans that it hired, Kobre & Kim, they are the scroungers.  Who knows.  There is scoundreldom written all over this.

But the fact remains that, as of right now, the company has presented all kinds of evidence that your client, Mr. LeBeau, has no right to represent the company.  At the preliminary injunction hearing, you may persuade me that's not right.  But as of right now, ruling on the TRO, the only evidence I have is the substantial evidence that the company put in front of me, which shows that Mr. LeBeau was terminated. He might may well have a shareholders' action.  He might well have an employment action.  But the company terminated, so what he doesn't have is a right to act for the company.

As of right now, at the temporary restraining order level, based on the evidence that I have in front of me --

MR. POSTRYGACZ:  But, your Honor, the issue with that, again, is there is already a scheduled conference in the dissolution hearing in Switzerland tomorrow.

THE COURT:  Fine.  Who knows what will happen there. Maybe that will affect something.

LC1sSINc

MR. POSTRYGACZ:  How he is even allowed to participate if he is not allowed to represent that he's part of the company, right?

THE COURT:  He's a shareholder of the company.  If you want to carve out in the temporary restraining order for him to be able to litigate in the Swiss proceeding of the, whatever it is called, happy to provide that.

MR. POSTRYGACZ:  What about the New York proceeding, the derivative action?

THE COURT:  Nothing is going to happen in the derivative action.  He's not representing the company.  He's representing himself as a shareholder.

MR. POSTRYGACZ:  Derivatively on behalf of the other shareholders.

THE COURT:  But that doesn't require him -- look, he has every right to bring a shareholder action.  That has nothing to do with whether he's an employee or a director of the company.  That's why shareholder actions are brought.

MR. POSTRYGACZ:  Well, they are asking for a declaration that he's still a director of the company.

THE COURT:  Great.  And you all can litigate it at a different time whether this case should be stayed in favor of the New York Supreme Court action.  I have no opinion on that.

MR. POSTRYGACZ:  Your Honor, I don't know if I brought this up.  With all due respect, I don't see how this is even a

LC1sSINc

related case to the John Doe action.

THE COURT:  OK.  That is done.  The case has been assigned to me.  You've got me.

MR. POSTRYGACZ:  I understand, but it's related to the New York action where the issues --

THE COURT:  That's not an option.

Look, here is the way the related case rule works, in case you've never dealt with it in the Southern District, when a new case is filed.  And the lawyer who is filing it says this is related to an existing case.  It's not an option to say, well, it's really related to New York Supreme, so get out of my courthouse.

It is going to be wheeled out to me as a related case or randomly wheeled out to some other judge.  In this particular case, particularly because there was already a dispute in the John Doe action about whether Kobre Kim should become counsel, who is representing the company in that action is a live case.  That is obviously related to this litigation.

Under the related case rules, these two cases are clearly related.  Other than explaining what is meant by access to e-mail accounts --

MR. POSTRYGACZ:  Access to e-mail accounts, if that is granted, then my client will not be able to access their Breaker New York entity e-mail accounts.

THE COURT:  All right.  Mr. Sauter, how do you propose

LC1sSINc

1    that the TRO be worded, given the fact that what it appears

2    right now is that there is a shared e-mail account that is used

3    by both the Swiss company and its employees and the U.S.

4    company and its employees?

5         All right.  I don't need an answer right now.  What

6    I'm going to do is, I'm going to give everybody time to think

7    about how it gets worded.  Because what it seems to me,

8    Mr. Postrygacz, is that they are suffering irreparable harm

9    from the fact that the U.S. entity is not giving them access to

10   their e-mail account.

11        That said, in the balance of harms, I have no desire

12   to cause harm to the U.S. company.  So the question is, how

13   does it get worded so the Swiss company and its employees and

14   contractors get access to their e-mails and their e-mail

15   accounts while U.S. company, its employees and its contractors

16   still have access to theirs?

17        MR. POSTRYGACZ:  Your Honor, may I suggest -- I don't

18   think there are that many people with these e-mail addresses --

19   we can give the names, and then we can also suggest who, you

20   know -- that they don't, for example, the SingularDTV New York

21   side doesn't read or access the GmbH side e-mails, and vice

22   versa.

