**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SINGULARDTV, GMBH, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-10130 |
| ZACHARY LEBEAU and KIMBERLY JACKSON, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## SINGULARDTV GMBH'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY

February 25, 2022

KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

Benjamin J. A. Sauter
Christopher S. Cogburn
Alexa R. Perlman

*Attorneys for Plaintiff*
*SingularDTV GmbH*

## PRELIMINARY STATEMENT

Through this Motion, Plaintiff SingularDTV GmbH ("SingularDTV" or the "Company") seeks an order authorizing limited, expedited discovery on a narrow but critical issue: the fate of the device(s) that the Defendants have used to store and access the Company's digital assets, which this Court's January 25 order (the "Consent Order") required Defendants to deliver to the parties' escrow agent. The Consent Order was extensively negotiated by the parties prior to its entry by the Court. Among other things, it plainly requires Defendants to "deliver physical possession of the device storing the Cold Wallet" to an escrow agent appointed by the parties.

Defendants failed to satisfy this requirement and now claim that the device in question no longer exists. This is problematic for several reasons. To begin with, the device may contain important information related to prior transfers from the Cold Wallet, including evidence relevant to the alleged "hack" that is the subject of separate litigation before this Court. Second, Defendants' potential retention of control over the device may enable them to continue accessing certain of the Company's digital assets. While the Defendants have represented through counsel that at least one device that previously held the Cold Wallet has been destroyed, they have refused to provide a sworn statement to that effect or to answer reasonable questions about what happened to the device(s) they have used to store and access the Cold Wallet over time.

To address these concerns, understand the extent of Defendants' violation of the Consent Order, and determine any relief that may be appropriate in response, SingularDTV respectfully requests that the Court enter an order requiring:

- that Defendants immediately produce nonprivileged documents responsive to the requests in Exhibit A to the Motion; and
- that Defendant LeBeau appear for an expedited deposition within 7 days after Defendants complete their document production.

## BACKGROUND

The essential facts regarding the parties' relationship, the dispute that underlies this case, and SingularDTV's use of a cold-storage device—that is, a device not connected to the internet that is used to store the private "keys" required to transact in cryptographic assets—were extensively briefed in the Company's motion for a preliminary injunction (*See generally* Pl.'s Mem. in Supp. of Mot. for Preliminary Inj. ("PI Brief," Dkt. No. 15).). Both parties have referred to this device as the "Cold Wallet" in previous filings. (*See, e.g.*, PI Brief at 5; Decl. of Zachary LeBeau ("LeBeau Decl.," Dkt. No. 37) at 7.) LeBeau possessed and was responsible for maintaining the Cold Wallet during his tenure as the Company's CEO.

When Defendants refused to hand over the Cold Wallet (among other assets) after SingularDTV fired them, the Company commenced this action and sought an injunction requiring Defendants to return those withheld assets. (*See* Dkt. Nos. 15–18.) After the Court granted a temporary restraining order to preserve the status quo, Defendants approached SingularDTV to discuss the possibility of an agreement that would resolve the issues raised in that motion.

The preliminary injunction hearing was postponed to allow the parties to discuss a potential resolution (*see* Order Adjourning Hr'g (Dkt. No. 60) at 1), which they did for several weeks. The centerpiece of the parties' negotiations was an agreement to transfer both the Cold Wallet itself and the digital assets stored on it to an escrow agent while the parties' corporate-governance disputes are resolved in Switzerland. During these negotiations, counsel on both sides repeatedly referred to the Cold Wallet as a "hardware device" or a "device," and the written terms of the parties' eventual agreement (the "Resolution Agreement")—both throughout the parties' negotiations and when executed—expressly contemplated that Defendants would surrender the

Cold Wallet by giving the escrow agent a physical piece of computer hardware (e.g., a laptop computer, a USB drive, or an external hard drive).[1]

The Court entered the Consent Order on January 25. (*See* Dkt. No. 66.) Through the Consent Order, the Court granted a "preliminary injunction resolving the Motion" filed by SingularDTV and incorporated into the Consent Order certain material terms of the Resolution Agreement. (Consent Order at 1.) The Consent Order—which, like the Resolution Agreement itself, was negotiated and approved by all parties—requires Defendants to:

- "transfer 12,000.415454144426866188 ETH held on a cold wallet hardware device ("Cold Wallet") to" the parties' escrow agent; and
- "deliver physical possession of the device storing the Cold Wallet, together with all charging devices and authorizations including log-in information and passwords, to" the parties' escrow agent.

