```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     SingularDTV GmbH,
 3
                  Plaintiff,
 4
              v.                          21 CV 10130 (VEC)
 5
     ZACHARY LeBEAU and KIMBERLY
 6   JACKSON,

 7                  Defendants.           Conference
     ------------------------------x
 8   SingularDTV GmbH,

 9                  Plaintiff,

10              v.                         21 CV 6000 (VEC)

11   JOHN DOE,

12                  Defendants.
     ------------------------------x
13
                                          New York, N.Y.
14                                        February 25, 2022
                                          2:00 p.m.
15   Before:

16                   HON. VALERIE E. CAPRONI,

17                                        District Judge

18                      APPEARANCES

19   KOBRE & KIM LLP
          Attorneys for Plaintiff
20   BY:  BENJAMIN J.A. SAUTER
          CHRIS COGBURN
21        -and-
     MORRISON-TENENBAUM, PLLC
22   BY:  JERALD M. TENENBAUM

23   NEIL L. POSTRYGACZ
          Attorney for Defendants
24
     PAUL F. CONDZAL
25        Attorney for Defendant Kimberly Jackson
```

1          (Case called)

2          MR. SAUTER:  Good afternoon, your Honor, Benjamin

3  Sauter from Kobre & Kim on behalf of the plaintiff, SingularDTV

4  GmbH.

5          With me today, your Honor, is my associate, Chris

6  Cogburn.  I've asked him to come to take advantage of your

7  Honor's local rule 3(b), which encourages the participation of

8  junior attorneys who have substantially assisted with briefing,

9  which Mr. Cogburn has.  So we will ask him to take part in

10 today's oral discussion as well.

11         THE COURT:  Terrific.  Thank you, Mr. Sauter.

12         Good afternoon, Mr. Sauter.  Good afternoon

13 Mr. Cogburn.

14         MR. COGBURN:  Thank you, your Honor.

15         THE COURT:  Let's go to the other Singular lawyer.

16         MR. TENENBAUM:  Hi, your Honor, Jerald Tenenbaum from

17 the firm Morrison-Tenenbaum.

18         THE COURT:  Good afternoon, Mr. Tenenbaum.

19         MR. TENENBAUM:  We represent SingularDTV GmbH in the

20 Doe matter.

21         THE COURT:  So you say.

22         MR. TENENBAUM:  So I say.

23         MR. POSTRYGACZ:  Good afternoon, your Honor, this is

24 Neil Postrygacz.  I represent both Kim Jackson and Mr. Zach

25 LeBeau in the first action.

```
 1                THE COURT:  Postrygacz.

 2                MR. POSTRYGACZ:  Yes, your Honor.

 3                THE COURT:  Is that close?

 4                MR. POSTRYGACZ:  It's very good.

 5                MR. CONDZAL:  Good afternoon, your Honor, Paul

 6   Condzal, attorney for Kim Jackson in this action.

 7                THE COURT:  The 10130 action.

 8                MR. CONDZAL:  Yes, your Honor.

 9                THE COURT:  I had you come in even though I've been

10   doing most things via telephone these days because there still

11   seem to be too many moving pieces in these cases that we need

12   to sort of figure out where they are going to come to rest.

13                Let me start with, what's the current status of the

14   dissolution proceedings in Switzerland?

15                Mr. Cogburn, are you the right person to talk to that?

16                MR. COGBURN:  I think Mr. Sauter is prepared to speak

17   to that.

18                THE COURT:  Mr. Sauter, what's the status of what's

19   going on in Switzerland?

20                MR. SAUTER:  My understanding, your Honor, is there

21   are proceedings that are being filed.  I think that proceedings

22   move a bit slower in Switzerland, but they are moving apace.

23   The parties are required to meet and discuss potential

24   resolutions as part of the Swiss process, so I believe that

25   there have been some discussions among Swiss lawyers
```

1    simultaneously with the proceedings going forward.

2            I don't think that there have been substantive

3    developments in the dissolution proceeding to date that would

4    be noteworthy, not that I'm aware of.  But those proceedings

5    are within the system, and they have brought the parties

6    together and are teed up to proceed.

7            THE COURT:  Does anybody else have any better

8    information about what's going on in Switzerland than that?

9            MR. POSTRYGACZ:  Your Honor, counsel was correct,

10   there is first a reconciliation hearing for the parties -- the

11   attorneys are asked to come in, they are given an opportunity

12   to try and resolve the matters before them.  If that doesn't

13   happen, then I think within three months you are given time to

14   file the actual claim with the court.  After the reconciliation

15   hearing, I believe the Court issues sort of authority for you

16   to be able to then file your claim.  I believe the period to

17   file that claim is three months, if I'm not mistaken.

18           There was talks, I believe, last week between the

19   parties' counsel in Switzerland regarding resolution of all

20   issues in the U.S. and Switzerland, but as counsel has informed

21   the Court, I don't think it's gotten to a point where -- it

22   hasn't gotten to a point where there is a real meeting of the

23   minds on how to move forward.

24           THE COURT:  The purpose of those talks is for the

25   owners of the company to figure out how to divide up whatever

1  the company has at this point?

2          MR. POSTRYGACZ:  It may be that.  It may be where one

3  side -- let's say Mr. Lubin and Mr. Cohen move forward with the

4  company, and my client is somehow bought out or moved.

