**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SINGULARDTV GMBH, <br><br> *Plaintiff*, <br><br> *v.* <br><br> ZACHARY LEBEAU and KIMBERLY JACKSON, <br><br> *Defendants.* | Index No. 1:21-cv-10130 <br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

Plaintiff SingularDTV GmbH ("SingularDTV" or the "Company"), by its attorneys Kobre & Kim LLP, as and for its first amended complaint (the "Amended Complaint") against defendants Zachary LeBeau ("LeBeau") and Kimberly Jackson ("Jackson"; and together with LeBeau, the "Defendants"), hereby alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This case concerns the Defendants' infringing use of the SingularDTV word mark (the "Mark"), a trademark which the Company uses to distinguish its goods and services in commerce, which the Company has registered in Switzerland, Australia, Japan, Korea, India, Mexico, Russia, Turkey, the European Union, and the United Kingdom, and for which the Company has a pending application for registration with the United States Patent and Trademark Office (the "USPTO"). The Mark is also registered under the Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks (the "Madrid Protocol"), an

1

international trademark registration system implemented through a series of treaties and administered by the Swiss-based World Intellectual Property Organization.

2.      This case also concerns Defendants' unauthorized access to the Company's e-mail accounts, the contents of which include highly sensitive business trade secrets and employee information.

3.      SingularDTV brings this action for equitable and injunctive relief to stop Defendants' continuing infringement of the Mark and possession of SingularDTV trade secrets. SingularDTV also seeks damages arising from that infringement, along with damages caused by Defendants' unauthorized access to Company computer systems and Defendants' misappropriation of the confidential and competitively sensitive information stored on those systems.

## PARTIES

4.      Plaintiff SingularDTV GmbH is a *Gesellschaft mit beschränkter Haftung* ("GmbH") organized and existing under the laws of Switzerland, with a principal place of business at Poststrasse 30, 6300 Zug, Switzerland.

5.      Defendant Zachary LeBeau is a resident of New York, New York. He is a SingularDTV shareholder and, on information and belief, is Jackson's common-law husband.

6.      Defendant Kimberly Jackson is a resident of New York, New York. On information and belief, she is LeBeau's common-law wife.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because SingularDTV asserts claims under three federal statutes: the Lanham Act (15 U.S.C. §§ 1051–1129), the Computer Fraud and Abuse Act (18 U.S.C. § 1030), and the Defend Trade Secrets Act

(18 U.S.C. §§ 1831–39).  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the plaintiff and defendants are completely diverse in citizenship and the amount in controversy exceeds $75,000.

8.      This Court has personal jurisdiction over the Defendants because the Defendants are New York residents and because the Defendants transacted business in New York giving rise to the claims asserted herein.

9.      Venue lies within this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District and all Defendants are residents of New York State.

## FACTUAL BACKGROUND

**SINGULARDTV'S FOUNDERS REGISTER THE MARK AND FORM THE COMPANY IN SWITZERLAND.**

10.      SingularDTV GmbH was founded by LeBeau, Arie Yehuda Levy-Cohen ("Levy-Cohen"), and Joseph Michael Lubin[1] ("Lubin," and together with LeBeau and Levy-Cohen, the "Shareholders"). In 2015 and 2016, the Shareholders—along with Jackson, LeBeau's common-law wife—developed a plan for the business that would become SingularDTV.

11.      On July 1, 2016, as their vision for that business came into sharper focus, the Shareholders, through Swiss counsel, filed an application to register the Mark with the Swiss Federal Institute of Intellectual Property (the "IPI," Switzerland's equivalent of the USPTO).

12.      Three months later, the Shareholders formed SingularDTV as a private GmbH in the Canton of Zug, Switzerland. The Shareholders divided the share capital of the Company as follows: 43% each to LeBeau and Lubin, respectively, and 14% to Levy-Cohen. Initially, each of the Shareholders also served as an officer and managing director ("Director[s]") of SingularDTV's Board of Directors (the "Board"). Specifically, LeBeau served as SingularDTV's CEO, Levy-

---

[1] Lubin is a co-founder of Ethereum and the founder of ConsenSys, a full-stack, global blockchain company.

