**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SINGULARDTV GMBH,

                   *Plaintiff*,

    *v.*

ZACHARY LEBEAU and KIMBERLY JACKSON,

                   *Defendants.*

---

Index No. 1:21-cv-10130

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiff SingularDTV GmbH ("SingularDTV" or the "Company"), by its attorneys Kobre & Kim LLP, as and for its complaint (the "Complaint") against defendants Zachary LeBeau ("LeBeau") and Kimberly Jackson ("Jackson"; and together with LeBeau, the "Defendants"), hereby alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This case concerns LeBeau's refusal to return many thousands of Ether ("ETH"), the native cryptocurrency of the Ethereum blockchain, as well as other digital assets rightfully belonging to SingularDTV following his termination as an officer and director of the Company. As of the date of this filing, the current value of the ETH wrongfully possessed by LeBeau is approximately US $50 million.

2.    This case also concerns a disturbing pattern of conduct by LeBeau—on an ongoing basis—to maliciously interfere with and exert control over the Company following his termination. LeBeau's rogue and illegal actions include, without limitation: (i) interfering with SingularDTV's

access to and control over its e-mail systems; (ii) accessing and monitoring Company and employee e-mail accounts, including highly sensitive business and employee information contained therein; (iii) launching unauthorized litigation on behalf of the Company, including in the Southern District of New York and elsewhere; and (iv) in all likelihood, continuing to dissipate Company assets under his possession and control.

3.      Defendant LeBeau is SingularDTV's co-founder and its former Director and former CEO. He is a filmmaker and self-proclaimed "pioneer of blockchain technology." He is also a charged felon—a fact that LeBeau did not disclose to SingularDTV at the Company's inception. In 2010, prosecutors in Iowa charged LeBeau with a dozen counts of fraud-based felonies for his role in a scheme to defraud the State through its film tax credit program, including by submitting exaggerated or fictitious invoices.[1] While not the subject of this Complaint, the Company has strong and well-founded suspicions that LeBeau engaged in similar fraudulent practices while working at SingularDTV, and the Company's investigation in this regard is ongoing.

4.      As set forth below, LeBeau is now leveraging his wrongful possession of SingularDTV's assets to try to extract a multimillion-dollar exit package from the Company. All indications are that LeBeau will continue to take steps to interfere with SingularDTV's business unless and until restrained. His malicious conduct is impeding SingularDTV from conducting its business operations and causing SingularDTV irreparable and ongoing harm.

5.      SingularDTV brings this action for equitable and injunctive relief to recover its wrongfully withheld property and e-mail accounts that are in the exclusive possession or control of Defendants. SingularDTV also seeks damages arising from Defendants' wrongful interference with its business and unauthorized access to Company computer systems.

---

[1] Prosecutors eventually dropped the charges against LeBeau after he agreed to cooperate in the prosecution of other members of his criminal network.

2

## PARTIES

6.      Plaintiff SingularDTV GmbH is a limited liability company (or *Gesellschaft mit beschränkter Haftung*) organized and existing under the laws of Switzerland, with a principal place of business at Poststrasse 30, 6300 Zug, Switzerland.

7.      Defendant Zach LeBeau is a resident of New York, New York. On information and belief, he is Jackson's common-law husband and a SingularDTV shareholder.

8.      Defendant Kimberly Jackson is a resident of New York, New York. On information and belief, she is LeBeau's common-law wife.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the plaintiff and defendants are completely diverse in citizenship and the amount in controversy exceeds $75,000. In addition, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because SingularDTV asserts claims under the federal Computer Fraud and Abuse Act (18 U.S.C. § 1030) and the federal Defend Trade Secrets Act (18 U.S.C. §§ 1831–39).

10.     This Court has personal jurisdiction over the Defendants because the Defendants are New York residents and because the Defendants transacted business in New York giving rise to the claims asserted herein.

11.     Venue lies within this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District and all Defendants are residents of New York State. On information and belief, venue also lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of property that is the subject of this action is situated here—namely, the laptop containing the private keys for the ETH that LeBeau is wrongfully withholding from SingularDTV.

## FACTUAL BACKGROUND

**SINGULARDTV IS FORMED IN SWITZERLAND IN 2016.**

12.     On December 2, 2016, LeBeau, Arie Yehuda Levy-Cohen ("Levy-Cohen"), and Joseph Michael Lubin[2] ("Lubin", together with LeBeau and Levy-Cohen, the "Shareholders") formed SingularDTV as a private limited liability company (GmbH) in the Canton of Zug, Switzerland. As such, SingularDTV is subject to the rules of Switzerland governing GmbH business entities.

13.     The Shareholders divided the share capital of the Company as follows: 43% each to LeBeau and Lubin, respectively, and 14% to Levy-Cohen. Initially, each of the Shareholders also served as an officer and managing director ("Director[s]") of SingularDTV's Board of Directors (the "Board"). Specifically, LeBeau served as SingularDTV's CEO, Levy-Cohen as CFO, and Lubin as CTO.

