Case 1:21-cv-10130-VEC   Document 91-9   Filed 04/15/22   Page 1 of 34

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ZACH LeBEAU, both individually and
derivatively on behalf of SINGULARDTV GmbH,

Index No: 655673/2021

Plaintiff,

v.

**FIRST AMENDED**
**VERIFIED COMPLAINT**

JOSEPH LUBIN, ARIE LEVY COHEN,
CONSENSYS AG, CONSENSYS INC.,

Defendants

and

SINGULARDTV, GmbH,

Nominal Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## NATURE OF THE ACTION

Plaintiff Zach LeBeau through undersigned counsel, sets forth this First Amended Verified Complaint against Defendants and Nominal Defendant based upon their conspiratorial self-dealing and documented self-interested financial transactions, all in violation of their respective corporate obligations and duties. Defendants have ridden wild over the Nominal Defendant and its New York-based business and operations. Their objective: to enrich themselves of millions of US dollars in cryptocurrency at the expense of the business, its shareholders and token holders. Plaintiff brings this action for breach by Joseph Lubin and Arie Levy Cohen of their respective fiduciary duties as directors and/or officers of the Company, breach of the Company Bylaws, the Company Articles of Association,

the New York Business Corporation Law, breach of the covenant of good faith and fair dealing under New York Law, unjust enrichment and fraud.

## THE PARTIES

1.      Plaintiff Zach LeBeau ("LeBeau") resides in New York City and is a current shareholder of the Nominal Defendant, SingularDTV GmbH.

2.      Defendant Joseph Lubin ("Lubin") is an individual who, on information and belief, resides in Brooklyn, New York. Lubin is a current shareholder of the Nominal Defendant, SingularDTV GmbH, and serves on its board of directors. Lubin is a habitual litigant in the state and federal courts in New York.[1]

3.      Defendant Arie Levy Cohen ("Cohen" and together with Lubin the "Director Defendants") is an individual who, upon information and belief, resides in Scotch Plains, New Jersey. Cohen is a current shareholder of the Nominal Defendant, SingularDTV GmbH, and served on its board of directors.

4.      ConsenSys AG and ConsenSys Inc. (together "ConsenSys" and collectively with the Director Defendants, the "Defendants"), is a blockchain technology company, on information and belief, having its principal place of business in New York. ConsenSys Inc. is a corporation organized under the laws of Delaware and headquartered at 48 Bogart Street Suite 22, Brooklyn, NY 11206. Defendant ConsenSys AG is a Swiss entity headquartered at 48 Bogart Street, Suite 22, Brooklyn, New York 11206. Lubin runs ConsenSys from Brooklyn where he oversees ConsenSys operations. According to recent reports, Lubin is in the process of raising hundreds of millions of dollars for ConsenSys on a pre-money valuation of more than $3 Billion.

---

[1] *See eg,* Kavita Gupta v. Lubin, et al., Index No. 650023/2022 (Sup. Ct. New York City. January 19. 2022); Blockcrushr Inc. v. ConsenSys, Inc. et al, No. 1:20-CV-03134 (E.D.N.Y.  July 14, 2020); Hines v. Lubin et al, Index No. 653293 (Sup.Ct. New York Cnty. June 5, 2019); *see also* ConsenSys Inc. v. Gupta, Index No. 650023 (Del. Chancery January 10, 2022).

Case 1:21-cv-10130-VEC  Document 91-9  Filed 04/15/22  Page 3 of 34

5.      Nominal Defendant SingularDTV is a GmbH (Gesellschaft mit beschränkter Haftung, or private limited company) organized and existing under the laws of Switzerland for the purpose of "development, marketing, distribution and licensing of software… and development, marketing, distribution and licensing of high-quality original film and television content." The business activities of the Nominal Defendant are conducted in New York.

6.      LeBeau and Lubin both reside in New York, New York where all business operations were in fact based and operated. Cohen, on information and belief, resides in New Jersey but conducts business in New York.

## JURISDICTION AND VENUE

7.      Venue is proper pursuant to CPLR § 503.

8.      This Court has jurisdiction pursuant to CPLR § 301 and §302.

## FACTUAL ALLEGATIONS

### I.    The Origin of SingularDTV

9.      The SingularDTV business was first conceptualized in 2014 by LeBeau and Kimberly Jackson ("Jackson") as a blockchain-based platform for enabling content creators to track and monetize their intellectual property rights; the platform would also be used to fund and create television and film assets related to blockchain and cryptocurrency.

10.     LeBeau and Jackson first conceived of their idea for creating a digital rights management platform based on blockchain technology in 2014. On or about September 2014, LeBeau and Jackson first met with Lubin, a luminary in the then nascent blockchain industry, to discuss his investment in a television series and their idea for the business that would ultimately become SingularDTV.

11.     At that time, Lubin was already well known as an early adopter of bitcoin and

one of the founders of the Ether (ETH) cryptocurrency launched in the fall of 2015, now known as Ethereum. On information and belief Lubin is a co-founder of Ethereum whose Ether cryptocurrency is the second largest in the world by global market capitalization. Lubin is also the founder of defendants ConsenSys Inc. and ConsenSys AG.

12.     Lubin describes consensys.net as "a leading Ethereum software company [that] enable[s] developers, enterprises, and people worldwide to build next-generation applications, launch modern financial infrastructure, and access the decentralized web."

13.     The concept propounded by Jackson and LeBeau was to develop blockchain based software for encoding the rights of content creators, thereby ensuring that license fees and royalties could be collected, tracked and timely paid. Currently, accounting and reconciliation of royalties in the entertainment industry is highly inefficient and unreliable, with rights holders having little transparency into revenues generated from the distribution of a work or the amounts they should receive in royalties.

14.     LeBeau and Jackson met Lubin on numerous occasions beginning in September of 2014 and convinced him to join their nascent content production business with a meager investment.

15.     In the first half of 2015, Lubin invested approximately $50,000 in New York-based non-party Evotion Media, LLC to co-produce a television series with LeBeau and Jackson.

16.     Lubin also agreed to join the yet unformed SingularDTV as its chief technology officer.

17.     Cohen came into the picture in early 2016. On information and belief, Lubin had known Cohen for many years. In 2016, Cohen was working for Morgan Stanley as a wealth manager. Cohen held himself out as an international financier, blockchain expert, and capable

Case 1:21-cv-10130-VEC   Document 91-9   Filed 04/15/22   Page 5 of 34

financial manager.

