# EXHIBIT A

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------------x

4  SINGULARDTV GmbH,

5                          Plaintiff,

6              -against-                Case No.
                                       1:21-cv-10130
7  ZACHARY LeBEAU and KIMBERLY JACKSON,  (VEC)

8                          Defendants.

9  ----------------------------------------x

10                      May 11, 2022
                        9:36 a.m.
11

12

13      Videotaped Deposition of ZACHARY LeBEAU,

14  taken by Plaintiff, pursuant to Notice, held

15  at the offices of Kobre & Kim LLP, 800 Third

16  Avenue, New York, New York, before Joseph R.

17  Danyo, a Shorthand Reporter and Notary Public

18  within and for the State of New York.

19

20

21

22  Job No. 210800

23

24

25

1

2    A P P E A R A N C E S :

3

4        KOBRE & KIM LLP
         Attorneys for Plaintiff
5            800 Third Avenue
             New York, New York 10022
6

7        By:   ALEXA PERLMAN, ESQ.

8              BENJAMIN SAUTER, ESQ.

9

10

         NEIL L. POSTRYGACZ, ATTORNEY AT LAW PC
11       Attorney for Defendant Zachary LeBeau
             419 Lafayette Street
12           New York, New York 10003

13       By:   NEIL POSTRYGACZ, ESQ.

14

15

16       PAUL F. CONDZAL, ESQ.
         Attorney for Defendant Kimberly Jackson
17           1330 Avenue of the Americas
             New York, New York 10019
18

19       By:   PAUL CONDZAL, ESQ.

20

21   Also Present:

22       ERIC FISCHER, Videographer

23                   ~oOo~

24

25

```
 1                    ZACHARY LeBEAU
 2          THE VIDEOGRAPHER:    This is the start
 3      of media unit 1 of the video-recorded
 4      deposition of Zachary LeBeau in the matter
 5      of SingularDTV GmbH versus Zachary LeBeau
 6      and Kimberly Jackson filed in the United
 7      States District Court, Southern District
 8      of New York, Case No. 1:21-cv-10130(VEC).
 9          This deposition is being held at
10      Kobre & Kim LLP, 800 Third Avenue, New
11      York, New York, on Wednesday, May 11, 2022
12      at approximately 9:36 a.m.   My name is
13      Eric Fischer, the legal video specialist
14      from TSG Reporting, Inc.   The court
15      reporter is Joe Danyo in association with
16      TSG Reporting.   All appearances are noted
17      on the stenographic record.
18          Will the court reporter please swear
19      in the witness.
20  Z A C H A R Y    L e B E A U, after having been
21  first duly sworn by Joseph R. Danyo, a Notary
22  Public, was called as a witness and testified
23   as follows:
24  EXAMINATION BY MR. SAUTER:
25          Q.   Good morning, Mr. LeBeau.   My name is
```

1              ZACHARY LeBEAU

2  Benjamin Sauter, an attorney for SingularDTV

3  GmbH.  Can I ask you to please state and spell

4  your name for the record?

5          A.   Zachary James LeBeau spelled

6  Z-a-c-h-a-r-y, James, J-a-m-e-s, LeBeau, L-e

7  capital B-e-a-u.

8          Q.   And What is your current address?

9          A.   464 West 44th Street, Ph D, New York,

10 New York, 10036.

11         Q.   Have you ever been deposed before?

12         A.   No.

13         Q.   So to introduce you to the process

14 and how I will be asking questions today and the

15 format of that, a few ground rules.

16         A.   Okay.

17         Q.   First, when I ask a question, I ask

18 that you please let me finish my question before

19 you respond so that the record is clear and we

20 are not talking over each other.  Likewise, I

21 will wait until you are done answering a question

22 before I ask my next question.  Do you

23 understand that?

24         A.   Yes.

25         Q.   If you don't understand a question

```
 1                  ZACHARY LeBEAU
 2   that I am asking, I ask that you please ask me to
 3   clarify it.   If you don't, I will assume that
 4   you understand my question.   Do you understand
 5   that?
 6           A.   Yes.
 7           Q.   In a deposition you need to give
 8   verbal answers because the transcript that is
 9   being typed doesn't pick up nods and shakes of
10   the head, so I ask that you give verbal responses
11   to my questions.   Do you understand that?
12           A.   Yes.
13           Q.   If your attorneys object to questions
14   that I ask, they may do that from time to time,
15   but you still need to answer my questions unless
16   they instruct you not to answer my question.   Do
17   you understand that?
18           A.   Yes.
19           Q.   If you want to take periodic breaks
20   during the deposition, that is okay.   Just let me
21   know and I will try to be accommodating to that.
22   We will plan to take a break about every hour or
23   so.  If you need one sooner than that, let me
24   know, but I ask that you not ask for a break in
25   the middle of a question, so please finish
```

```
 1                      ZACHARY LeBEAU

 2   answering a question, and then we can discuss

 3   taking a break.  Okay?

 4          A.   Okay.

 5          Q.   You have taken an oath to tell the

 6   truth.  Do you understand that you are obligated

 7   to tell the truth in this deposition the same way

 8   as if you were in front of a judge in court in

 9   this case?

10          A.   Yes.

11          Q.   Is there any reason that you feel

12   that you cannot do that today?

13          A.   No.

14          Q.   Are you on any medications that would

15   prevent you from telling the truth?

16          A.   No.

17          Q.   In October 2016 SingularDTV conducted

18   what is often referred to as an ICO or initial

19   coin offering.  Is that correct?

20          A.   Yes.

21          Q.   In essence, in that transaction

22   SingularDTV generated Singles tokens and sold

23   some of those tokens for Ethereum.  Do you agree

24   with that?

25          A.   Yes.
```

```
 1                    ZACHARY LeBEAU

 2         Q.    Through that process, the company

 3   generated 580,000 Ethereum, correct?

 4         A.    580,000 Ether, yes.

 5         Q.    Thank you for that clarification.

 6   When the company raised those 580,000 Ether

 7   through the ICO, where was that Ether initially

 8   stored?

 9         A.    In the company's cold wallet wallet

10   address.

11         Q.    Was that wallet address an address

12   that begins 0XC7831?

13         A.    I don't recall.

14         Q.    Does that sound familiar to you?

15         A.    I don't recall.

16         Q.    We will come back to that, Mr.

17   LeBeau.  I will show you a document that

18   hopefully will refresh your recollection.  Right

19   now unless you have a problem with it, I will ask

20   that you assume that is the SingularDTV address,

21   and I will ask you some questions to confirm that

22   in a few minutes.

23              MR. POSTRYGACZ:  Objection.  Why

24         don't we use the document instead of just

25         assuming that that's the case?
```

Page 8

1                    ZACHARY LeBEAU

2               MR. SAUTER:  I just said I will show

3          him a document, and we will confirm that.

4               MR. POSTRYGACZ:  Okay.

5          Q.   The initial address that received the

6     Ethereum that was raised, what was the procedure

7     for accessing that Ethereum?

8               MR. CONDZAL:  In 2016?

9          Q.   In 2016 right after the ICO, what was

10     the procedure for accessing the Ether that was

11     raised?

12          A.   An Icebox cold wallet system was put

13     in place.

14          Q.   Can you describe that system?

15          A.   It was an ecosystem components that

16     acted as a cold wallet for the wallet address.

17          Q.   When you say a cold wallet, what do

18     you mean?

19          A.    In this case, I am referring to the

20     wallet address of the GmbH that stored the Ether

21     from the ICO.

22          Q.   And does the word "cold" signify

23     offline to you?

24          A.   It can.

25          Q.   So, in this context, when you used

1                   ZACHARY LeBEAU

2    the word "cold wallet," were you referring to a

3    system that maintained that address offline?

4         A.   In this moment, yes.

5              MR. POSTRYGACZ:  What moment, just to

6         be clear?

7              MR. SAUTER:  I'm referring right now

8         to the address where the Ether was

9         initially raised directly after the ICO.

10        Q.   At that time.

11        A.   Yes.

12        Q.   It was held in a cold storage device

13   called Icebox, correct?

14        A.   It was stored -- Icebox is a

15   software.  The components that comprised the cold

16   wallet gave access to the wallet address and the

17   Ether.

18        Q.   What were the components of Icebox?

19        A.   The Icebox software itself, a Mac

20   Mini that served as the interface, USB hard

21   drives that contains wallet file, USB hard drives

22   that contained the password and a seed phrase.

23        Q.   What was the function of the Mac Mini

24   computer?

25        A.   It acted as an interface.

1                    ZACHARY LeBEAU

2          Q.   What do you mean by interface?

3          A.   It was the device used to access the

4    wallet address.

5          Q.   Was it connected to the Internet?

6          A.   No.

7          Q.   You mentioned a USB device.  Two USB

8    devices.  Can you describe what each of those was

9    used for in the system?

10          A.   There were two sets of USB hard

11    drives.  One set contained the wallet file that

12    was used to gain access to the wallet address and

13    the other set of USB hard drives contained the

14    password that was used together with the wallet

15    file to gain access to the wallet address.

16          Q.   Were there passwords to access the

17    USB devices themselves?

18          A.   No.

19          Q.   How did the USBs interact with the

20    Mac Mini computer to make transactions from the

21    cold wallet?

22          A.   The USB hard drive that contained the

23    wallet file was connected to the Mac Mini and

24    from there the wallet file was accessed to then

25    prompt a password.  The password was then input.

1                    ZACHARY LeBEAU

2   It didn't need to be connected to the USB or to

3   the Mac Mini, it just needed to be accessed so

4   the password could be seen and then input.

5           Q.   So the USB that held the password

6   didn't need to be plugged into the computer, but,

7   if one needed to know the password, it would be

8   on that USB device?

9           A.   Correct.

10          Q.   Is that accurate?  Good.  Were there

11  private keys separate and apart from the USB

12  devices to effectuate transactions?

13          A.   If we are talking about 2016, no.

14          Q.   You mentioned a seed phrase.  What is

15  that?

16          A.   A seed phrase is a master key that

17  allows access to a wallet address through a

18  specific derivation path.

19          Q.   So, using the seed phrase, one could

20  access the wallet and effectuate transactions

21  without the USBs that you just described.  Is

22  that accurate?

23          A.   In 2016 using Icebox software, yes.

24          Q.   What did the seed phrase look like?

25  Was it a series of words?  Was it something

1                    ZACHARY LeBEAU

2    different?

3          A.   It was 12 words.

4          Q.   Who was involved in setting up the

5    Icebox wallet in 2016?

6          A.   I was.  Joseph Lubin, Arie Levy-Cohen

7    and Kim Jackson.

8          Q.   Anybody else?

9          A.   I don't recall.

10         Q.   Do you recall if there were

11   programmers who would have been involved in that

12   process?

13         A.   Christian Lundquist, the CTO of

14   Consensus at the time, was in the office.

15         Q.   What role, if any, did he have in how

16   the Icebox system was set up?

17         A.   Christian Lundquist was one of the

18   main programmers of Icebox.

19         Q.   Was the Icebox system set up before

20   or after Ether was raised in the ICO?

21         A.   Before.

22         Q.   After it was set up, who maintained

23   physical possession of the Mac Mini computer?

24         A.   I did.  It was placed in a safety

25   deposit box in a bank that I had access to.

1                    ZACHARY LeBEAU

2         Q.   Were you the only one who had access

3    to that safety deposit box?

4         A.   Kim Jackson had access to that safety

5    deposit box.  She never accessed that safety

6    deposit box.

7         Q.   Is Kim Jackson your wife?

8         A.   She is.

9         Q.   Who had physical possession of the

10   USB containing the wallet file at the time Icebox

11   was set up?

12        A.   Kim Jackson and myself.

13        Q.   Was that in a safe deposit box as

14   well?

15        A.   Yes.

16        Q.   Who had possession of the USB device

17   containing the password?

18        A.   Joseph Lubin and Arie Levy-Cohen.

19        Q.   Did they each have their own separate

20   device, or was there one device with a password?

21        A.   They each had their own separate

22   device.

23        Q.   Do you know where those were kept?

24        A.   I do not.

25        Q.   For the USB with the wallet file, was

```
 1                    ZACHARY LeBEAU

 2   there one USB with the wallet file, or were there

 3   two or more?

 4           A.   I had my copies.  Kim had her copies.

 5           Q.   So how many did you have and how many

 6   did Kim have?

 7           A.   I had two.  Kim had two.  Joseph was

 8   given two.  And Arie was given two.

 9           Q.   So in total, there were four USBs

10   with the wallet file, two of which you had and

11   two of which Kim had, is that correct?

12           A.   Correct.

13           Q.   And there were four copies total of

14   the password USB, two of which Joe had and two of

15   which Arie had?

16           A.   Correct.

17           Q.   Were all four of the USBs with the

18   wallet file kept in the same safe deposit box?

19           A.   Two were kept in the safety deposit

20   box and two were kept in a safe at our apartment.

21           Q.   Was the computer ever kept in a safe

22   in your apartment or was it always in a safe

23   deposit box?

24           A.   It was always in a safety deposit box

25   until -- in 2016.
```

1                    ZACHARY LeBEAU

2          Q.   The seed phrase, was that written

3    down?

4          A.   Yes, it was.

5          Q.   How was it written down?

6          A.   It was written down with pen and

7    paper at the time of the wallet creation.  Wallet

8    address creation at the Consensus office.

9          Q.   And at that time where was it kept?

10         A.   It was kept in a safety deposit box.

11         Q.   The same one with the computer and

12   the USB file?

13         A.   Correct.

14         Q.   So all of those things were kept

15   together in the same safety deposit box?

16         A.   Yes.

17         Q.   Was that seed phrase ever copied or

18   reproduced in any other way?

19         A.   No.

20              MR. POSTRYGACZ:  Objection, by whom?

21   Him?

22         Q.   By anybody.  Do you have any

23   knowledge if that seed phrase was ever copied or

24   reproduced?

25              MR. CONDZAL:  I want to make sure the

```
 1                    ZACHARY LeBEAU

 2        record is clear.  Until now you are

 3        talking -- we are talking about 2016 now,

 4        and until you say otherwise, we are

 5        talking about 2016?

 6             MR. SAUTER:  I am going to get to all

 7        the other iterations of the wallet but

 8        right now I'm talking about the initial

 9        setup.

10             THE VIDEOGRAPHER:  The time now is

11        9:53 a.m.  We are going off the record.

12             (Recess taken)

13             THE VIDEOGRAPHER:  The time now is

14        9:57 a.m.  We are back on the record.

15   BY MR. SAUTER:

16        Q.   Mr. LeBeau, are you familiar with the

17   website called Etherscan?

18        A.   Yes.

19        Q.   I am going to show you a document I

20   am going to mark as Exhibit 1.

21             (Plaintiff's Exhibit 1, Printout from

22        Etherscan website, was so marked for

23        identification, as of this date.)

24        Q.   Mr. LeBeau, I will represent to you

25   that this is a printout from that site.  Do you
```

1                     ZACHARY LeBEAU

2    see at the top it says Address.  It has an

3    0XC783102 written at the top?

4         A.   Yes.

5         Q.   Right below that, you see the word

6    "SingularDTV wallet"?

7              MR. POSTRYGACZ:  Where is that?

8         Okay.  It is not right below it.

9         A.   I see it.

10         Q.   I am representing to you that this

11    address is associated with SingularDTV wallet on

12    Etherscan.  Does that refresh your recollection

13    as to whether that address is the address that

14    corresponds to the cold wallet?

15         A.   Yes.

16         Q.   You can put that aside.  Just to

17    close that out, am I correct that that address is

18    the original address for the SingularDTV cold

19    wallet?

20              MR. POSTRYGACZ:  Based on your

21              representation that this is from

22              Etherscan.

23              MR. SAUTER:  He just said it

24              refreshed his recollection.

25         Q.   So based on your recollection now.

1                    ZACHARY LeBEAU

2         A.    Yes.   The ending of the address

3    refreshes my recollection.