23        MR. SAUTER:  I was going to suggest that.  I could

24   probably give you some names now for purposes of the temporary

25   restraining order.  But maybe what makes sense is we can just

LC1sSINc

1   submit a list of names for the people who we think we need

2   access to.

3          THE COURT:  You're actually going to need to submit

4   language for what it needs to say.  OK.

5          Then the second is, you don't have any objection, you

6   agree that number three on the proposed temporary restraining

7   order does not cause any harm to your client?

8          MR. POSTRYGACZ:  Let me just review it now.

9          (Pause)

10          No, your Honor.

11          THE COURT:  OK.  And four you object to?

12          MR. POSTRYGACZ:  Yes, your Honor.

13          There is also a situation where there is some business

14   arrangements for film that had been ongoing and continue to go.

15   There is a film that is being distributed, and there is

16   constant communication between the New York -- between

17   SingularDTV LLC and other representatives of the distributor

18   and other parties.

19          THE COURT:  How does that amount to holding yourself

20   out as an officer or representative of the plaintiff, which is

21   SingularDTV GmbH?

22          MR. POSTRYGACZ:  Again, your Honor, the questions

23   regarding the ownership of the actual film assets, whether or

24   not -- whether or not they were owned by the GmbH, but

25   certainly the New York entity had the authority, and actually

LC1sSINc

1     as counsel said, they are exclusive to Singular, the GmbH,

2     produced and created this content, so they were the ones who

3     dealt with anyone.

4          Again, the GmbH only deals with back office issues,

5     accounting, and then there is certain requirements that a Swiss

6     GmbH has to have, as far as a resident, director, Mr. Patrick

7     Allenspach, I believe.

8          So this would interfere with them being able to

9     continue operating in normal course even if, you know, it's

10    later established that the asset was a GmbH asset.

11         MR. SAUTER:  If I may, your Honor?

12         THE COURT:  Yes.

13         MR. SAUTER:  The services agreement that governs the

14    relationship between the GmbH and Breaker provides very clearly

15    that intellectual property generated through GmbH funds by

16    Breaker is GmbH property.  That's actually one of the things

17    that your Honor would see in board minutes that, for example,

18    terminate Kim Jackson as COO.  One the things they ask her to

19    do is turn over that intellectual property.  That may well end

20    up being a dispute.

21         But it is covered, I think, by holding themselves out

22    to be and act on behalf of the GmbH.  Because that agreement,

23    the services agreement has been terminated.  They've been

24    directed to turn over assets, and yet as counsel acknowledges,

25    they are going out and continuing to market GmbH intellectual

LC1sSINc

1    property.

2             It poses, in a lot of ways, the same issues as the

3    assets going out.  It is somebody who is not authorized to

4    control that intellectual property, taking measures to do it.

5             THE COURT:  Let me ask you something.  Why has it

6    taken your client so long to come into court?

7             MR. POSTRYGACZ:  Your Honor, irreparable harm --

8             THE COURT:  Let him answer.

9             MR. SAUTER:  Your Honor, I can go through some dates.

10   I think it may be instructive, because SingularDTV has been

11   trying to work out these issues with Mr. LeBeau for some time

12   and put in place the corporate infrastructure that happens.

13            But Mr. LeBeau was terminated as CEO on May 27.

14   Ms. Jackson was terminated and instructed to perform no

15   additional work and deliver the intellectual property on

16   May 28.  That is Mraz declaration four, Mraz declaration five.

17            THE COURT:  You can sit down.  That's in May.

18            MR. SAUTER:  The whole dispute starts in May, correct?

19            August 26 was the decision in Allenspach 10 to remove

20   Mr. LeBeau as a shareholder.  At that time, the parties --

21            THE COURT:  Not that's a shareholder, as a director.

22            MR. SAUTER:  Excuse me.  Correct.

23            We are still discussing a potential consensual

24   resolution, as your Honor can see in the letter that Mr. LeBeau

25   attached to the board minutes, so that takes through August.