(*Id.* at 2.) Defendants complied with the first of these requirements on the same day the Consent Order was entered, transferring the ETH stored on the Cold Wallet to the escrow agent, where it remains today. Over 100 different types of other tokens belonging to the Company appear to remain on the Cold Wallet.

On January 28, three days after transferring the ETH, counsel for Defendants met with counsel for SingularDTV and the escrow agent to "deliver physical possession of the device storing the Cold Wallet." But instead of producing a "device," Defendants' counsel handed over only two sheets of paper containing strings of characters that were printed from a computer. One of those sheets of paper appeared to contain private keys and a seed phrase for a separate wallet, while another appeared to include private keys—but no seed phrase—for the Cold Wallet. When

---

[1] The Resolution Agreement comprises multiple documents that remain confidential. SingularDTV expects that Defendants will not—because they cannot—dispute that those documents describe the Cold Wallet using explicit references to computer hardware. In the event that Defendants do contest the contents of those documents, SingularDTV will move to submit them under seal for the Court's review.

counsel for SingularDTV asked why Defendants had not surrendered the device (as required by the terms of the Consent Order negotiated by the parties), Defendants' counsel claimed—for the first time—that no such device exists, and that the Cold Wallet has been maintained exclusively as a so-called "paper wallet" for several years.

Concerned by this apparent refusal to produce the storage device, SingularDTV immediately sought clarification. During a meet-and-confer discussion the following day, Defendants' counsel again claimed that the keys to the company's wallet have been stored on paper ever since the original Cold Wallet device was "dismantled" years ago. He also stated that the sheets of paper turned over to the escrow agent contained the only extant copies, digital or physical, of the relevant keys and seed phrases, and that Defendants had therefore complied with "the spirit of the agreement" between the parties, notwithstanding the Resolution Agreement's and Consent Order's explicit references to a hardware device. At the conclusion of the discussion, counsel for Defendants offered to provide a sworn statement from Defendant LeBeau confirming these and other relevant facts.

SingularDTV took Defendants up on this offer the following week. In an e-mail sent on February 4, counsel for SingularDTV asked counsel for Defendants to provide a sworn statement:

- identifying all devices on which the Cold Wallet was held from 2016 to the present;
- identifying the location of all such devices (or, in the event that any of those devices have been destroyed, explaining why);
- explaining when, how, and why the Cold Wallet was moved from one device to another;
- explaining how the sheets of paper comprising the "paper wallet" came to exist, identifying the device they were printed from, and explaining how and where the keys and seed phrases printed on them were stored over time;
- identifying all persons who have ever had access to the "paper wallet" or the information printed on it; and

- explaining why Defendants failed to disclose the purported nonexistence of the Cold Wallet hardware device until the day that they were due to turn that device over to the parties' escrow agent.

Counsel for Defendants never responded to this e-mail. But Defendants now claim, in their portion of the parties' joint letter filed last week ("Joint Letter," Dkt. No. 70), that they have "elected not to" follow through on their offer to provide sworn statements addressing the fate of the Cold Wallet, purportedly because of SingularDTV's "disingenuousness on these issues." (*Id.* at 4.)

SingularDTV does not know what "disingenuousness" Defendants are referring to, and Defendants themselves have declined to specify. In any event, after spending weeks negotiating an agreement designed to secure valuable Company assets while the parties' corporate-governance disputes are resolved elsewhere, SingularDTV must now take additional steps to ensure the security of those assets and to determine the extent of Defendants' apparent violations of the Resolution Agreement and the Consent Order. SingularDTV therefore requests that the Court grant its motion for expedited discovery on this narrow but important issue.

## ARGUMENT

Courts in this District apply a "flexible standard of reasonableness and good cause" in evaluating requests for expedited discovery. *Strike3 Holdings, LLC v. Doe*, 329 F.R.D. 518, 520 (S.D.N.Y. 2019). To determine whether such a request is reasonable, courts look to four factors: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury [that] will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998).