5          Another way forward is that my client, Mr. LeBeau,

6  moves forward along with the U.S. entity, basically operating

7  the business the way it was intended to be, and Mr. Lubin and

8  Mr. Cohen would not be part of that operation.  Or, as your

9  Honor said, the company moves forward with dissolution and

10 liquidation.

11         THE COURT:  There are any number of things that could

12 happen in Switzerland --

13         MR. POSTRYGACZ:  Yes, your Honor.

14         THE COURT:  -- in connection with that proceeding.

15         I have not read all of the motion to intervene in the

16 21 CV 6000 matter.  The answer to this may be in those papers,

17 and I just haven't read it yet.

18         Is there also some proceeding in the United States

19 where the subject matter of the proceeding is who is the

20 rightful representative of SingularDTV in the United States,

21 Kobre & Kim's clients or Mr. Postrygacz's clients?

22         MR. POSTRYGACZ:  Your Honor, may I?

23         THE COURT:  Sure.

24         MR. POSTRYGACZ:  There is a derivative action filed in

25 Supreme New York.  It's filed by Mr. Zach LeBeau individually

1     and derivatively on behalf of the GmbH.

2            In that action there are several requests for

3     declaratory judgment that the resolutions that allegedly

4     removed Mr. LeBeau from his positions as a director, that they

5     are not valid.  There is also claims against Mr. Lubin and

6     Mr. Cohen for breaches of the bylaw and acting against the best

7     interest of the companies.

8            Mr. Rubin also owns a company named ConsenSys, which

9     is a party in the derivative action.  ConsenSys developed the

10    IP or part of the IP for the GmbH.  So Mr. Lubin was wearing

11    both the ConsenSys hat and the GmbH hat.  In fact, in one of

12    the board minutes --

13           THE COURT:  I don't want to argue that.  What's the

14    status of that derivative case?

15           MR. POSTRYGACZ:  A motion to dismiss was filed.

16    Mr. LeBeau -- actually, this is Mr. Tenenbaum's case.  Perhaps

17    he should be the one who speaks about it.

18           THE COURT:  Mr. Tenenbaum, what's the status of the

19    derivative case?

20           MR. TENENBAUM:  The defendants, Mr. Lubin and

21    Mr. Cohen, have asserted motions to dismiss that complaint.  It

22    is not quite fully submitted.  It will be fully submitted, I

23    think, March 9 or March 10, and there is also a pending motion

24    to disqualify counsel for Mr. Lubin in that case that will also

25    be fully submitted on March 9 or March 10.

1                    THE COURT:  Does Kobre & Kim represent Lubin?

2                    MR. SAUTER:  No, your Honor.

3               For the record to be clear, Mr. Tenenbaum does not

4     represent the company, SingularDTV GmbH, to my understanding,

5     in the derivative case.  I understand that he represents

6     Mr. LeBeau individually in that case.  the company that GmbH

7     has not been served as a party to that case, Kobre & Kim could

8     represent it if it were required to show up in the derivative

9     case, but it has not to date, so we have not made an appearance

10    in that case.

11                   THE COURT:  So the derivative lawsuit is going forward

12    without the company?

13                   MR. SAUTER:  The company is listed in the caption.

14                   THE COURT:  But they haven't been served.

15                   MR. SAUTER:  As a nominal defendant.  To my knowledge,

16    they have not been served and there is no certificate of

17    service in that case.  There is a pending motion to dismiss

18    that case on *forum non conveniens* grounds to be resolved in

19    Switzerland.

20                   THE COURT:  Is that the one that's not yet quite fully

21    briefed?

22                   MR. TENENBAUM:  That's correct.

23                   THE COURT:  That's the motion to dismiss on *forum non*

24    *conveniens*.

25                   MR. TENENBAUM:  There is also an amended complaint in

8

1   that case as well.

2          THE COURT:  So that case is down the road at best.

3          MR. TENENBAUM:  Yes.

4          MR. POSTRYGACZ:  Your Honor, just to correct something

5   counsel said, the motion is not to disqualify Kobre & Kim.  I

6   believe it's to disqualify the law firm of Tibor & Nagy, who

7   are not parties to these actions.

8          THE COURT:  He didn't say to disqualify Kobre & Kim.

9   He said to disqualify Lubin's counsel, which is not Kobre &

10  Kim.

11         That brings us to some of the other Hanging Chads,

12  which is, Kobre & Kim tell me that the defendants have not yet

13  put into escrow the device that stored the cold wallet.  And

14  the defendant says there is no physical device that stored the

15  cold wallet.  Correct?

16         MR. POSTRYGACZ:  Your Honor, there was a physical

17  device, but the physical device was two pieces of paper.

18         THE COURT:  How is that a device?

19         MR. POSTRYGACZ:  Interestingly, I was at the exchange,

20  at the escrow agent at Kobre & Kim, as was an attorney named

21  Matt Corva.  He attended via Zoom.

22         THE COURT:  How do you spell that?

23         MR. POSTRYGACZ:  C-o-r-v-a.  He is counsel for

24  ConsenSys and I believe for Mr. Lubin.

25         When we presented or when I presented the two pieces

1    of paper with the keys on them, we discussed whether or not

2    that can be a cold wallet, and he in fact stated that pieces of

3    paper qualify as cold wallets as long as the code or the

4    numbers that are on those papers bring you to the wallet and

5    the ether.