Cohen as CFO, and Lubin as CTO. In addition, since late 2018, Jackson provided the Company with COO services as an independent contractor.

13.     According to its Articles of Association, SingularDTV's corporate purpose is the "development, marketing, distribution and licensing of software, in particular the creation of a blockchain and Ethereum-based production and distribution platform, as well as the development, marketing, distribution and licensing of high-quality film and TV content."

14.     In December 2016, SingularDTV was registered with the Swiss Commercial Register.

**JACKSON AND LEBEAU FORM BREAKER TO SUPPORT SINGULARDTV'S BUSINESS.**

15.     The month after SingularDTV was created, LeBeau and Jackson formed a separate New York limited liability company that does business under the trade name Breaker LLC ("Breaker").[2] Though it was established to provide exclusive support to certain SingularDTV projects, Breaker is a separate entity. Jackson—LeBeau's wife—is Breaker's sole Member and Director. On information and belief, LeBeau acts as Breaker's de facto CEO. Together, LeBeau and Jackson exercise total control over Breaker.

16.     Breaker's work in support of the SingularDTV business was conducted under a Service and Development Agreement (the "Agreement"), which the companies entered into in January 2017,[3] and which required Breaker to perform certain services for SingularDTV and prohibited Breaker from performing work for itself or others. The Agreement contains a comprehensive non-compete clause restricting Breaker from working with other businesses, and assigning any and all intellectual property rights developed by Breaker to SingularDTV.

---

[2] Breaker's formal corporate name is SingularDTV LLC.
[3] SingularDTV and Breaker amended the Agreement in October 2018. The amendment did not affect any term relevant to this Complaint.

4

**SINGULARDTV REGISTERS THE MARK INTERNATIONALLY AND FURTHER DEVELOPS ITS BUSINESS.**

17.     On March 14, 2017, SingularDTV registered the Mark under the Madrid Protocol and applied to register the Mark in ten additional jurisdictions.

18.     On March 16, 2017, the IPI granted SingularDTV's application to register the Mark in Switzerland. The Mark was granted protection that same year in the European Union[4] and Australia. The following year, the Mark was registered in Russia; in 2019, it was registered in four more countries: Japan, Mexico, Korea, and India. The Company's application with the USPTO is pending.

19.     On information and belief, LeBeau, then SingularDTV's CEO, retained the outside counsel responsible for preparing and submitting these applications for trademark registration. In each case, LeBeau's chosen outside counsel—instructed by the Company and acting on its behhalf—sought to register the Mark as a distinctive identifier used to market and sell SingularDTV goods and services.

20.     As SingularDTV's business expanded, it used the Mark to identify and distinguish its goods and services in commerce, including in the United States.

21.     SingularDTV used social media platforms, including Medium and Twitter, to promote its tools and services to potential users and to keep interested parties apprised of the development status of those tools and services.

22.     In addition, in late 2017, SingularDTV launched Tokit, a blockchain-based smart-contract system designed to enable artists and content creators in the entertainment industry to

---

[4] The European Union's registration of the Mark was separately registered in the United Kingdom following the United Kingdom's exit from the European Union.

manage rights, revenues, and royalties associated with their projects through the creation and issuance of cryptographic tokens.