14.     SingularDTV's corporate purpose is the "development, marketing, distribution and licensing of software, in particular the creation of a blockchain and Ethereum-based production and distribution platform, as well as the development, marketing, distribution and licensing of high-quality film and TV content."

15.     The Shareholders, through Swiss legal counsel, filed a Notarial Deed and Articles of Association (the "Articles") and adopted Organisational By-Laws and Board Regulation (the "Bylaws"). The Articles and Bylaws are the Company's sole governance documents. The Swiss Commercial Register for the Canton of Zug maintains a publicly available and legally authoritative online database of registered companies at https://zg.chregister.ch/ (the "Commercial Registry").

---

[2] Lubin is a co-founder of Ethereum and the founder of ConsenSys, a full-stack, global blockchain company.

16.     At the time they formed the Company, LeBeau did not disclose to the Company or the other Directors that he had previously been criminally charged with a multitude of fraud offenses. Specifically, in 2010, LeBeau was charged (along with several other defendants) in the Polk County District Court of Iowa with one class B felony count of ongoing criminal conduct and 11 class C counts of first-degree fraudulent practices for his alleged role in a scheme to defraud the State of Iowa through its film tax credit program. According to various contemporaneous news articles, LeBeau was a "participant in a criminal network that unlawfully exaggerated expenditures far beyond their actual fair-market values on applications for tax credits."[3] "Prosecutors alleged there was evidence of double-billing and highly inflated expenditures—many that were for in-kind services or in-kind payments where no actual transactions took place."[4] "Prosecutors also allege[d] in court documents that people served as line producers and other film positions that were fictitious or overstated in applications filed with the state and that some proposed film projects were submitted even though no script had been developed."[5] Ultimately, shortly before trial, charges against LeBeau "were dropped in exchange for his cooperation in the case."[6]

17.     On information and belief, LeBeau concealed his criminal history from the other co-cofounders because he knew that disclosing it would, at a minimum, have resulted in heightened scrutiny of his use and control of Company assets. Lubin and Levy-Cohen would not have staked their reputations on an association with LeBeau had they been aware of his criminal history, nor would they have trusted him to be a responsible steward of the Company's assets and operations.

---

[3] https://wcfcourier.com/news/local/govt-and-politics/separate-trials-ordered-for-accused-filmmakers/article_80281dac-8b8a-540e-bfd1-9750b45334d8.html
[4] *Id.*
[5] *Id.*
[6] https://www.twincities.com/2011/02/16/minn-filmmaker-pleads-guilty-in-iowa-fraud-trial/.

**SINGULARDTV LAUNCHES THE SNGLS TOKEN TO FUND THE COMPANY'S PLANNED PROJECTS.**

18.     On October 2, 2016, SingularDTV launched an Ethereum-based "SNGLS" token in a "token generation event" (the "TGE"). The TGE raised approximately 580,000 ETH (worth approximately US $7.5 million at the time).[7]

19.     Specifically, under the terms & conditions of the TGE (the "Token Terms"), a total of one (1) billion SNGLS tokens (all of equal value) were generated by a smart contract[8] system (the "Smart Contract"): 500 million tokens were acquired by "[u]sers" (the "Token Holders") at an exchange value per SNGLS token of 0.00116 ETH (or $0.015 per SNGLS), raising around US $7.5 million worth of ETH (580,000 ETH); 400 million SNGLS tokens were allocated to the Company for future services (the "Company SNGLS"); and 100 million SNGLS tokens were allocated to SingularDTV's early financial contributors.

20.     The Company uses the ETH raised in the TGE to fund the development of its projects. As set forth in the Token Terms, SingularDTV's projects were originally intended to consist of (i) an original television series, (ii) a documentary division, (iii) a digital rights management platform built on Ethereum, and (iv) a video-on-demand distribution portal.

21.     The ETH raised in the TGE are Company property. They have been accounted for as company assets since the date of the TGE. A 2018 valuation of the ETH, created for SingularDTV's year-end financial statements and signed by LeBeau, "confirm[ed] that . . . the company is the beneficial owner and can dispose of the assets." In a request for conciliation naming SingularDTV as Respondent, which LeBeau filed in Switzerland just this September, LeBeau admitted that the "wallet" in which the ETH is stored is "Respondent's wallet."

---

[7] SingularDTV did not convert its ETH into fiat currency post-launch—thus, a substantial amount of value was added to its resources with ETH's rise over the past five years.

[8] A "smart contract" is a program stored on the blockchain that runs when predetermined conditions are met.

22.     The Company SNGLS, meanwhile, were locked up through the Smart Contract and could not be transferred for a period of two (2) years from the TGE. SingularDTV also committed to, among other things, reinvest the revenues generated in connection with those tokens into further development of the SingularDTV Projects.