18.     On information and belief, Cohen started his career as an international entrepreneur based out of Barbados. He claims to have participated in the emergence of the internet by overseeing private placement investments and guiding capital raising efforts tied to emerging technologies. He has also been a Swiss private banker and serves as an owner or officer of multiple businesses around the world. Cohen has been registered as a broker with the Financial Industry Regulatory Authority (FINRA) since on or around 2007. The FINRA BrokerCheck® website indicates that Cohen was registered with Morgan Stanley in New York between March of 2007 and May of 2018. According to BrokerCheck®, following his termination from Morgan Stanley, Cohen went to work on-and-off for Ashton Stewart & Co., Inc. in Miami, Florida until March 22, 2019.  While Cohen has claimed to hold a master's degree in taxation and finance from New York University, he has never provided documentation to evidence that he ever received a degree from New York University.

19.     In 2016, Lubin, Cohen, LeBeau and Jackson founded SingularDTV to bring to market the concepts envisioned by LeBeau and Jackson.

20.     The Swiss Entity was formed on October 28, 2016, for the purpose of issuing SNGLS cryptocurrency tokens. The tokens that SingularDTV planned to issue could not be issued in the United States due to regulatory constraints.

21.     Lubin, LeBeau and Cohen were designated as the founders and appointed as managing directors of the Swiss Entity. The formation documents listed Lubin, LeBeau and Cohen as having the following shareholdings:

Case 1:21-cv-10130-VEC   Document 91-9   Filed 04/15/22   Page 6 of 34

| Name | Shares | Pct. Interest |
|------|--------|---------------|
| Joseph Lubin | 86 | 43% |
| Zachary LeBeau | 86 | 43% |
| Arie Levy Cohen | 28 | 14% |
| | 200 | 100% |

`

22.     The Board of Managing Directors of the Swiss Entity (the "Board of Directors" or the "Board") consists of LeBeau, Lubin and Cohen.[2]

23.     In addition to the Swiss Entity, Lubin, Cohen, LeBeau and Kimberly Jackson ("Jackson", and together with Lubin, Cohen and LeBeau, the "Founders") established a US affiliate in New York, SingularDTV, LLC (the "NY Entity" and together with the Swiss Entity "SingularDTV").

24.     The NY Entity was founded on November 7, 2016, less than 10 days following the formation of the Swiss Entity. The Founders established the NY Entity to handle all business operations of the consolidated SingularDTV enterprise.

25.     The business of SingularDTV was run from New York City. Activities related to creating and acquiring entertainment assets, as well as software development activities, were conducted principally through the NY Entity which employed more than 100 people.

26.     The Founders agreed to divide responsibilities along the lines of their respective areas of expertise: Lubin agreed to serve as the Company's Chief Technology Officer (CTO), Cohen as the Chief Financial Officer (CFO), LeBeau as the Chief Executive Officer (CEO) of the Swiss Entity, and Jackson as the COO of the Swiss Entity and the CEO of the NY Entity. LeBeau and Jackson controlled the day-to-day operations of SingularDTV from New York.

27.     Lubin's role was to develop the SingularDTV's technology, however it was clear from the start that (a) he was only marginally interested in the project, having invested no capital,

---

[2] The composition of the Board at the time of filing is in dispute.

and (b) the relationship between ConsenSys and SingularDTV was fraught with conflicts.

28.    In an e-mail to LeBeau, Lubin admitted that "…there might be a conflict of interest at some point if we are doing business together as separate entities. But if it is just advisory it should be fine and you will have to make sure I don't weigh in too much on issues in which there might be some benefit to me or my companies."

29.    Cohen on the other hand saw this as an opportunity to establish himself as an important figure in digital finance.

## II.    The Formation and Structure of SingularDTV

30.    The Swiss / NY affiliate entity model was established for the purpose of creating a legal separation between (a) content and software development work, all of which was conducted in New York and (b) the heavily regulated Initial Coin Offering (ICO) planned under the laws of Switzerland through the Swiss Entity.

31.    The NY Entity was located in New York City and ran all day-to-day business management and operations of both entities.

32.    The NY Entity operated at all times as an alter-ego of the Swiss Entity, as they were tied together by a simple services agreement (put in place for Swiss compliance purposes and to afford Jackson access that a founder of the enterprise was entitled to). Under that agreement, the NY Entity was an uncapitalized 'captive' of the Swiss Entity. Under the terms of the services agreement, the NY entity was permitted to provide services ONLY on behalf of the Swiss Entity.

33.    Moreover, fulfillment of the ICO obligations fell to Jackson, LeBeau and the NY Entity. All of SingularDTV's business to this day has been conducted from New York.

34.    The Swiss Entity was established solely to issue the cryptocurrency tokens; once the ICO was completed, its very existence as a GmbH gave rise to ongoing compliance

requirements, the fulfillment of which became its sole business purpose.

35.     The NY Entity pays for the operating expenses of SingularDTV, including without limitation hosting services, computers, email, and offices for both the Swiss Entity and the NY Entity.

36.     In the fifth meeting of the SingularDTV Board, the participants had a detailed discussion regarding the dual entity structure of SingularDTV in which SingularDTV's counsel stated that "liability and tax considerations spoke strongly for a separation. Also privacy restrictions are stronger in Switzerland and Europe…." It was further clarified in that meeting that all business activities of SingularDTV took place in the US, while the Swiss Entity was set up for the ICO.

### III.     The SNGLS Initial Coin Offering (ICO)

37.     Prior to establishing the Swiss Entity and the NY Entity, the Founders planned to raise capital through an Initial Coin Offering (the "ICO").

38.     In preparation for its ICO, the Founders established the Swiss Entity for the purpose of issuing tokens, and the NY Entity for hiring employees and performing the Company's obligations to the token holders pursuant to the ICO.

39.     On or around October 2, 2016 the Company launched its ICO raising approximately $7,500,000 in Ether from investors through the sale of SNGLS tokens.

40.     The goal of the ICO was to raise capital to develop, market, distribute and license a blockchain and Ethereum based content production and distribution platform, and to develop, market, distribute and/or license original film and television content.