4         Q.    Thank you.

5              MR. CONDZAL:   Are you done with that

6         exhibit?

7              MR. SAUTER:   I am done with that

8         exhibit.   Correct.

9         Q.    The safe deposit box that you

10   mentioned, were you alone able to access it or

11   was it a dual entry by you and Ms. Jackson?

12        A.    I was able alone to access it.

13        Q.    Was Ms. Jackson able to access it

14   alone?

15        A.    She was able to.   She never accessed

16   it.

17        Q.    When transactions at this time in

18   2016 were made from the cold wallet, can you

19   describe step by step how that would happen as a

20   matter of process?

21        A.    Arie Levy-Cohen and I would get

22   together.   I would bring the Mac Mini.   We

23   would hook it up to a monitor, a mouse, a

24   keyboard, plug it in for power.   He would bring

25   his USB hard drive that had the password on it.

Page 19

```
 1                    ZACHARY LeBEAU
 2   I would bring the USB hard drive that had the
 3   wallet file on it.  And then we would sit down
 4   and power on the Mac Mini, open up the Icebox
 5   software.   I would plug in the USB hard drive
 6   that had the wallet file and he would open the
 7   file on his USB hard drive that had the password,
 8   and by prompting the wallet file and by entering
 9   the password, it gave us access to the wallet
10   address.
11            Q.    Then how would funds actually be sent
12   from that address to another address?
13            A.    We would input the wallet address of
14   where the funds were being sent to, the amount,
15   the Nonce.  It's a prompt displaying the
16   sequential event of transactions being sent in
17   that manner with that software.   A QR code was
18   generated and then a telephone was used to scan
19   the QR code, which then pushed the transaction
20   over the network.
21            Q.    A telephone is how it connected to
22   the Internet?
23            A.    Correct.
24            Q.    Did you ever go through that process
25   with Joe Lubin?
```

1                    ZACHARY LeBEAU

2          A.   No.

3          Q.   How many times did you do it with

4   Arie Cohen?

5          A.   I don't recall.

6          Q.   Less than ten or more than ten would

7   you say?

8          A.   I don't recall.   I don't recall.

9          Q.   I am going to show you a document

10  that I will mark as Exhibit 2.

11              (Plaintiff's Exhibit 2, Document

12          describing key management practices, was

13          so marked for identification, as of this

14          date.)

15         Q.   This is a document that we received

16  from your counsel.   Are you familiar with this

17  document?

18              MR. POSTRYGACZ:   You don't have the

19         Bates stamped versions?

20              MS. PERLMAN:   This was the standalone

21         document you sent to us the first time.

22         It wasn't Bates stamped.

23         A.   Yes.   I am familiar with this

24  document.

25         Q.   What is it?

```
 1                   ZACHARY LeBEAU
 2        A.   It is a document describing possible
 3   key management practices.
 4        Q.   Do you know who wrote it?
 5        A.   I believe it was a group effort.
 6        Q.   Who was involved in that group?
 7        A.   Milad Mostavi, myself and I'm not
 8   sure who else was involved.
 9        Q.   Who is Milad Mostavi?
10        A.   Milad Mostavi was a member of
11   Consensus, a developer of Consensus.
12        Q.   Where was he based?
13        A.   In Bucharest, Romania.
14        Q.   Do you know when this document was
15   produced?
16             MR. POSTRYGACZ:   Objection.
17             Produced by us or just produced in the
18             course of business?
19             MR. SAUTER:   Created.
20        Q.   Do you know when this document was
21   created?
22        A.   Sometime before the creation of the
23   wallet address.
24        Q.   Is the procedure and description of
25   Icebox that is reflected in this document, is
```

Page 22

1                    ZACHARY LeBEAU

2    that consistent with how Icebox was actually set

3    up?

4          A.    No.

5          Q.    In what way is it not consistent?

6          A.    As I read this third paragraph under

7    the heading Cold Storage Using Icebox, it says

8    this version prevents the seed from being

9    displayed.   That was never the case.

10         Q.    How was the seed displayed in fact?

11         A.    It is the first thing that pops up

12   when you create a wallet address.

13         Q.    When you refer to the wallet address,

14   are you referring to the 0XC7 address that we

15   just looked at?

16         A.    I am referring to the 29 capital DA

17   and little F address.  Yes.  I go by the ending.

18         Q.    The last numbers in there?

19         A.    Yeah.  I do both usually, but it is

20   easier the last three for some reason.

21         Q.    For simplicity in this deposition, if

22   I refer to that as the cold wallet address, can

23   we agree that we're talking about the same

24   address?

25         A.    Pardon me.   How do you refer to it?

1                    ZACHARY LeBEAU

2         Q.   The cold wallet address.

3         A.   How do you say it?  0XC783?

4         Q.   The first four letters and numbers.

5    Correct.

6         A.   Okay.

7         Q.   So, when you would access the

8    interface on the Mac Mini, you would actually see

9    the seed phrase for that wallet address?

10        A.   When we created it.   Yes.

11        Q.   Who was there to see that?

12        A.   All four founders.

13        Q.   Is that when you wrote it down on a

14   piece of paper?

15        A.   Yes.   It literally says write this

16   seed phrase down and keep in a safe place, which

17   was what happened.

18        Q.   In Exhibit 2 that we are looking at

19   now, there is a reference to a key store.  Do you

20   know what the key store is?

21             MR. CONDZAL:  Do you want to direct

22        his attention to that.

23             MR. POSTRYGACZ:  Or give him time to

24        read the whole document.

25             Take a second.  Read the document at

```
1                    ZACHARY LeBEAU
```

2     your pace.  It is not a race.

3           THE WITNESS:  I know.

4     A.    Can you repeat the question, please.

5     Q.    The document refers to something

6     called a key store.  My question is do you know

7     what that is?

8     A.    It is the wallet file I have been

9     referring to.

10     Q.    If you look at the second page of

11     this document about halfway down, the next to

12     last full paragraph, "The key store should be

13     printed, laminated and kept in a prior approved

14     safe."  Did that ever happen?

15     A.    No.  These were just general

16     guidelines at the time too.  It didn't prove

17     practical.  It was wishful thinking, but how do

18     you take a laminated piece of paper and then put

19     it into a computer so you can prompt it to -- it

20     is just not possible.  So.

21     Q.    The seed phrase that was generated

22     and written down when the Icebox storage was

23     created, do you still have access to that?

24     A.    No.

25     Q.    What happened to that?

1                    ZACHARY LeBEAU

2         A.   It was destroyed, although I have

3    memorized it, so I haven't forgotten it.

4         Q.   All 12 words?

5         A.   Yes.

6         Q.   When was it destroyed?

7         A.   2020.

8         Q.   What about the Mac Mini computer and

9    the USB keys, were they also destroyed?

10        A.   Yes.

11        Q.   Were they all destroyed at the same

12   time?

13        A.   No.

14        Q.   I will come back to that.  Let's do

15   the declaration.

16             MR. CONDZAL:  Are you finished with

17        this document?

18             MR. SAUTER:  I'm finished.

19             MR. CONDZAL:  Can we take a

20        one-minute break before you go to your

21        next document.

22             THE VIDEOGRAPHER:  The time now is

23        10:11 a.m.  We are going off the record.

24             (Recess taken)

25             THE VIDEOGRAPHER:  The time now is

1                    ZACHARY LeBEAU

2        10:14 a.m.  We are back on the record.

3   BY MR. SAUTER:

4        Q.   Mr. LeBeau, before the break, you

5   referenced that you memorized the seed phrase for

6   the cold wallet.  When did you memorize that?

7        A.   At the end of 2017.

8        Q.   Why did you memorize it?

9        A.   I felt considerable pressure that the

10  wallet address access could be in danger and that

11  the safest way to keep that safe was to memorize

12  the seed phrase.

13       Q.   Why did you feel that the wallet

14  address was in danger?

15       A.   I had been experiencing, my wife and

16  I had been experiencing several hacking and

17  fishing attempts against us and the company.

18       Q.   When did that take place?

19       A.   It started in the summer of 2016 and

20  became a normal occurrence after that,

21  particularly after the token generation event or

22  the ICO.  It got to a point even when my wife was

23  physically impersonated at our local bank branch

24  just a couple of blocks away from our house and

25  that can be quite scary.  So it just started in

1                    ZACHARY LeBEAU

2    the summer of 2016 and progressed from there.

3         Q.   So you thought the safest thing to do

4    was to memorize the 12 word seed phrase, correct?

5         A.   Yes.

6         Q.   At the time that you memorized that

7    phrase, where was the phrase being kept?

8         A.   In a safety deposit box.

9         Q.   So when you memorized it, where did

10   you memorize it?

11        A.   I took the seed phrase from the

12   safety deposit box and started with the first

13   four words.  Then I placed it back into the

14   safety deposit box and made sure I had those four

15   words memorized.  When I had those four words

16   memorized, I went back to the safety deposit box

17   to memorize the second set of four words.  It

18   progressed like this for some time until I had

19   memorized all 12 words.

20        Q.   Over what period of time did it take

21   you to memorize the 12 words?

22        A.   I don't recall.

23        Q.   Do you recall when you started this

24   process of trying to memorize the seed phrase?

25        A.   At the end of 2017.

1                    ZACHARY LeBEAU

2          Q.    Do you recall when you finished being

3    able to memorize the seed phrase?

4          A.    I don't recall.

5          Q.    Was it closer to a week, closer to a

6    month, several months, ballpark?

7          A.    I don't recall.

8          Q.    How many total trips did it take to

9    complete the memorization to the bank?

10         A.    I don't recall.

11         Q.    In memorizing the seed phrase, did

12   you ever take the seed phrase out of the bank?

13         A.    I don't recall.

14         Q.    You don't recall if you would

15   memorize the four words each time in the safe

16   deposit box part of the bank or you took it out

17   and memorized it outside of the bank?

18         A.    The process was for me to stay in the

19   safety deposit box room, remember those four

20   words to the best of my ability, and then put it

21   back into the safety deposit box.

22         Q.    After you did that the first time,

23   how long after that did it take before you went

24   back the second time?

25         A.    I don't recall.

1                    ZACHARY LeBEAU

2        Q.   Do you recall it being a matter of

3   days, a matter of weeks?

4        A.   I don't.

5        Q.   You said earlier that you didn't

6   think Kim Jackson had ever accessed the safe

7   deposit box on her own.  Is that accurate?

8        A.   Yes.

9        Q.   What is the basis for that?

10       A.   I had the key to the safety deposit

11  box.  She didn't have a key.  She never asked me

12  for a key.

13       Q.   Do you still remember the 12-word

14  seed phrase sitting here today?

15       A.   I do.

16       Q.   And am I correct that you could use

17  that to reconstitute the cold wallet if you

18  wanted to?

19       A.   No.

20       Q.   Why not?

21       A.   Because the Icebox software is no

22  longer functional.

23       Q.   When did the Icebox software become

24  no longer functional?

25       A.   It had functioning problems from the

Page 30

1                          ZACHARY LeBEAU

2    very beginning.   In 2016 it wasn't functioning

3    properly.   In 2017 as well.   By 2019, it was a

4    completely obsolete piece of software that no

5    longer had any developers developing on it and

6    was completely nonfunctional in the entire

7    cryptoverse.

8            Q.   In what way was it not functional?

9            A.   The developers didn't continue to

10   maintain it, so you couldn't do anything with it.

11   You couldn't access it.   You couldn't run it as

12   software.   It wasn't functioning.   It was

13   inoperative.

14           Q.   In 2019 literally if you tried to go

15   through this process that we have been discussing

16   to send Ethereum from the cold wallet, you

17   wouldn't have been able to do that?

18           A.   That's correct.

19           Q.   The seed phrase, the paper copy that

20   was created when the wallet was created, that was

21   destroyed in 2020?

22           A.   Correct.

23           Q.   If you were concerned about the

24   security of the wallet beginning in 2016, why did

25   you wait until 2020 to destroy the seed phrase?

1                    ZACHARY LeBEAU

2            MR. POSTRYGACZ:  Objection.

3       A.   The seed phrase was kept in a safety

4  deposit box.  It seemed a safe place.

5       Q.   But you still went to the trouble to

6  memorize it in 2017?

7       A.   Correct.

8       Q.   But you didn't destroy the seed

9  phrase itself until 2020?

10           MR. POSTRYGACZ:  Objection.  Asked

11           and answered.  Is that a question or are

12           you testifying, Counsel?

13       Q.   Correct?

14       A.   Sorry.  Could you repeat the

15  question.

16       Q.   You testified that you memorized the

17  seed phrase because you feared for the safety of

18  the wallet, correct?

19           MR. POSTRYGACZ:  Objection.

20           THE WITNESS:  Do I answer?

21           MR. POSTRYGACZ:  Yes.

22           MR. SAUTER:  Yes.

23       A.   Yes.

24       Q.   The reason you memorized the seed

25  phrase is because you thought somebody could get

```
 1                     ZACHARY LeBEAU
 2   access to the seed phrase, correct?
 3        A.   No.
 4        Q.   So why did you memorize the seed
 5   phrase?
 6        A.   I thought someone could get access to
 7   the wallet address.
 8        Q.   How could they get access to the
 9   wallet address?
10        A.   They could collect the components
11   that encompassed the Icebox cold wallet.
12        Q.   The USB key and the computer?
13        A.   Correct.
14        Q.   Those are also kept in the safe
15   deposit box, correct?
16        A.   In 2016, yes.
17        Q.   Right.
18             MR. POSTRYGACZ:   Objection.   Whose
19        USB drives?
20        Q.   The Mac Mini and Mr. LeBeau's USB
21   keys were kept in a safe deposit box, correct?
22        A.   In 2016, yes.
23        Q.   You thought that safe deposit box was
24   secure, correct?
25        A.   Yes.
```

1                    ZACHARY LeBEAU

2          Q.    So how could somebody get access to

3    the Icebox wallet if two of the three components

4    needed to access that wallet were in a safe

5    deposit box?

6          A.    During travel, when it was necessary

7    to travel with those components, that was the

8    danger, when they were outside of the safety

9    deposit box.

10         Q.    How did memorizing the seed phrase

11   protect the wallet?

12         A.    If there seemed to be any perceived

13   security threat, then that seed phrase could be

14   used to safeguard the funds to access the wallet

15   address.

16         Q.    Why was the seed phrase destroyed in

17   2020?  The written seed phrase.

18         A.    The private key was printed.

19         Q.    So why destroy the seed phrase?

20         A.    It became obsolete.

21         Q.    If it was obsolete, then why destroy

22   it?

23              MR. POSTRYGACZ:  Objection.

24         Argumentative.

25              You can answer.

1                    ZACHARY LeBEAU

2          A.    There is a danger in holding any

3    information, even obsolete information, primarily

4    because bad actors, robbers, kidnappers, for

5    example, don't understand the technical aspects

6    of these components.  It could put someone's life

7    at risk if a robber or a kidnapper sees a seed

8    phrase, theoretically they could think that is a

9    valid seed phrase.

10         Q.    At this time it was still in the

11   safety deposit box?

12         A.    At which time?

13         Q.    The time it was destroyed.

14         A.    No.

15         Q.    Where was it when it was destroyed?

16         A.    It was in my possession.

17         Q.    Where was that?

18         A.    At my apartment.

19         Q.    Why was it in your apartment?

20         A.    The pandemic started.  The banks shut

21   down.  They closed.  I perceived that as a

22   problem, potential security issue, a bank being

23   closed, and felt that it was appropriate to hold

24   it in my safe in my apartment.

25         Q.    Which bank held the safe deposit box

Page 35

1                    ZACHARY LeBEAU

2   with the Icebox components?

3              MR. POSTRYGACZ:  At what point?

4        Q.   All points in 2016, which bank?

5        A.   TD Bank.

6        Q.   Was there any other bank that held

7   the Icebox cold wallet components?