LC1sSINc

```
 1                  September, Mr. LeBeau filed a Swiss proceeding.

 2                  THE COURT:  September what?

 3                  MR. SAUTER:  September 24.

 4                  THE COURT:  LeBeau?

 5                  MR. SAUTER:  Filed the Swiss dissolution proceeding,

 6       so the company was dealing with that.

 7                  September 25, the next day, the New York State

 8       derivative case was filed.

 9                  I will say, there's been an issue, your Honor, with

10       another counsel for SingularDTV, who is not representing them

11       here in this case, and we are, but we weren't retained until

12       they started making problems about SingularDTV's existing

13       counsel.  So we were brought in.

14                  THE COURT:  I'm sorry.  Say that again.

15                  MR. SAUTER:  There was some delay while we were being

16       retained.

17                  THE COURT:  Was the Swiss company previously

18       represented?

19                  MR. SAUTER:  Correct, your Honor.  But Breaker said

20       that they would not deal with that counsel, so we were --

21                  MR. POSTRYGACZ:  That's not correct.

22                  MR. SAUTER:  -- we were brought in to represent

23       SingularDTV, the Swiss company, so that counsel was not

24       handling this case.

25                  THE COURT:  I don't understand.  Your opponent said we
```

LC1sSINc

1    won't deal with the Swiss company's counsel and therefore?

2            MR. SAUTER:  The counsel on the New York derivative

3    case representing --

4            THE COURT:  For the company?

5            Hang on a second.  I will give you an opportunity.

6            MR. POSTRYGACZ:  OK.

7            THE COURT:  Please don't interrupt.

8            MR. POSTRYGACZ:  OK, your Honor.

9            THE COURT:  So the derivative case is filed.  They've

10   already got counsel?

11           MR. SAUTER:  Correct.

12           THE COURT:  OK.

13           MR. SAUTER:  There were discussions, as I understand

14   in the context of that case, and LeBeau has told them that they

15   couldn't represent the company.  The company doesn't agree with

16   that, but --

17           THE COURT:  They said they had a conflict?

18           MR. SAUTER:  That was a suggestion, your Honor,

19   correct.

20           THE COURT:  Well, don't be so coy.

21           MR. SAUTER:  That was the suggestion to them.

22           Kobre & Kim was brought in to represent the company.

23   We got up to speed.  We tried to meet and confer.  The

24   meet-and-confer discussions took a while.  They were

25   rescheduled as we have described in our brief.  Our meet and

LC1sSINc

confer took place -- well, the e-mails, your Honor, were turned

off, as we discussed, October 8.  We met and conferred with

them by early November, and here we are.

So there have been --

I want to add one other data point for your Honor.

Early on, there was proposal -- this was over the summer, I

believe, your Honor, in July -- there was a proposal to put the

assets in a custody arrangement.  So there was a multiple-week

period during that time where a custodian was contacted,

telephone calls were had.  They eventually didn't go anywhere,

but that took us through the summer.

So I say all this, your Honor, to say that this

dispute hasn't been ripe for that long.  The e-mails were

canceled less than two months ago.  Counsel has gotten up to

speed.  There have been attempts to meet and confer and work

things out.  Meanwhile, the company is crippled.  It's not able

to conduct business, your Honor.

THE COURT:  Mr. Postrygacz, what did you want to say

about that?

MR. POSTRYGACZ:  Your Honor, certainly the multi-safe

issue has been ripe for quite some time.

THE COURT:  The what?

MR. POSTRYGACZ:  The multi -- either contained in the

wallet and who has possession, that's been ripe for some time,

because that's been in my client's possession on behalf of the

LC1sSINc

1   company.  So to say that they didn't have an action to bring is

2   not true.

3         Another thing, they keep saying that their company

4   can't operate, the Swiss company can't operate.  In the minutes

5   they've submitted, they've resolved to wind down the company.

6   The company is dissolving.  Essentially, when they terminated

7   that service agreement, they cut off all the operations of the

8   company, the operation of the company which created all the IP,

9   all the software, all the film, anything that the company

10  needed.

11        Again, there is a dissolution.  There is no business

12  of the company, so there really is no harm.  The only business

13  of the company is coming out of the New York entity.

14        THE COURT:  Yes, Mr. Sauter?

15        MR. SAUTER:  There is through a contract to the

16  benefit of the GmbH.  The GmbH holds these assets and monetizes

17  them.  It has intellectual property and can continue to

18  monetize them.  It is not obligated to work through Breaker.

19  Its e-mails were cut off.  Its assets were stopped.  So it's

20  not able, as a practical matter, to continue operating right

21  now.