Among other circumstances, expedited discovery is available to determine appropriate remedies when a party appears to have violated an injunction. *See, e.g., Still's Pharmacy, Inc. v.*

*Cuomo*, 981 F.2d 632, 635 (2d Cir. 1992) (noting that district court "found the State to be in contempt of" injunction stemming from prior settlement "and ordered expedited discovery of State officials"); *TracFone Wireless, Inc. v. GCA Elecs., LLC*, 950 F. Supp. 2d. 1326, 1327 (N.D. Ga. 2013) (reopening case and granting "expedited discovery to determine the scope of Defendants' violations of" permanent injunction); *SRA Ins. Agency, LLC v. Virtus LLC*, No. 21-2181-DDC-JPO, 2021 WL 1840065, at *7 (D. Kan. May. 7, 2021) (granting expedited discovery "designed to discern the nature and scope of any breaches that may have occurred of the Preliminary Injunction"). The availability of expedited discovery in such situations flows from a court's inherent authority "to manage its proceedings, vindicate its authority, and effectuate its decrees." *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994); *accord In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 417 (E.D.N.Y. 2007) (granting injunction to prevent violation of preexisting protective order because "[c]ourts have the inherent authority to enforce their orders").

The Court should grant the limited discovery SingularDTV requests here because Defendants are in violation of the Consent Order and have failed to adequately explain their conduct. Less than a week after the Court entered the Consent Order, Defendants disobeyed its plain terms by failing to "deliver physical possession of the device storing the Cold Wallet." (*See* Consent Order at 2.) And, since then, Defendants have refused to meaningfully respond to SingularDTV's requests for reasonable assurances that this failure has not jeopardized the Company assets that remain on the Cold Wallet. The narrow discovery SingularDTV requests would impose a minimal burden on Defendants, while enabling SingularDTV and the Court to understand the extent and consequences of their violation of the Consent Order.

6

I.    **SingularDTV Faces a Threat of Irreparable Harm if Defendants Have Retained Control over the Cold Wallet.**

Courts in this District and elsewhere have long recognized that, where assets held by a defendant are the subject of a plaintiff's equitable claim, the risk of losing those assets is an irreparable harm redressable through injunctive relief. *See, e.g.*, *Shamrock Pwr. Sales, LLC v. Scherer*, No. 12-cv-8959 (KMK) (JCM), 2016 WL 6102370, at *7 (S.D.N.Y. Oct. 18, 2016) (approving injunction freezing assets "to the extent they are the target of a claim for equitable relief"). In support of its motion for a preliminary injunction, SingularDTV explained that cryptographic assets (like those stored on the Cold Wallet) present an unusually acute risk of dissipation because they "know no borders, fluctuate wildly in price, and, when sold on third-party exchanges, are virtually impossible to trace and disgorge." (PI Brief at 23.)

LeBeau's lengthy record of reckless (indeed, seemingly willful) mismanagement of Company assets underscores this risk. The latest and most egregious instance of LeBeau's mishandling of Company assets was his unilateral transfer of approximately US $2 million worth of SNGLS and SNGJ tokens to an alleged "hacker," who laundered the SNGLS tokens through Binance and sent the SNGJ tokens to GazeTV, a company founded by Defendants. (*See* Supp. Decl. of Patrik Allenspach (Dkt. No. 53) ¶ 21, Ex. 32; Decl. of Kevin Madura (Dkt. No. 52) ¶ 16.) But it is far from the only such instance. Just days before the alleged hack, LeBeau converted 599 Company ETH into approximately US $2 million, which he then apparently paid to Writers Block LLC, a company he owns. And in this very case, the accountant for Defendants' company, SingularDTV LLC ("Breaker"), has admitted that LeBeau would "proactively convert" the ETH on the Cold Wallet, even in circumstances "having nothing to do with a funding request." (Decl. of Edward Greenwood (Dkt. No. 45) ¶ 20.)

Defendants' suspicious conduct leading up to and since the entry of the Consent Order only heightens the risk that LeBeau may continue to engage in unauthorized (and likely irreversible) transfers of Company assets. If it is true, as Defendants now claim, that the Cold Wallet has been maintained as a "paper wallet" for several years, it is difficult to imagine an innocent explanation for their total failure to disclose to that fact to SingularDTV at any point before delivering this "paper wallet" to the parties' escrow agent. Even more inexplicable is Defendants' active negotiation of a Resolution Agreement and Consent Order that expressly call for Defendants to deliver a "device." (*See* Consent Order at 2.) Exacerbating the Company's concerns, Defendants have now reneged on their offer to provide a sworn statement attesting to the truth of their representations about the fate of the Cold Wallet, with no explanation except a vague reference to SingularDTV's "disingenuousness on these issues." (Joint Letter at 4.) If defendants continue to possess the devices that held the Cold Wallet, or copies of the "paper wallet" they delivered to the escrow agent, then they continue to have access to the assets on the Cold Wallet.