6              Kobre & Kim, as the escrow agent, has the ether.  They

7    have acknowledged it.  There is no more paper.  My client

8    presented me with the only two pieces of paper that had those

9    numbers, the code, the specific code that would get you to the

10   crypto.  That's been presented.  Kobre & Kim, as escrow agent,

11   as I said, acknowledged first that the test ether went through

12   and that the remaining ether went through.  They are asking for

13   something that doesn't exist.

14             THE COURT:  My issue is, this is going to get resolved

15   in the fullness of time, I am confident.

16             What I found both surprising and annoying is that I

17   was asked to and did sign a consent order that referenced a

18   device.  And now what you are telling me is, there is no

19   device.  But if there was no device, I should not have been

20   given a consent order that said the things that charge the

21   device, etc., will be turned over.

22             MR. SAUTER:  Your Honor, if I may be heard for a

23   moment.

24             THE COURT:  Sure.  I was just looking for the consent

25   order.  I thought I had it with me.

1          MR. SAUTER:  I have a copy.

2          THE COURT:  I've got it.  I just flipped past it.

3          Mr. Postrygacz, what I'm referring to is the paragraph

4     in the consent order that says:  It is further ordered that

5     defendants shall deliver physical possession of the device

6     storing the cold wallet, together with all charging devices and

7     authorizations, including log-in information and passwords, to

8     an escrow arrangement as separately agreed upon by the parties.

9          Under no use of English is pieces of paper with a

10    number written on it a device.  Because if it were, the

11    prepositional phrase together with all charging devices and

12    authorizations would make no sense because you can't charge a

13    piece of paper.

14         MR. POSTRYGACZ:  Understood, your Honor.

15         THE COURT:  So the question is, why was the consent

16    order written and agreed to with a device if there is no

17    device?

18         MR. POSTRYGACZ:  Your Honor, there should have been

19    language that said if any.  I agree with you, your Honor, and I

20    apologize for any annoyance and inconvenience that has caused

21    the Court.  Certainly there should have been language if any,

22    and that was missed, but that does not take away the fact that

23    whatever cold wallet my client had possession of, he

24    transferred to the escrow agent, and now the escrow agent is in

25    possession of all the ether that was alleged to be in the

1    possession of my client, Mr. LeBeau.

2           THE COURT:  Mr. Sauter.

3           MR. SAUTER:  A few things that I would like to

4    correct, your Honor.

5           The first is, I disagree with counsel's

6    characterization of what Mr. Corva said about the cold wallet.

7           THE COURT:  That's OK.  We don't need to get into

8    that.  That's a merits issue.

9           MR. SAUTER:  Second of all, the agreement that the

10   parties reached and the consent order required two separate

11   things.  One was the transfer of the Ethereum.  That is on the

12   cold wallet.  That has happened.  There is a separate

13   requirement, which was transfer of the old storage device.  In

14   the parties' agreement it was treated entirely separately, for

15   good reason, your Honor.

16          THE COURT:  Why?  What's the good reason?

17          MR. SAUTER:  Two reasons.

18          The first is, that cold-storage wallet, which we had

19   understood until the day Mr. Postrygacz showed up at the escrow

20   agent with pieces of paper, was on the device, actually

21   contains many other company assets.  I believe to date there

22   are over a hundred separate assets held on the cold wallet,

23   which was why --

24          THE COURT:  Like what?  What other assets?

25          MR. SAUTER:  Other cryptocurrency tokens.

1            THE COURT:  Bitcoin or Dogecoin or something.

2            MR. SAUTER:  Correct.

3            THE COURT:  Let me just say that if there has ever

4    been a case that tells me why anybody would invest in crypto is

5    insane, it is this case.

6            MR. SAUTER:  No comment, your Honor.

7            The reason the parties or the reason SingularDTV

8    negotiated to have the device turned over, it would be

9    administratively burdensome to transfer these 100, some of

10   which are liquid tokens, to the agent, so the device was agreed

11   to be transferred.

12           When counsel says the Ethereum was transferred, that's

13   true, but the device was not.  What the escrow agent received,

14   surprisingly to it, was just these pieces of paper.

15           Now, we think that's important, A, because there are

16   other assets on this device; B, there certainly was a device at

17   a point in time which the company understood was still in

18   existence until this escrow deposit happened and now has

19   questions if it is true that it has been destroyed or no longer

20   exists, what happened to it, where is it, who else has control

21   of it, are there other devices.

22           THE COURT:  I got it.  I got the issue.

23           In your letter what you've indicated is, you may be

24   coming back to me at some point with a request for a contempt,

25   but that's not on the agenda right now.

1         MR. SAUTER:  Not contempt, your Honor.  We did today

2    file the motion that was contemplated in our letter to the

3    Court.  I don't expect the Court to have had a chance to digest

4    it yet, but in the joint letter that we submitted we informed

5    the Court that we intended to file a request for discovery

6    about these issues, which we have just filed today, to figure

7    out what has happened to the device that did exist, and we have

8    just learned no longer exists.

9         I want to make one more statement for the record.

10   Another reason why this is important is, if this code, on a

11   piece of paper, it was a typed piece of paper that was

12   delivered to the escrow agent, if that code is in the

13   possession of or can be accessed by somebody else, Mr. LeBeau,

14   Ms. Jackson, somebody else, somebody could use potentially that

15   code to access all of these assets.  So the assets that went

16   into the escrow arrangement would be vulnerable to being taken.