23.     The Tokit website (accessible at https://tokit.io) identifies Tokit to potential users as a SingularDTV offering, including in several videos in which LeBeau appears:






24.     The Company also used the Mark to identify Tokit as a SingularDTV offering in other media. For example, an article written by LeBeau and posted to Medium on November 6,

6

2017, describes Tokit as "the first of SingularDTV's suite of decentralized applications to launch on the blockchain."[5]

25.    In January 2018, the Company further expanded its business by announcing the development of EtherVision, a decentralized, blockchain-based content distribution platform. As with Tokit, the Company used the Mark to identify EtherVision as a SingularDTV service, including in an article posted to Medium entitled "SingularDTV: Welcome to EtherVision"[6] and in a white paper hosted on GitHub, which is entitled the "SingularDTV / EtherVision-onepager."[7]

26.    The Company's use of the Mark in commerce has continued in more recent years. Last summer, for example, the Company used the Mark to introduce a business-to-business, software-as-a-service platform for the management of royalties and other creative rights (the "B2B SaaS Platform"). In announcing the B2B SaaS Platform, the Company described it as "a part of the SingularDTV ecosystem" that would "further[] the mission of SingularDTV and integrat[e] key developments in the web3 space over the past several years."[8] The Company currently plans for the B2B SaaS Platform to be a first-priority strategic focus for the next several years.

27.    Through its use in connection with these unique commercial projects, the Mark has acquired additional distinctiveness, value, and prestige within the relevant market.

---

[5] The Tokit article is available at https://medium.com/singulardtv/tokit-is-here-the-evolution-in-entertainment-begins-1d3e9eaff348.

[6] The EtherVision article is available at https://medium.com/singulardtv/singulardtv-welcome-to-ethervision-4ee659d03921.

[7] The white paper is available at https://github.com/SingularDTV/EtherVision-onepager.

[8] SingularDTV's announcement of the B2B SaaS Platform is available at https://singulardtv.medium.com/introducing-the-breaker-royalty-management-platform-60a819b80c1e.

**BREAKER USES THE MARK IN CONNECTION WITH WORK PERFORMED FOR SINGULARDTV.**

28.     As part of its arrangement with Breaker, SingularDTV permitted Breaker to use the Mark in connection with the marketing of goods and services produced by Breaker pursuant to the Agreement.

29.     Breaker did this, for example, when it produced *Trust Machine*, a documentary film about blockchain technology, using the Mark to describe the film in promotional materials that have since been reproduced on IMDb (https://www.imdb.com/title/tt7407496/plotsummary?ref_=tt_ov_pl)  and on the director's personal website (https://alexwinter.com/projects/trust-machine/):

> TRUST MACHINE is the first blockchain-funded, blockchain-distributed, and blockchain-focused documentary, from entertainment tech company SingularDTV and Futurism Studios. The feature documentary explores the evolution of cryptocurrency, blockchain and decentralization, including the technology's role in addressing important real-world problems, such as world hunger and income inequality.

30.     To present a single, cohesive brand to the marketplace, SingularDTV and Breaker also shared several web domains, including singulardtv.com (the "SingularDTV Domain"). As Breaker's sole member and SingularDTV's COO, Jackson took primary responsibility for managing the companies' joint website.

**LEBEAU'S MISUSE OF COMPANY RESOURCES LEADS TO HIS AND JACKSON'S OUSTER FROM THE COMPANY, AND SINGULARDTV TERMINATES THE AGREEMENT WITH BREAKER.**

31.     After a series of disputes about LeBeau's control over the Company's financial assets—culminating in an incident in which, under highly suspicious circumstances that are the subject of related litigation before this Court,[9] LeBeau unilaterally transferred over US $2 million

---

[9] *SingularDTV GmbH v. Doe*, Case No. 1:21-cv-6000 (VEC) (S.D.N.Y.).

worth of Company assets to a purported "hacker" posing as Levy-Cohen—SingularDTV's Board voted on May 27, 2021 to terminate LeBeau as CEO with immediate effect and withdrew all his signatory authorities and powers to act on behalf of the Company.

32.    At the same meeting, the Company's Directors voted to terminate SingularDTV's relationship with Breaker "as soon as possible," to cease "any spending on content" (i.e., the services Breaker was to provide under the Agreement), and to "take[] all steps to completely exit any remaining obligation for the production of content, effective immediately."