**SINGULARDTV STORES THE ETH AND SNGLS RAISED AND ALLOCATED IN THE TGE IN A COLD WALLET THAT LEBEAU NOW EXCLUSIVELY CONTROLS.**

23.     SingularDTV's founders decided that the ETH raised in the TGE, as well as the Company SNGLS, would be secured in a cold wallet[9] (the "Cold Wallet") to which they would be automatically transferred by operation of the Smart Contract.

24.     The founders initially configured the Cold Wallet with multi-signature (or "multi-sig") protections—i.e., multiple signatures or private keys[10] would be required to authorize a transaction.

25.     Multi-sig cold wallets are the industry standard and among the most secure storage methods for custody of digital assets. Among other things, multi-sig protection ensures that no one person can unilaterally withdraw assets from the wallet.

26.     Unbeknownst to the other Shareholders and other board members at the time, LeBeau later reconfigured the Cold Wallet as a single-signature wallet to which he alone holds the private keys, such that no second person is required to enter a private key to initiate a transaction.

---

[9] A "wallet" is (comparable to an electronic purse) an address on the blockchain where tokens such as ETH are stored and from where transactions can be carried out with these tokens (which are then also stored again on the blockchain, resulting in an unbroken chain of transactions). For a transfer of an amount of cryptocurrency to a recipient, a so-called "private key" is required, with which such a transfer from the wallet to a recipient is "authorized." "The terms hot wallet and cold wallet derive from the more general terms hot storage, meaning online storage, and cold storage, meaning offline storage. A hot wallet is a [cryptocurrency] wallet for which the private keys are stored on a network-connected machine (i.e.[,] in hot storage). By contrast, for a cold wallet the private keys are stored offline." Steven Goldfeder et al., *Securing Bitcoin Wallets via a New DSA/ECDSA Threshold Signature Scheme*, at 10, Princeton University, available at http://stevengoldfeder.com/papers/threshold_sigs.pdf. In other words, "a cold wallet is a wallet from which [cryptocurrency] cannot be spent without accessing cold storage," such as a laptop, USB drive, or other physical device. *Id.*

[10] In Ethereum, the private key is a string of 64 random hex characters.

In addition, LeBeau currently maintains sole and exclusive possession of the physical device containing these private keys—and, as a result, the ETH raised in the TGE, which can only be transferred using those private keys. On information and belief, these keys are stored on a computer located in a safe in one of LeBeau's New York City apartments. As a result, no one at the Company can prevent LeBeau from unilaterally disposing of the Company's assets on the Cold Wallet—something he has already done in the past. LeBeau has total and exclusive control over the Cold Wallet assets, even though they belong to the Company.

27.     As of November 22, 2021, the Cold Wallet contains approximately 12,000 ETH and various other digital assets, with a current market value of approximately US $50 million. These are Company assets used to fund the Company's ongoing operations and further business development.

**LeBeau Transfers $2M Of SingularDTV's Assets From The Cold Wallet To An Unknown Party Without Board Approval, And The Board Demands That LeBeau Transfer The Company's Assets To A Multi-Sig Wallet.**

28.     In early 2021, SingularDTV's General Counsel at the time, Carl Volz, was in discussions with Levy-Cohen for the Company to attribute Levy-Cohen's ownership interest in the Company equally among the other two shareholders. At or about that same time, a still-unknown person (the "Hacker") apparently hacked Volz's computer and e-mail account. SingularDTV has not ruled out the involvement of one or more Company insiders in this intrusion.

29.     The Hacker allegedly "set-up a[] Microsoft Outlook rule directing communications from an e-mail address [Volz] knew to belong to Levy-Cohen to an 'RSS' folder that [he] never checked." *SingularDTV GmbH v. John Doe*, No. 21-cv-06000-VEC (S.D.N.Y. filed July 13, 2021), ECF No. 6-3 ¶ 11. Thereafter, the Hacker "began to impersonate Levy-Cohen in e-mail correspondences using an e-mail account which closely mimicked Levy-Cohen's known e-mail

address." *Id.* ¶ 12. The Hacker then "ask[ed] how quickly the settlement transactions could be finalized." *Id.* ¶ 15. Volz then sent a "copy of the settlement agreement" to the Hacker. On May 6, 2021, the Hacker replied with an executed copy of the agreement and two wallet addresses for the transfer of the funds agreed upon in the alleged settlement agreement. *Id.* ¶ 17.

30.     Later that same day, without any discussion with Levy-Cohen or Lubin, LeBeau transferred 76.8 million Company SNGLS and other Company-owned tokens to the Hacker. At the time, these tokens had a value of over $2 million. The Hacker later transferred the tokens to various wallet addresses and later to Binance, a third-party cryptocurrency exchange, rendering the payment untraceable.

31.     Notably, LeBeau also transferred a separate denomination of tokens issued by the Company—"SNGJ" tokens—to the Hacker. The SNGJ tokens were transferred to another wallet address and were then paid to Gaze TV, a blockchain-based video platform that, on information and belief, was co-founded by LeBeau, Jackson, and Jack Cheng, who is a confidant and business associate of LeBeau.