41.     Using funds obtained from the ICO, which were and continue to be held by the Company in Ether (ETH), the Company launched its first product, a smart contract application

dubbed Tokit (Tokit.io). Tokit, short for "tokenize it", was the first of SingularDTV's suite of decentralized applications to launch on the blockchain. The Tokit development process was managed by Jackson and LeBeau from the SingularDTV offices in New York using ConsenSys-affiliated developers located in Romania.

42.     In or around January of 2019, the Company released its video and music distribution portal, *Breaker. Breaker* was a smart-contracts via a television-on-demand platform that used blockchain to automatically disperse royalties to rights holders. *Breaker* was developed by Jackson and LeBeau from the Singular offices in New York using ConsenSys-affiliated developers in Romania.

43.     In or around April of 2019 the Company launched Breaker Studios, based in New York, to create a blockchain entertainment studio that uses smart contracts to manage the economics of each project. SingularDTV LLC rebranded as Breaker as a D/B/A, at this time. Breaker Studios was launched during this rebrand of the DDP product and films that were to be produced and distributed via this platform.   One of its first projects was a documentary titled *Trust Machine: The Story of Blockchain*, directed by Alex Winter.

44.     In or around January of 2020 SingularDTV began development of a new software platform specifically targeting revenue management for the media entertainment industry. Development was spearheaded by LeBeau and Jackson from the SingularDTV offices in New York using primarily in-house developers located in New York.

45.     As of the date of this lawsuit, the Ethereum owned by the Company has a market value of an estimated thirty-six million dollars (US$36,000,000).

46.     The appreciated cryptocurrency obtained through the ICO has been deployed by the NY Entity to pay employees primarily in the United States, develop software through

ConsenSys, a company located in New York, (at grossly inflated rates) and produce entertainment assets, including feature films that have premiered at film festivals worldwide and have won a number of prestigious awards.

47. From the inception of the Company, all development activities related to the ICO obligations have been conducted exclusively through the NY Entity under the direction of LeBeau and Jackson, while the Swiss Entity, owned jointly by LeBeau, Cohen and Lubin, has served its role as the project-funding alter-ego.

48. While the NY Entity and the Swiss Entity are separate and distinct companies, they function as a single business operation. Notably, the NY Entity paid more than five million dollars to ConsenSys for software development services related to the Breaker software.

## IV.   Corporate Governance of SingularDTV

49. SingularDTV held periodic meetings which were attended by the Founders. Meetings were held in New York, NY on July 11, 2018, September 11, 2018, December 12, 2018, and May 2, 2019.

50. All business of SingularDTV, including the business of the NY Entity and the Swiss Entity, was discussed at these meetings. Meeting minutes were prepared by counsel located in the United States and logged in the books and records of the Swiss Entity.

51. Cohen became the CFO of SingularDTV in or around 2017 and served as the 'resident director' of the Swiss Entity. Cohen was paid a salary for his services as the CFO and the resident director; yet despite being well compensated for his alleged expertise as an international financier and DiFi expert, Cohen was unable to handle the role as CFO. His tenure in that role was characterized by missed financial reporting deadlines, mismanagement, waste and the blatant misuse of SingularDTV funds.

Case 1:21-cv-10130-VEC Document 91-9 Filed 04/15/22 Page 11 of 34

52.     Throughout 2017 and into 2018, Cohen hired staff for his own personal use and made lavish purchases and personal investments using proceeds of the ICO that were intended to fund the operations of SingularDTV in New York.

53.     Cohen's extensive misdeeds are cataloged in the criminal complaint filed against him in Switzerland. *See generally* Exhibit 15 to Memorandum of Law in Support of the Motion to Dismiss the original complaint filed on behalf of Defendants ConsenSys AG, ConsenSys Inc., and Joe Lubin [Docket No. 40], Tenenbaum Decl. **Exhibit "A"**.

54.     Most egregious was Arie Cohen's use of Company funds to make personal investments in various businesses. In one garish example, Arie Cohen, while serving as SingularDTV's CFO, founded a business called Codex Execution GmbH in Zug, Switzerland ("Codex Execution"). Codex Execution was conveniently established to provide corporate accounting services for expatriate businesses in Switzerland.

55.     Codex Execution promptly signed up SingularDTV as its first client. The contract between Codex and SingularDTV GmbH bears the signature of Arie Cohen *on behalf of both businesses*. The term of the contract was for an indefinite period and was not terminable by SingularDTV and required SingularDTV to pay Codex a flat monthly fee of approximately $12,500.

56.     This contract stood to benefit Cohen's self-interest over the best interest of SingularDTV and its shareholders.

57.     Cohen neither sought nor received the approval of either the Swiss or the NY Entity for these acts in clear contravention of the By-Laws, which expressly prohibit conflicts of interest that result in personal financial gain.

58.     Specifically, Section VII(1)(b) of the By-Laws require that all contractual

arrangements with the Swiss Entity be conducted at arms' length. "This principle is generally applicable to transactions and contractual relationships with affiliated parties of the Company and its shareholders as well as with Business Partners In- and outside of Switzerland." Section X of the By-Laws establishes a definition for Conflicts of Interest: "A conflict of interest may arise when a Body, shareholder or the Company, Employee, Business Partner or a Party takes actions or has interests that may make it difficult to perform his duties and responsibilities for the Company. All such conflicts shall be avoided. Particular areas of conflict of interest that are of concern include (a) Personal financial gain: Every Party shall avoid any situation that may involve, or appear to involve, a conflict between their personal interests and the interests of the Company. In dealing with current or potential Business Partners, he/she shall act in the best interests of the Company. He/she shall not seek to gain personal advantage because of his/her position. He/she shall make prompt and full disclosure to his supervisor or the Board of any situation that may involve a conflict of interest." SingularDTV Articles of Association and By-Laws, pars. 54-55.

59.     Cohen was removed as the Swiss Entity CFO in April of 2018 and resigned his directorship on February 12, 2019.

60.     The Company decided to decommission the costly and dysfunctional operations in Zug, Switzerland, and Lubin and LeBeau agreed that the Swiss Entity should be dissolved due to its futility and excessive compliance costs.

61.     All Company operations (other than those specifically required to be maintained in Switzerland) were removed to New York under the direction and control of LeBeau and Jackson.

62.     LeBeau and Jackson spent the next year untangling the financial and contractual mess created by Cohen in 2017 and 2018.

63.     Following the removal/resignation of Cohen, meetings of the Founders became

Case 1:21-cv-10130-VEC  Document 91-9  Filed 04/15/22  Page 13 of 34

rare.