8        A.   No.

9        Q.   Which TD Bank branch held it?

10        A.   The TD Bank branch at 40 Fulton

11   Street downtown.

12        Q.   Are you saying that that branch

13   closed during the pandemic?

14        A.   I believe it did.

15        Q.   When is your recollection of when

16   that happened?

17        A.   In the beginning of the pandemic.  I

18   don't recall exactly when.  Banks were closing.

19        Q.   Is it still closed today?

20        A.   No.

21        Q.   Did they notify you that they were

22   closing?

23        A.   I don't recall.

24        Q.   Did you take the seed phrase out of

25   the bank vault in response to an understanding

ZACHARY LeBEAU

1
2  that the bank was closing?

3       A.   I don't recall.

4       Q.   Did you tell anybody that you were

5  taking the seed phrase out of the safe deposit

6  box?

7       A.   I don't recall.

8       Q.   Do you think there would have been

9  any correspondence about that?

10      A.   No.

11      Q.   How long was it at your apartment

12 before it was destroyed?

13      A.   I don't recall.

14      Q.   More than a week?

15           MR. POSTRYGACZ:   How long was what

16      kept at the apartment?

17           MR. SAUTER:   The seed phrase, which

18      is what we are talking about.

19      A.   I don't recall how long.

20      Q.   More than a week?

21      A.   Yes.

22      Q.   More than a month?

23      A.   I don't recall.

24      Q.   How about the Mac Mini computer, was

25 that also taken out of the safe deposit box and

1                    ZACHARY LeBEAU

2  taken to your apartment?

3         A.   No.

4         Q.   Was it ever stored anywhere besides

5  the TD Bank that we discussed?

6              MR. POSTRYGACZ:  What is it?

7              MR. SAUTER:  The Mac Mini what we are

8         talking about.

9              MR. POSTRYGACZ:  We were also talking

10        about the seed phrase.  Please be specific

11        when we are jumping.

12        Q.   How about the Mac Mini computer, was

13  that taken out of the safe deposit box and taken

14  to your apartment?

15        A.   No.

16        Q.   Was it ever stored anywhere else

17  besides the TD Bank that we have been discussing?

18        A.   Yes.

19        Q.   Where else?

20        A.   It was taken to Europe in 2017.

21        Q.   Why was it taken to Europe in 2017?

22        A.   Arie and I had to do transactions.

23  Arie was in Switzerland.

24        Q.   Did you take it with you on the

25  airplane?

1                    ZACHARY LeBEAU

2         A.   Yes.

3         Q.   Was it stored anywhere besides your

4    person during that trip?

5         A.   Yes.

6         Q.   Where?

7         A.   In a lockbox in my Airbnb.

8         Q.   Was that lockbox something you

9    brought with you or something in the Airbnb?

10        A.   No, it was something in the Airbnb.

11        Q.   After that trip, was it brought back

12   to the United States?

13        A.   No.

14        Q.   Where was it left?

15        A.   It was destroyed in Bucharest.

16        Q.   During that trip?

17        A.   During that trip.

18        Q.   What about the USB key with the

19   wallet file, was that ever stored anywhere

20   besides the TD Bank safe deposit box?

21        A.   The two sets, the two USB hard drives

22   that were designated to be stored in the safety

23   deposit box were stored in the safety deposit

24   box.  I don't recall it being stored anywhere

25   else.  I had two sets.  One stored in the safety

```
 1                    ZACHARY LeBEAU
 2   deposit box and one stored in my apartment.  The
 3   one I stored in my apartment I did take with me
 4   to Europe in 2017.
 5          Q.   Did you take both of them with you to
 6   Europe?
 7          A.   Both of what?
 8          Q.   Both of the USB keys that were being
 9   stored in your lockbox in your apartment.
10          A.   No.  I took one.
11          Q.   Was the one that you took with you
12   destroyed in Bucharest along with the Mac Mini
13   computer?
14          A.   No.
15          Q.   What happened to it?
16          A.   I took it back to the United States.
17          Q.   Why did you take it back?
18          A.   It was my version of the wallet file.
19          Q.   Could you use that wallet file to
20   recreate the cold wallet address?
21          A.   No.
22          Q.   Could you use it in conjunction with
23   the seed phrase to recreate the cold wallet
24   address?
25          A.   No.
```

1                    ZACHARY LeBEAU

2          Q.   So why would you keep the wallet

3    file?

4               MR. POSTRYGACZ:  Objection.  Asked

5          and answered.

6               Go ahead.

7          A.   Because I could use that with the

8    password to access the wallet address.

9          Q.   The wallet file and the password

10   could together be used to access the wallet?

11         A.   Correct, via Icebox software.

12         Q.   So why was the Mac Mini computer

13   destroyed?

14         A.   I thought it could have been stolen.

15         Q.   On its own the Mac Mini computer

16   couldn't do anything, correct?

17         A.   I know that, but potential robbers or

18   kidnappers don't know that.  And also I had my

19   wallet file on my possession as well.

20         Q.   So, when you came back to the United

21   States, where did you store the USB key that you

22   took with you to Switzerland?

23         A.   I put it back in the safe.

24         Q.   The trip to Switzerland where the Mac

25   Mini was destroyed, when was that?

```
 1                    ZACHARY LeBEAU
 2              MR. POSTRYGACZ:  Objection.  That's
 3         not what he testified to.
 4         Q.   The Mac Mini was destroyed in
 5    Switzerland, correct?
 6         A.   No.
 7         Q.   Where was it destroyed?
 8         A.   The Mac Mini was destroyed in
 9    Bucharest.
10         Q.   What was the date that the Mac Mini
11    was destroyed in Bucharest?
12         A.   I don't recall the exact date, but it
13    was in the beginning of October of 2017.
14         Q.   Who was there at the time it was
15    destroyed?
16         A.   Consensus developers and personnel.
17         Q.   Do you remember anybody in
18    particular?
19         A.   Milad Mostavi oversaw the destruction
20    of the Mac Mini interface.  There were two men
21    dismantling it.  Catalin.  I remember him being
22    the primary guy deconstructing it.  I don't
23    remember his last name.
24         Q.   What happened to it after it was
25    deconstructed?
```

Page 42

1                           ZACHARY LeBEAU

2          A.   It was thrown away, disposed of in

3   several different trash receptacles around the

4   City of Bucharest.

5          Q.   Who performed that?

6          A.   I did.

7          Q.   Was Kim Jackson with you?

8          A.   When?

9          Q.   At the time of the destruction.

10         A.   Yes.

11         Q.   Was she with you when the device was

12  thrown away?

13         A.   No.

14         Q.   Was there a videotape made during the

15  destruction process?

16         A.   I don't believe so.

17         Q.   You don't recall anybody videotaping

18  the destruction?

19         A.   I do not.

20         Q.   I am going to show you Exhibit 3.   A

21  copy of your declaration.  You can take a look at

22  it.

23              (Plaintiff's Exhibit 3, Declaration,

24         was so marked for identification, as of

25         this date.)

1                    ZACHARY LeBEAU

2          Q.   I ask you to turn to paragraph 40.

3    Actually, before I get there, do you recognize

4    this document?

5          A.   I do.

6          Q.   This is a declaration you submitted

7    in the case that brings us here today, correct?

8          A.   Pardon me?  Can you repeat the

9    question.

10         Q.   This is a declaration that you

11   submitted in a court case in the Southern

12   District of New York, correct?

13         A.   Yes.

14         Q.   Is that your signature at the end?

15         A.   Yes.

16         Q.   When you wrote this, you were telling

17   the truth?

18         A.   Yes.

19         Q.   Sitting here today and having just

20   reviewed the document, is there anything in it

21   that you think needs to be changed?

22              MR. POSTRYGACZ:  Do you want him to

23         review the entirety of the document?

24         Q.   Sitting here today, that you have

25   read, is there anything that you think needs to

1                    ZACHARY LeBEAU

2   be changed?

3              MR. CONDZAL:  Do you want to take a

4         few minutes to review the document?

5              THE WITNESS:  I should read it.

6              MR. CONDZAL:  Do you want to go off

7         the record for five minutes to let him

8         read it?

9              MR. SAUTER:  We can go off the

10        record.

11             THE VIDEOGRAPHER:  The time is 10:39

12        a.m.  We are going off the record.

13             (Recess taken)

14             THE VIDEOGRAPHER:   The time now is

15        10:57 a.m.   We are back on the record.

16        This begins media 2.

17  BY MR. SAUTER:

18        Q.   Before we turn to Exhibit 3, I have a

19  couple of follow-up questions.   The seed phrase

20  that you memorized, if I understood your

21  testimony earlier, you said that the seed phrase

22  can't be used to reconstitute the wallet outside

23  of Icebox.   Is that accurate?

24        A.   What do you mean by reconstitute?

25        Q.   Can you use the seed phrase to access

1                    ZACHARY LeBEAU

2   the cold storage wallet outside of Icebox?

3          A.   There were only two ways to ever

4   access the cold wallet  through the seed phrase.

5   One of those ways was through the Icebox

6   software.

7          Q.   What was the other way?

8          A.   Through the Tokit.IO software.

9          Q.   So if one knew the seed phrase, one

10  could access the wallet either through Icebox or

11  through Tokit.IO software?

12         A.   Correct.

13         Q.   But no other way?

14         A.   Correct.

15         Q.   How do you know that there is not

16  another way?

17         A.   The seed phrase is very specific to

18  the derivation path.   To my knowledge, the only

19  two software systems that ever used that specific

20  derivation path was Icebox and Tokit.

21         Q.   Does Tokit still exist?

22         A.   No.

23         Q.   When did it -- did it ever exist?

24         A.   Yes.

25         Q.   When did it stop existing?

Page 46

1                    ZACHARY LeBEAU

2        A.   It began degrading and becoming

3   inoperative in 2020 and now it is completely

4   defunct.

5        Q.   So your understanding is that there

6   would be no way to use the seed phrase that

7   you have memorized to access the cold storage

8   wallet?

9              MR. POSTRYGACZ:   Objection.   Asked

10             and answered.

11             Go ahead.

12        A.   Correct.

13        Q.   When the Mac Mini was destroyed in

14   Bucharest, it just held Icebox software, correct?

15        A.   Correct.

16        Q.   Why go to the trouble to dispose of

17   it in multiple trash cans across Bucharest?

18             MR. POSTRYGACZ:   Objection.   Asked

19             and answered.   Argumentative.

20             But go ahead.

21        A.   It is an appropriate safe way to

22   dispose of a sensitive piece of electronics.

23        Q.   Aside from the Icebox software, was

24   there anything else on that computer?

25        A.   No.

1                    ZACHARY LeBEAU

2        Q.    Why do you consider it sensitive or

3   why did you consider it sensitive?

4        A.    It was one of the components to

5   access the wallet address.

6        Q.    And that component could have been

7   recreated on another computer, correct?

8        A.    At that time, yes.

9        Q.    Were there other people at

10  SingularDTV who were made aware of the

11  destruction of the Mac Mini computer when it was

12  destroyed in Bucharest?

13            MR. POSTRYGACZ:   Objection.

14        SingularDTV LLC, SingularDTV GmbH, both?

15        Q.    The GmbH.

16        A.    Yes.

17        Q.    Who?

18        A.    All the founders were made aware.

19        Q.    Were they made aware before it was

20  destroyed or after?

21        A.    I don't recall before.   Definitely

22  after.

23        Q.    How were they made aware of that?

24        A.    I don't recall.

25        Q.    So you don't recall if they approved

```
1                  ZACHARY LeBEAU

2  the destruction of the Mac Mini before it was

3  destroyed?

4            MR. POSTRYGACZ:   Objection.

5       A.   I don't recall.

6       Q.   Turn to Exhibit 3 that is right in

7  front of you, your declaration.   Have you had a

8  chance now to review it?

9       A.   Yes.

10       Q.   Is there anything that you stated in

11  this declaration that you would change sitting

12  here today?

13       A.   Probably word things differently

14  today.

15       Q.   What would you word differently?

16       A.   Well, maybe not.  I see that this is

17  referring to 2016, so.

18       Q.   What are you referring to when you

19  say it is referring to 2016?

20       A.   43.  The original wallet which

21  requires a key from Lubin and Cohen remains in

22  place and I still have access to the failsafe

23  master key.  If that is referring to 2016, that

24  is accurate, but -- that is accurate then if it

25  is referring to 2016.
```

Page 49

1                          ZACHARY LeBEAU

2          Q.   So in 2016 you had access to the

3     failsafe master key and the original wallet

4     was in place.  Is that what you are saying right

5     now?

6          A.   Yes.

7          Q.   The date that you wrote this

8     declaration, December 7, 2021, are you now saying

9     that what you wrote in 43 is not accurate?

10         A.   Well, this is referring to 2016.

11         Q.   Your testimony is paragraph 43 is

12    referring to 2016?

13         A.   The original wallet which requires

14    a -- I would rephrase that now to wallet address

15    to be even more specific.  The wallet address has

16    never changed.  It has only been the access to

17    the wallet address that has ever changed.

18         Q.   Sorry.  You would change what to

19    address?

20         A.   It says the original wallet.  I think

21    that is confusing.

22         Q.   The original wallet refers to Icebox,

23    correct?

24         A.   Well, I would say this refers to the

25    original wallet address because that remains in

```
 1                     ZACHARY LeBEAU
 2   place.  The wallet address has never changed.
 3           Q.    The wallet --
 4           A.    It has always been the same from
 5   creation until now.
 6           Q.    Does that wallet address sitting here
 7   today require a key from Lubin and Cohen?
 8           A.    No, because the Icebox software is
 9   completely inoperative and defunct, so this
10   entire quote wallet setup is obsolete.
11           Q.    So when you wrote, let's take it one
12   step at a time.  What you wrote, the original
13   wallet which requires a key from Lubin and Cohen
14   remains in place.  I'm correct that the original
15   wallet, the Icebox wallet, does not remain in
16   place, correct?
17           A.    The original, the Icebox wallet does
18   not remain in place.  The wallet address remains
19   in place.
20           Q.    So why did you write the original
21   wallet which requires a key from Lubin and Cohen
22   remains in place?
23           A.    It could mean referring to 2016.
24           Q.    But it is written in the present
25   tense.  The original wallet which requires a key
```

```
 1                     ZACHARY LeBEAU
 2   from Lubin and Cohen remains in place.  Remains
 3   is a present tense verb, correct?
 4          A.   The original wallet address remains
 5   in place.  The actual cold wallet itself does not
 6   remain in place.
 7          Q.   Okay.
 8          A.   It seems to me --
 9               MR. POSTRYGACZ:  Wait for him to have
10          a question.
11          A.   Apologies.
12          Q.   At the time you wrote this
13   declaration in December 7, 2021, it also would
14   not have been true to say the original wallet
15   address requires a key from Lubin and Cohen
16   because in December of 2021 the wallet address
17   did not require a key from Lubin and Cohen,
18   correct?
19               MR. CONDZAL:  Hold on one second,
20          please.
21               (Discussion off the record)
22               MR. SAUTER:  Is there an objection?
23          Are you instructing the witness not to
24          answer?
25          A.   I know what this is.  This sentence
```

Page 52

1                    ZACHARY LeBEAU

2   is written in present tense from the past point

3   of view.  So this sentence is written in present

4   tense as if it was 2016.

5          Q.   So your testimony sitting here today

6   is, when you wrote paragraph 43, you were writing

7   it as if, when you wrote this declaration, you

8   were writing it in 2016?  Is that your testimony

9   today?

10         A.   Yes.

11              MR. POSTRYGACZ:   Objection.

12         Q.   Can you look at paragraph 42.

13         A.   42.

14         Q.   The first sentence says, "Ultimately

15  once Consensus stopped maintaining the Icebox

16  interface, the software keys degraded and became

17  unusable."  Do you see that?