22        MR. POSTRYGACZ:  Your Honor, they haven't -- they

23  submitted no contract with a separate party.  They say they

24  have the ability, but it's been how long since they were cut

25  off that agreement and, actually, they do so in contravention

LC1sSINc

1    to the promises made to the token holders at the ICEO, that its

2    IP was going to be created, so if they terminated and if they

3    are actually operating to fulfill those promises, you would

4    think that they would contract with another party to continue

5    the creation and not be in breach to those token holders.

6            THE COURT:  They don't have to contract with Breaker

7    U.S.

8            MR. POSTRYGACZ:  Definitely not, but --

9            THE COURT:  And what they are saying is, you're

10   impeding their ability to do anything.

11           MR. POSTRYGACZ:  Well, what happened between May and

12   October when the e-mail was -- when their e-mail access was

13   restricted?

14           THE COURT:  Certainly -- well, then they had their

15   e-mail address.  They had e-mail accounts until October.  They

16   were able to do business, and they were discussing with LeBeau

17   getting back their coins.

18           MR. POSTRYGACZ:  But there was no IP being created,

19   which was the only purpose of the company.

20           THE COURT:  OK.  All right.  Look, that is way beyond

21   the scope of this TRO here.

22           MR. POSTRYGACZ:  I understand.  But, your Honor, there

23   is no harm because the company's winding down as far as the

24   GmbH.  There are no operations.  The only harm would be to in

25   any way restrain my clients and the New York entity, because

LC1sSINc

1    that is where the business is operating from.

2              THE COURT:  But it is their IP, right?

3              Is there a dispute about that, that the intellectual

4    property belongs to the Swiss company?

5              MR. POSTRYGACZ:  There will be a dispute, your Honor.

6              THE COURT:  As of right now, I've got no evidence.

7              MR. POSTRYGACZ:  Not here, your Honor.  Again, in that

8    short time period, we could not address that.

9              THE COURT:  Yes, OK.

10             All right.  Let's take a five-minute break.

11             MR. POSTRYGACZ:  Thank you, your Honor.

12             (Recess)

13             THE COURT:  I'm now ready to rule.  For the following

14   reasons, plaintiff's request for a TRO is granted in part.

15             Plaintiff, SingularDTV, is alleging that two of its

16   former officers have, since being terminated, gone rogue by

17   illegally retaining SingularDTV's property, including digital

18   financial assets and SingularDTV's e-mail accounts and

19   electronic documents.  That's plaintiff memorandum at one and

20   three, docket number 15.  According to plaintiff, on May 27,

21   2021, the board of SingularDTV terminated Zachary LeBeau, the

22   company's then Chief Executive Officer, and terminated its

23   relationship with Kimberly Jackson, LeBeau's common law wife,

24   who worked as an independent contractor for the company as its

25   COO.  Mraz declaration paragraphs six to seven, docket ten.

LC1sSINc

1          That's not how it is pronounced.

2          MR. SAUTER:  Mraz, your Honor.

3          THE COURT:  Mraz declaration, Exhibit 4, docket ten.

4          Despite having been terminated, defendants, allegedly

5   acting on behalf of SingularDTV, filed a lawsuit before this

6   court on July 13, 2021.  See SingularDTV GmbH v. Doe; 21 c.v.

7   6000.  Mr. LeBeau also maintains control over a Cold Wallet,

8   and the only private key that permits access to it, which

9   contains digital assets that SingularDTV alleges are company

10  property, valued at approximately $50 million.  Plaintiff's

11  memorandum at one, four.  I acknowledge that the defendant's

12  attorney asserts that it is a multi-key wallet, and that LeBeau

13  has only the emergency key, and that the defendant argues that

14  LeBeau was not legitimately terminated from employment by

15  SingularDTV.  Finally, according to plaintiff, Mr. LeBeau and

16  Ms. Jackson have denied SingularDTV's employees access to their

17  e-mail accounts by establishing a relationship with a

18  third-party reseller, DAG Tech, that manages SingularDTV's

19  e-mail systems and computer networks and takes direction from

20  defendants.  That's plaintiff's memorandum at 11.

21          A TRO is an "extraordinary remedy and should not be

22  routinely granted."  Patton v. Dole, 806 F.2d 24, 28 (2d Cir.