In short, SingularDTV's assets are not safe to the extent that LeBeau is able to transfer them. This risk prompted SingularDTV to move for a preliminary injunction at the outset of this case, and the Consent Order resolving that motion was supposed to have eliminated any remaining risk. But if Defendants have somehow retained control over the Cold Wallet or the tokens that are still stored on it, then—at least as to those assets—the Consent Order is a nullity; they are no safer than if the Court had never entered it. SingularDTV is entitled to know whether Defendants have so thwarted the parties' agreement and the Court's Consent Order so that, if necessary, it can pursue contempt sanctions and other appropriate remedies.

## II.     SingularDTV Is Likely to Succeed on the Merits.

As SingularDTV has explained in previous filings, its claim to recover the Cold Wallet and the assets stored on it turns on two issues: whether the assets in question belong to the Company,

and, if so, whether Defendants are current officers of the Company authorized to remain in possession or control of those assets. Defendants admit that the Cold Wallet and its contents are Company assets. (*See* LeBeau Decl. ¶ 35–43.) And, by entering into the Resolution Agreement and agreeing to be bound by the Consent Order, Defendants relinquished any remaining claim to retain control over those assets until the corporate-governance disputes are resolved. If Defendants have since violated the Resolution Agreement and Consent Order by surreptitiously retaining control over the Cold Wallet, SingularDTV will be entitled both to continue pursuing claims for the return of that asset and to seek compensation for any damages caused by Defendants' failure to obey the Consent Order. *See Al Hirschfield Found. v. Margo Feiden Galleries Ltd.*, 438 F. Supp. 3d 203, 207 (S.D.N.Y. 2020) (explaining that compensatory sanctions for violation of court order are available "to make reparation to the injured party and restore the parties to the position they would have held had the order been obeyed" (internal quotation marks and alterations omitted)).

### III. The Requested Discovery is Tailored to the Irreparable Harm that Would Result from Defendants' Continuing to Control the Cold Wallet.

SingularDTV seeks expedited discovery relating to a single issue: the fate of the device used to hold the Cold Wallet. As noted above, SingularDTV first met and conferred with Defendants to allow them to provide the necessary information voluntarily and, in keeping with the offer Defendants made during that discussion, requested a sworn statement:

- identifying all devices on which the Cold Wallet was held from 2016 to the present;
- identifying the location of all such devices (or, in the event that any of those devices have been destroyed, explaining why);
- explaining when, how, and why the Cold Wallet was moved from one device to another;
- explaining how the sheets of paper comprising the "paper wallet" came to exist, identify the device they were printed from, and explain how and where the keys and seed phrases printed on them were stored over time;
- identifying all persons who have ever had access to the "paper wallet" or the information printed on it; and

- explaining why Defendants failed to disclose the purported nonexistence of the Cold Wallet hardware device until the day that they were due to turn that device over to the parties' escrow agent.

The document requests in Exhibit A to the Motion seek the same information, all of which is tailored directly to the goal of determining what happened to the Cold Wallet, when and how it happened, and who was responsible. SingularDTV requests a deposition of LeBeau for the same reason. As such, the Motion easily satisfies the requirement of "some connection between the expedited discovery and the avoidance of the irreparable injury." *Gidatex*, 13 F. Supp. 2d at 420.

## IV.  The Irreparable Harm that Would Result from Defendants' Continuing to Control the Cold Wallet Dwarfs the Minimal Burden Imposed by the Requested Discovery.

The final factor to be considered in determining the reasonableness of a request for expedited discovery is "some evidence that the injury [that] will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Id.* As explained above, if Defendants continue to possess the Cold Wallet, they would be able to access and dissipate company assets in contravention of the Consent Order. Moreover, the device(s) that stored the Cold Wallet may contain important information about the Defendants' prior use of Company assets that that could be irretrievably lost if not delivered to the Company.  On the other hand, Defendants would not suffer any cognizable injury in explaining the fate of a device they have failed to deliver, mere days after they agreed—and were ordered by this Court—to do so.

## CONCLUSION

For these reasons, SingularDTV respectfully requests that the Court enter an order requiring:

- that Defendants immediately produce nonprivileged documents responsive to the requests in Exhibit A to the Motion; and
- that Defendant LeBeau appear for an expedited deposition within 7 days after Defendants complete their document production.

Dated: New York, New York
       February 25, 2022

Respectfully submitted,

/s/ Benjamin J. A. Sauter
Benjamin J. A. Sauter
Christopher S. Cogburn
Alexa R. Perlman
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

*Attorneys for Plaintiff SingularDTV GmbH*