17        THE COURT:  The whole point of the escrow arrangement

18   was to put the Ethereum into escrow?

19        MR. SAUTER:  The Ethereum and the other company

20   assets, correct.

21        THE COURT:  I was unaware that there were other

22   company assets.  Perhaps it's somewhere in your papers, but I

23   was unaware of that.

24        What does the piece of paper do?

25        MR. TENENBAUMS:  If it's the only piece of paper in

1    existence, then that would amount to escrowing those assets.

2    But if there was a device somewhere that still has those

3    numbers on it --

4              THE COURT:  Or they just copied them on a Xerox

5    machine.

6              MR. SAUTER:  Exactly.  If there is another piece of

7    paper like that in the world or it could be gotten from a

8    device that still exists, then the paper the escrow agent has

9    is worthless.

10             THE COURT:  Can you get to the Ethereum based on that

11   piece of paper?

12             MR. SAUTER:  There seems to be some question about

13   that and whether seed phrases are also necessary to access the

14   wallet that also weren't delivered.

15             THE COURT:  You have actually tried to access the

16   account to see if you've got control of the cryptocoins?

17             MR. SAUTER:  The expectation, and this is in the

18   agreements that the parties signed, is the parties would have

19   an opportunity to do just that at the time of delivery.  When

20   opposing counsel showed up with just a piece of paper, there

21   was no ability to access the software that would be necessary,

22   allegedly, to use that string of numbers to test the log.

23             MR. POSTRYGACZ:  Your Honor, may I speak?

24             THE COURT:  Yes.  Briefly.

25             MR. POSTRYGACZ:  Some of what counsel said is

1    disingenuous.  We did receive e-mail confirmation from Kobre &

2    Kim as escrow agent that they weren't able to access the

3    remaining ether.  They are also supposed to take that remaining

4    ether and have it in escrow in a separate coin base account.

5    If somebody else had that code, once that ether is transferred

6    to a coin base account held by the escrow agent, nobody can get

7    to that because it's no longer where it was.  Those concerns I

8    don't think are realistic.

9            Also, as I said, there was confirmation that the first

10   test of ether went through and that's why the remaining ether

11   was sent, and there was confirmation that it was received.  So

12   I'm actually very confused now by what counsel is saying about

13   not being able to access the ether.

14           Again, all these other assets or coins that counsel

15   mentions, they are not included in the consent order.  This was

16   about the ether.  The ether is now held by the escrow agent.

17           And ConsenSys, again, it comes up, Mr. Lubin, that

18   device that they are mentioning that they claim they thought

19   still existed up until recently was actually destroyed at

20   ConsenSys by ConsenSys employees to make sure that nobody would

21   be able to access the device.

22           MR. SAUTER:  Your Honor, just to be really clear, I'm

23   not claiming that the ether is not secure.  That was

24   transferred.  It is held separately from the device that I'm

25   talking about.

1        THE COURT:  So the ether that was accessed through the

2   string of numbers has been moved from whoever created that

3   string of numbers into an account that someone else is

4   responsible for.  So even if I had that string of numbers, I

5   would not be able to get to the ether.

6        MR. SAUTER:  The ether is secure, you are correct.

7   It's in an entirely separate place controlled by the escrow

8   agent.  That is not the case for the other assets that are on

9   the cold-storage wallet and device that we believe.

10        THE COURT:  And that you allege belong to Singular --

11        MR. SAUTER:  DTV GmbH, correct.

12        These factual issues are coming up about when it was

13   destroyed.  That's exactly what we want to test in discovery,

14   because there is a clear violation of the consent order.  I

15   don't think that's in dispute.  The question is whether there

16   is an excuse.  To evaluate whether there is a valued excuse for

17   not delivering that, we submit, there needs to be some

18   discovery as to what happened to the device.  Are there other

19   devices who has had access to it.  And that's what our motion

20   is about, your Honor.

21        THE COURT:  Are you seeking discovery?  You need that

22   before you file an amended complaint which you had proposed to

23   file by March 4?

24        MR. SAUTER:  Your Honor, these are separate issues.

25   We would -- we are prepared to take the discovery on the

MCRNS1N21

1    consent order as soon as your Honor would authorize it.  The

2    complaint can proceed on a separate track.

3         MR. COGBURN:  Your Honor, if I may, if what you and

4    counsel are looking for are copies of the brief and the

5    exhibits in the motion that contain the proposed document

6    requests, we have copies here.

7         MR. POSTRYGACZ:  Your Honor, I have not seen the

8    motion.  I believe it was filed while I was already in court,

9    and my phone is downstairs with security.

10        THE COURT:  Understood.

11        MR. POSTRYGACZ:  Your Honor, I notice here that they

12   say we refused to provide a sworn statement.  We are happy to

13   provide a sworn statement that the pieces of paper that were

14   provided were the only pieces of paper that my client had with

15   the code and that any devices were destroyed and he is not in

16   possession of any devices.  That's certainly something that we

17   can provide to the defendant.

18        THE COURT:  Here is what I am going to do.  This

19   motion was filed today.

20        Mr. Postrygacz, how long do you want to respond?  I am

21   going to do an expedited briefing on the issue of taking

22   discovery solely on the issue of whether there has been a

23   breach of the consent decree.