33.    The following day, in a written notice to Jackson and LeBeau, SingularDTV terminated the Agreement with Breaker and instructed Jackson "to perform no additional work from receipt of this notice," "to incur no additional fees," and to "fully[y] deliver . . . any intellectual property or financial assets held by Breaker LLC on behalf of Singular[DTV]." Neither Jackson nor LeBeau responded to this notice.

34.    On June 8, 2021, after Jackson failed to surrender SingularDTV's intellectual property and other assets following the termination of the Agreement, SingularDTV's Board resolved to terminate Jackson's position as COO, as well.

**DEFENDANTS REFUSE TO RELINQUISH CONTROL OVER THE COMPANY OR ITS ASSETS, INCLUDING ITS INTELLECTUAL PROPERTY AND E-MAIL ACCOUNTS.**

35.    Unwilling to accept that SingularDTV had fired them, LeBeau and Jackson refused to step away from the Company. Instead, they continued to hold themselves out as representatives of the Company and unlawfully retained control over valuable Company assets.

36.    On information and belief, LeBeau and Jackson took these steps maliciously and in bad faith to generate additional leverage in negotiations over LeBeau's exit from SingularDTV. Shortly before an August 27, 2021, Shareholders' meeting convened to discuss the removal of

LeBeau as a director of the Company, LeBeau sent the Company an extortionate "exit proposal." In his "proposal," LeBeau demanded that, in exchange for his ownership interest in SingularDTV, he be given all of the Company's "entertainment assets," a share of the valuable cryptographic tokens belonging to the Company, and a share of the Company's future profits from the B2B SaaS Platform. The Company rejected this proposal.

37.     At a Shareholders' meeting held on September 24, 2021, Lubin and Levy-Cohen voted to remove LeBeau from the Company's Board.

38.     Two weeks after LeBeau's removal from the Board, Neil Postrygacz, Defendants' counsel, wrote to the Company to inform it, without prior warning, that Breaker "w[ould] no longer be providing the GmbH with e-mail services." Defendants immediately disabled SingularDTV's access to its Company e-mail accounts and their contents.

39.     In reality, Defendants were commandeering SingularDTV's e-mail accounts, usurping control of highly sensitive business and employee information in the process.

40.     Breaker never "provided" SingularDTV with e-mail services. Rather, SingularDTV received third-party business services, including e-mail services, from Microsoft, which Defendants arranged through a reseller, DAG Tech, that it did not disclose to SingularDTV until May 2021. Although Breaker brokered these services through DAG Tech, SingularDTV was the identified client, "service recipient," and payor on invoices issued by Microsoft.

41.     On information and belief, despite lacking any legitimate basis to do so, Defendants disrupted this relationship by instructing DAG Tech to cut off all e-mail access to SingularDTV employees.

42.     The disruption on SingularDTV's business was immediate and crippling. The Company and its employees lost access to financial accounts, privileged legal communications,

10

years of highly sensitive business and personal information, tax and employee social security information, and extensive communications with clients and other third-party service providers.

43.     Defendants' decision to hijack SingularDTV's e-mail systems was malicious, without right or justification, and specifically intended to inflict harm on the Company and its employees. Defendants' intent in terminating SingularDTV's e-mail access was to disrupt the Company's business and generate leverage in negotiations over LeBeau's desired separation package and division of SingularDTV's assets.

44.     Worse still, Defendants not only terminated the Company's access to its e-mail accounts, but also assumed control over those accounts and gained unfettered access to the Company's highly sensitive business information and trade secrets—not to mention the personal information of SingularDTV's employees.

45.     During meet-and-confer discussions prior to the filing of the original complaint in this action, Postrygacz informed Company counsel that the Company's e-mail accounts were being actively monitored. Postrygacz refused to identify who had access to the accounts, how many people had access, or what controls were in place to ensure the security of sensitive company and employee information.