32.     Volz allegedly learned the following day that Levy-Cohen had not signed any "settlement agreement" and was not the recipient of the Company SNGLS and other tokens LeBeau transferred on May 6, 2021.

33.     Upon learning of this, Lubin, through counsel and in his capacity as a Director, sent a letter to LeBeau demanding that LeBeau: (i) provide an explanation regarding the hacked tokens, including why he had made such a transfer unilaterally; and (ii) transfer the contents of the Company wallets, including the Cold Wallet, to wallets with multi-signature protections to prevent similarly sudden and likely irreversible losses.

34.     Article 23 of the Company's Articles provides that the Board "is entrusted with the overall management of the corporation and the supervision of the managing directors," and "has the following inalienable and irrevocable competences and duties (art. 810 para 2 CO): . . . (4) supervision of the persons to whom management responsibilities were delegated, in particular with regard to compliance with the law, articles of association, regulations and [Board] directives." The Bylaws have an analogous provision. Bylaws, § 4.B.

35.     Likewise, under Section H of the Bylaws, "[e]ach member of the Board may at all times request information about all matters concerning the Company and its business," and "each Board member has the right to request information from Senior Management . . . regarding particular business transactions."

36.     LeBeau responded to the Board's letter erratically, making unfounded allegations against Levy-Cohen and Lubin. LeBeau did not, however, provide any further explanation regarding his handling of the hacked tokens, nor did he transfer the Company assets to a multi-sig wallet. LeBeau remains in wrongful possession of the Cold Wallet and the Company's digital assets.

**AFTER LEBEAU REFUSES TO TRANSFER THE COMPANY'S ASSETS TO WALLETS WITH MULTI-SIG PROTECTION, THE BOARD TERMINATES HIM AS CEO AND REVOKES HIS AUTHORITY TO SIGN ON THE COMPANY'S BEHALF.**

37.     On May 19, 2021, Levy-Cohen, as Chairman of the Board, invited all Directors to a Board meeting to be held by videoconference on May 27, 2021, to discuss "the compliance incident and resolutions to be taken" [i.e., the hack], and "the exit of [LeBeau] as CEO," among other things. Proper notice was provided to all Directors, the meeting was duly convened, and sufficient quorum was verified under the bylaws, which state that "[a] Board meeting is validly

constituted if at least 50% of the Managing Directors are present (including by video or telephone conference)." Bylaws, § 4.D. Lubin and Levy-Cohen attended. LeBeau chose not to attend.

38.     At the May 27, 2021 meeting, the Board, with Lubin and Levy-Cohen voting in favor, terminated LeBeau as CEO with immediate effect, and withdrew all his signatory authorities and powers to act in the name and on behalf of the Company.[11]

39.     The Board also instructed LeBeau to:

(i) "refrain from continuing [to] hold[] personal control over or disposing of any (digital) assets that belong to the Company (e.g., by way transferring, assigning or selling assets to third parties, or using them in any other way), or otherwise taking any action in relation to such assets that have the effect of depriving the Company from exercising exclusive control over such assets";

(ii) "effect a transfer of all Company assets under [his] direct or indirect control . . . to ['a multisignature wallet' address 'with at least 2 out of 3 signatures required, of which at least 2 will be Company employees with fiduciary obligations'] within 48 hours of his receipt of the Address, the legitimacy of which shall be confirmed and authenticated using video conferencing"; and

(iii) "provide to the Company all documentation and information required or appropriate for the Company to be able to regain immediate control of its digital and other assets belonging to the Company, including, but not limited to, the documentation and information, including the private key, with respects [*sic*] to the accounts, custodians or wallets in which any such (digital) assets are held for any address containing digital assets which [LeBeau] does not cause a transfer to the Address within 48 hours."

**LeBeau Offers To Transfer The ETH To A Third-Party, Only To Reverse Course.**

40.     On June 15, 2021, one of LeBeau's New York attorneys, Neil Postrygacz, spoke by phone with Matt Corva, an attorney and confidant of Lubin. On that call, Corva informed Postrygacz that LeBeau was unlawfully holding SingularDTV assets. Postrygacz stated, and later confirmed by e-mail, that LeBeau was "more than willing to transfer the ether to a custodial account while the corporate disputes get resolved."

---

[11] Under the Bylaws, the "removal of the Company's CEO" requires "the consent of at least 50% of all appointed Managing Directors." Bylaws, § 4.F. And "[t]he Board appoints the persons authorized to represent the Company and sign on its behalf" and "determines their signing authority. *Id*. § VI.

41.     SingularDTV then coordinated with a third party, Bank Frick, to accept a transfer of SingularDTV's ETH on the Cold Wallet from LeBeau. LeBeau spoke by phone with Bank Frick but did not transfer the ETH.

42.     As it turns out, this promise to put the ETH in escrow was just a play for time. LeBeau had no intention of transferring the ETH to Bank Frick. To date, neither LeBeau nor Postrygacz has provided any legitimate basis for LeBeau's refusal to transfer the ETH on the Cold Wallet back to the Company.