64.     Cohen did not attend any meetings of the Directors between on or about October 2018 and May 27, 2021.

65.     Lubin mostly ignored SingularDTV except when it came to ConsenSys invoicing matters.

66.     Cohen suddenly and suspiciously re-appeared at the May 27, 2021, meeting at which Cohen and Lubin removed LeBeau as the CEO of the Company and arbitrarily severed the connection between the NY Entity and the Swiss Entity by terminating the intra-company services agreement that had been in place since 2018.

67.     LeBeau has disputed the validity of that meeting and the arbitrary and oppressive actions of the Company on numerous grounds.

68.     Since May of 2021, on information and belief, Cohen and Lubin while based in their respective residences in New York and New Jersey, have held multiple meetings by video conference, each of which has been attended by both US and Swiss Counsel (as required under the Swiss law). Neither Lubin nor Cohen attended those meetings from Switzerland.

69.     All of the corporate actions taken by the Company since the removal of LeBeau have been formally disputed by LeBeau. LeBeau has provided the Company with detailed notices of his objections, yet the Company, purportedly under the control of Cohen and Lubin, has taken no action to investigate the objections raised by LeBeau or to rectify its corporate governance failures.

70.     Since Cohen resigned his position as a director in 2019, he is ineligible to attend meetings, cannot be counted for purposes of quorum, and cannot vote on matters brought before the board.

71.     Cohen's February 12, 2019, resignation from the company must be declared valid, and he must be restrained from serving in any management / director capacity for or on behalf of SingularDTV.

72.     Since that time there is no evidence that Cohen has been reinstated as a director which would have required LeBeau's vote and/or authorization, which was never given.

73.     Likewise, Lubin should be restrained from participating in the management of SingularDTV due to ongoing self-dealing prohibited by the By-Laws and the laws of the State of New York, both of which expressly prohibit transactions intended for personal financial gain at the expense of shareholders.

74.     Lubin and Cohen have both misused their positions as directors and officers of the Company to reap substantial personal benefit from the appreciation of cryptocurrency raised in the SingularDTV ICO.

## V.      Lubin's Breach of Fiduciary Duty and Other Wrongful Acts

75.     Lubin was on notice that his holding simultaneous board positions with SingularDTV and ConsenSys would lead to serious conflicts of interest unless he exercised a heightened level of care to avoid such conflicts, whether actual or perceived.

76.     In a December 2018 meeting of the SingularDTV Board (held in New York), Lubin confessed that he was at that meeting on behalf of ConsenSys and not SingularDTV.

77.     Despite Lubin's admitted recognition that such glaring conflicts existed, Lubin took no actions to ameliorate the ongoing breaches of his fiduciary obligations to the SingularDTV enterprise. By way of example, Lubin could have appointed a designee to serve on the Board.

78.     Instead, Lubin misused his position as a director of SingularDTV to benefit his

other business interests for example by using the information he gleaned as SingularDTV insider to coerce unjustified payments to ConsenSys.

79.     Lubin, on information and belief, gave proprietary financial information of SingularDTV to ConsenSys, or, in the alternative used information learned in his capacity as a Director of SingularDTV to enable ConsenSys to extort SingularDTV for millions of dollars in alleged software development fees.

80.     Lubin intentionally caused ConsenSys to delay entering into a software development agreement with SingularDTV, and then, as part of his plot to drain SingularDTV's capital, caused his company to withhold the release of its software code, demanding exorbitant fees and unconscionable contract terms.

81.     In 2018 as SingularDTV was preparing to bring its software platform to market, ConsenSys finally agreed to provide a proposed software development agreement. However, the proposed contract terms gave SingularDTV only a revocable license in the software. According to the agreement provided by ConsenSys, ConsenSys would retain ownership of the software. ConsenSys only agreed to convey ownership of the software in exchange for an additional fee of $2,000,000 from SingularDTV, essentially taking the GmbH's code hostage pending payment of the required ransom. .

82.     That agreement was negotiated in New York and specifies jurisdiction in New York.

83.     SingularDTV paid an eye-popping $11,095,448 to ConsenSys and its Romanian affiliate for development of the Breaker software. On information and belief, Lubin personally authorized ConsenSys and its Romanian affiliate to charge amounts that he knew could not be justified, supported or defended with the knowledge that SingularDTV (a) could pay the

Case 1:21-cv-10130-VEC   Document 91-9   Filed 04/15/22   Page 16 of 34

exorbitant fee because the value of ETH had appreciated dramatically, and (b) would pay whatever was demanded in order to launch the product platform which LeBeau and Jackson had been developing for two years.

84.     Lubin coerced SingularDTV to pay the exorbitant fees to ConsenSys and its Romanian Affiliate; only then did ConsenSys agree to release the software to SingularDTV for its launch.

85.     On information and belief, SingularDTV paid more for software development services in 2018 than any other ConsenSys/Lubin customer. On information and belief, the SingularDTV payments did not reflect services performed, but rather were calculated to keep Lubin's company afloat.

86.     Through the actions of Lubin, SingularDTV was also coerced into granting ConsenSys a perpetual right in the very software it paid Lubin and his associates a massive sum to develop.

87.     On information and belief, Lubin personally instructed ConsenSys personnel to hold the SingularDTV software code hostage.

88.     By acting in their own personal pecuniary interests over the best interest of the Company, Lubin and Cohen breached their contractual obligations and defaulted on their statutory obligations under the laws of New York; further, they disregarded SingularDTV's commitments to its token holders in breach of New York law.

89.     They have also paid little heed to the services they pledged to provide in exchange for their combined 57% interest in the Company.

90.     Upon information and belief, Lubin and Cohen, from the start, viewed SingularDTV as a business to exploit for their own personal gain, just as Lubin has exploited

other founders and ConsenSys employees over the years.

91.     By exploiting his position as a 'founder of Ethereum' Lubin appeared to welcome LeBeau into the ConsenSys 'hub and spoke' with the promise that he would use his connections to realize the original intent of the SingularDTV enterprise.

92.     Instead, Lubin at first neglected the business, then exploited it for the appreciated value of its cryptocurrency holdings.