18         A.   Yes.

19         Q.   The next sentence says, "Following

20  Cohen's resignation, I alone administered the

21  wallet again without objection or challenge."  Do

22  you see that sentence?

23         A.   Yes.

24         Q.   So, in that sentence, your point of

25  view is not 2016, correct?

1               ZACHARY LeBEAU

2          MR. POSTRYGACZ:  Objection.

3     A.    Correct.  It is not 2016.

4     Q.    Because according to you, Mr. Cohen

5     resigned after 2016, correct?

6     A.    Correct.

7     Q.    So after that happened, you are

8     saying you alone administered the wallet after

9     2016, correct?

10    A.    No.  After, I administering the

11    wallet alone would have been late 2018 on.

12    Q.    So when you wrote paragraph 42, you

13    were referring to the time period 2018 on.

14    Correct?

15    A.    Cohen resigned April of 2019.

16    Q.    So when you wrote paragraph 42, you

17    were referring to after Mr. Cohen allegedly

18    resigned in 2019, correct?

19         MR. POSTRYGACZ:  Objection.

20    A.    Yes.  This sentence states after

21    Cohen's resignation, which was April 2019.  I

22    alone administered the wallet.

23    Q.    The next sentence says, "I suggested

24    to Lubin that we reestablish multi-signature

25    controls and preferences."  In that sentence you

1                    ZACHARY LeBEAU

2    are also referring to events that took place

3    after 2016, correct?

4          A.   I am referring to events that took

5    place in 2019.

6          Q.   So what about paragraph 43 makes you

7    think you are speaking from a 2016 point of view?

8               MR. POSTRYGACZ:   Objection.

9          A.   Because none of the keys, none of the

10   USB, the key from Lubin and Cohen would not

11   access the wallet address today.   The seed

12   phrase would not access the wallet address today.

13         Q.   That is what you testified to earlier

14   today, I understand that, but it is not what you

15   wrote in paragraph 43, so I am trying to

16   understand in paragraph 43 why you wrote "The

17   original wallet which requires a key from Lubin

18   and Cohen remains in place."

19              MR. POSTRYGACZ:   Objection.   Asked

20         and answered.

21         Q.   The founders, your testimony now when

22   you wrote these words, you wrote them as if you

23   were speaking in 2016, and I am just trying to

24   understand what about this paragraph suggests

25   that you were speaking from a 2016 point of mind

```
1                    ZACHARY LeBEAU
2    as opposed to just saying something that was not
3    correct?
4         A.   Well, it couldn't be spoken from
5    today, because it is not possible to access the
6    wallet address with the seed now and with Lubin
7    and Cohen's password.
8         Q.   So if somebody reading this
9    declaration were to understand it to mean today,
10   not 2016, that understanding would be incorrect,
11   right?
12             MR. POSTRYGACZ:  Objection.  Asked
13        and answered.
14        A.   It just requires the word "address"
15   after wallet.
16        Q.   Let's go back to that.  If it said
17   address, sir, the original address which requires
18   a key from Lubin and Cohen remains in place, that
19   too would be false, wouldn't it, because the
20   address today does not require a key from Lubin
21   and Cohen, correct?
22             MR. POSTRYGACZ:  Objection.
23        A.   Well, the original wallet address
24   remains.
25        Q.   The original wallet address remains,
```

Page 56

1                      ZACHARY LeBEAU

2    I understand that, but the original wallet

3    address does not still require a key from Lubin

4    and Cohen, correct?

5              MR. POSTRYGACZ:  Objection.  Asked

6         and answered.

7         A.   You would not be able to access the

8    wallet address with the USB hard drive password

9    from Lubin and Cohen.  Correct.

10        Q.   Not only would you not be able to

11   access it but it doesn't require it.

12             MR. POSTRYGACZ:  Is that a question,

13        Counsel?

14        Q.   Correct?

15             MR. POSTRYGACZ:  Objection.  Asked

16        and answered.

17        A.   Apologies.  Can you repeat the

18   question.

19        Q.   In December 2021, you were able to

20   make transactions from the cold wallet on your

21   own without any keys from Lubin and Cohen,

22   correct?

23        A.   I was able to make transactions from

24   the wallet address without keys, without Lubin

25   and Cohen, correct.

1          ZACHARY LeBEAU

2          Q.   As of December 2021, the original

3     wallet, the Icebox wallet, did not remain in

4     place is your testimony today, correct?

5          A.   The original Icebox wallet did not,

6     ended, it did not exist in 2021.

7          Q.   Look at paragraph 40.

8          A.   Yes.

9          Q.   One more question.  When you refer to

10    the failsafe master key in paragraph 43.

11         A.   Yes.

12         Q.   What are you referring to?

13         A.   The seed phrase.

14         Q.   The 12-word seed phrase?

15         A.   Yes.

16         Q.   But at the time that you wrote this

17    in December 2021, that 12-word seed phrase could

18    not have been used to access the wallet according

19    to your testimony today, correct?

20         A.   The seed phrase.  Did you say

21    December 2021?

22         Q.   Correct.  In December 2021, could the

23    12-word seed phrase that you have memorized have

24    been used to access the cold wallet?

25         A.   May I ask a question?  Is that

Page 58

1                    ZACHARY LeBEAU

2     possible?

3              MR. POSTRYGACZ:  If it is a rephrase.

4        Q.   If there is something that you don't

5     understand, let me know and I will try to

6     rephrase.

7              MR. CONDZAL:  Do you want the

8         question reread?

9              THE WITNESS:  No.

10       A.   The seed phrase would have accessed

11    the cold wallet address in 2021 through Tokit.IO.

12    That was operational for that purpose at that

13    time.

14       Q.   In December 2021?

15       A.   Yes.

16       Q.   You testified earlier that Tokit

17    stopped existing in 2020, so can you explain what

18    you mean?

19       A.   No.  I testified that Tokit started

20    to become inoperative in 2020.  It became defunct

21    in 2021.

22       Q.   What is the difference?

23       A.   The difference is in 2020 it started

24    to show, it started not to work properly.

25       Q.   How did it not work properly?

Page 59

1                    ZACHARY LeBEAU

2          A.    Certain functions just wouldn't work.

3    For example, the wallet interface stopped

4    working.  It required developers to maintain it.

5    This became an issue all throughout 2020 and in

6    2021 to a point where the only reason it was kept

7    functioning was to send the Ether from the wallet

8    address to the escrow agent.

9          Q.    So to be clear, at the time that you

10   sent, am I correct that you personally sent Ether

11   to the escrow agent?

12         A.    Yes.

13         Q.    And that was done from a wallet on

14   Tokit?

15         A.    No.  It was done from the exact same

16   wallet address from Tokit.IO.

17         Q.    When you say wallet address, you mean

18   the cold storage wallet address ending in 9DAF,

19   correct?

20         A.    Correct.

21         Q.    At that time you could have used the

22   seed phrase that you had memorized to

23   reconstitute the wallet on Tokit.IO, correct?

24              MR. POSTRYGACZ:  Objection.  At what

25         time?

1              ZACHARY LeBEAU

2         Q.   In December 2021.

3         A.   I could use the seed phrase to access

4    the wallet address.  Correct.

5         Q.   And send funds from the wallet

6    address?

7         A.   Yes.

8         Q.   You could have done that as of the

9    date that you sent funds to the escrow agent?

10        A.   That was the point to keep Tokit.IO

11   operational until the escrow agent received the

12   Ether.

13        Q.   How did you access Tokit.IO

14        A.   Through the seed.

15        Q.   Was Tokit.IO software on a computer?

16   Was it in a cloud?

17        A.   On the Internet like online banking.

18   You could access it from anything, phone, laptop,

19   computer, tablet, et cetera.

20        Q.   Would you describe that as an

21   interface?

22        A.   Tokit.IO

23        Q.   Correct.

24        A.   A website like online banking.

25        Q.   And you had access to that on the

1                    ZACHARY LeBEAU

2    Internet?

3          A.   Yes.

4          Q.   So at any point until the Ether was

5    sent to the escrow agent, you could have used the

6    seed phrase that you had memorized to access the

7    cold storage wallet on Tokit.IO

8          A.   Not at any point.

9          Q.   Why not?

10         A.   When Tokit.IO broke down, there was

11   no access.

12         Q.   When was the last point in time when

13   you could access the wallet on Tokit.IO

14         A.   The day that the Ether was sent to

15   the escrow agent.

16         Q.   But also before that date you could

17   have used the seed phrase to access the cold

18   wallet?

19         A.   I could use the seed phrase to access

20   the wallet address when Tokit.IO was operational.

21         Q.   When did it become inoperational?

22         A.   It began in 2020.

23         Q.   Right, but you could also use the

24   seed phrase to access the cold wallet on Tokit.IO

25   after 2020 into 2021, correct?

Page 62

1                          ZACHARY LeBEAU

2          A.    It would break in 2020.  We would

3     have to fix it.  It would break again.  We would

4     fix it.  It would break again.  It was a

5     recurring theme with Tokit.IO, so, if it was

6     maintained, we could get it working again.

7          Q.    My question was different.  You could

8     have used the seed phrase to access the cold

9     wallet on Tokit.IO in 2021, correct?

10          A.    Yes.

11          Q.    Can you still do that today?

12          A.    No.

13          Q.    Why not?

14          A.    Tokit.IO does not function.

15          Q.    When did it stop functioning in a way

16     that would prevent you from using the seed phrase

17     to access the cold wallet?

18          A.    After I sent the Ether to the escrow

19     agent.

20          Q.    Who operates Tokit.IO, if you know?

21          A.    Nobody does.

22          Q.    Who did operate Tokit.IO prior to

23     sending the Ether to the escrow agent?

24          A.    In 2021, it was SingularDTV.

25          Q.    Was there a chief executive of

Page 63

1                    ZACHARY LeBEAU

2   Tokit.IO

3           A.   No.

4           Q.   Was there an executive team that was

5   in charge of Tokit.IO                                1

6           A.   Not in 2021.

7           Q.   What about in 2020?

8           A.   Not in 2020 either.

9           Q.   What about 2019?

10          A.   No executive team.

11          Q.   Did you ever have a role in Tokit.IO

12          A.   I had a role in Tokit.IO in 2017 and

13   2018.

14          Q.   What was your role?

15          A.   I was one of the original creators of

16   it.

17          Q.   Did you invest money in it?

18          A.   Me personally?

19          Q.   Yes.

20          A.   No.

21          Q.   Did SingularDTV invest money in it?

22          A.   Yes.

23          Q.   At that time, when you were involved

24   in Tokit.IO, who maintained the wallet platform?

25               MR. POSTRYGACZ:  Objection.

1                    ZACHARY LeBEAU

2        A.   Developers hired, Consensus

3   developers hired by SingularDTV.

4        Q.   Could Tokit.IO be made to operate

5   again if one were to invest the resources and

6   development personnel?

7             MR. POSTRYGACZ:   Objection.

8        A.   I don't know.

9        Q.   Is there any reason you are aware of

10  that it could not become operational again?

11       A.   Yes.

12       Q.   What is that?

13       A.   As it has been explained to me, code

14  rots.  A software program isn't developed in a

15  vacuum.  It is developed with several

16  interworking, interconnected, interoperable

17  parts, software, et cetera.  If those parts

18  aren't upgraded and maintained and kept

19  cohesively together, then software rots and

20  becomes unusable.  You have to start from

21  scratch.  So Tokit.IO could never exist again.

22  You would have to start from scratch and build

23  something that operated similarly perhaps.

24       Q.   In January 2020 when Ether was sent

25  to the escrow agent, at that point Tokit.IO

Page 65

1                    ZACHARY LeBEAU

2  operated well enough to effectuate that

3  transaction, correct?

4          A.    Its only purpose for operating was to

5  send the Ether to the escrow agent.

6          Q.    And it was able to effectuate that

7  transaction at that time?

8          A.    That was the purpose for it being

9  operational, yes.

10         Q.    So what changed from that transaction

11 that made it unable to perform that kind of

12 transaction again?

13         A.    I don't know.

14         Q.    If Tokit were to become usable again,

15 would you be able to use the seed phrase to

16 access the cold wallet?

17               MR. POSTRYGACZ:  Objection.

18         A.    I don't think Tokit could become

19 usable again.

20         Q.    What is your basis for saying that?

21         A.    Just as I said, Tokit was developed

22 not in a vacuum but with several other softwares

23 and components that needed to be maintained and

24 upgraded together in order for it to be Tokit.

25 As it has been explained to me by developers,

1                    ZACHARY LeBEAU

2   code rots.   Once that code is rotted, you can't

3   reconstitute or rebuild that code.   You have to

4   program brand new code.   So it would need to be

5   a software program using the same derivation path

6   would need to be developed, but that would not be

7   Tokit.IO.

8           Q.   Explain code rots to me because I

9   have a vision of code that it is written down and

10  it still exists, so in what way does it rot?

11  Are you saying it no longer literally exists or

12  it doesn't work anymore?

13          MR. POSTRYGACZ:   Objection, compound

14      question.

15          A.   As it has been explained to me by

16  developers, software isn't developed in a vacuum.

17  It requires a number of different software

18  systems and components to work together, so if

19  those software systems and components are active,

20  if they are constantly being updated and upgraded

21  and worked on, maintained, by developers, and

22  another component or software is not, then it

23  degrades and is left behind.   So rotting in this

24  sense means that code becomes nonfunctional

25  anymore.   It doesn't work with the other parts.

Page 67

1                    ZACHARY LeBEAU

2        Q.   In January 2022, those systems and

3  components worked well enough to allow the

4  transfer to the escrow agent to occur, correct?

5             MR. POSTRYGACZ:  Objection.  What

6        systems and components?

7        A.   Tokit had been in a state of rot

8  since 2020.  It was only kept functional to do

9  one thing in January, and that was to send the

10  Ether to the escrow agent.

11        Q.   But sitting here today, you can't

12  tell me what has changed from then to now that

13  would prevent that from happening again?

14        A.   It would require input from the

15  developers to be accurate and precise.

16        Q.   Paragraph 40 of your declaration,

17  sir.  You wrote, "On two separate occasions I met

18  with Arie to access the wallet and had to use the

19  seed phrase when Arie's access failed."  What are

20  you referring to in this paragraph?

21        A.   Arie and I would get together to

22  access the cold wallet, me with my wallet file

23  and him with his password, to access the wallet

24  address and make transactions.  His password

25  failed on two occasions, so we were unable to

```
 1                    ZACHARY LeBEAU
 2   access the wallet address and the company's
 3   funds.
 4        Q.   Did his password work on other
 5   occasions?
 6        A.   Yes.
 7        Q.   So when you say on two separate
 8   occasions, you are referring to the two occasions
 9   when you had to use the seed phrase?
10        A.   Yes.
11        Q.   There were other occasions where you
12   and Arie got together to spend funds from the
13   wallet and his key worked?
14        A.   Yes.  His password worked.
15        Q.   Do you recall when the two occasions
16   were when his key failed?
17        A.   Early on in 2016.  One was definitely
18   in 2016.  The other one could have been early
19   2017.  I don't recall exactly the second one.
20        Q.   Do you know why they had failed?
21        A.   No.
22        Q.   Were they the first two times that he
23   tried to use it?
24        A.   He tried over and over and over until
25   we decided it wasn't going to work and had to go
```

1                    ZACHARY LeBEAU

2    get the seed phrase.

3         Q.   When you used the seed phrase to

4    access the wallet, was Arie there at that time?

5         A.   Yes.

6         Q.   How did that process work to use the

7    seed phrase to access the wallet?

8              MR. POSTRYGACZ:   On these two

9         occasions?

10             MR. SAUTER:   Correct.

11        A.   It prompts you to type in the seed

12   phrase.   The Icebox software prompts you to enter

13   the 12-word seed phrase.

14        Q.   Is that like I forgot my password

15   button, and then it asks you for the seed phrase?