23  1986).  A party seeking a TRO must show: (1) a likelihood of

24  success on the merits; (2) that the party is likely to suffer

25  irreparable injury in the absence of an injunction; (3) that

LC1sSINc

the balance of hardships tips in the party's favor; and (4)
that an injunction is in the public interest.  Capstone
Logistics Holdings, Inc. v. Navarrete, 736 F. App'x 25 at 26
(2d Cir. 2018).  That burden is even higher when a party seeks
relief "that alters the status quo by commanding some positive
act, as opposed to a preliminary injunction seeking only to
maintain the status quo." Cacchillo v. Insmed, Inc., 638 F.3d
401, 406 (2d Cir. 2011).  To meet that higher board, a party
seeking a mandatory injunction must show a "clear or
substantial likelihood of success on the merits." Doninger v.
Neihoff, 527 F.3d 41, 47 (2d Cir. 2008).

          With respect to the first prong, the court is
persuaded that SingularDTV has shown a clear or substantial
likelihood of success on the merits.  Plaintiff asserts claims
for replevin; trespass to chattels; constructive trust;
restitution; conversion; violation of the Computer Fraud and
Abuse Act, 18 U.S.C. Section 1030; and violation of the Defend
Trade Secrets Act, 18 U.S.C. 1836.  Complaint paragraphs 67
through 120.  Because all of these claims pertain to
defendants' allegedly improper possession of the Cold Wallet
and e-mail server, plaintiff need only demonstrate a
substantial likelihood of success on the merits for one of the
stated causes of action.

          Beginning with replevin, to prevail on a claim for
replevin in New York State, a plaintiff must show that the

LC1sSINc

1    party has a superior possessory right to the chattel and that

2    it made a demand for possession from the defendants.

3    Press Access LLC v. 1800 Postcards, Inc., 2012 WL 4857547, at

4    *1 (S.D.N.Y. October 9, 2012).  Plaintiff provides compelling

5    evidence that the company has a superior possessory right to

6    the assets stored in the Cold Wallet, including Mr. LeBeau's

7    admission in a Swiss proceeding that the wallet is

8    respondent's, referring to SingularDTV.  Mraz declaration,

9    Exhibit 8 at four, docket ten.  The same is true of access

10   to the Swiss company's employees' e-mail accounts, which

11   constitutes company property and which were created for Swiss

12   company purposes.  Ghazi affidavit, docket 6-9, SingularDTV

13   GmbH v. Doe.

14        Plaintiff has also demonstrated that it has made a

15   demand for possession from defendants.  Plaintiff submits as

16   evidence an e-mail from defendants' lawyer about the potential

17   transfer of assets in the Cold Wallet.  See Allenspach

18   declaration, Exhibit 8, and a request during a meet and confer

19   for the same.  See Sauter declaration paragraph seven, docket

20   number eight.  Plaintiff also submits as evidence written

21   correspondence in the context of discussions regarding a cease

22   and desist with respect to the other action pending before this

23   court in which the company demanded that control over its

24   e-mail accounts be returned.  Sauter declaration, Exhibit 1,

25   docket eight.

LC1sSINc

1          Based on this evidence, plaintiff has demonstrated a

2     substantial likelihood of success on the replevin claim, and

3     the court need not reach the other causes of action in its

4     complaint.

5          With respect to the second prong, irreparable harm is

6     clearly met here.  "A party's loss of control of a business

7     constitutes irreparable harm." <u>Global Switching, Inc. v.</u>

8     <u>Casper</u>, 2006 WL 385815, at *3 (E.D.N.Y. February 17, 2006).

9     Plaintiff has lost control over major assets and its e-mail

10    apparatus.  Irreparable harm is consistently found in cases

11    where unauthorized individuals have gained access to a

12    company's confidential information.  See, e.g., <u>Intertek</u>

13    <u>Testing Servs., N.A., Inc. v. Pennisi</u>, 443 F. Supp. 3d 303, 331

14    (E.D.N.Y., March 9, 2020).

15         With respect to the third prong, the court must

16    consider whether the balance of the equities favors granting

17    temporary relief.  Defendants have conceded that they will

18    suffer no hardship by being enjoined from dissipating the

19    assets in the Cold Wallet.  Whereas, the risk that they will

20    dissipate the assets will cause irreparable harm to plaintiff.