24        MR. POSTRYGACZ:  As much time as your Honor would give

25   me.

1          THE COURT:  That's not going to be much.

2          Today is the 25th.  Your response is going to be due

3    March 4.  Any reply will be due March 8.  I intend to resolve

4    that issue very quickly so you can either go forward or not.

5          Your amended complaint is due the 4th.  The parties

6    are then supposed to meet and confer on a case management plan,

7    including a discovery schedule.

8          What might make sense is to roll all this discovery

9    together because I don't see that there is really any kind of

10   bright line between the issues that are at issue with what

11   happened to the rest of these assets and the fundamental issues

12   at stake in your lawsuit.

13         Or am I missing something, Mr. Cogburn?

14         MR. COGBURN:  Your Honor, I think that's correct.

15   We'd like to proceed expeditiously with all of this.  If there

16   is a reason why proceeding with discovery on the merits of the

17   amended complaint would slow down our interest in taking

18   discovery on the issue of whether there has been a violation of

19   the consent order, we would ask that that discovery proceed as

20   quickly as possible.  But if all of those can proceed

21   expeditiously, then we have no problem.

22         THE COURT:  Is there any reason why discovery on this

23   case can't proceed expeditiously?

24         MR. COGBURN:  Not that I can think of, your Honor.

25         MR. POSTRYGACZ:  No, your Honor.

```
1              THE COURT:  Why don't we do this then.  Let's scratch

2    what I just said in terms of the schedule for responding to the

3    motion.  You are filing the amended complaint on the 4th.  By

4    the 11th I want a proposed discovery schedule.  I want that

5    discovery schedule to be expeditious.  That then should moot

6    your request for immediate discovery on this issue.  If for

7    some reason it doesn't, when you send me the agreed-upon

8    discovery schedule, tell me that you couldn't reach an

9    agreement that resolves the issue of whether you should get

10   expedited discovery on that single issue, in which case I'll

11   then set a very quick briefing schedule on this motion, resolve

12   that.  But, meanwhile, you will be proceeding on merits

13   discovery in your main case.  Make sense?

14             MR. POSTRYGACZ:  Yes, your Honor.

15             THE COURT:  I'm seeing nods all the way around.

16             On your case, Mr. Tenenbaum, the 6000 case, I don't

17   know if it's fully briefed or not yet.  The motion of Kobre &

18   Kim --

19             MR. TENENBAUM:  That is fully briefed, the motion to

20   intervene.

21             THE COURT:  It hasn't been decided.  Sorry, but you

22   are not real high on my list at the very moment.  I am not

23   going to say I am not going to get to it soon, but it's not

24   immediately.

25             You are all reasonable people.  You got two groups of
```

1  people who are saying they represent the company.  How do you

2  anticipate me resolving the question of whether Singular,

3  represented by Kobre & Kim gets to intervene in the lawsuit

4  brought by Singular represented by Tenenbaum?

5          To me, it's almost like that whole lawsuit should be

6  stayed pending either or both the New York State litigation,

7  the New York derivative lawsuit, or the Switzerland

8  proceedings, because those are the cases that are going to

9  resolve the question of who is the company.

10          MR. TENENBAUM:  The only problem with staying that

11  case is that, as Kobre & Kim has pointed out, the more time

12  that elapses, the more difficult a trail is to follow.

13          THE COURT:  Is there really a trail to follow?

14          MR. TENENBAUM:  Of course there is.  We have subpoenas

15  out to Binance, but that whole process has basically stopped

16  because of the motion to intervene.

17          THE COURT:  The subpoena shouldn't have stopped if you

18  have already served a subpoena.

19          MR. TENENBAUM:  There needs to be a motion to compel.

20  There is legal work that needs to be done on that case.  If

21  it's OK with your Honor, we would like to proceed with that

22  case and keep pushing it along.

23          THE COURT:  But the problem is, who are you?  You say

24  you are the company.  You say you represent the company.  Kobre

25  & Kim say they represent the company.  If you were working

1    together trying to pursue an alleged bad guy, that would make

2    sense, but you are opposing their motion to intervene.

3              MR. TENENBAUM:  I actually proposed that we work

4    jointly on this matter, but that was refused by Kobre & Kim.  I

5    thought that was a good recommendation.

6              THE COURT:  Mr. Cogburn, I put the same question to

7    you.

8              MR. COGBURN:  Yes, your Honor.  I understood.  I think

9    beginning with the last point that your Honor discussed and

10   that Mr. Tenenbaum discussed, our client has explained to us

11   that they have no interest in being represented by Mr.

12   Tenenbaum, which is why we are not able to, as he says, work

13   with him on this.

14             There is actually a more fundamental problem, though,

15   that prevents that, which is that the company, with us and with

16   the help of an outside consulting firm that's done some

17   investigation into this, we filed a declaration from a Kevin

18   Madura attesting to these issues in, I believe, the 10130 case.

19             The evidence that's that that firm has collected is

20   beginning to point towards Mr. LeBeau's knowing involvement.

21             THE COURT:  I remember that.  You definitely put that

22   in those papers because that was my recollection.