46.     SingularDTV has since learned that, at a minimum, the e-mails of its resident signatory, Patrik Allenspach, were accessed and read by two Breaker employees, Edward Greenwood and Gigi Dessources.

47.     At or around the same time, Defendants caused the contents of at least two SingularDTV e-mail accounts—those belonging to former CFO Martin Trepp and former head of compliance Amrita Rizal—to be forwarded without authorization to Jackson's separate e-mail account (kim@breaker.io), despite the fact that she had been terminated by SingularDTV.

48.     SingularDTV has also since collected evidence showing that, during their hijack of the Company's e-mail accounts, Defendants failed to forward important correspondence to SingularDTV's remaining representatives, despite promising to do so.

49.     Although Defendants have since agreed and been ordered by this Court to return certain e-mail accounts to the Company's control, they have never provided the Company with information regarding the nature or extent of their intrusion into these accounts. On information and belief, Defendants used their control over Company e-mail accounts to access and misappropriate confidential and competitively sensitive Company information, without authorization, and to further strengthen their negotiating position with the Company.

50.     In addition, Defendants were responsible for the permanent loss of several e-mail accounts for former SingularDTV directors, employees, and contractors. These include the e-mail account used by Levy-Cohen during his terms as acting CFO, President of the Board of Directors, and Resident Director. In particular, on information and belief, Defendants intentionally caused these e-mail accounts to be deleted when they migrated the Company's other e-mail accounts from the Singulardtv.com domain to the breaker.io domain under their exclusive control. To date, Defendants have refused to provide any meaningful explanation for their failure to preserve this valuable company property, which is causing SingularDTV ongoing harm.

51.     Furthermore, LeBeau and Jackson continue to wrongfully retain possession and control of their own SingularDTV e-mail accounts. As the former CEO and COO, respectively, of SingularDTV, their SingularDTV e-mail accounts, along with all other accounts that they have used to conduct Company business, rightfully belong to SingularDTV.

**DEFENDANTS CONTINUE TO USE THE MARK IN CONNECTION WITH BREAKER'S BUSINESS.**

52. In addition to commandeering the Company's e-mail accounts, Defendants have also continued to use the Mark in connection with Breaker projects. This continuing use of the Mark is infringing and without permission, as Breaker, following the termination of the Agreement, is no longer authorized to perform work for SingularDTV or use the Mark.

53. One glaring example of Defendants' ongoing infringement of the Mark is Breaker's continuing use of and exclusive control over the SingularDTV Domain. In yet another malicious act apparently calculated to enhance Defendants' negotiating position with SingularDTV, Jackson confirmed, in discussions preceding the filing of this Amended Complaint, that she currently has control over the SingularDTV Domain. Nevertheless, Jackson has refused and still refuses to relinquish the SingularDTV Domain to the Company.

54. As of the filing of this Amended Complaint, the SingularDTV Domain directs web traffic to a shared landing page (reproduced below) that displays two prominent links side by side. On the left, this page directs users to a link promoting "Breaker Studios"—the trade name associated with Breaker Studios, LLC, a new entity Defendants formed in September 2021, presumably as a vehicle for the continuation of content-based work Breaker performed on behalf of SingularDTV—and the fruits of which, under the Agreement, are SingularDTV property. On the right, a separate link promotes digital-rights-management projects, including the B2B SaaS Platform, that, on information and belief, Defendants intend to continue developing in competition with SingularDTV.



55.     Defendants infringing use of the Mark within and in connection with the SingularDTV Domain is likely to confuse potential consumers by associating Breaker's business with SingularDTV and conveying the impression that SingularDTV endorses and continues to support that business. In truth, Breaker's work on behalf of SingularDTV ended last May, when the Company's Directors voted to terminate the Agreement and notified Defendants of that termination in writing, thus revoking Breaker's authority to continue to perform work on SingularDTV's behalf and stripping Breaker of permission to use SingularDTV's Mark in commerce.