**DESPITE HAVING BEEN TERMINATED AS CEO AND STRIPPED OF HIS SIGNATURE AUTHORITY, LEBEAU CAUSES AN ACTION IN THE COMPANY'S NAME TO BE FILED IN THE SDNY.**

43.     On July 13, 2021, more than six weeks after he was terminated as CEO and stripped of his authority to act in the name of the Company, LeBeau and Jackson caused another attorney, Jerald Tenenbaum, to file a 'John Doe' lawsuit in this Court (the "John Doe Action"), purportedly seeking to identify the Hacker and recover the Company SNGLS and other tokens stolen in the hack.

44.     LeBeau had no authority to file or cause to be filed a lawsuit in the name of the Company—and therefore neither did Tenenbaum. Indeed, at a Board meeting only one month before the John Doe Action was filed, the Board noted that two other attorneys LeBeau retained, including Postrygacz, were not "acting in the interests of the Company and refut[ed] that either, at any time, had a valid mandate from the Board to serve the Company." At that same meeting, the Board "resolved to confirm that the only the firm [that] has a mandate to serve the Company" is Wenger & Vieli, a Swiss law firm.

**LEBEAU ATTEMPTS TO LEVERAGE HIS CONTROL OF THE COLD WALLET TO EXTORT THE COMPANY INTO PAYING HIM A RANSOM, AND IS TERMINATED AS A SINGULARDTV DIRECTOR.**

45.    On August 17, 2021, Levy-Cohen, as Chairman of the Board, called a meeting of the Board for August 27, 2021. The agenda for the meeting included, among other things, the convocation of an extraordinary shareholders' general meeting on September 24, 2021, to discuss removing LeBeau as a Director of SingularDTV.

46.    Just minutes before the August 27 Board meeting, LeBeau sent two documents to Levy-Cohen and Lubin: (i) a "Written Statement" of his "official position" and (ii) a document outlining "two possible ways forward for the company" (the "Exit Proposal"). LeBeau asked that these documents be appended to the Board minutes, and they were.

47.    The Exit Proposal makes clear that LeBeau intends to leverage his wrongful possession and control of the Company's assets, including the Cold Wallet, as a bargaining chip to extract a ransom from the Company under the guise of cashing in his ownership interest. Specifically, the Exit Proposal makes two "suggestions" as to how the current situation might be resolved: "Path 1" and "Path 2".

48.    Path 1 is to "cease all development and spending of money" and litigate in "the courts of various jurisdictions . . . the fate of our business." Path 1 also includes LeBeau "initiat[ing] a claim to forcibly dissolve the GmbH and distribute the remaining assets accordingly." LeBeau commenced such an action on September 24, 2021, via a request for conciliation filed in Zug, Switzerland. This action remains pending.

49.    According to LeBeau, Path 2 is to "split the company in 2." Specifically, the Company and its other Shareholders (Levy-Cohen and Lubin) would keep 10,000 ETH and the digital rights management platform, while LeBeau would get (i) the Company's entire

entertainment division (into which several tens of millions of dollars have been invested to date), 2,000 ETH (worth more than US $8 million), and a share of the profits from the Company's digital rights management platform. The company's remaining financial resources would be used to liquidate the company in Switzerland, after which certain assets would be distributed among the Shareholders.

50.     LeBeau's proposal would not only provide him with a completely disproportionate financial gain, but would also mean the end of SingularDTV in its current form.

51.     At the September 24, 2021, shareholders' general meeting, LeBeau was removed as a Director of SingularDTV.

**DEFENDANTS WRONGFULLY EXERT CONTROL OVER THE COMPANY'S ASSETS AND E-MAIL ACCOUNTS.**

52.     To generate additional leverage in his negotiations with SingularDTV, LeBeau took further malicious steps intended to obstruct SingularDTV's ongoing business operations and relationships.

53.     On October 8, 2021, without prior warning, Postrygacz wrote to Patrik Allenspach, a representative and Resident Signatory of SingularDTV, to inform him that "the US entity w[ould] no longer be providing the GmBH with e-mail services." In reality, Defendants were commandeering SingularDTV's and its employees' e-mail accounts, usurping control of highly sensitive business and employee information in the process.

54.     Postrygacz's reference to "the US entity" refers to SingularDTV LLC, a New York limited liability company that does business under the trade name Breaker LLC ("Breaker"). Though it was established to provide support to certain SingularDTV projects, Breaker is a separate legal entity. Jackson—LeBeau's wife—is Breaker's sole Member and Director. On

14

information and belief, LeBeau acts as Breaker's de facto CEO. Together, LeBeau and Jackson exercise total control over Breaker.