93.     Lubin is desperate to preserve his reputation, even going so far as to speciously blame the victim, LeBeau, in Federal Court pleadings in order to draw attention away from his own unethical conduct, which could jeopardize ConsenSys' current fundraising efforts.[3]

94.     Lubin's current scheme to silence criticism of his past indiscretions by removing LeBeau and Jackson will have the added benefit of giving Lubin direct control over more than $36,000,000 in Ethereum (at recent value) and $10,000,000 in US Dollars; this is the final act of the Lubin subterfuge.

**VI.     Cohen's Resignation and the Subsequent Hack**

95.     On February 12, 2019, facing allegations of misappropriation of Company assets, Cohen sent a letter to the Company announcing his resignation as Director.

96.     Over the following year, Cohen negotiated with the Company for the redemption and surrender of his ownership interest in SingularDTV in exchange for the release of all claims and causes of action against him related to his past misconduct.

97.     During this period, Cohen did not participate in any activities related to SingularDTV. While he remained a shareholder (he had already resigned his Directorship), he

---

[3] *Ethereum Developer Consensys Poised to Double Its Valuation In Pending Fundraise,* https://www.theblockcrypto.com/post/131445/ethereum-developer-consensys-poised-to-double-its-valuation-in-pending-fundraise (last visited January 30, 2022)

withdrew from all management and supervisory roles, including by delegating his remaining voting rights to Lubin in contravention of Swiss Law.

98.     Finally, on or about February 17, 2020, the Company proposed a formal settlement to Cohen (the "Proposed Settlement") whereby Cohen would relinquish all his shares in SingularDTV and formally confirm his resignation from all positions with respect to the Company. In exchange, he would receive a lump sum payment and other rights.

99.     Cohen initially ignored the SingularDTV offer; that offer was rescinded on or about February 28, 2020, when Cohen began to waffle. Then, in early 2021, negotiations restarted in earnest.

100.     Lubin initially supported the Cohen redemption due to the damage caused by Cohen's illegal and embarrassing conduct, but, on information and belief, he soured on the transaction once he realized it would mean the loss of his voting majority as the holder of Cohen's proxy.

101.     Over the course of the next two months, the Company fell victim to a hacking scheme perpetrated by a party whose identity has yet to be discovered.

102.     The hacker was able to gain access to the computer of the Company's United States general counsel and to change an email rule having the effect of hiding emails sent by Cohen.

103.     The hacker then created an email account that was nearly identical to Cohen's account and used that email account to negotiate the final term of the proposed settlement.

104.     The settlement and redemption documents were returned by email to Company counsel with Cohen's signature.

105.     Upon receiving the executed documents, the Company released the agreed upon sum to the cryptocurrency wallets designated by the alleged third-party posing as Cohen.

Case 1:21-cv-10130-VEC Document 91-9 Filed 04/15/22 Page 19 of 34

106.     The scheme was revealed days later, but the hacker had already transferred the payment through a third-party cryptocurrency trading platform, rendering it untraceable using available tools.

107.     Cohen and Lubin seized on the opportunity, wrongfully terminating LeBeau as the CEO and later removing him from the Board.

108.     On May 27, 2021, Lubin and Cohen purportedly held a meeting of the Directors, without proper notice to LeBeau, to remove him as a Director and a Company signatory. They also resolved to sever all ties between the Swiss Entity and the NY Entity, thereby severing Jackson's oversight over the business of the Company she helped found.[4]

109.     Lubin and Cohen began a campaign to oppress LeBeau, coerce him to sell his ownership stake in SingularDTV for less than the value of his pro rata portion of SingularDTV's cryptocurrency holdings, and to deprive LeBeau of the benefits of his equity interest in the Swiss Entity.

110.     To that end, Lubin and Cohen purportedly held additional meetings on June 8, 2021, and August 27, 2021, without required notice to LeBeau.

111.     LeBeau attended the August 27, 2021, meeting electronically (though in New York). At that meeting, LeBeau raised formal objections to the then current and prior no-notice meetings. Notwithstanding LeBeau's objections, Lubin and Cohen self-servingly approved the minutes of the past meetings and the corporate actions they authorized to arbitrarily remove

---

[4] Prior to being wrongfully terminated as the Company Chief Operating Officer, Jackson commenced a lawsuit on behalf of SingularDTV in the Southern District of New York against the yet unidentified 'John Doe' to identify the perpetrator of the alleged hack and to recover the stolen funds. On August 16, 2021, the Court granted Singular DTV's motion for expedited discovery, and SingularDTV has since issued Subpoenas to uncover the identity of wrongdoer. In November of 2021, Cohen and Lubin engaged counsel to file a Motion to Intervene in that case. The court has not yet rendered a decision on that motion. *SingularDTV GmbH v. John Doe* SDNY (Case No. 1:21-cv-06000-VEC).

LeBeau and maliciously sever ties with the NY Entity.

112. After having referenced the hack as a pretext for terminating LeBeau as CEO of the Company, Lubin and Cohen have since failed and refused to take any actions whatsoever to uncover the source of the hack and theft of company assets.

113. Cohen and Lubin's refusal to investigate the source of the hack amounts to a material breach of their fiduciary duties to the shareholders. Further, without a thorough investigation, the shareholders will never learn if it was Cohen or a third party who executed the redemption paperwork and took possession of the cryptocurrency payment.[19]

90. If it is determined that Cohen executed the redemption paperwork, then it must be deemed effective and enforceable against him.

91. Further, if it is determined that Lubin was involved with Cohen in the fraudulent settlement negotiation and redemption transaction, then he should likewise be deemed ineligible to serve as a director of the Company and will be jointly liable to the Company for the stolen cryptocurrency.

**VII. LeBeau has Standing to Bring Derivative Claims on Behalf of SingularDTV**

92. LeBeau has continuously held Swiss Entity shares, from the date of formation to the present date.

93. LeBeau brings this derivative action on behalf of the Company for the benefit of SingularDTV to redress injuries suffered, and to be suffered, as a direct result of breach of fiduciary duties by Defendants.

94. The Swiss Entity is named solely as a nominal party in this action.

95. Plaintiff is, and continuously has been, at all relevant times, a shareholder of the Swiss Entity. Plaintiff will adequately and fairly represent the interests of the Swiss Entity.

96.     LeBeau has not made a demand on the Board to pursue this action because demand would be futile and, therefore excused. The Board consists of LeBeau, Lubin and Cohen.

97.     A demand would be futile if a complaint alleges with particularity that (1) a majority of the directors are interested in the transaction, or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction.