16   The way you described it earlier, as I understood

17   it, was you put in the wallet file, and it asks

18   you for a password.   I understand these two

19   occasions that the password didn't work, so how

20   do you get from there to using the seed phrase?

21             MR. POSTRYGACZ:   I believe there are

22        two open questions on the record.   Which

23        one do you want him to answer?

24        Q.   Do you understand my question?

25        A.   No.

```
 1                     ZACHARY LeBEAU

 2        Q.   When does Icebox ask you to enter the

 3   seed phrase?

 4             MR. POSTRYGACZ:   At which point in

 5        time?  Any point in time or during those

 6        two occasions?

 7        Q.   During the two occasions we are

 8   talking about.

 9        A.   There is a field on the screen where

10   you can input the seed phrase.

11        Q.   Instead of entering the key that Arie

12   and Lubin had?

13        A.   No.   Instead of entering the wallet

14   file.

15        Q.   So all you have to do using the seed

16   phrase in 2016, I will ask the question again.

17   All you have to do to access the wallet in 2016

18   was enter the seed phrase?

19             MR. POSTRYGACZ:   Are you asking a

20        question?

21        Q.   Correct?

22        A.   Correct.

23        Q.   So what is the point of setting up

24   the system whereby you held the wallet file and

25   Joe and Arie held the password if that actually
```

1                    ZACHARY LeBEAU

2   was not necessary?

3          A.    It is a failsafe because on those two

4   occasions, it was necessary to enter the seed

5   phrase because Arie's password did not work.

6          Q.    At any time did you -- at any time

7   other and these two times with Arie, did you use

8   the seed phrase to access the wallet?

9          A.    No.  With Arie, no.

10         Q.    What about without Arie?  Did there

11  come any time where you on your own used the seed

12  phrase to access the wallet?

13         A.    With Tokit.IO.

14         Q.    When was the first time?

15         A.    Late 2018.

16         Q.    Why did you do that?

17         A.    To fund company business.

18         Q.    Did you tell anybody that you were

19  accessing the wallet using the seed phrase on

20  your own?

21                MR. POSTRYGACZ:  Objection.  I mean

22          this is going outside the scope of your

23          application as well as the judge's order.

24          We're here to discuss the cold wallet

25          device and issues related to it, and that

1                    ZACHARY LeBEAU

2         related to his getting consent to spend or

3         access the code wallet.  So we're going to

4         instruct-- well, I'm going to instruct my

5         client not to answer that question.

6         Q.   Are you going to take your counsel's

7    instruction?

8              MR. CONDZAL:  I just want to add to

9         the record that reading from I think it's

10        docket number 76, page 4 and page 5, there

11        are six specific lines of inquiry that are

12        spelled out on page 5.  It's referred to

13        as narrow issues, and you have identified

14        the devices.  You have identified the

15        locations.  We've explained how and when

16        it was moved.  So that's three of the six.

17             So it would seem that we would be

18        getting into the section about paper

19        wallets.

20             I would also note that in this

21        document there's nothing about access or

22        the witness's access, and I think, in all

23        fairness, we've been good enough to allow

24        this to go past where it should have

25        probably gone, and I'm going to note that

1               ZACHARY LeBEAU

2   for the record and ask you, Counsel, with

3   all respect, to stick to the lines of

4   inquiry that you have outlined.

5        MR. SAUTER:  I respectfully disagree

6   that this question is anywhere outside the

7   scope of what we have been authorized to

8   ask about, and in fact based on the

9   testimony today, it's becoming

10  increasingly unclear how Mr. LeBeau has

11  been able to access the cold wallet and

12  whether he's still able to, and I think it

13  is absolutely appropriate for us to be

14  able to probe that, and part of it, as we

15  have learned today, seems to be his

16  ability to access the cold wallet through

17  Tokit.IO.  So I am exploring his ability

18  to use Tokit.IO unilaterally, which is

19  certainly relevant to his ability to

20  continue to use Tokit.IO to continue to

21  access the cold storage wallet.

22       He has equivocated today about his

23  ability to do that at different points in

24  time, and I disagree that we are going

25  anywhere beyond the permissible scope of

1             ZACHARY LeBEAU

2  inquiry.

3     MR. POSTRYGACZ:  Counsel, honestly

4  you are being disingenuous here.  We know

5  that the Ether is being held in a separate

6  account by Kobre & Kim as escrow agent.

7  The fact of whether or not he is able to

8  access a wallet that does not have any of

9  the crypto or the Ether is irrelevant, and

10  again you're going beyond the scope of

11  what you requested in your application and

12  what the court ordered.

13     MR. CONDZAL:  Specifically I just

14  want to add to that.  You say, identify

15  all devices, identify location of such

16  devices, explain how one cold wallet was

17  moved from one device to another.

18        Access to the cold wallet on Tokit

19  I'm pretty sure is not mentioned anywhere

20  in your request, sir.

21     MR. SAUTER:  Well, I can tell you we

22  filed a consent order that Mr. LeBeau

23  agreed to where he was supposed to deliver

24  devices.  He didn't deliver a device.  So

25  we are trying to understand why, and that

1              ZACHARY LeBEAU

2  is the purpose of this deposition.

3       MR. CONDZAL:  We understand that, but

4  the question is about devices, not access,

5  not about the history of access, not

6  about, you know, what happened in 2016.

7  It's about devices, and then you've got

8  about the paper wallet.  It is pretty

9  clear in your document, sir.  It's your

10 document.  You wrote it, right?  So you

11 submitted it.  This is what the court

12 based its decision on.

13      It would seem to me in all fairness

14 that, you know, and I'm not saying you

15 can't go a sentence or two or a line of

16 inquiry or two, but now you are full-on

17 engaged in questions, and again, with all

18 respect, I think that you have a

19 fundamental misunderstanding on your side

20 of the table about how these transactions

21 occur.

22      So I think that it would be better

23 well-suited to the purposes of this

24 deposition that we stick to what you were

25 permitted to inquire about.  The limited

1           ZACHARY LeBEAU

2    inquiry.

3         MR. SAUTER:  Again, the premise of

4    the entire consent order was that we

5    thought there was a device.

6         MR. CONDZAL:  But that's not.  That's

7    what you bootstrapped.  In fact, there is

8    nothing in any of the documents prior to

9    that.  The whole supposition is that you

10   are somehow inconvenienced by the fact

11   that you have to reconfigure meaningless

12   tokens.  That's the premise.  That's what

13   is in your reply brief.  That's the

14   premise of this, that you have got X

15   amount of tokens that need to be

16   reconfigured, and that, if we had some

17   device, you wouldn't have to go through

18   that process.

19        Effectively you're complaining about

20   having to combine PDFs.  So the idea here

21   is we're here, and we're ready to

22   continue, and we want you to continue.

23   Continue on the line of inquiry, sir,

24   because there is nothing, you know, the

25   device, you know, there is no dispute

```
 1                ZACHARY LeBEAU

 2  Ether is in your account, and there is no

 3  dispute that Ether was turned over, and

 4  you have made allegations about so-called

 5  digital assets, quote unquote, that might

 6  be contained on the device.  That is the

 7  extent of your paper, sir.

 8        So here you have effectively a

 9  laundry list of topics, and we are

10  respectfully requesting that you stick to

11  this laundry list to the extent possible.

12        MR. SAUTER:  With respect, I don't

13  know what most of what you just said

14  means.  Our request is motivated by the

15  apparent fact, which this deposition has

16  mostly confirmed, that Mr. LeBeau retains

17  an ability to access the cold wallet.  It

18  is true that the Ethereum has been sent

19  off of the cold wallet to the escrow

20  agent's account, but there remains other

21  assets on that address, which is the

22  primary motivation for our attempts to get

23  discovery and satisfaction that Mr. LeBeau

24  does not still have the ability to access

25  those in violation of the consent order.
```

```
 1                ZACHARY LeBEAU
 2        MR. POSTRYGACZ:  That's not what your
 3   application states, and that's not a
 4   correct recital of what has happened.  We
 5   are not going to allow, or I'm not going
 6   to allow my client to answer any questions
 7   that go outside the scope of what you
 8   requested and the court ordered.
 9        MR. CONDZAL:  And 99 percent of what
10   you have obtained in testimony is calling
11   for speculation.  You haven't defined, and
12   if you would be good enough to define the
13   assets that you're discussing.
14        MR. POSTRYGACZ:  I thought that we
15   went through this during that argument
16   when you tried to insinuate to the judge
17   that our client still had access to the
18   Ether, and then it was clarified that it
19   was actually in your possession.  It's
20   clear here what you were going after, and
21   what the judge is allowing is the fact
22   that there was language that included
23   power cords and cables that would raise
24   some questions with possibly what was
25   provided to the escrow agent, but all
```

1                    ZACHARY LeBEAU

2   these other questions they have no

3   relevance.  At least, they're outside the

4   scope of what has been asked for and

5   ordered, whether or not they have

6   relevance to the overall fight we're

7   fighting, but that's not why we are here

8   today.

9        MR. SAUTER:  Well--

10        MR. CONDZAL:  The question was what

11   else might be on the device, not whether

12   my client or Mr. LeBeau has access to a

13   cold wallet, in theory, if some website

14   worked or could be brought up to work.

15   That's not the inquiry.

16        MR. SAUTER:  Look, you're obstructing

17   my deposition at this point.  Call the

18   judge if you want.  Stop talking over me.

19   The purpose of this deposition is to

20   explore Mr. LeBeau's access to the cold

21   wallet.  We are learning it's more than

22   through a device.  It's through a variety

23   of means.  I will ask questions about it,

24   and, if you obstruct the deposition, if

25   you instruct him not to answer, then we

1                    ZACHARY LeBEAU

2    can just talk to the judge about it.

3         MR. POSTRYGACZ:  I suggest you give

4    the judge a call, because, again, it's not

5    about his access.  It was related to

6    language that was included in the

7    agreement, and that's why we are here

8    today.  It's not about his access.  Your

9    case, the underlying action has nothing to

10   do with access, and you're just trying to

11   go after our client for information that's

12   outside the scope of what was ordered.

13        So call the judge, because otherwise

14   we have instructed, or I've instructed my

15   client not to answer any questions that go

16   beyond that scope, including the last one

17   that you just asked.

18        MR. SAUTER:  About his ability to

19   access Tokit.IO

20        MR. POSTRYGACZ:  Whatever the last

21   question was.

22        MR. CONDZAL:  You asked the last

23   question five times, sir.  I counted.

24        MR. SAUTER:  We've been talking so

25   long I can't remember what the last

1                    ZACHARY LeBEAU

2          question is.  I'm trying to find it.

3                    MR. POSTRYGACZ:  I am sure the court

4          reporter can find it.

5          Q.   Let's fast forward to January 25,

6     2022.  Pursuant to a court order, you through

7     your counsel delivered certain information to the

8     escrow agent, correct?

9          A.   Correct.

10         Q.   What information did you deliver?

11         A.   I delivered Ether to the escrow

12    agent.

13         Q.   You didn't actually deliver Ether.

14    It wasn't tangible.  What did you tangibly

15    deliver to the escrow agent?

16         A.   Private key.

17         Q.   What else?

18         A.   I delivered, what was delivered was

19    the company's wallet address private key, and

20    Joseph Lubin, the private key to Joseph Lubin's

21    wallet address that contained his Singles tokens.

22         Q.   Focusing on the wallet address

23    private key, explain to me how that key was

24    generated?

25                   MR. POSTRYGACZ:  Objection.  Asked

1              ZACHARY LeBEAU

2         and answered.

3              But go ahead.

4         A.   The private key was exported from

5    Tokit.IO and printed on a piece of paper.

6         Q.   When did Tokit.IO become the platform

7    for the cold storage wallet?

8         A.   It never became a platform for cold

9    storage.  It was only an access point to the

10   wallet address.

11        Q.   When was the first time it was used

12   as an access point for that address?

13        A.   Late 2018.

14        Q.   Why was it used to access the wallet

15   in late 2018?

16        A.   It was the only means by which at

17   that time the wallet address could be accessed.

18        Q.   What was the procedure to access the

19   cold storage wallet through Tokit.IO

20        A.   The procedure to access the wallet

21   address was to input the seed phrase into

22   Tokit.IO.

23        Q.   When is the last time that Icebox was

24   used to access the cold storage wallet?

25        A.   In 2019.

1                    ZACHARY LeBEAU

2          Q.    From then until when Tokit was used,

3    was there anything else in between to access the

4    cold storage wallet?

5          A.    From when?

6          Q.    From between when Icebox was used to

7    when Tokit.IO was used, were there any other

8    platforms that were used to access the cold

9    storage wallet?

10         A.    No.   Only Icebox and Tokit.IO were

11   the only softwares that were ever used.

12         Q.    What about after, did there come a

13   time after Tokit.IO where another software was

14   used?

15         A.    There was never any software used to

16   access the wallet address for the purpose of

17   transferring any Ether or cryptocurrency.

18         Q.    The private key that was delivered to

19   the escrow agent in January 2022, when was that

20   private key exported?

21         A.    In 2020.

22         Q.    Can you describe how it was exported?

23         A.    There was a field on Tokit where you

24   could request to export your private key and it

25   would show you.

1               ZACHARY LeBEAU

2          Q.   And from there, did you save it

3     somewhere?

4          A.   No.  I printed it on a piece of

5     paper.

6          Q.   Directly from the display?

7          A.   No.  I copied and pasted it to a

8     notepad and then printed it from there.

9          Q.   What happened to the notepad on which

10    it was pasted?

11         A.   It was never saved.  It was erased,

12    deleted.  Can you delete something that was never

13    saved?  I have no idea.

14         Q.   You didn't know how to affirmatively

15    save that notepad on your computer.  Is that your

16    testimony?

17         A.   That's correct.  I only printed out,

18    the only copy of the private key that exists is

19    the piece of paper that I printed.

20         Q.   That was in 2020?

21         A.   Yes.

22         Q.   Do you remember what month?

23         A.   I do not.

24         Q.   Where was it stored at that time

25    after it was printed?

Page 85

```
 1                    ZACHARY LeBEAU

 2         A.    It was stored in a safe in my

 3   apartment.

 4         Q.    Was that the same safe that held the

 5   USB keys we discussed earlier?

 6         A.    It was.

 7         Q.    Was it ever removed from that safe

 8   after it was first put there?

 9         A.    Only to deliver it to you, to the

10   escrow agent.

11         Q.    Was there anybody else who ever had

12   access to that private key?

13         A.    No.  It was kept in a safe that my

14   wife could access, but I had sealed it in an

15   envelope that was never broken until the day that

16   I delivered it to the escrow agent.

17         Q.    Why did you print the private key if

18   you had already memorized the seed phrase?

19         A.    Because the seed phrase wasn't

20   working anymore because Tokit.IO was failing.  So

21   if Tokit.IO doesn't work, there is no way to

22   access the wallet address with the seed.  The

23   failsafe, the number one thing that you need to

24   access that, the only thing you need to access

25   that wallet address is the private key.
```

1                    ZACHARY LeBEAU

2          Q.   So when you sent Ether to the escrow

3    agent, can you describe step by step how you

4    accomplished that?

5          A.   I went to Tokit.IO, input the seed

6    and sent the Ether to the wallet address that I

7    was given.

8          Q.   What seed did you use?

9          A.   The 12-word seed.

10         Q.   The one that you memorized?

11         A.   Yes.

12         Q.   In May 2021, there were discussions

13   about a multi-signature wallet?  Do you recall

14   that?

15         A.   Yes.

16         Q.   Was that through the platform called

17   NONCES?

18         A.   Yes.

19         Q.   Can you explain to me what was

20   happening with that?

21         A.   I had been lobbying to reinstate a

22   multi-sig function around the wallet address for

23   quite some time, and that was one of the efforts

24   to reinstate multi-sig permissions around the

25   wallet address.

1                    ZACHARY LeBEAU

2        Q.    How would it work or how was it

3   intended to work?