21         Finally, the court agrees with plaintiffs that the

22    final factor -- whether granting relief would be in the public

23    interest -- is not implicated because SingularDTV's dispute

24    where division is purely private litigation.  See <u>Greendige v.</u>

25    <u>Allstate Ins. Co.</u>, 2003 WL 22871905, at *3 (S.D.N.Y.

LC1sSINc

1    December 3, 2003).

2              For these reasons, the TRO is granted in part.

3    Specifically, as of 4:02 p.m., defendants are temporarily

4    restrained from taking any step, whether by their personal

5    actions or by causing another to act to transfer, conceal,

6    encumber, dissipate, or otherwise impair the value of any

7    assets in their possession or control that are the property of

8    the plaintiff, including but not limited to the Cold Wallet,

9    the digital assets stored on the Cold Wallet, the private keys

10   associated with those digital assets, and any and all proceeds

11   thereof.

12             I'm prepared to supplement the TRO with directions

13   regarding e-mail access, but, frankly, from the presentation

14   today, I'm not quite sure what exactly that should say.

15             The parties are ordered to meet and confer and to

16   propose new language by 7:30 tonight.  If the parties cannot

17   agree on what is appropriate language, the goal being to give

18   the employees and the contractors of the Swiss company access

19   to their e-mail accounts, as I have defined an e-mail account,

20   their e-mail boxes, without depriving the U.S. company,

21   employees and contractors of access to their e-mail boxes.

22             So you need to met meet and confer, see if you can

23   come up with acceptable language that encapsulates that idea,

24   that notion being, one, that the defendants have agreed would

25   not harm the defendants.  If the parties can't agree, you must

LC1sSINc

1   both submit proposed language by 8:00 p.m. tonight.

2            In terms of the preliminary injunction, the request

3   for the preliminary injunction, the defendants' response to the

4   request for the preliminary injunction is due December 7.  The

5   plaintiff's response is due December 10.

6            We will have a hearing on the request for the

7   preliminary injunction -- I'm not telling you how to litigate

8   this, but I would suggest you all have live witnesses because

9   there are clearly questions of fact here.

10           The hearing will be held on December 14 at 10:00 a.m.

11           Anything further from the plaintiff, Mr. Sauter?

12           MR. SAUTER:  Nothing further, your Honor.

13           I just want to correct one potential statement that I

14  may have made.  I just want to make sure the record is clear.

15  At the end of the argument, I may have said -- I don't have the

16  transcript in front of me -- I may have said that the counsel

17  in the derivative case was representing Arie Levy-Cohen.  That,

18  I don't believe that that is the case.  If I said that, it's

19  not what I meant.

20           THE COURT:  That he was representing who?

21           MR. SAUTER:  Arie Levy-Cohen.

22           THE COURT:  The issue was whether the company had

23  representation.

24           MR. SAUTER:  The company hasn't appeared in that case

25  at this time.

LC1sSINc

1          THE COURT:  Who is the counsel that was allegedly

2     conflicted?

3          MR. SAUTER:  The counsel who represents the company

4     otherwise.

5          THE COURT:  But had not appeared?

6          MR. POSTRYGACZ:  They did appear, your Honor.

7          MR. SAUTER:  They appeared for consensus, your Honor,

8     potentially Joe Lubin.  I just didn't want to give the

9     impression that they appeared for Arie Levy-Cohen, because I

10    don't believe that's the case.

11         MR. POSTRYGACZ:  Your Honor, I can give some color on

12    that, if you would like.  I don't think it is relevant.

13         THE COURT:  I don't think it matters.

14         MR. POSTRYGACZ:  OK.

15         THE COURT:  Anything further from the defendant?

16         MR. POSTRYGACZ:  No, your Honor.

17         THE COURT:  All right.  Thank you, all.

18         MR. POSTRYGACZ:  One question.

19         December 14, I don't have the my calendar in front of

20    me, do we know what date that is?

21         THE COURT:  It's a Tuesday.

22         MR. POSTRYGACZ:  That's great, your Honor.

23         THE COURT:  The TRO is only good for ten days.  I'm

24    starting a trial on the 15th.  It had to be that day, unless

25    you want to consent to a longer TRO.

LC1sSINc

1          MR. POSTRYGACZ:  No, your Honor.

2          THE COURT:  OK.

3          MR. POSTRYGACZ:  Thank you, your Honor.

4          (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25