23             MR. COGBURN:  If Mr. Tenenbaum has been retained, as

24   we understand is the case, and is being instructed by

25   Ms. Jackson or Mr. LeBeau, or some combination of the two, the

1    company is not comfortable allowing him to be involved in, much

2    less captain that effort to discover who was involved --

3                 THE COURT:  Understood.

4                 MR. COGBURN:  Because Mr. Tenenbaum is correct that

5    the company is interested in finding out who did this as

6    quickly as possible and, because of that, the company wants

7    that action to remain active and to continue issuing sentences

8    to pursue the subpoena to Binance.

9                 THE COURT:  Timeout.

10               MR. TENENBAUM:  Your Honor, may I respond?

11               THE COURT:  Just a second.  Let's let Mr. Cogburn do

12   his job.

13               I hear you.  But let's be practical for a second.  We

14   have got two law firms and four people who are saying -- two in

15   each saying, I represent rent the company and the other two

16   saying, I represent the company.  One of you is right, but you

17   are not both right.

18               How do you, Mr. Cogburn, propose that we proceed for

19   me to resolve who of you gets to pursue the 6000 case?  Is it

20   that we are going to have a little mini trial in the context of

21   a motion to intervene?

22               MR. COGBURN:  I think, your Honor can make that

23   decision based on the evidence that has already been submitted

24   in that action on the intervention motion.

25               THE COURT:  That's basically the same evidence that

1    was presented on the motion for the PI, correct?

2            MR. COGBURN:  Correct.  And we think that that proves

3    conclusively that Mr. LeBeau is no longer employed as CEO of

4    the company.  He was terminated back in May 2021.  Ms. Jackson

5    was terminated shortly thereafter, in early June.

6            THE COURT:  But doesn't that get me into the whole

7    reason why we were going to have to have a hearing on the PI,

8    which is, LeBeau says not true, that was not a legitimate

9    meeting.  I was never fired.  I am still the king.

10           MR. COGBURN:  I fully accept that your Honor would

11   have to make some sort of evidentiary finding on that, and it

12   may be the case that that's just unavoidable in the context of

13   this case, even though the company thinks, as it said here and

14   elsewhere, that those corporate governance issues should be

15   definitively resolved in Switzerland.

16           We think it's possible for your Honor to do that based

17   on the evidence before you in a way that makes clear that you

18   are not making a definitive determination that would have, for

19   example, *res judicata* effect over a court that is sitting in

20   Switzerland or potentially over the derivative action that's

21   pending in New York State court.

22           But the reality is, we, as you say, have two sets of

23   lawyers who are purporting to represent the company in this one

24   case and are at loggerheads, and I don't think there is a way

25   for the Court to avoid making some sort of determination as to

1   who is actually --

2          THE COURT:  I have this other case right now where an

3   inventor of board games is suing Hasbro over the idea of a

4   matchup of games, like Twister and Connect 4.

5          MR. COGBURN:  Sounds much more interesting than this

6   case, your Honor.

7          THE COURT:  This case is like some insane law student

8   who says, I know.  Let's combine federal courts and securities

9   or corporations and see how that goes.  That's what this is.

10  This is like an incredibly complicated federal court civil

11  procedure problem mashed in with corporations law of who is in

12  charge.

13         MR. TENENBAUM:  It would be a good law school exam

14  question.

15         THE COURT:  Thank you, Mr. Cogburn.

16         MR. POSTRYGACZ:  Your Honor, may I say a couple of

17  things briefly?

18         THE COURT:  Wait a minute.  Hang on just a second.

19  I'll get you next.

20         Do you agree that like ultimately to resolve the

21  motion to intervene we are going to need a hearing to

22  resolve -- you don't have to concede you need a hearing.  But

23  fundamentally what I have to resolve to resolve that question

24  is what is the larger issue here, which is what individuals are

25  the company right now?

1           MR. TENENBAUM:  Those are exactly the questions that

2   are posed in the derivative action and in this case.  That's

3   really fundamental.  So, yes, a hearing would absolutely be

4   required, and evidence.

5           THE COURT:  Does everybody agree, that is, Kobre &

6   Kim, Tenenbaum, and Mr. Postrygacz, that that case is actually

7   right now, from a company perspective, whoever is in charge of

8   this company, everybody agrees that that action is the right

9   action to resolve that question?

10          MR. TENENBAUM:  We certainly agree with that.

11          THE COURT:  Tenenbaum does, yes.

12          MR. SAUTER:  The company's position, your Honor, is

13  these corporate law questions should be resolved in Switzerland

14  by Swiss courts because this is a Swiss company.

15          THE COURT:  By the same token, that would argue in

16  favor of staying all this in deference to Switzerland.

17          MR. SAUTER:  If it came to that, your Honor, that

18  would be the company's preference, to stay this in favor of

19  resolution in Switzerland.

20          What I think Mr. Cogburn was trying to express is, you

21  can actually have it both ways.  There is a motion where the

22  other side had an opportunity to submit the evidence.  There is

23  evidence before you -- I think that the Court could make a

24  determination based on the evidence that was submitted before

25  it on this motion without -- it could reserve rights.  I am not

1   making a decision as to other evidence or what you might submit

2   in Switzerland.  But as to what's before me now --

3        THE COURT:  Why isn't that going to have a res

4   judicata effect?  It either was or could have been litigated.

5        MR. POSTRYGACZ:  It would, your Honor.  Another

6   interesting part is, the lawsuit that was filed by Mr.