56.     Defendants infringing use of the Mark within and in connection with the SingularDTV Domain also dilutes the Company's brand. Both links on the landing page direct users to non-private, non-secure web addresses. Users who click on either link using a modern web browser are likely to be warned that proceeding to the relevant pages puts them at risk for theft of their personal data. When clicking on either link from within Microsoft Edge, for example,

14

users receive an ominous message that their "connection isn't private" and that "[a]ttackers might

be trying to steal [their] information . . . (for example, passwords, messages, or credit cards)":



57.     By using the SingularDTV Domain to direct web traffic to other, non-secure pages,

Defendants wrongly present SingularDTV as either incapable of or unconcerned with protecting

the privacy of its users. For a company whose business revolves around the management of royalty

and distribution rights on the blockchain, this severely dilutes SingularDTV's goodwill and lessens

public trust in the Company and its management.

**FIRST CAUSE OF ACTION**
**<u>TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT, 15 U.S.C. § 1114</u>**

58.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs

1 to 57 above, and incorporates them herein by this reference.

59.     SingularDTV is the exclusive owner of the Mark, which identifies and distinguishes

SingularDTV's goods and services in the marketplace.

60.     The Mark is fanciful, arbitrary, and otherwise inherently distinctive when used in

connection with SingularDTV's goods and services.

15

61.     The Mark identifies SingularDTV as the exclusive source of goods and services offered under the Mark and has thereby acquired further distinctiveness, value, and prestige within the relevant market.

62.     SingularDTV has the exclusive right to use the Mark in commerce for advertising, promoting, offering for sale, and selling its goods and services.

63.     SingularDTV's exclusive rights in the Mark are superior to any rights that Defendants could attempt to establish in and to the Mark.

64.     Defendants are using the SingularDTV Mark in commerce to advertise, promote, offer for sale, and sell the goods and services offered by Breaker.

65.     Defendants' use of the Mark to advertise, promote, offer for sale, and sell the goods and services offered by Breaker has confused, misled, and deceived, and is likely to continue confusing, misleading, and deceiving, consumers about whether Breaker is SingularDTV, is affiliated with SingularDTV, or is licensed or authorized to produce and sell goods and services for SingularDTV.

66.     Defendants' use of the Mark to advertise, promote, offer for sale, and sell the goods and services offered by Breaker has confused, misled, and deceived, and is likely to continue confusing, misleading, and deceiving, consumers about whether Breaker's goods and services are affiliated, connected, and/or associated with SingularDTV's goods and services.

67.     Defendants' use of the Mark to advertise, promote, offer for sale, and sell the goods and services offered by Breaker has confused, misled, and deceived, and is likely to continue confusing, misleading, and deceiving, consumers about whether Breaker's goods and services originate from, are sponsored, endorsed, or approved by, or are offered under a license from SingularDTV.

16

68.    Since SingularDTV's termination of the Agreement, Defendants' use of the Mark has been without SingularDTV's consent.

69.    Based on their preexisting business relationship with SingularDTV, Defendants had actual, longstanding knowledge of SingularDTV's ownership of and superior rights in the Mark at the time Defendants began using the Mark without SingularDTV's consent.

70.    Defendants' knowing unauthorized use of the Mark is a bad-faith tactic designed to further their scheme to extort exorbitant consideration from SingularDTV in exchange for LeBeau's relinquishment of his ownership interest in the Company.

71.    On information and belief, Defendants have realized economic value to which they had and have no legal or equitable entitlement, including increased profits and consumer goodwill, from their unauthorized use of the Mark.