55. Although Breaker performed some services for SingularDTV under a services agreement, it never "provided" SingularDTV with e-mail services. Rather, SingularDTV received third-party business services, including e-mail services, from Microsoft, which Breaker arranged through a reseller, DAG Tech, that it did not disclose to SingularDTV until May 2021. While Breaker brokered these services through DAG Tech, SingularDTV was the identified client, "service recipient," and payor on invoices issued by Microsoft. For its part, DAG Tech recognized that it was facilitating e-mail services for the benefit of SingularDTV. On information and belief, despite lacking any legitimate basis to do so, Breaker disrupted this relationship by instructing DAG Tech to cut off e-mail access to SingularDTV and its employees.

56. The disruption on SingularDTV's business was immediate and crippling. The Company and its employees lost access to privileged legal communications, financial accounts, years of highly sensitive business and personal information, tax and employee social security information, and extensive communications with clients and other third-party service providers.

57. Breaker's decision to hijack SingularDTV's e-mail systems was malicious, without right or justification, and specifically intended to inflict harm on the Company and its employees. Breaker did not provide any justification for its decision in its October 8 e-mail or thereafter, despite numerous demands by SingularDTV to restore access. Breaker's intent in terminating SingularDTV's e-mail access was to disrupt the Company's business and generate leverage in negotiations over the Cold Wallet and LeBeau's separation package.

58. Worse still, Defendants have not only terminated the Company's and its employees' access to its e-mail accounts, but have also assumed control over those accounts and

now appear to have unfettered access to the Company's highly sensitive business information and trade secrets, not to mention the personal information of SingularDTV's employees.

59.     During meet-and-confer discussions prior to the filing of this Complaint, Postrygacz informed Company counsel that the Company's e-mail accounts were being actively monitored. Postrygacz refused to identify who had access to the accounts, how many people had access, or what controls were in place to ensure the security of sensitive company and employee information. Postrygacz also refused to engage in discussions about reactivating or restoring the Company's access to its e-mail accounts.

**LEBEAU AND JACKSON'S SELF-SERVING REFUSAL TO RETURN SINGULARDTV'S ASSETS HAS PARALYZED THE COMPANY'S DEVELOPMENT, CAUSING IT TO LOSE MARKET SHARE AND TRUST.**

60.     Since the TGE, SingularDTV has, in large part, stored its assets on the Cold Wallet. Accordingly, SingularDTV depends on the assets in the Cold Wallet to finance its business operations and carry out Company projects, as the Company is not yet generating revenue from other sources. As of today's date, the ETH in the Cold Wallet are worth approximately US $50 million.

61.     SingularDTV's April 2021 business plan anticipates that the Company will need CHF 12 million over the next three years to further develop the digital rights management platform, which the is the Company's current strategic focus.

62.     SingularDTV requires use of its assets in the Cold Wallet to develop and carry out its business operations. Because of Defendants' conduct, SingularDTV cannot access most of its financial resources, which are required for the continued operation and development of its business. The Company is also unable to make sound financial plans, including by exchanging

ETH (the price of which is extremely volatile) at an opportune moment to obtain further liquidity in traditional currencies.

63.     By stifling the Company's development activity, Defendants' mismanagement and reckless actions have also, on information and belief, caused various cryptocurrency exchanges, including Binance, to delist SNGLS, thereby driving down its price and injuring Token Holders and the Company.

64.     In addition, there is a high risk that LeBeau will dissipate the assets in the Cold Wallet for personal use. LeBeau's refusal to transfer the ETH to a third-party custodian for safekeeping pending the outcome of the parties' ownership dispute is indicative of his intent in this regard.

65.     To date, LeBeau's misuse of SingularDTV assets is strikingly similar to the conduct that resulted in his being charged with several felonies for allegedly attempting to defraud the State of Iowa by fraudulently claiming transferrable tax credits. In addition, LeBeau's removal as CEO was due to his involvement in the wrongful transfer of SingularDTV assets, which he caused at least through negligence—and in which he may have been a knowing participant.

66.     By holding SingularDTV's assets and e-mail systems hostage, LeBeau is inflicting irreparable and ongoing harm on SingularDTV's business. If the public loses confidence in the Company's ability and/or the value of the SNGLS token, no damages will be sufficient to repair the injury.

### FIRST CAUSE OF ACTION
### REPLEVIN

67.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 66 above, and incorporates them herein by this reference.

68.     The Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts are property of SingularDTV.

69.     SingularDTV has a possessory right to the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts that is superior to that of LeBeau.

70.     SingularDTV is entitled to the immediate possession and control of the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts.

71.     Defendants are nevertheless in possession and/or control of the Cold Wallet and, on information and belief, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts, and are wrongfully withholding them from SingularDTV.

72.     SingularDTV has demanded that Defendants return the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts. Defendants have refused to comply with SingularDTV's demand.

73.     Defendants' wrongful possession of the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts is proximately causing immediate and irreparable harm to SingularDTV, including losses that cannot be calculated, such as lost business, lost business opportunities, loss of reputation, loss of goodwill, and potential third-party liability.

74.     SingularDTV is entitled to the immediate return of the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail

18

accounts, together with damages and court costs, interest, and any other relief this Court deems just and proper.