98.     Demand is excused as to both Lubin and Cohen because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the fraudulent and extortionate behavior, and a pattern of self-dealing, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves.

99.     Lubin and Cohen, in complete abdication of their obligations as fiduciaries, have failed to investigate the hack and theft of company assets or their own self-dealing, acts which have resulted in the diminution of the Company's value, waste, fraud and unjust enrichment.

100.     Instead of investigating the hack, Lubin and Cohen have brought an action against LeBeau and Jackson in the Southern District of New York (*SingularDTV GmbH v. Zachary LeBeau & Kimberly Jackson*, 21-CV-10130 (S.D.N.Y.) (the "SDNY Action") which inexplicably attempts to link the LeBeau as the perpetrator of the hacking incident. The SDNY Action is retaliatory against LeBeau and Jackson and serves no business purpose other than to harass LeBeau and Jackson.

101.     By bringing the SDNY Action, the Director Defendants have acknowledged that New York is the proper forum for adjudicating disputes related to SingularDTV.

102.     As a result of the foregoing, Lubin and Cohen breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus

excused.

103.    Additional reasons demand on the Board is futile, and demand thus excused, is that the Director Defendants are beholden to each other. Lubin and Cohen have collaborated to seize control over the Company and to disintermediate Jackson and LeBeau. They are each aware that the other has engaged in wrongful, coercive and deceptive acts that violate the laws of the State of New York and Switzerland as well as the By-Laws, yet they have taken no actions whatsoever to investigate or to recover amounts that have been wrongfully misappropriated.

104.    Further evidencing the stratagem of the Director Defendants, Cohen has wrongfully attempted to give Lubin a proxy to vote his interests as a director and as a shareholder, rendering Lubin - the image-obsessed oligarch – the voting majority over SingularDTV and its cryptocurrency assets.

105.    Moreover, Lubin is the owner of ConsenSys, a co-defendant in this matter, and should thus be precluded from directing the Company's actions with respect thereto.

106.    Lubin and Cohen face a substantial likelihood of liability in a manner not shared by the Company and its shareholders.

107.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not taken any action on behalf of the Company to mitigate damages; instead, they have taken affirmative steps to stop the Company from redressing the injuries suffered. Therefore, demand on the board would be futile and is thus excused.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty)

108.    The Plaintiff realleges and incorporates by reference herein in their entirety the allegations contained in the foregoing paragraphs.

Case 1:21-cv-10130-VEC Document 91-9 Filed 04/15/22 Page 23 of 34

109.    The Director Defendants, residents of New York and New Jersey, allege that they are majority shareholders and directors of the Swiss Entity and as such entitled to direct the activities of the Swiss Entity from the United States.

110.    As Directors of the Company, Lubin and Cohen owed the Company, its shareholders, and token holders fiduciary duties including the duty of loyalty, the duty to act in good faith and the duty to exercise reasonable care.

111.    As detailed above, from the Company's inception, Lubin and Cohen have put their own personal and business interests ahead of those of the nominal defendant, its token holders and its shareholders.

112.    Examples of the above, in the case of Cohen, include siphoning capital into luxury items and investments in Canada and Switzerland for his own personal benefit; and in the case of Lubin, include holding the SingularDTV software code-base hostage in exchange for multi-million-dollar payments that he used to finance his separately held New York based blockchain business.

113.    At meetings of the Directors of the Swiss Entity, again held in New York, Lubin and Cohen have attempted to remove LeBeau as the CEO of SingularDTV, remove Jackson as COO of SingularDTV, and arbitrarily terminate the services agreement between the Swiss Entity and the NY Entity in contravention of New York law.

114.    Further, by allowing these breaches to continue and by conspiring to oust LeBeau and Jackson to obfuscate their self-serving activities, Lubin and Cohen have failed to safeguard the interests of the Company.

115.    Further, Lubin and Cohen have ignored that Cohen resigned as Director in 2019, again attempting to rewrite the past to suit their current ends.

116.    All actions taken by Cohen and Lubin at improperly conducted meetings are contrary to the best interest of the Company, its shareholders and its token holders.

117.    The resolutions passed at these meetings serve no legitimate Company purpose and instead are arbitrary, retaliatory, and meant to oppress LeBeau and deprive LeBeau of the benefits of his ownership an equity interest in SingularDTV.

118.    The actions of Lubin and Cohen have cost SingularDTV millions of dollars as outlined herein and in the Swiss criminal complaint [Docket 41].

119.    If the Defendant Directors are permitted to continue their wrongful activities, there is no chance that SingularDTV will ever recover the misappropriated funds.

120.    As a foreseeable consequence, the Plaintiff has suffered and will continue to suffer substantial harm and damage proximately caused by the unlawful conduct of Cohen and Lubin.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Breach of the Company's Bylaws)

121.    The Plaintiff realleges and incorporates by reference herein in their entirety the allegations contained in the foregoing paragraphs.

122.    The Company adopted By-Laws dated February 9, 2018.

123.    In clear contravention of the Company's By-Laws, which expressly prohibit conflicts of interest for personal financial gain, Lubin and ConsenSys developed software for and on behalf of the Company which it held hostage in exchange for payments that cannot be justified.

124.    Lubin feigned an arm's length relationship between the Romanian Developers and ConsenSys, yet they are affiliated and coordinated their invoicing and negotiations to maximize their leverage over the Nominal Defendant.

125.    Cohen repeatedly breached the Company By-Laws by siphoning Company capital into luxury items and personal projects for his own benefit, all without notice to the Board or

Case 1:21-cv-10130-VEC  Document 91-9  Filed 04/15/22  Page 25 of 34

permission.

126.    Neither Cohen nor Lubin took any actions to disclose, mitigate or eliminate their conflicts of interest and misdeeds against the Company.

127.    As a foreseeable consequence, the Plaintiff has suffered and will continue to suffer substantial harm and damage proximately caused by the unlawful conduct of Cohen and Lubin in an amount to be determined at trial but not less than ten million dollars.

## AS AND FOR THE THIRD CAUSE OF ACTION
### (Declaratory Judgment and Injunctive Relief)

128.    The Plaintiff realleges and incorporates by reference herein in their entirety the allegations contained in the foregoing paragraphs.

129.    As a result of the facts described above, an actual, present, and justiciable controversy exists between Plaintiff and Defendants.