4        A.    At that time it was intended that I,

5   the resident director of the GmbH, Patrick

6   Allenspach and our financial controller, Ed

7   Greenwood, would all have multi-signature

8   permissions for a brand new wallet address that

9   would hold the company's Ether from the original

10  wallet address.

11       Q.    So was the intention that the

12  multi-signature would apply to a different wallet

13  address, not the original address?

14       A.    Correct.

15       Q.    Was that ever implemented?

16       A.    No.

17       Q.    Was it implemented in part?

18       A.    We began, we being myself and Patrick

19  and Ed, we began the process of it.  We began

20  testing it, and at some point in time due to some

21  issues with the software, the NONCES software

22  itself, we stopped testing.  So I could alert the

23  developers of the NONCES software of the issues

24  we were having.  That was the end.

25                    MR. CONDZAL:  Counsel, can we take

```
 1                    ZACHARY LeBEAU
 2        five?
 3             MR. SAUTER:  We can take five.  I'm
 4        almost at a breaking point.  We can take
 5        lunch now if you want, or five.  Do you
 6        want to take lunch now?
 7             MR. CONDZAL:  Well, it depends on how
 8        much longer you're going to go.  If you've
 9        got an hour left, I would rather just go
10        with the hour and take five.
11             MR. SAUTER:  That's fine.  Okay.  I
12        don't know how much more time I have.  We
13        can take five.
14             MR. CONDZAL:  Why don't we just take
15        five.  Is that okay, Counsel?
16             THE VIDEOGRAPHER:  The time now is 12
17        p.m.  We're going off the record.  This
18        ends media label 2.
19             (Recess taken)
20             THE VIDEOGRAPHER:  The time now is
21        12:18 p.m.  We are back on the record.
22        This begins media label 3.
23   BY MR. SAUTER:
24        Q.   Mr. LeBeau, we discussed earlier in
25   the morning how the Mac Mini interface was
```

1                    ZACHARY LeBEAU

2    destroyed.  Can you explain the circumstances in

3    which the USB keys that were held in the TD Bank

4    safe deposit box and in a safe in your apartment

5    were destroyed?

6          A.    After printing the private key, I

7    destroyed the USB hard drives.

8          Q.    Did you destroy all of them together

9    or at different times?

10         A.    All of the ones that Kim and I had in

11   our control at the same time.

12         Q.    So all four of them?

13         A.    Yes.

14         Q.    How were they destroyed?

15         A.    Screwdriver and hammer and pliers

16   used to pry open the USB opening and then the

17   actual components itself smashed into pieces.

18         Q.    You physically destroyed all four of

19   the devices?

20         A.    I did.

21         Q.    When was that?

22         A.    In 2020.

23         Q.    Do you recall which month?

24         A.    I don't recall which month.

25         Q.    The seed phrase that was written on

1                    ZACHARY LeBEAU

2  paper, how was that destroyed?

3         A.   At the same time with fire.

4         Q.   Mr. LeBeau, I am going to show you a

5  document that I will mark as Exhibit 4.

6              (Plaintiff's Exhibit 4, e-mail from

7              Mr. LeBeau dated August 19, 2018, was so

8              marked for identification, as of this

9              date.)

10        Q.   Mr. LeBeau, I will give you a moment

11 to look over this if you want it, but my first

12 question for you is whether you recognize it?

13        A.   Yes, I do.

14        Q.   What is it?

15        A.   It is the e-mail I sent to several

16 people including the founders of SingularDTV with

17 the subject of founders meeting and action items.

18        Q.   The date that is written at the top

19 of this is August 19, 2018.  Do you have any

20 reason to think that is not the date?

21        A.   I have no reason to think that is not

22 the date.

23        Q.   Halfway down the first page, there is

24 a subheading that says The Cold Wallet.  Do you

25 see that?

1                    ZACHARY LeBEAU

2          A.   Yes.

3          Q.   It says, "The cold wallet ETH is

4    secure.  In order to access the cold wallet ETH,

5    the interface needs to be restored.  It was

6    agreed by our founders that there is no need to

7    restore the interface at this time."  Do you see

8    that?

9          A.   Yes.

10         Q.   What was the interface that needed to

11   be restored?

12         A.   The Mac Mini.

13         Q.   And why did it need to be restored?

14         A.   Why did it or did not?

15         Q.   Did it.

16         A.   Well, it was agreed that there was no

17   need to restore it at that time.

18         Q.   But, okay.  The Mac Mini had been

19   destroyed at this time?

20         A.   Yes.

21         Q.   So there was a need to restore an

22   interface in order to use the cold wallet,

23   correct?

24         A.   In order to access the cold wallet

25   Ether.

1                    ZACHARY LeBEAU

2         Q.    Was any decision made at this point

3    about what interface would be used to replace the

4    Mac Mini, if at all?

5         A.    I don't recall.

6         Q.    I will show you another document now

7    and I will mark this Exhibit 5.

8              (Plaintiff's Exhibit 5, e-mail chain

9              titled Founders Meeting and Action Item,

10             was so marked for identification, as of

11             this date.)

12        Q.    You can take a look to familiarize

13   yourself with this document.  You can take a look

14   at the whole document.  My question for you is

15   going to be in the middle of page ZL 102.  Do you

16   see a subheading that says Cold Wallet?

17        A.    Yes.

18        Q.    In the first line it says, "There are

19   probably only about three people of the hundred

20   or so connected to SingularDTV that can reproduce

21   the cold wallet interface, Joe, Milad and

22   myself."

23              Do you see that?

24        A.    Yes.

25        Q.    Who is Milad?

1                    ZACHARY LeBEAU

2          A.   Milad Mostavi was a Consensus

3     developer.

4          Q.   Joe is Joe Lubin?

5          A.   Joe is Joseph Lubin.

6          Q.   Why did you think that you, Milad and

7     Joe Lubin were the only people that could

8     reproduce the cold wallet interface?

9          A.   I thought we had the technical

10     capability to reproduce the cold wallet

11     interface.

12          Q.   When you say reproduce the cold

13     wallet interface, what did you have in mind?

14          A.   The Mac Mini interface and Icebox

15     software.

16          Q.   Ultimately that was never done,

17     correct?

18          A.   Correct.

19          Q.   Eventually Tokit.IO was used to

20     interface with the wallet, correct?

21          A.   Correct.

22          Q.   Did Milad have any role in the

23     decision to use Tokit.IO as opposed to some other

24     interface?

25          A.   He recommended using Tokit.IO.

1                  ZACHARY LeBEAU

2          Q.   Do you remember when he did that?

3          A.   Late 2018.

4          Q.   Were there discussions about the

5    decision to use Tokit.IO as the replacement

6    interface?

7          A.   I don't recall.

8          Q.   Do you recall who you would have

9    discussed that with?

10          A.   I recall discussions about accessing

11    the wallet address with all the founders and

12    members of the executive team.

13          Q.   Do you recall those discussions being

14    verbal or in writing?

15          A.   Verbal.

16          Q.   Do you recall having any e-mail

17    correspondence about that?

18          A.   No.

19          Q.   Where do you recall those discussions

20    taking place?

21          A.   At the SingularDTV office on

22    40 Fulton Street downtown New York City.

23          Q.   There's two sentences later, you

24    wrote, "The history of hackings in ETH stolen

25    from team members in Zurich is problematic and

Page 95

1              ZACHARY LeBEAU

2  represents a need for further education and

3  training re block chain wallet key management

4  practices."

5           What was the history of hacking that

6  you are referring to?

7      A.   I recall that a couple of the

8  employees from the Switzerland office had

9  suffered hacks that resulted in the loss of

10  Ether.

11     Q.   Was that company Ether?

12     A.   No.

13     Q.   One more question for you on this

14  topic.  If you can turn back to your declaration,

15  which I believe was Exhibit 2.

16           MR. POSTRYGACZ:  No, it's 3.

17           MR. SAUTER:  Excuse me.  Exhibit 3.

18     Q.   Turn to paragraph 38.  The first

19  sentence says, "To secure the wallet, we were

20  provided with a system-generated 12-word seed

21  phrase, a wallet file and a password.  Jackson

22  and I were given the wallet file on a hard

23  drive."

24           My question for you is what was that

25  hard drive?

1                    ZACHARY LeBEAU

2          A.    The USB hard drive.

3          Q.    The same USB that we have been

4    speaking about?

5          A.    Correct.

6               MR. POSTRYGACZ:  I can't hear you.

7               You're tending to get lower at the end of

8               a question.  I'm having a difficult time

9               hearing you.

10              MR. SAUTER:  Well, if Mr. LeBeau has

11              a difficult time hearing me, he can let me

12              know, but he answered that question.

13              MR. POSTRYGACZ:  Alright, but you

14              keep your voice up a little bit.  I'm

15              letting you know I'm having a hard time

16              hearing you.  I would think that you would

17              want the people, especially counsel, in

18              the room to be able to hear your

19              questions.

20              MS. PERLMAN:  You have your realtime

21              as well.

22              MR. POSTRYGACZ:  He is reading it,

23              and I like to hear the question.

24         Q.    Mr. LeBeau, I am showing you Exhibit

25    6.

1          ZACHARY LeBEAU

2          (Plaintiff's Exhibit 6, Responses and

3     objections in response to document

4     requests, was so marked for

5     identification, as of this date.)

6     Q.   Do you recognize this document, Mr.

7  LeBeau?

8     A.   I don't see a date on it.

9          MR. POSTRYGACZ:  It should be the

10    last page.

11    A.   I don't recall this document, but I

12  understand what it is.

13    Q.   Do you understand that it is

14  responses and objections that were submitted on

15  your behalf in response to document requests that

16  were sent by my client to you?

17    A.   I understand that.

18    Q.   Did you have an opportunity to review

19  this document before it was served on

20  SingularDTV?

21    A.   I don't recall.

22    Q.   You don't recall reviewing it?

23         MR. POSTRYGACZ:  Objection.  That is

24    not what he testified to.  You asked if he

25    recalled having an opportunity and he said

1                    ZACHARY LeBEAU

2        he doesn't recall.

3            Q.   Do you recall reviewing it?

4            A.   I don't recall.

5            Q.   Do you recall that any documents were

6    provided to SingularDTV at the same time as these

7    responses and objections were served?

8            A.   I don't recall.

9            Q.   I will represent to you, Mr. LeBeau,

10   that Exhibit 2 that is in front of you and that

11   we have already discussed, you can take a look at

12   it.  That document in front of you that we

13   previously marked as Exhibit 2 was the only

14   document that was produced to me along with this

15   document.  Do you understand that Exhibit 2 was

16   produced to me as part of this litigation in

17   response to the document request that SingularDTV

18   sent?

19           A.   I do.

20           Q.   Do you know which document requests

21   Exhibit 2 was produced in response to?

22               MR. POSTRYGACZ:  Objection.

23               Only if you know.

24           A.   I don't know.

25           Q.   You didn't make that determination?

1              ZACHARY LeBEAU

2              MR. POSTRYGACZ:  Are you asking a

3        question?

4        A.   I don't understand the question.

5   What determination?

6        Q.   Did you make a determination about --

7   did you make a determination to produce that

8   particular document that I have marked as Exhibit

9   2?

10             MR. POSTRYGACZ:  Objection.

11       A.   I produced this document.

12       Q.   Did you make a determination as to

13  which requests it was responsive to?

14             MR. POSTRYGACZ:  Objection.

15       A.   Yes.

16       Q.   Which requests?

17       A.   I was ordered by the judge to do a

18  search for e-mail and files that had to do with

19  the destruction of the cold wallet.

20             MR. CONDZAL:  So the record is clear,

21        this is the first demand, not the second.

22        Okay?

23             THE WITNESS:  Understood.

24             MR. SAUTER:  This document responses.

25             MR. POSTRYGACZ:  Which document

1                    ZACHARY LeBEAU

2        responses?  You are looking at a piece of

3        paper.

4             MR. SAUTER:  Defendants' responses

5        and objections to the plaintiff's document

6        requests which we have marked as an

7        exhibit in front of the witness.

8        Q.   At the time that you served those

9   responses and objections to SingularDTV on

10  April 20, 2022, at that time had you conducted a

11  search for documents?

12       A.   Yes.

13       Q.   What search did you conduct?

14       A.   A search of e-mail and files.

15       Q.   How did you conduct that search?

16       A.   I searched e-mail using keywords and

17  searched for files using keywords.

18       Q.   You later filed a certification with

19  the court describing a search that you conducted,

20  correct?  Do you remember that?

21       A.   Yes.

22       Q.   Is that the same search you had

23  conducted prior to April 20, 2022 or a different

24  search?

25             MR. CONDZAL:  Objection.  Why don't

```
1                    ZACHARY LeBEAU

2         you show him the document that you are

3         talking about just do reference him?

4         Q.   Do you remember?

5         A.   I performed two searches.

6         Q.   What were the search terms that you

7    used the first time?

8         A.   I don't recall all the search terms I

9    used.

10        Q.   Was this document that is in front of

11   you as Exhibit 2, was that the only document that

12   you identified after your first search or were

13   there other documents that you identified?

14        A.   This was the only document identified

15   in my first search.

16        Q.   Would you be able to recreate the

17   search that you ran to identify that single

18   document?

19             MR. POSTRYGACZ:  Objection.

20        A.   I don't recall exactly the keywords I

21   used in this first search.

22        Q.   Is there anything that would refresh

23   your recollection about what search terms you

24   used?

25        A.   No.
```

```
 1                    ZACHARY LeBEAU

 2        Q.   What e-mail accounts did you search

 3   in identifying that document?

 4             MR. POSTRYGACZ:   What time?

 5             MR. SAUTER:   The first search that he

 6        conducted.

 7             MR. POSTRYGACZ:   Thank you.

 8        A.   My e-mail account

 9   ZacharyLeBeau@Gmail.com, and then whatever e-mail

10   that I received in that account from others.

11        Q.   Did you search anywhere else besides

12   that e-mail account?

13        A.   No.

14        Q.   How long did you take to search?

15        A.   Several hours.

16        Q.   Was it in one day?

17        A.   Yes.

18        Q.   How many documents, approximately,

19   did you identify?

20             MR. POSTRYGACZ:   Objection.   Asked

21        and answered.

22        A.   This is the only document I

23   identified.

24        Q.   When you identified that -- strike

25   that.
```

```
1                    ZACHARY LeBEAU

2              Why did you decide to search using

3    search terms?

4              MR. POSTRYGACZ:  Objection.

5         A.   Can you repeat the question.

6         Q.   Why did you decide to conduct your

7    search with search terms?

8         A.   I'm not aware of how else I would

9    conduct a search.

10         Q.   Well, did it surprise you in trying

11   to respond to ten requests about the cold wallet

12   that you only found one document?

13             MR. POSTRYGACZ:  Objection.

14         A.   No.

15         Q.   Did you think at the time there might

16   be other documents in your e-mail account?

17         A.   No.

18         Q.   It never occurred to you?

19             MR. POSTRYGACZ:  Objection.

20             MR. CONDZAL:  Objection.

21         Q.   You mentioned you conducted a second

22   search, correct?

23         A.   Yes.

24         Q.   Why did you conduct that second

25   search?
```

1                         ZACHARY LeBEAU

2          A.   I was instructed to by the judge.

3          Q.   How did you conduct that search?

4          A.   I approached it in a much more -- I

5     approached it in a different way.

6          Q.   How was the way different?

7          A.   Wrote out all the keywords, recorded

8     those keywords, all the e-mails searched,

9     recorded those.

10         Q.   How much time did you spend searching

11    for documents the second time?

12         A.   Two or three full working days, at

13    least eight hours a day.

14         Q.   Approximately 20 hours you spent the

15    second time?

16         A.   Possibly.

17         Q.   Through that effort, you identified

18    about 56 documents or so, correct?

19         A.   I don't recall.

20         Q.   Do you recall it being more than 50

21    documents?