7   Tenenbaum's office was filed sometime in --

8        MR. TENENBAUM:  It was filed on September 25, your

9   Honor.  The Doe action was filed on July 13.  The derivative

10  action was filed on September 25.

11       MR. POSTRYGACZ:  The SingularDTV, represented by Kobre

12  & Kim, admitted in papers, I believe, that it took them eight

13  months to undergo any investigation because clearly what they

14  are trying to do is make Zach LeBeau the bad guy, regardless.

15  It's why they included language regarding him being a charged

16  felon.  It's why they even included six paragraphs out of 66 in

17  this complaint regarding the hack.  Nothing in this

18  complaint -- the causes of action don't deal with Zach being

19  the hacker.  The relief does not deal with Zach being the

20  hacker.

21       Now, the John Doe action, Kobre & Kim hasn't said that

22  any action taken by Tenenbaum was not reasonable.

23       Look, Tenenbaum found out that there was an e-mail

24  connected to this hacker.  So what did they do?  They went and

25  they tried to get information regarding that e-mail.  Then they

1   got information regarding Binance and the crypto finding its

2   way to Binance.  What did Tenenbaum do?  Issued subpoenas to

3   Binance.

4           They claim there is a concern that because Tenenbaum

5   represents LeBeau or Jackson that he's not going to go after

6   the actual culprit who they say is LeBeau.  Mr. Tenenbaum has

7   taken all reasonable action to try and identify the actual

8   e-mail address and the Binance accounts connected to the

9   crypto.

10          The same concerns that they have regarding Mr. LeBeau

11  we had for Mr. Cohen.  Mr. Cohen --

12          THE COURT:  I got it.

13          How do you spell Binance?

14          MR. POSTRYGACZ:  B-i-n-a-n-c-e.

15          MR. TENENBAUM:  Can I have one point, your Honor?

16          THE COURT:  Sure.

17          MR. TENENBAUM:  The alleged crypto expert issued the

18  report on December 23.

19          THE COURT:  Who is the alleged crypto expert?

20          MR. TENENBAUM:  In one of their exhibits in this

21  matter, your Honor.

22          The hack happened in May.  Kobre & Kim didn't do

23  anything until December regarding the hack.  Then suddenly it's

24  LeBeau.

25          Putting Kobre & Kim in charge of the Doe matter only

 1   creates a witch hunt for LeBeau.  They have already decided who

 2   the perpetrator is.

 3        THE COURT:  We can't argue the merits of that right

 4   now.  I'm just trying to figure out literally how I move from

 5   where I am to where I want to be, which is both of these cases

 6   off of my docket.

 7        Mr. Sauter.

 8        MR. SAUTER:  I was going to tell your Honor that I

 9   have a whole graphic illustration of why the crypto transfers

10   and the hack point very reasonably to Mr. LeBeau, and I would

11   be happy to walk the Court through that.

12        THE COURT:  You're going to have an opportunity.  It's

13   just not going to be today.  It's curious that LeBeau would

14   have hired a law firm -- this is the most elaborate rouse of

15   hiring somebody to chase -- like this is a movie.  Now we have

16   a securities federal court, civil procedure, Hasbro, and --

17        MR. SAUTER:  It's not that elaborate, your Honor.

18   They hired a law firm to serve subpoenas on futile targets to

19   cover their tracks.  It's one possible interpretation.  We

20   don't know.  We are interested in getting to the bottom.

21        What I can say is, there is a very clear round-trip

22   transaction of the alleged hacked funds that left the cold

23   wallet that Mr. LeBeau controls and then went right back to it.

24        MR. POSTRYGACZ:  Your Honor, my client, when given the

25   opportunity, will clearly show that whatever is indicated does

1   not point back to him.

2            MR. TENENBAUM:  Also, this person has not been

3   qualified as an expert, I would also add.  We will also have an

4   expert that shows that it cannot have possibly been LeBeau.

5            THE COURT:  I can hardly wait.

6            Let me be clear.

7            What this illustrates is this case has to be on very

8   expedited discovery.  You've all got very clear ideas about

9   where we need to go.  I actually think -- I'm not sure that it

10  really matters what case we view the discovery in, whether it's

11  pursuant to your desire to intervene in the 6000 case or

12  whether it's this case, because it's all the same characters.

13           I think I had proposed these cases be consolidated.  I

14  sort of take that back.  I am not sure that they can be

15  consolidated.  I am not sure they need to be consolidated.

16  It's sort of a different problem.

17           MR. TENENBAUM:  Your Honor, can I also add something?

18           THE COURT:  Yes.

19           MR. TENENBAUM:  I don't believe the cases should even

20  be listed as related.

21           THE COURT:  They are definitely listed as related.

22           MR. TENENBAUM:  Looking back, in a decision by your

23  Honor in 2014, you referenced the Southern District of New York

24  rules for the division of business among district judges,

25  Section 13(a), which says:  Civil cases shall not be deemed

1  related merely because they involve common legal issues or the

2  same parties.