72.    Defendants' acts and conduct described herein constitute trademark infringement in violation of 15 U.S.C. § 1114.

73.    Defendants' unlawful actions have proximately damaged SingularDTV in an amount to be determined at trial.

74.    Defendants are liable to SingularDTV for the damages caused by their unlawful actions.

75.    Defendants are also vicariously liable for any acts of trademark infringement undertaken by Breaker. As Breaker's sole owners and officers, Defendants have the legal right and practical ability to control Breaker's infringing conduct, did in fact control Breaker's infringing conduct, and had and have a direct financial interest in Breaker's infringing conduct.

76.    In addition, Defendants are entitled to recover enhanced damages and attorney's fees due to Defendants' knowing, willful, and malicious infringement of the Mark.

17

77.     SingularDTV has also suffered unquantifiable and irreparable harm as a result of Defendants' unlawful actions.

78.     Defendants should be permanently enjoined from ever again infringing on the Mark.

79.     Defendants should be ordered to return the SingularDTV Domain to SingularDTV.

**SECOND CAUSE OF ACTION**
**TRADEMARK DILUTION UNDER THE LANHAM ACT, 15 U.S.C. § 1125**

80.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 79 above, and incorporates them herein by this reference.

81.     SingularDTV is the exclusive owner of the Mark, which identifies and distinguishes SingularDTV's goods and services in the marketplace.

82.     The Mark is fanciful, arbitrary, and otherwise inherently distinctive when used in connection with SingularDTV's goods and services.

83.     The Mark identifies SingularDTV as the exclusive source of products offered under the Mark and has thereby acquired further distinctiveness, value, and prestige within the relevant market.

84.     SingularDTV has the exclusive right to use the Mark in commerce for advertising, promoting, offering for sale, and selling its goods and services.

85.     SingularDTV's exclusive rights in the Mark are superior to any rights that Defendants could attempt to establish in and to the Mark.

86.     Defendants are using the SingularDTV Mark in commerce to advertise, promote, offer for sale, and sell the goods and services offered by Breaker.

18

87.     Defendants' use of the Mark to advertise, promote, offer for sale, and sell the goods and services offered by Breaker has blurred the Mark, impairing the Mark's distinctiveness by associating it with a separate and inferior business with which SingularDTV is not affiliated and which it does not endorse.

88.     In addition, Defendants' use of the Mark to advertise, promote, offer for sale, and sell the goods and services offered by Breaker has tarnished the Mark, harming SingularDTV's reputation by associating the Mark with negative and undesirable business conduct, including but not limited to the direction of web traffic, via the SingularDTV Domain, to non-private, non-secure web pages.

89.     Defendants' unlawful blurring and tarnishing of the Mark has proximately damaged SingularDTV in an amount to be determined at trial.

90.     Defendants are liable to SingularDTV for the damages caused by their unlawful actions.

91.     Defendants are also vicariously liable for any acts of trademark dilution undertaken by Breaker. As Breaker's sole owners and officers, Defendants have the legal right and practical ability to control Breaker's diluting conduct, did in fact control Breaker's diluting conduct, and had and have a direct financial interest in Breaker's diluting conduct.

92.     SingularDTV has also suffered unquantifiable and irreparable harm as a result of Defendants' unlawful blurring and tarnishing of the Mark.

93.     Defendants should be permanently enjoined from ever again infringing on the Mark.

94.     Defendants should be ordered to return the SingularDTV Domain to SingularDTV.

19

## THIRD CAUSE OF ACTION
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030

95.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 94 above, and incorporates them herein by this reference.

96.     Defendants violated the Computer Fraud and Abuse Act (the "CFAA", 18 U.S.C. § 1030) by, among other things, willfully and maliciously impairing SingularDTV's access to the contents of its business e-mail systems and, without authorization, accessing or permitting to be accessed the contents of those e-mail systems.

97.     On information and belief, Defendants have obtained data from SingularDTV's e-mail systems despite having no authorization and/or exceeding their authorization to access those e-mail systems.

98.     The servers on which SingularDTV's business e-mail systems are hosted are a "protected computer" within the meaning of the CFAA.