## SECOND CAUSE OF ACTION
### TRESPASS TO CHATTELS

75. SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 74 above, and incorporates them herein by this reference.

76. The Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts are the sole and exclusive property of SingularDTV.

77. By denying and/or instructing a third party to deny SingularDTV access to and control over its Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts, Defendants have interfered with SingularDTV's possession of its property.

78. Defendants' interference with SingularDTV's possession of the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts is proximately causing irreparable harm to SingularDTV, including losses that cannot be calculated, such as lost business, lost business opportunities, loss of reputation, loss of goodwill, and potential third-party liability.

79. SingularDTV is entitled to an injunction requiring Defendants to immediately cease their interference with SingularDTV's Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts, and to restore SingularDTV's possession and control of the same.

80. SingularDTV is also entitled to recover compensatory damages in the amount of all losses proximately caused by Defendants' interference with SingularDTV's Cold Wallet, the

19

digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts, together with court costs, interest, and any other relief this Court deems just and proper.

## THIRD CAUSE OF ACTION
### CONSTRUCTIVE TRUST

81.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 80 above, and incorporates them herein by this reference.

82.     As SingularDTV's former CEO and Director, LeBeau had a confidential and/or fiduciary relationship with SingularDTV.

83.     Through the Smart Contract, SingularDTV transferred to a wallet controlled by LeBeau the digital assets generated during the TGE in reliance on LeBeau's promise that those digital assets would be held and used for the sole benefit of SingularDTV.

84.     LeBeau has unjustly enriched himself by keeping the Company's digital assets in a single-signature Cold Wallet, from which he can unilaterally dispose of Company assets and which he refuses to return to SingularDTV, despite being terminated as the Company's CEO and removed from its Board of Directors.

85.     Defendants have likewise unjustly enriched themselves by commandeering access to SingularDTV's business e-mail accounts, which contain trade secrets and other competitively sensitive and valuable private information.

86.     SingularDTV is entitled to an order declaring that the Cold Wallet, the digital assets stored on the Cold Wallet, and the private keys associated with them, and any and all proceeds thereof, as well as SingularDTV's business e-mail accounts and their contents, are held by Defendants in constructive trust for the benefit of SingularDTV until such time as these assets are restored to the possession and control of SingularDTV.

20

## FOURTH CAUSE OF ACTION
### RESTITUTION

87.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 86 above, and incorporates them herein by this reference.

88.     LeBeau has unjustly enriched himself, at SingularDTV's expense, by keeping the Company's digital assets in a single-signature Cold Wallet, from which he can unilaterally dispose of Company assets and which he refuses to return to SingularDTV, despite being terminated as the Company's CEO and removed from its Board of Directors.

89.     Defendants have also unjustly enriched themselves by commandeering access to the Company's e-mail accounts, which contain trade secrets and other competitively sensitive and valuable private information and which, on information and belief, Defendants have misappropriated to enrich themselves at the expense of the Company.

90.     Equity and good conscience require that LeBeau return the Company's Cold Wallet, the digital assets stored on the Cold Wallet, and the private keys associated with them to their sole and rightful owner, SingularDTV.

91.     Equity and good conscience likewise require that Defendants return to the Company control over its e-mail accounts, along with any financial gains that accrued to Defendants due to their misappropriation of the contents of those e-mail accounts.

92.     SingularDTV has demanded on multiple occasions that Defendants return the Company's Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts, but Defendants have not done so.

93.     SingularDTV is entitled to restitution of its Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and all gains that have accrued to

Defendants through their misappropriation of the Company's e-mail accounts, together with court costs, interest, and any other relief this Court deems just and proper.

### FIFTH CAUSE OF ACTION
### <u>CONVERSION</u>

94.     SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 93 above, and incorporates them herein by this reference.

95.     The Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts are property of SingularDTV.

96.     Defendants are exercising dominion over the Cold Wallet and, on information and belief, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts.

97.     Defendants' dominion is wrongful, because they have no rightful claim to the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, or the Company's e-mail accounts.

98.     SingularDTV has demanded on multiple occasions that Defendants return the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts, but they have not done so.

99.     Defendants' continued dominion over the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets, and the Company's e-mail accounts is inconsistent with and in derogation of SingularDTV's right to these assets.

100.     Defendants' conversion of the Cold Wallet, the digital assets stored on the Cold Wallet, and the private keys associated with those digital assets, and the Company's e-mail accounts has proximately is proximately causing immediate and irreparable harm to SingularDTV,

including losses that cannot be calculated, such as lost business, lost business opportunities, loss of reputation, loss of goodwill, and potential third-party liability.

101.　　SingularDTV is entitled to the immediate return of the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with them, and the Company's e-mail accounts, together with damages and court costs, interest, and any other relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**

102.　　SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 101 above, and incorporates them herein by this reference.

103.　　Defendants violated the Computer Fraud and Abuse Act (the "CFAA", 18 U.S.C. § 1030) by, among other things, willfully and maliciously impairing SingularDTV's access to and control over the contents of its business e-mail systems and, without authorization, accessing or permitting to be accessed the contents of those e-mail systems.