130.    As alleged herein, the actions of the Director Defendants, including the holding of at least three director meetings, and the passage of resolutions at those meetings, were taken without complying with the By-Laws, the Articles of Association or the laws of Switzerland.

131.    For two of the meetings notice was improper, and no notice at all was given to LeBeau of the June 8, 2021, meeting.

132.    As alleged herein, Cohen resigned as Director of the Company on February 9, 2018, and no vote of the shareholders ever returned him to such office. As such, he is barred from participating in Directors' meetings or taking actions that are delegated to Directors of the Company.

133.    Further, Cohen's conduct is the subject of investigation in Switzerland and a separate action in the Southern District of New York (related to his possible involvement in a hacking incident and theft with respect to the Company); his actions render him ineligible to serve

on the SingularDTV board.

134. Cohen had no involvement with the Company between October 2018 and May 27, 2021; he re-emerged at the behest of Lubin only to try and wrest control of the Company from its original founders.

135. Lubin has exploited his role with SingularDTV and drained its assets to benefit ConsenSys.

136. Lubin has acknowledged this conflict yet has failed to take any action whatsoever to ameliorate the conflict.

137. Lubin and Cohen have hidden behind corporate formalities to freeze LeBeau and Jackson out of the business they conceptualized and founded.

138. Lubin is also trying to gain control over the Company's software for which ConsenSys was already paid an enormous sum to develop. This is not Lubin's first attempt to take possession of software for his company's benefit to the detriment of SingularDTV. After withholding an agreement for the development services provided by ConsenSys, ConsenSys provided an agreement that sought to provide merely a limited license to use the software code. The Company was only able to obtain the code base after it agreed to pay an extortionate sum.

139. From the Company's inception, Lubin and Cohen have acted in their individual best interests over the best interest of the Company, its shareholders and the token holders and are thus ineligible to serve as directors.

140. Accordingly, Plaintiff is entitled to a judgment (a) declaring that LeBeau's removal from the Board was improper and restoring him to the Board, (b) enjoining the Company from making payments to the Directors or Shareholders without the consent of the disinterested Directors, (c) declaring that Cohen's resignation from the Board was valid and is binding on the

Case 1:21-cv-10130-VEC Document 91-9 Filed 04/15/22 Page 27 of 34

Company, (d) declaring void all resolutions of the Board that did not include the vote of both Lubin and LeBeau and (e) enjoining, restraining, and prohibiting Lubin and Cohen from holding Board meetings and/or passing Board resolutions until such time as a court of competent jurisdiction determines whether Lubin and Cohen are eligible to serve on the Board, or, if earlier until such time as the shareholders of the Company elect three independent directors to serve on the Board.

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Unjust Enrichment Against ConsenSys)

141.    The Plaintiff realleges and incorporates by reference herein in their entirety the allegations contained in the foregoing paragraphs.

142.    As alleged herein, ConsenSys held the SingularDTV software code-base hostage in exchange for aggregate payments of $11,095,448.

143.    Upon information and belief, Lubin always intended for ConsenSys to own and exploit the software assets it developed for and on behalf of the Company.

144.    ConsenSys agreed to develop the software though dodged the Company's efforts to negotiate terms, enter into a services agreement or obtain invoices for the services allegedly provided.

145.    It was understood from the Company's inception that ConsenSys would develop the rights management software envisioned by the Company on fair and reasonable terms.

146.    However instead of performing the services through ConsenSys, Lubin, outsourced development services to a third party in Romania and, on information and belief, conspired with the Romanian developers to charge excessive development fees.

147.    Neither the Romanian developer nor ConsenSys was willing to provide a contract for services or invoices to support their demand for $11,095,448 in payments.

148.    Lubin also directed ConsenSys to withhold delivery of the SingularDTV

software code unless the Company agreed to pay the exorbitant, unsupported and unjustified invoice amounts.

149.   On information and belief, SingularDTV paid more for software development services than any other ConsenSys customer in 2018. In fact, SingularDTV may have been ConsenSys' only paying customer that year.

150.   In 2018, as the Company was preparing to bring its software platform to market, ConsenSys finally provided a form of development agreement. However, the proposed contract terms gave SingularDTV only a revocable license to use the software. Ownership would be retained by ConsenSys, and not conveyed to the customer, here SingularDTV.

151.   When SingularDTV refused to agree to such commercially unreasonable terms, ConsenSys, demanded an additional fee of $2,0000,000 in exchange for conveying and assigning all right, title and interest in the code base to its client, again without proving any justification therefor.

152.   Ultimately, the Company was coerced to pay the extortionate fee and settled on a payment plan in exchange for release of the code base. The Company paid $11,095,448 to ConsenSys and its affiliates for the software, and still was obligated to grant ConsenSys a perpetual, royalty-free license.

153.   ConsenSys received the benefit of payments it was not entitled to by withholding agreements, invoices, and ultimately the intellectual property they were engaged to develop, harming the Company in the process.

154.   It would be unjust, and there is no good reason, to allow ConsenSys to receive fees that are at least twenty times higher than market rate at the time, and an additional fee for conveyance of ownership in the work product.

155. As a result the Company, its shareholders, and token holders have suffered damages in an amount to be determined at trial but not less than ten million dollars.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Fraud Against Lubin and Cohen)

156. The Plaintiff realleges and incorporates by reference herein in their entirety the allegations contained in the foregoing paragraphs.

157. SingularDTV was first conceptualized in 2014 by LeBeau and Jackson as a blockchain-based platform for enabling content creators to track and monetize their intellectual property rights; the platform would also be used to fund and create television and film assets related to blockchain and cryptocurrency.

158. Lubin and Cohen joined the Company early on as subject matter experts and were granted shares in exchange for services that were promised but never rendered.

159. Instead, Lubin and Cohen used their positions as directors and officers of the Company to reap substantial personal benefit from the appreciation of cryptocurrency raised in the Company's IC), in the case of Cohen, by siphoning capital into personal projects for his own benefit and extravagant purchases of luxury items; and in the case of Lubin, by holding the SingularDTV software code-base hostage in exchange for $11,095,448 that he used to finance ConsenSys.

160. Lubin did not invest any capital in the Company or provide any of the promised services as CTO. All CTO services were provided through ConsenSys, principally by its contractors in Romania.