22         A.   No, I don't recall.

23         Q.   You don't recall at all how many

24    documents you identified?

25         A.   I do not recall.

1                     ZACHARY LeBEAU

2          Q.   Did you produce all of the documents

3     that you identified?

4          A.   Yes.

5          Q.   Did you review documents for

6     responsiveness to the document requests?

7               MR. POSTRYGACZ:  Objection.

8          A.   I don't understand what that means.

9          Q.   I will rephrase it.  When you ran

10    your search terms, how many e-mails did you

11    identify in total through those search terms?

12         A.   Every e-mail that I identified I

13    included.

14         Q.   Every e-mail that hit on the search

15    terms that you ran, you produced to us?  Is that

16    your testimony?

17         A.   No.

18         Q.   So did you review the universe of

19    documents that you found for responsiveness to

20    the document requests?

21              MR. POSTRYGACZ:  Objection.

22         A.   When I searched and when e-mails

23    would come up, I would look at those e-mails.

24         Q.   How did you determine which ones to

25    produce or not produce?

1          ZACHARY LeBEAU

2          MR. POSTRYGACZ:   Objection.

3     A.   I had a list of parameters that the

4   judge requested and I supplied the documents that

5   the judge required.

6     Q.   How did you determine if a document

7   was responsive to that parameter or not?

8          MR. POSTRYGACZ:   Objection.

9     A.   Well, for example, I remember a case

10   where an instance where when I searched for cold

11   wallet, a script, a screenplay came up from some

12   entertainment company that sent me a script and

13   it had the word "cold wallet" in it, so I was

14   obviously not going to include that.

15     Q.   Were there any documents that you had

16   questions about whether they should be produced

17   or not?

18     A.   No.

19     Q.   When you searched, did you search for

20   the term "cold storage"?

21     A.   Yes.

22     Q.   Is that in the certification that you

23   filed, which I am providing to you as Exhibit 7.

24          (Plaintiff's Exhibit 7,

25          Certification, was so marked for

1                    ZACHARY LeBEAU

2          identification, as of this date.)

3          A.   It does not appear to be, but I am

4   100 percent certain I searched cold storage.

5          Q.   So how did you prepare this

6   certification to the court?

7               MR. POSTRYGACZ:  Objection.

8          A.   Wrote down the e-mails that I

9   searched and the keywords that I searched.

10          Q.   Is there any record that you have

11   that you actually did search the term "cold

12   storage"?

13          A.   No.

14          Q.   Is there a reason why you would have

15   searched that term, but it doesn't appear in this

16   document?

17               MR. POSTRYGACZ:  Objection.

18          A.   I do not know why it does not appear

19   in this document.

20          Q.   The terms -- after each request, Mr.

21   LeBeau, one of the fields says e-mail word

22   searches.  Do you see that?  You can start with

23   request number 1.

24          A.   Yes.

25          Q.   On page 2 at the top it says e-mail

1                    ZACHARY LeBEAU

2     word searches.  Do you see that?

3          A.   Yes.

4          Q.   And there are words in quotation

5     marks.  Do you see that?

6          A.   Yes.

7          Q.   Were you searching for those exact

8     terms?  Is that how the search worked?

9          A.   I was searching for these terms.

10         Q.   Two of them that I see kind of in the

11    middle of that paragraph, one says seed phrases

12    and passwords.  Do you see that?  There's an S at

13    the end of the plural nouns.

14         A.   Yes.

15         Q.   Do you know if your search would have

16    captured the word "password" if it's not plural?

17         A.   It does.

18         Q.   There is a phrase in there towards

19    the end, "necessary to transact in digital assets

20    held at the cold wallet address."  Why did you

21    pick that as a search term?

22              MR. POSTRYGACZ:  Objection.

23         A.   These were taken-- I took that from a

24    previous document thinking that it would be a

25    good idea to search for that.

```
 1                  ZACHARY LeBEAU

 2        Q.    Okay.   It is a pretty specific

 3   phrase.

 4              MR. CONDZAL:   You should object to

 5              all of these on privilege and

 6              confidentiality.   This is obviously

 7              attorney-client work client privilege, and

 8              I notice that you say you wrote, he wrote.

 9              The fact of the matter is the lawyers

10              write this, and the client reviews it for

11              accuracy.   He doesn't write anything.   We

12              all know that, and you're going, we have

13              let you go actually I think a little bit

14              past where you should have gone in terms

15              of where the client privilege, but, you

16              know, all of these are taken from your

17              demand.   Your own definition.   I haven't

18              had a chance, but I will certainly review

19              to see if cold storage is contained in

20              your demands, because if it were, it would

21              have been searched.

22              MR. SAUTER:   We should probably

23              confer about this, but do you even

24              represent Mr. LeBeau?

25              MR. POSTRYGACZ:   I assert the same
```

```
 1                ZACHARY LeBEAU
 2      privilege.  I assert the privilege.  Any
 3      of these questions relate to
 4      attorney-client privilege, and he will be
 5      instructed not to answer.
 6           MR. SAUTER:  That is totally fine.  I
 7      don't know how this document was prepared,
 8      so I guess that is your job to object.  I
 9      have no idea how these were determined,
10      but, if you're going to assert privilege,
11      that is your prerogative.
12           MR. POSTRYGACZ:  That's correct.
13           MR. SAUTER:  Okay.  We should
14      probably meet and confer about some of
15      these if you are going to instruct him not
16      to answer these questions.
17           MR. POSTRYGACZ:  That's fine.
18           MR. CONDZAL:  We are more than
19      willing to.
20      Q.   Following each of the responses to
21 the requests in your declaration, it says that
22 you searched, you conducted searches of my e-mail
23 accounts and computer files.  Which e-mail
24 accounts were searched?
25      A.   I only have one e-mail account.
```

1                    ZACHARY LeBEAU

2        Q.   Which account is that?

3        A.   ZachLeBeau@Gmail.com.

4        Q.   You don't use a SingularDTV account?

5        A.   No.

6        Q.   Have you ever?

7        A.   Yes.

8        Q.   Do you still have access to that

9    account?

10       A.   No.

11       Q.   Why not?

12            MR. POSTRYGACZ:   Objection.

13       A.   My SingularDTV e-mail address ended

14   in 2018.  I had everything from that e-mail

15   address automatically forwarded to my

16   ZachLeBeau@Gmail.com account, so anything that

17   came in from SingularDTV for that e-mail address

18   was automatically sent to ZachLeBeau@Gmail.com,

19   so I would have record of it.

20       Q.   Is that the same for breaker e-mail

21   address?

22       A.   That's correct.

23       Q.   Which computer files did you search?

24       A.   All the computer files I have in my

25   possession.

1                    ZACHARY LeBEAU

2        Q.   Where are those computer files

3   stored?

4             MR. POSTRYGACZ:  Objection.

5        A.   On my computer at my home at my

6   apartment.

7        Q.   Which computer is that?

8        A.   It is a laptop computer.

9        Q.   Is it a Mac or PC?

10            MR. POSTRYGACZ:  Objection.  What is

11        the relevance?

12            MR. SAUTER:  I want to understand how

13        the search was conducted.  I think it's

14        absolutely appropriate.

15            MR. POSTRYGACZ:  It is appropriate to

16        know which computer he used when searching

17        e-mail addresses.  Can he use your

18        computer if he wants?  There is no basis

19        in your harassing my client.

20            I instruct you not to answer that

21        question.

22            MR. SAUTER:  He says that he reviewed

23        computer files.  I am trying to understand

24        what computer files, which computers they

25        are on.  There is nothing wrong with this

1                    ZACHARY LeBEAU

2         question.

3                    MR. POSTRYGACZ:   And he testified

4         that he reviewed the files on his

5         computer.  You don't have to know a

6         specific computer for him to have reviewed

7         it.

8         Q.    How many computers did you review?

9         A.    All of my computers that I own.

10        Q.    How many do you own?

11        A.    I own three.

12        Q.    Below that, you have e-mail names

13   searched.  Does that mean that your search was

14   limited to e-mails containing those names?

15        A.    What I searched, for example, was Kim

16   Jackson and then I searched a completely

17   different search Kim@SingularDTV.com.  So I did

18   not search at the same time Kim Jackson, Kim at

19   SingularDTV.com.

20        Q.    Okay.  If I understand you conducted

21   a broad search for Kim Jackson and stopped.  Is

22   that accurate?

23        A.    I conducted a search where I put the

24   name Kim Jackson in the search field and that was

25   one search, and then I, for example, put in

1                    ZACHARY LeBEAU

2    Kim@SingularDTV.com as another search.  I did not

3    put them together in the same search.

4         Q.   Then after you searched for Kim

5    Jackson, for example, did you review all of those

6    e-mails or did you then limit it to the search

7    terms following each request?

8         A.   I reviewed all of those e-mails.

9         Q.   Can I ask why did you run different

10   searches for each request as opposed to just one

11   search and then review them for responsiveness?

12             MR. POSTRYGACZ:  Objection,

13        attorney-client privilege.

14             Don't answer.

15             MR. SAUTER:  So for the e-mail

16        search, by the way, you can assert

17        privilege if you think you can, but for

18        the record, the first paragraph of this

19        declaration says that Mr. LeBeau

20        personally conducted the following

21        searches, so I think it is absolutely --

22             MR. POSTRYGACZ:  It doesn't say that

23        he didn't do so without the advice,

24        Counsel, in print or anything else from

25        counsel.

1              ZACHARY LeBEAU

2      MR. SAUTER:  But he has disclosed

3   this declaration and he has waived

4   whatever privilege that is waivable.

5      MR. POSTRYGACZ:  There is nothing

6   waivable.

7      MR. CONDZAL:  Where does it say that

8   he waived a privilege in writing?

9      MR. SAUTER:  He submitted a

10  declaration describing what he did and you

11  are trying to prevent me from asking him

12  what he did.

13     MR. CONDZAL:  The questions you are

14  asking implicate his communications with

15  his counsel.  Clearly implicate his

16  communications with his counsel.  If you

17  want to ask him did you put this into your

18  search engine, did you put this into your

19  search engine, clearly that would be an

20  appropriate question.

21     MR. SAUTER:  And he answered those.

22     MR. CONDZAL:  And he did, if you want

23  to go down that path.  But if you ask

24  where did you derive this information or

25  how did you come up with this information

1                    ZACHARY LeBEAU

2    and that implicates attorney-client and

3    attorney work product, based off your

4    documents, by the way, based off your

5    demand and based off your definitions,

6    right, then I think it is clearly, it

7    would be appropriate to assert the

8    privilege, but nowhere in this document

9    does it say that he waives the privilege.

10   I think that is --

11        MR. SAUTER:  You keep using the word

12   "clearly."  Nothing is clear about what he

13   did or what he was instructed to do.

14        MR. CONDZAL:  Are you kidding.  You

15   have a seven-page effectively Jackson

16   affidavit, the likes of which I have never

17   seen before in New York practice, and it

18   specifies specifically item by item in

19   response to the court's order of what

20   information he needs to provide, and you

21   out of the hat pull out the one phrase he

22   didn't, might have not searched or might

23   not have written down here more

24   accurately, and oh, you didn't search

25   that, because it wasn't defined in your

1             ZACHARY LeBEAU

2    demand, and that's because none of your

3    demands mention that.

4         So the fact is that when you are

5    asking him about where this information

6    derived, you are implicating

7    attorney-client privilege and work

8    product.  So if you want to ask away about

9    what specifically you did to search, that

10   is one thing and that is fine enough.

11        MR. POSTRYGACZ:  He has answered

12   every question that does not implicate

13   advice or input from counsel.  You asked

14   him how many computers, whether or not he

15   inputted those search terms, and when you

16   go beyond that to a place that is

17   appropriate to invoke that privilege, we

18   will --

19        MR. SAUTER:  Are you telling me that

20   lawyers chose those search terms or he

21   chose the search terms in consultation

22   with lawyers?  Assert your privilege

23   objection.  But if he came up with those

24   search terms, there is nothing privileged

25   about that.

```
 1                    ZACHARY LeBEAU
 2            MR. POSTRYGACZ:   I am asserting the
 3       privilege.
 4       Q.   You testified earlier, Mr. LeBeau,
 5  that you made a decision about whether a document
 6  was responsive to a request when you were making
 7  decisions about whether to produce it.  My
 8  question is this.  When you ran a set of
 9  searches, for example, request 1, am I correct
10  you ran these e-mail word searches at the top of
11  page 2 in order to try to identify documents
12  responsive to request 1?  Is that accurate?
13       A.   Yes.
14       Q.   And if I understood your testimony,
15  that returned a set of documents that you then
16  reviewed, is that correct?
17       A.   Yes.
18       Q.   Then you made a determination about
19  whether those documents were responsive to
20  request 1, is that accurate?
21       A.   Yes.
22       Q.   Did you then run a separate search
23  for request number 2 for different words, the
24  words that are down there in e-mail word searches
25  underneath request 2?
```

1                    ZACHARY LeBEAU

2             MR. POSTRYGACZ:  Objection.  Are you

3        asking him if he actually conducted the

4        searches indicated in number 2?

5             MR. SAUTER:  I am asking if he

6        conducted different searches for 1,

7        different searches for 2, different

8        searches for 3.

9        Q.   Did you run different searches to try

10   to identify documents for each request?

11        A.   Yes.

12        Q.   So if a document came up in request

13   response to your search for request 2 and it was

14   responsive actually to request 1, you wouldn't

15   have produced that, right?

16             MR. POSTRYGACZ:  Objection.

17             MR. CONDZAL:  Objection.

18        A.   Of course I would have produced it.

19        Q.   Why did you run different searches

20   for every request?

21        A.   To be thorough.

22        Q.   This is my point.  A thorough search

23   would have been to run the search terms and

24   review them all for responsiveness.  The way it

25   appears.

```
 1              ZACHARY LeBEAU
 2      MR. POSTRYGACZ:  Are you testifying?
 3      MR. SAUTER:  I am asking a question,
 4  Neil.
 5      MR. POSTRYGACZ:  Oh, really?  It
 6  seemed to me like you were giving your
 7  opinion as to what a thorough search would
 8  be.  That is how you started it.  And
 9  quite honestly, I don't think anyone here
10  is interested in that.
11      MR. CONDZAL:  You have ten specific
12  questions in your demand.  You have
13  definitions in your demand.  They are very
14  clear.  If you take the definition and you
15  take your demand and you cull it out, then
16  the witness just testified that if he
17  sound something, for example, in response
18  to question 7 and it was responsive to
19  question 1, he produced that as well.
20      MR. SAUTER:  First of all, your
21  objections are way off base.  I don't know
22  on what ground you are speaking about his
23  production and his decision-making,
24  because as far as I know, you don't even
25  represent him.
```

```
 1                ZACHARY LeBEAU

 2         MR. POSTRYGACZ:  Counsel can make

 3    objections for clients they don't

 4    represent if they are co-counsel.  Where

 5    is it stated that that is not acceptable?

 6    Why don't you make sure that your

 7    questions don't invoke privilege.  It is

 8    pretty simple.

 9         MR. SAUTER:  Second of all, if you

10    seem to be --

11         MS. PERLMAN:  You don't represent Mr.

12    LeBeau, correct?

13         MR. SAUTER:  If you are not

14    representing Mr. LeBeau, I have a problem

15    with the objections that are being lodged

16    by Ms. Jackson's counsel.  In fact, he

17    referred to Ms. Jackson's declaration.

18         MR. POSTRYGACZ:  That's fine.  I

19    reiterate any objections that I didn't

20    make that co-counsel made.

21         MR. CONDZAL:  Is there a question

22    pending?

23         MR. SAUTER:  No, we are still

24    speaking on the record.

25         MR. CONDZAL:  Let's take a break for
```

```
 1                    ZACHARY LeBEAU

 2          a minute.

 3                    THE VIDEOGRAPHER:  Going off the

 4          record at 1:02 p.m.

 5                    (Recess taken)

 6                    THE VIDEOGRAPHER:  The time now is

 7          1:04 p.m.  We are back on the record.

 8     BY MR. SAUTER:

 9          Q.   Mr. LeBeau, did you include the word

10     "Tokit.IO" as a search term?

11          A.   I do not believe so.

12          Q.   I am going to show you a document and

13     mark this as Exhibit 8.

14                    (Plaintiff's Exhibit 8, Exhibit A to

15          motion, was so marked for identification,

16          as of this date.)

17          Q.   After you have a minute to look at

18     it, please let me know if you recognize it.

19                    MR. POSTRYGACZ:  Is this part of

20          another document?

21                    MR. SAUTER:  These are the document

22          requests that he is supposed to be

23          searching in response to, Neil.

24                    MR. POSTRYGACZ:  This is part of your

25          production, right?  It is just including
```

```
 1              ZACHARY LeBEAU
 2  like four or five pages in?
 3       MR. CONDZAL:  This is an exhibit to
 4  the motion.  There is no question pending,
 5  correct?
 6       MR. SAUTER:  Not yet.
 7       MR. CONDZAL:  I need a quick men's
 8  room break.
 9       MR. POSTRYGACZ:  I am going to take
10  one as well.
11       THE VIDEOGRAPHER:  The time is 1:06
12  p.m.  We are going off the record.
13       (Recess taken)
14       THE VIDEOGRAPHER:  The time now is
15  1:12 p.m.  We are back on the record.
16       MR. SAUTER:  I want the record to be
17  clear that counsel who does not appear to
18  represent the witness asked for a break.
19  We took a ten-minute break.  We came back.
20  I handed the witness an exhibit, and
21  before I had a chance to ask any
22  questions, another break was requested and
23  now we are back on the record.
24       MR. POSTRYGACZ:  Let the record
25  indicate also that before this last break
```

1                   ZACHARY LeBEAU

2          was taken, counsel asked if there was an

3          open question.  Mr. Sauter responded that

4          there was no open question.  And based on

5          his instructions that the client can take

6          any break needed as long as there is no

7          open question, that is exactly what was

8          done.