3        Here, the Doe case deals with a very specific issue.

4  It deals with a hack and it deals with the misappropriation of

5  some cryptocurrency.  The action initiated by Kobre & Kim

6  before this Court deals with governance issues, it deals with

7  allegations of misappropriation by LeBeau specifically of

8  intellectual property and e-mail, other things have nothing to

9  do with the sum certain that was stolen through the hack.  The

10 fact they have common parties does not make them related, your

11 Honor.

12       THE COURT:  Here is the thing.  It doesn't make a

13 dime's worth of difference to anybody other than how it counts

14 when they are counting my cases.  I wouldn't worry too much

15 about that because it has already been assigned to me.  Perhaps

16 if I had thought better of it at the time, I would have sent

17 one of these cases to somebody else.

18       MR. TENENBAUM:  In any event, your Honor, the motion

19 to intervene should have a hearing.

20       THE COURT:  You think there needs to be a hearing on

21 the motion to intervene?

22       MR. TENENBAUM:  I think there are material issues that

23 need to be resolved.  There has to be discovery as well.

24       THE COURT:  Whether they are consolidated or not, you

25 need to all work together.  I want a single discovery proposal

1  which will deal both with your motion to intervene and the --

2  what's the number on this case?  And the 10130 case.

3        MR. TENENBAUM:  Your Honor, with the Court's

4  permission, we would like to pursue the motion to compel

5  against Binance in the Doe matter.

6        THE COURT:  What's the view on Binance?  Is there any

7  reason why they shouldn't proceed with a motion to compel?

8        MR. SAUTER:  I would need to talk to my client about

9  that, your Honor.  My main concern is, I do a lot of

10  cryptocurrency litigation.  I have not been given the case

11  file.  To the extent there is a representation of SingularDTV

12  GmbH by two law firms, presumably we would get a copy of all of

13  those files.  I haven't seen those.  I don't know what Binance

14  has said.

15        I can tell you from my experience, if the account is

16  held in Binance's offshore entity, as opposed to their U.S.

17  entity, they will likely contest that on jurisdictional

18  grounds, in which case it may be a futile motion.  It will

19  depend on the Court's jurisdiction on whether their counsel

20  shows up to contest it.  It may be very expensive.  It will be

21  a question for the client whether they want to devote those

22  kinds of resources to that kind of motion.  I haven't spoken to

23  my client about that.

24        THE COURT:  Your client is not paying.  Their client

25  is paying.

1          MR. SAUTER:  I guess that's a question, your Honor.

2    We don't think their client should be paying with SingularDTV

3    funds.

4          THE COURT:  Do they have access to SingularDTV funds?

5          MR. SAUTER:  They have access to some funds that were

6    previously supplied to Breaker by the GmbH.  There are assets

7    that are in dispute right now about whether they should go back

8    to SingularDTV GmbH.  I don't know what the dispute would be.

9    I think there are assets that reside within Breaker.  They

10   should go back to SingularDTV GmbH.  That is a question that is

11   pending in Switzerland right now.

12         THE COURT:  The short answer is no.

13         MR. TENENBAUM:  OK.

14         THE COURT:  Again, that means everybody should be on

15   the same path to wanting expedited discovery in this case.

16   There is no right to a jury trial in this case.  Nobody is

17   asking for a jury anywhere, right?  This matter would just be a

18   hearing.  But nobody is seeking a jury in the 10130 case?

19         MR. POSTRYGACZ:  I don't believe so, your Honor.

20         MR. SAUTER:  Your Honor, I believe that we have asked

21   for a jury in our complaint.  I would need to speak with my

22   client.

23         MR. POSTRYGACZ:  I have the complaint right here, your

24   Honor.  I can let you know in a second.

25         THE COURT:  There is.  There is a jury demand.

1          MR. SAUTER:  I don't have authority to waive that at

2    this point.

3          THE COURT:  So here is the thing.  If this ends up not

4    being a jury trial, I can try it at my leisure and I can

5    guarantee you I can give you a trial this summer.  If there is

6    a jury trial demanded, I can't guarantee you a trial this

7    summer.  In fact, the likelihood of you getting a trial this

8    summer is remote because we are still going to be subject to

9    some COVID restrictions.  Talk to your client about whether

10   they really want a jury trial on this or not.

11         But this hearing, in any event, would not be

12   subject -- that's going to just be a hearing, if that's where

13   we end up.  I think that's something you all need to think

14   about, is whether you want what is essentially the critical

15   question in your 10130 case decided in the context of a hearing

16   relative to the motion to intervene.  That is a little bit what

17   the parties -- what you want or what the parties sort of

18   collectively want, what makes sense.

19         If you all can't all agree on what you want and what

20   makes sense, then I am going to do it on my schedule on what

21   makes sense for me, which will likely be a hearing on the 6000

22   case as soon as the discovery has been conducted and the

23   parties say they are ready for a hearing.

24         I think that's everything I can tell you and all the

25   information I can get from you to help me unravel this morass.

1          With that, anything further from the plaintiffs,

2     Mr. Cogburn or Mr. Sauter?

3          MR. COGBURN:  No, your Honor.

4          THE COURT:  Anything further from you, Mr. Tenenbaum?

5          MR. TENENBAUM:  No, your Honor.

6          THE COURT:  Anything further from Mr. LeBeau, Mr.

7     Postrygacz?

8          MR. POSTRYGACZ:  No, your Honor.  Just thank you for

9     your time.

10         THE COURT:  How about anything on behalf of

11    Ms. Jackson from Mr. Condzal?

12         MR. CONDZAL:  No, your Honor.  I apologize for

13    dominating the record.

14         THE COURT:  Gosh.  You're going to have to be shier.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25