99.     Defendants' interference with SingularDTV's business e-mail systems caused damage to a protected computer by, among other things, impairing and interrupting SingularDTV's ability to access its information, data, and systems.

100.     The above violation of the CFAA has proximately caused significant damage to SingularDTV, including (1) costs and monetary losses in excess of $5,000 within a year of the filing of this complaint and (2) other losses that cannot be calculated, including lost business, loss of reputation, loss of goodwill, and potential third-party liability.

101.     SingularDTV is entitled to an injunction permanently prohibiting defendants from accessing SingularDTV's e-mail accounts and other computer systems without authorization.

20

102.     SingularDTV is also entitled to recover damages in the amount of all revenue lost, costs incurred, restoration and investigation costs, and other consequential damages caused by Defendants' unauthorized access to SingularDTV's business e-mail systems.

## FOURTH CAUSE OF ACTION
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

103.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 102 above, and incorporates them herein by this reference.

104.     Defendants violated the Defend Trade Secrets Act (the "DTSA", 18 U.S.C. §§ 1831 through 1839) by, among other things, willfully and maliciously terminating SingularDTV's access to the contents of its business e-mail systems and, without authorization, accessing or permitting to be access the contents of those e-mail systems.

105.     SingularDTV's e-mail systems include substantial confidential information, including competitively sensitive trade secrets that derive value from their secrecy.

106.     Defendants have misappropriated and/or conspired to misappropriate the trade secrets stored on SingularDTV's e-mail systems.

107.     On information and belief, Defendants transferred certain trade secrets stored on SingularDTV's e-mail systems to unknown accounts and remain in possession of those trade secrets.

108.     SingularDTV is entitled to an injunction requiring Defendants to destroy all documents, copies of documents, computer files, e-mail messages, and other materials in their possession that contain, reflect, or refer to SingularDTV's trade secrets.

109.     SingularDTV is also entitled to an injunction requiring Defendants to refrain permanently from misappropriating, in whole or in part, any competitively sensitive information belonging to SingularDTV.

110.     SingularDTV is also entitled to recover compensatory damages in the amount of all losses proximately caused by Defendants' misappropriation of SingularDTV's trade secrets.

111.     SingularDTV is also entitled to recover damages in the amount by which Defendants have been unjustly enriched due to their misappropriation of SingularDTV's trade secrets.

112.     SingularDTV is also entitled to recover enhanced damages and attorneys' fees due to Defendants' willful and malicious misappropriation of SingularDTV's trade secrets.

## JURY DEMAND

SingularDTV demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, SingularDTV respectfully requests judgment in its favor and against Defendants:

a.   declaring that the Mark is a valid, protectable trademark;

b.   declaring that SingularDTV's rights in and to the Mark are superior to any rights Defendants could assert in and to the Mark;

c.   requiring Defendants to transfer the SingularDTV Domain to SingularDTV;

d.   requiring Defendants to account for profits;

e.   ordering Defendants to pay SingularDTV a reasonable royalty for their use of the Mark;

f.   permanently enjoining Defendants from using the Mark in commerce;

g.  permanently enjoining Defendants from accessing or causing to be accessed SingularDTV's business e-mail accounts or other computer systems without authorization;

h.  permanently enjoining Defendants from accessing or causing to be accessed SingularDTV's trade secrets without authorization;

i.  awarding SingularDTV damages in an amount to be determined at trial, including enhanced damages and attorneys' fees for Defendants' willful and malicious conduct; and

j.  granting all other relief the Court deems just and proper.

Dated:  New York, New York

March 4, 2021

Respectfully submitted,

/s/ Benjamin J.A. Sauter
Benjamin J.A. Sauter
Christopher S. Cogburn
Alexa R. Perlman
KOBRE & KIM LLP
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
Facsimile: (212) 488-1220

*Attorneys for Plaintiff SingularDTV GmbH*