104.　　On information and belief, Defendants are able to obtain and have obtained data from SingularDTV's e-mail systems despite having no authorization and/or exceeding their authorization to access those e-mail systems.

105.　　The servers on which SingularDTV's business e-mail systems are hosted are a "protected computer" within the meaning of the CFAA.

106.　　Defendants' interference with SingularDTV's business e-mail systems is causing damage to a protected computer by, among other things, impairing and interrupting SingularDTV's ability to access and control its information, data, and systems.

107.　　Defendants' violation of the CFAA is proximately causing irreparable harm to SingularDTV.

23

108.   Defendants' violation of the CFAA has proximately caused significant damage to SingularDTV, including (1) costs and monetary losses in excess of $5,000 within a year of the filing of this complaint and (2) other losses that cannot be calculated, including lost business, loss of reputation, loss of goodwill, and potential third-party liability.

109.   SingularDTV is entitled to an injunction requiring Defendants to immediately restore SingularDTV's access to and control over its business e-mail systems and prohibiting Defendants from (i) interfering with SingularDTV's control over its business e-mail systems and (ii) continuing to access SingularDTV's business e-mail systems without authorization.

110.   SingularDTV is also entitled to recover damages in the amount of all revenue lost, costs incurred, restoration and investigation costs, and other consequential damages caused by Defendants' unauthorized access to SingularDTV's business e-mail systems.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

111.   SingularDTV repeats and realleges each and every allegation set forth in paragraphs 1 to 110 above, and incorporates them herein by this reference.

112.   Defendants violated the Defend Trade Secrets Act (the "DTSA", 18 U.S.C. §§ 1831 through 1839) by, among other things, willfully and maliciously terminating SingularDTV's access to and control over the contents of its business e-mail systems and, without authorization, accessing or permitting to be access the contents of those e-mail systems.

113.   SingularDTV's e-mail systems include substantial confidential information, including competitively sensitive trade secrets that derive value from their secrecy.

114.   Defendants have misappropriated and/or conspired to misappropriate the trade secrets stored on SingularDTV's e-mail systems.

24

115.    Defendants have actual possession of the trade secrets stored on SingularDTV's e-mail systems and exercise control over access to those systems.

116.    Defendants' misappropriation of SingularDTV's trade secrets is proximately causing irreparable harm to SingularDTV.

117.    SingularDTV is entitled to an injunction requiring Defendants to immediately cease their unauthorized access of SingularDTV's business e-mail systems and to restore SingularDTV's access to and control over those systems.

118.    SingularDTV is also entitled to recover compensatory damages in the amount of all losses proximately caused by Defendants' misappropriation of SingularDTV's trade secrets.

119.    SingularDTV is also entitled to recover damages in the amount by which Defendants have been unjustly enriched due to their misappropriation of SingularDTV's trade secrets.

120.    SingularDTV is also entitled to recover enhanced damages and attorney's fees due to Defendants' willful and malicious misappropriation of SingularDTV's trade secrets.

## JURY DEMAND

SingularDTV demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, SingularDTV respectfully requests judgment in its favor and against Defendants:

   a.   requiring Defendants to return the Cold Wallet, the digital assets stored on the Cold Wallet, the private keys associated with those digital assets to SingularDTV, and any and all proceeds thereof;

25

b. requiring Defendants to return to SingularDTV all SingularDTV assets in their possession or control, including but not limited to all company digital assets, however denominated and wherever held;

c. declaring that the Cold Wallet, the digital assets stored on the Cold Wallet, and the private keys associated with them, and any and all proceeds thereof, as well as SingularDTV's business e-mail accounts and their contents, are held by Defendants in constructive trust for the benefit of SingularDTV;

d. requiring Defendants to restore or cause to be restored SingularDTV's access to and control over its and its employees' business e-mail accounts and other electronic records;

e. enjoining Defendants from accessing or causing other persons to access SingularDTV's and/or its employees' business e-mail accounts and other electronic records;

f. enjoining Defendants from holding themselves out as officers, directors, representatives, employees, or agents of SingularDTV;

g. enjoining Defendants from purporting to take, or causing any other person to take, any action of any kind on behalf of SingularDTV;

h. awarding SingularDTV damages in an amount to be determined at trial; and

i. granting all other relief the Court deems just and proper.

Dated: New York, New York
        November 29, 2021

                                        Respectfully submitted,


                                        /s/ Benjamin J. A. Sauter
                                        Benjamin J. A. Sauter
                                        Christopher S. Cogburn
                                        KOBRE & KIM LLP
                                        800 Third Avenue
                                        New York, NY 10022
                                        Telephone: (212) 488-1200
                                        Facsimile: (212) 488-1220

                                        *Attorneys for Plaintiff SingularDTV GmbH*