161. Cohen did not invest any capital in the Company. Cohen served as the Company's CFO until April 27, 2018 (a paid position), when he was replaced by the Company due to his unlawful conduct.

162.    Cohen and Lubin were granted 57% of the Company's shares yet provided no consideration whatsoever for their equity interests.

163.    Both Cohen and Lubin, when accepting their respective shares, had no intention of fulfilling their promises to the Company.

164.    Cohen and Lubin misrepresented their participation in the Company for the purpose of inducing LeBeau and Jackson to enter into a business arrangement in which Cohen and Lubin would together have the power and authority to divert financial resources for their unrelated business interests.

165.    LeBeau reasonably relied on these misrepresentations to the detriment of the Company, which did not receive the promised services and instead ending up losing millions through misappropriation and self-dealing by the Director Defendants.

166.    As a result the Company, its shareholders, and token holders have suffered damages in an amount to be determined at trial but not less than ten million dollars.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### (Fraud Against Lubin and ConsenSys)

167.    The Plaintiff realleges and incorporates by reference herein in their entirety the allegations contained in the foregoing paragraphs.

168.    Lubin pledged that ConsenSys would develop the rights management software envisioned by the Company on fair and reasonable terms.

169.    At the urging of Lubin, SingularDTV agreed to work with ConsenSys to develop its software platform.

170.    However, ConsenSys intentionally refused to provide a contract or invoices, despite repeated requests from SingularDTV.

171.    In 2018 as SingularDTV was preparing to bring its software platform to market,

ConsenSys finally provided a form of development agreement. However, the proposed contract terms gave SingularDTV only a revocable license to use the software.

172.    When SingularDTV refused to agree to the commercially unreasonable terms demanded by ConsenSys, ConsenSys switched gears and demanded a fee of approximately $2,000,000 to pay for the assignment to SingularDTV, without justification for this new charge.

173.    The SingularDTV had no choice but to pay the extortionate fee for conveyance of the code base.

174.    As alleged herein, upon information and belief, Lubin always intended for ConsenSys to own and exploit the software developed for SingularDTV.

175.    Lubin and ConsenSys misrepresented to SingularDTV that they could provide the best blockchain development services at the best price while refusing to provide a development agreements or invoices until the last possible moment.

176.    ConsenSys only provided a contract at the end of the project, on the eve of launch, in order to extort the maximum possible amount from SingularDTV.

177.    On information and belief, Lubin decided that a huge sum of money would be more valuable than ownership of the software.

178.    The Company detrimentally relied on Lubin, who was supposed to be representing the best interest of SingularDTV and its shareholders.

179.    Lubin and ConsenSys knew that SingularDTV could afford to pay the enormous sums demanded and would pay any price for the software.

180.    Based on Lubin and ConsenSys' stall tactics and misrepresentations, SingularDTV was forced to pay ConsenSys an aggregate amount of $11,095,448.

181.    As a result the Company, its shareholders, and token holders have suffered damages

in an amount to be determined at trial but not less than ten million ($10,000,000) dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LeBeau respectfully requests that the Court enter judgment against Defendants, jointly and severally, as follows:

A.  Declaring that Lubin and Cohen have breached their fiduciary duties to SingularDTV and awarding damages for the first cause of action in an amount to be determined at trial;

B.  Declaring that Lubin and Cohen have breached the SingularDTV By-Laws and awarding damages for the second cause of action in an amount to be determined at trial;

C.  For the third cause of action:

   (i)   Declaring that that LeBeau's removal from the Board was improper and restoring him to the Board;

   (ii)  Enjoining SingularDTV from making payments to any member of the Board or any of the shareholders without the consent of disinterested members of the Board;

   (iii) Declaring that Cohen's resignation from the Board is binding on SingularDTV;

   (iv)  Declaring null and void all actions of the Board following the removal of LeBeau.

   (v)   Enjoining, restraining, and prohibiting Lubin and Cohen from holding meetings of the Board and/or passing resolutions until such time as a court of competent jurisdiction determines whether Lubin and Cohen are eligible to

Case 1:21-cv-10130-VEC   Document 91-9   Filed 04/15/22   Page 33 of 34

serve on the Board, or, if earlier until such time as the shareholders of the Company elect three independent directors to serve on the Board;

D.  Awarding damages for the fourth cause of action including without limitation $[2,000,000] paid to ConsenSys for assignment of the SingularDTV software code-base and millions of US dollars in overpayments for the software code base;

E.  For the fifth and sixth cause of action:

   (i)  awarding SingularDTV damages in the form of restitution of all amounts misappropriated by Cohen;

   (ii)  awarding SingularDTV damages for all compensation paid or payments of a material nature by SingularDTV to the Director Defendants and their affiliates including without limitation ConsenSys;

   (iii)  awarding SingularDTV damages in an amount to be determined at trial.

   (iv)  awarding LeBeau damages in an amount to be determined at trial.

F.  Awarding SingularDTV and the Plaintiff pre-judgment and post-judgment interest, as well as reasonable attorneys' and expert witness' fees and other costs; and

G.  Awarding such other relief as this court deems just and proper.


  Dated: New York, NY
         February 11, 2022


                          **MORRISON TENENBAUM PLLC**

                          By: _/s/ Jerald Tenenbaum_____
                              Jerald Tenenbaum, Esq.
                              87 Walker Street, Second Floor
                              New York, New York 10013
                              Tel: (212) 620-0938
                              Email: jerald@m-t-law.com

                              *Attorney for Plaintiff*

Case 1:21-cv-10130-VEC   Document 91-9   Filed 04/15/22   Page 34 of 34

## VERIFICATION

JERALD M. TENENBAUM states pursuant to CPLR 2106 and under penalty of perjury as follows:

I am an attorney duly admitted to practice before the Courts of the State of New York, and I am not a party to this action. I reside in the State of New York, and I am a member of the law firm of Morrison Tenenbaum PLLC, with offices in the County of New York. Morrison Tenenbaum PLLC represents the Plaintiff in the above-captioned action. The Plaintiff is not located within the county in which my office is located.

I have read the foregoing First Amended Complaint and know the contents thereof. Based upon information and records supplied to my office by Plaintiff, the statements made in the foregoing First Amended Complaint are true to my knowledge and/or information, except to the matters therein stated upon information and belief, and as to those matters, I believe them to be true.

_____
Jerald M. Tenenbaum, Esq.