9               MR. SAUTER:  Except the client didn't

10         ask for a break, Neil.

11         Q.   I am going to show you an Exhibit 9.

12              (Plaintiff's Exhibit 9, Order dated

13         April 6, 2022, was so marked for

14         identification, as of this date.)

15         Q.   Turn to the very end of that

16    document, please.  First of all, do you recognize

17    this document, Mr. LeBeau?

18         A.   No.

19         Q.   Do you understand from the face of

20    this document, that it is an order by the judge

21    in this case dated April 6, 2022?

22         A.   Yes.

23         Q.   Turn to the last page.  Do you see

24    the word "Conclusion"?

25         A.   Yes.

1            ZACHARY LeBEAU

2        Q.   You see the first sentence after that

3   says, "For the foregoing reasons, Plaintiff's

4   motion was granted in part and denied in part.

5   Defendants are ordered immediately to produce all

6   non-privileged documents that are responsive to

7   Plaintiff's requests in Exhibit A to Plaintiff's

8   motion."

9            Do you see that?

10       A.   Yes.

11       Q.   Do you understand that to be an order

12  by Judge Caproni in this case?

13       A.   Yes.

14       Q.   Please turn back to Exhibit 8.  I am

15  representing to you that this is Exhibit A to the

16  motion that we just read.  I ask you to turn to

17  the last page of this document.  Request 8.  This

18  is one of the requests that SingularDTV put to

19  you.

20            Do you see that it says "All

21  documents concerning methods through which funds

22  on a code wallet have been transferred at any

23  point in, time including without limitation your

24  transfer of ETH to an escrow agent on January 25,

25  2022 pursuant to an escrow agreement between you

1                    ZACHARY LeBEAU

2    and SingularDTV."  Do you see that request?

3          A.   Yes.

4          Q.   You understand that to be one of the

5    requests for documents that Judge Caproni ordered

6    you to respond to, correct?

7          A.   Yes.

8          Q.   So Tokit.IO is a method through which

9    funds on a code wallet have been transferred at

10   any point in time, correct?

11         A.   Wallet address, yes.

12         Q.   So is it surprising to you that there

13   wasn't a single document that you produced

14   mentioning Tokit.IO

15         A.   No.

16              MR. POSTRYGACZ:  Objection.

17         Q.   You didn't search for Tokit.IO,

18   correct?

19         A.   I did not search for Tokit.IO.

20   Having said that, the search I did do is so

21   comprehensive that all those other keywords, if

22   Tokit was involved, would have come up with

23   something if Tokit was involved.  It did not.

24         Q.   What is your basis for saying that?

25         A.   Well, the fact that the keywords are

1                    ZACHARY LeBEAU

2    several and very specific, and I did not see any.

3    There are no documents, e-mail or otherwise, that

4    contain Tokit.IO referring to the ten questions

5    or requests.

6         Q.   You didn't actually search for

7    Tokit.IO, so how could you know that?

8              MR. POSTRYGACZ:   Objection.   Asked

9         and answered.

10        A.   I did go through every single e-mail

11   that I possess in between early 2016 until the

12   day that I searched every single e-mail.

13        Q.   So your testimony is that you

14   searched every e-mail?  Then I'm having trouble

15   understanding why you ran search terms?  Is your

16   testimony now that you read every single e-mail

17   that you have from 2016 to present?

18             MR. POSTRYGACZ:   Objection.

19        Harassing.   Argumentative.

20        Q.   Is that your testimony?

21        A.   Yes.

22        Q.   Every e-mail?

23        A.   Yes.

24        Q.   In your e-mail account?

25        A.   Yes.

1                    ZACHARY LeBEAU

2          MR. POSTRYGACZ:  Objection, asked and

3     answered.  Do you want to ask it again?

4          Q.   Do you understand you are under oath

5     today?

6          A.   Yes.

7          Q.   Just like if you were in court?

8          A.   Yes.

9          MR. POSTRYGACZ:  Excuse me.  Stop

10     harassing my client.  He testified.  He

11     knows he has to testify honestly.  The

12     fact that you don't like an answer does

13     not give you the right to question whether

14     or not he is telling the truth.  He

15     understands.  He understood at the

16     beginning that he is testifying under

17     oath.  He testified that it is the same as

18     if he was before a judge.  So stop

19     harassing my client if you don't like the

20     answers he is giving.

21          MR. SAUTER:  To be fair, Neil, it is

22     completely inconsistent with how he

23     described searches five minutes ago.

24          MR. POSTRYGACZ:  It is not

25     inconsistent at all.

```
 1                    ZACHARY LeBEAU
 2              MR. CONDZAL:  You are rapid-firing
 3         the questions, and he lost track of what
 4         you were saying obviously.  Do you really
 5         think he's going to testify white and then
 6         five minutes later testify black?
 7         Q.   So, Mr. LeBeau, you wrote in your
 8    declaration, "I personally conducted the
 9    following due and diligent searches for
10    responsive documents as defined in the request as
11    follows."  Do you see that?
12         A.   Yes.
13         Q.   That is in paragraph 1 of your
14    declaration, right?
15         A.   Yes.
16         Q.   If your testimony now is that you
17    reviewed every single e-mail that you have, why
18    did you run searches of your e-mail account?
19              MR. POSTRYGACZ:  Attorney-client
20         privilege.
21              Please don't answer.  Don't answer.
22              MR. SAUTER:  You instruct him not to
23         answer?
24              MR. POSTRYGACZ:  Attorney-client
25         privilege, yes.
```

1               ZACHARY LeBEAU

2          Q.   You didn't write in your declaration

3    that you searched every e-mail that you have from

4    2016 to the present, right?

5               MR. CONDZAL:   I don't think the

6          witness testified he searched eight years

7          or six years of every e-mail that he has

8          on any --

9          A.   I didn't state that in the document.

10         Q.   You didn't state that in the

11   document, but your testimony today is that you

12   reviewed every single e-mail from 2016 to the

13   present.  Correct?

14         A.   That is the truth.

15         Q.   Why didn't you write that in this

16   declaration?

17              MR. POSTRYGACZ:   Objection,

18         attorney-client privilege.  If you want,

19         we can meet and confer on that.

20              MR. SAUTER:   We absolutely will.

21              MR. POSTRYGACZ:   All right.

22         Excellent.

23         Q.   Do you ever communicate on messaging

24   apps, Mr. LeBeau?

25         A.   No.

```
 1                    ZACHARY LeBEAU
 2        Q.   Never?
 3             MR. POSTRYGACZ:  Objection.  Asked
 4        and answered.
 5             You can answer again.
 6        A.   I don't use messaging apps.  Just
 7   text on my telephone.
 8        Q.   Did you search your texts?
 9        A.   Yes.
10        Q.   You never use messaging apps?
11             MR. POSTRYGACZ:  Objection.  Asked
12        and answered.  Stop harassing my client.
13        A.   No.
14             MR. POSTRYGACZ:  You asked three
15        questions in a row.  He gave the same
16        exact answer.
17        Q.   Do you ever use WhatsApp?
18        A.   No.
19        Q.   Telegram?
20        A.   No.
21        Q.   Signal?
22        A.   No, nothing like that, no.
23        Q.   You never have?
24             MR. POSTRYGACZ:  Objection.  Asked
25        and answered.  Harassing my client.
```

1               ZACHARY LeBEAU

2        Q.   Never once?

3        A.   I don't use those applications.

4        Q.   Today you don't?

5        A.   I don't use them today.

6        Q.   Have you in the past?

7        A.   I have used WhatsApp in the past.

8        Q.   Have you communicated with

9   SingularDTV employees on WhatsApp?

10       A.   I communicated with Arie on WhatsApp.

11   Arie Levy-Cohen Cohen.

12       Q.   Do you communicate with Kim Jackson

13   on WhatsApp?

14       A.   No.

15       Q.   Did you search your WhatsApp

16   communications in responding to these document

17   requests?

18       A.   I don't have Arie's conversation on

19   WhatsApp.  So no.

20       Q.   You did not search WhatsApp?

21       A.   I don't have WhatsApp.  I don't have

22   Arie communications on WhatsApp.

23       Q.   I want to go back to the first search

24   that you conducted in responding to the first

25   order from Judge Caproni to produce documents in

```
 1                    ZACHARY LeBEAU
 2  this case.  I asked you earlier about that search
 3  and you said you couldn't remember the specific
 4  search terms you used or e-mail addresses.  I
 5  want to give you one more chance.  Are there any
 6  specifics that you remember about that search?
 7              MR. POSTRYGACZ:  Objection.  Asked
 8         and answered.
 9         A.   I don't recall.
10         Q.   And am I correct that there is
11  nothing that would refresh your recollection
12  about how you went about the search that you
13  conducted the first time around?
14         A.   No.
15              MR. SAUTER:  I am probably almost
16         done, but let's take a five-minute break,
17         and I will come back.
18              MR. POSTRYGACZ:  Sure.
19              THE VIDEOGRAPHER:  The time now is
20         1:23 p.m.  We're going off the record.
21         This ends media label 3.
22              (Recess taken)
23              THE VIDEOGRAPHER:  The time now is
24         1:40 p.m.  We are back on the record.
25         This is the beginning of media label 4.
```

1                    ZACHARY LeBEAU

2     BY MR. SAUTER:

3          Q.   Mr. LeBeau, really just one more

4     question for you.  One of the lawsuits that is

5     pending in the Federal Court concerns a payment

6     to an alleged hacker of Singles tokens.  Correct?

7          A.   Correct.

8               MR. POSTRYGACZ:  Objection.

9          Q.   When those funds were sent, was that

10    done through Tokit.IO using the seed phrase?

11              MR. POSTRYGACZ:  Objection.

12         A.   Yes.

13              MR. SAUTER:  That is all the

14         questions I have for now.  I am going to

15         leave the deposition open pending our meet

16         and confer about some of the document

17         scope and search issues that we've been

18         discussing, but I don't have any further

19         questions.

20              MR. POSTRYGACZ:  Well, limited just

21         to that, to the issues that we --

22              MR. SAUTER:  Well, and some of the

23         privilege calls that you've made.

24              MR. POSTRYGACZ:  Yeah, the privilege

25         calls, but nothing else, right, as far as

1               ZACHARY LeBEAU

2  anything else, you have asked all the

3  questions?

4       MR. SAUTER:  Subject to what will be

5  raised in additional documents that might

6  be produced, yes.

7       MR. POSTRYGACZ:  What other documents

8  are going to be produced?

9       MR. SAUTER:  Well, I think we're

10 going to have an issue with the search

11 that was conducted and we will discuss

12 that and the privilege calls.

13      MR. POSTRYGACZ:  Well, that would be

14 pursuant to a court order.  We are not

15 going to agree to produce any further

16 documents.  So there is no subject to

17 further production, unless there is a

18 court order.  So the deposition besides

19 the meeting and confer over these issues,

20 otherwise you're done with your questions,

21 correct?

22      MR. SAUTER:  Yes, subject to whatever

23 comes out of our discussions, I'm done.

24      MR. POSTRYGACZ:  Okay.

25      THE VIDEOGRAPHER:  The time now is

```
 1                    ZACHARY LeBEAU

 2          1:42 p.m.  We are going off the record.

 3          This ends media unit 4 and concludes

 4          today's portion of the testimony.

 5               (Time noted:  1:42 p.m.)

 6                         _____

 7

 8  Subscribed and sworn to

 9  before me this____day of_____, 2022.

10  _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2              C E R T I F I C A T I O N

3

4         I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7              That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10             I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto set

15   my hand this 12th day of May, 2022.

16

17

18   _____

                    JOSEPH R. DANYO

19

20

21

22

23

24

25

1

2                         I N D E X

3  Witness                                        Page

4  ZACHARY LeBEAU                                    3

5

6                       E X H I B I T S

7  Plaintiff's                                    Page

8       Exhibit 1  Printout from Etherscan website   16

9       Exhibit 2  Document describing key          20
                   management practices

10
        Exhibit 3  Declaration                       42
11
        Exhibit 4  e-mail from Mr. LeBeau dated      90
12                 August 19, 2018

13      Exhibit 5  e-mail chain titled Founders      92
                   Meeting and Action Item
14
        Exhibit 6  Responses and objections in       97
15                 response to document requests

16      Exhibit 7  Certification                    106

17      Exhibit 8  Exhibit A to motion              122

18      Exhibit 9  Order dated April 6, 2022        124

19                         ~oOo~

20

21

22

23

24

25

1

2                         ERRATA SHEET

3   Name of Case: SingularDTV GmbH v Zachary LeBeau

4   Date of Deposition: May 11, 2022

5   Name of Deponent: ZACHARY LeBEAU

6   Page        Line          Change              Reason

7   _____     _____     _____   _____
    _____     _____     _____   _____
8   _____     _____     _____   _____
    _____     _____     _____   _____
9   _____     _____     _____   _____
    _____     _____     _____   _____
10  _____     _____     _____   _____
    _____     _____     _____   _____
11  _____     _____     _____   _____
    _____     _____     _____   _____
12  _____     _____     _____   _____
    _____     _____     _____   _____
13  _____     _____     _____   _____
    _____     _____     _____   _____
14  _____     _____     _____   _____
    _____     _____     _____   _____
15  _____     _____     _____   _____
    _____     _____     _____   _____
16  _____     _____     _____   _____
    _____     _____     _____   _____
17  _____     _____     _____   _____
    _____     _____     _____   _____
18  _____     _____     _____   _____
    _____     _____     _____   _____
19  _____     _____     _____   _____
    _____     _____     _____   _____
20  _____     _____     _____   _____
    _____     _____     _____   _____
21  _____     _____     _____   _____

22                          _____
                            Signature of Deponent
23
    Subscribed and sworn before me
24  this_____day of_____, 2022.
    _____
25  (Notary Public) My Commission Expires:_____